## EXHIBIT B

**FEBRUARY 9, 2021 HEARING TRANSCRIPT**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                          :

5                                     :    Chapter 11

6    WARDMAN HOTEL OWNER, L.L.C.   :    Case No. 21-10023 (JTD)

7            Debtors.              :

8    _____:

9

10                                  United States Bankruptcy Court

11                                  824 North Market Street

12                                  Wilmington, Delaware

13                                  February 9, 2021

14                                  10:01 a.m. – 11:31 a.m.

15

16

17

18

19

20

21   B E F O R E :

22   HON JOHN T. DORSEY

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  JASON SPENCER

Page 2

1    HEARING re Doc #5 Motion of the Debtor for Entry of Interim

2    and Final Orders (I) Authorizing Debtor to Obtain

3    Postpetition Secured Financing, (II) Granting Liens and

4    Providing Superpriority Administrative Expense Claims, (III)

5    Granting Adequate Protection to Prepetition Secured Party,

6    (IV) Modifying the Automatic Stay, (V) Scheduling a Final

7    Hearing, and (VI) Granting Related Relief

8

9    HEARING re Doc #6 Debtor's Motion Seeking Entry of an Order

10   Rejecting Hotel Management Agreement, Effective as of the

11   Petition Date

12

13   HEARING re Doc #62 Marriott Hotel Services, Inc.'s Motion

14   for the Authority to Exercise Rights of Recoupment or, in

15   the Alternative, Relief From Automatic Stay to Exercise

16   Rights to Setoff

17

18   HEARING re Doc #59 Marriott Hotel Services, Inc.'s Motion to

19   Transfer Venue to the Bankruptcy Court for the District of

20   Columbia

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   PACHULSKI STANG ZIEHL & JONES LLP

4        Attorneys for the Debtors

5

6   BY:  LAURA DAVIS JONES (TELEPHONICALLY)

7        MAXIM B. LITVAK (TELEPHONICALLY)

8

9   MORRIS, NICHOLS, ARSHT & TUNNEL LLP

10        Attorneys for Marriott Hotel Services Inc.

11

12   BY:  CURTIS S. MILLER (TELEPHONICALLY)

13

14   ALSTON & BIRD

15        Attorneys for Pacific Life Insurance Company

16

17   BY:  DAVID WENDER (TELEPHONICALLY)

18

19   TELEPHONIC WITNESS(ES):

20   JAMES D. DECKER

21

22

23

24

25

Page 4

1   ALSO PRESENT TELEPHONICALLY:

2

3   DAVID M. BERTENTHAL

4   BHAVANA BOGGS

5   TIMOTHY P. CAIRNS

6   LINDA CASEY

7   COLIN DAVIDSON

8   LAURA DAVIS

9   MICHAEL DRISCOLL

10  BENJAMIN GILBERT

11  LARRY HALPERIN

12  LAURA HANEY

13  LINDSAY HARRISON

14  RICHARD JING

15  ORI KATZ

16  DAVID MANDERSCHEID

17  MICHAEL MARTINEZ

18  ERIC MOATS

19  BRYAN MOHLER

20  FIRST NAME

21  JENNIFER NASSIRI

22  DOMENIC PACITTI

23  JOHN PAULSEN

24  PATRICK POTTER

25  LAUREL RAYMOND

1   ITAI RAZ

2   RICHARD RILEY

3   JOSHUA ROSENTHAL

4   TODD SOLOWAY

5   WENDY SPIRO

6   GRANT STEIN

7   JESSICA STEINHAGEN

8   ALEX TREPP

9   DEVKI VIRK

10   JOHN WALDECK

11   GEOFFREY WILLIAMS

12   BECKY YERAK

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  Can everyone hear me

3    okay?  Yes.  Okay.  It's Judge Dorsey we're --

4          MS. DAVIS JONES:  Yes, Judge.

5          THE COURT:  -- on the record in Wardman Hotel

6    Owner, LLC, Case No. 21-10023.  I will go ahead, turn it

7    over to Debtor's counsel to run the agenda.

8          MS. DAVIS JONES:  Thank you, Your Honor.  Good

9    morning.  Laura Davis Jones of Pachulski, Stang, Ziehl, and

10   Jones on behalf of Wardman Hotel Owner, LLC.  Your Honor, we

11   have before you a third amended agenda.  Hopefully that has

12   made it to Your Honor's attention.  The good news of the

13   amendment is that the issues are narrowing down.

14          Your Honor, indeed, after we have submitted now

15   two more certifications of counsel, there's only one matter

16   remaining on the agenda to go forward.  Specifically, Your

17   Honor, from looking at the third amended agenda, Matters 1

18   through 7, the Court has signed orders on those.  Thank you

19   so much.  Matter 8, our DIP financing.  Your Honor, we did

20   submit, albeit late yesterday, a certification of counsel

21   showing a resolution of that issue.  Also, Your Honor, we

22   have a certification of counsel with respect to the

23   rejection of the HMA contract.  That's No. 9.

24          Number 11 on the agenda, Your Honor, the parties

25   agreed to adjourn.  Marriott reached out to us with respect

1    to adjourning that, which we have agreed to.  So that matter

2    leaves us with Matter No. 10, Your Honor, which is the

3    Marriott motion to change venue.

4              THE COURT:  All right.  I did see the COC for the

5    DIP financing and the rejection of the HMA right before the

6    hearing.  I reviewed those.  Unless anybody wants to be

7    heard, I'm prepared to enter those orders.  Does anyone wish

8    to be heard on those two?

9              MR. MILLER:  Your Honor, Curtis Miller of Morris

10   Nichols on behalf of Marriott.  If I could be heard briefly?

11             THE COURT:  Go ahead.

12             MR. MILLER:  My comment is actually not with

13   respect to either of those.  I don't have comments -- well,

14   actually, I do have one comment with respect to the DIP

15   order, but first, as with respect to Docket Item 11 which is

16   Marriott's motion to exercise rights of recoupment or in the

17   alternate, relief from the automatic stay.  Your Honor, I

18   did reach out to Mr. Cavello before this hearing to advise

19   the Court that the parties had agreed to adjourn that.  I

20   just wanted to raise a housekeeping issue, that because that

21   at least at this point would likely be an evidentiary

22   hearing, I didn't know if Your Honor wanted us to reach back

23   out to chambers to ask for that hearing date because it's

24   likely going to be longer than an hour, or if we should just

25   set it for the next omnibus hearing or, you know, if

1    (indiscernible) but --

2              THE COURT:  When is our next omnibus hearing in

3    this case?

4              MR. MILLER:  I would have to defer to Ms. Jones

5    about that.

6              MS. DAVIS JONES:  I knew that would happen, Judge.

7    I apologize.  I do not have that omnibus date in front of

8    me, Your Honor.  It is approximately a month out, though.

9    We had told Mr. Miller prior to this hearing that we would

10   coordinate among the parties to come up with what we thought

11   would make sense as a date and then visit with your

12   chambers, if that would work, Your Honor.

13             THE COURT:  Yeah, let's do that.  I'm not sure.

14   I'm just going to see if I have anything else scheduled so

15   far on that date and we could just set it for that date and

16   extend the time, but I can't find it on my calendar right

17   now either, so yeah, just reach out to chambers and if that

18   omnibus date works and there's -- oh, here.  No, that's not

19   it.  If there's time during that omnibus day, we can hear it

20   then.  If not, we'll set a different date.

21             MS. DAVIS JONES:  That's fine, Your Honor.  Thank

22   you so much.

23             THE COURT:  Okay.

24             MR. MILLER:  And Your Honor, with respect to the

25   DIP motion, I know Your Honor said that you had reviewed

1    that revised form of order and obviously we did our best to

2    resolve and not bring as many issues as we -- bring as few

3    issues as we needed to before Your Honor, and the DIP as

4    revised by the Debtor did resolve the most important issues

5    to us with -- that existed in the DIP financing and the most

6    important of which was that the order didn't affect claims

7    Marriott has against Pacific Life under the subordination

8    and non-disturbance agreement between Marriott and Pacific

9    Life, and that's set forth and expressly preserved in the

10   DIP order.

11          And the way that the order's set up, is as you

12   would traditionally see it, Your Honor, that there is a

13   challenge period and if Marriott discovers that there are

14   additional claims that it wants to bring against

15   (indiscernible) member or Pac Life, it'll seek to do so in

16   accordance with Paragraph 27 of that order, and that's a

17   procedure we agreed to, Your Honor, so we did want to just

18   mention that we were able to ultimately resolve the issues

19   with the releases, and we expect and I've discussed with

20   Debtor's counsel we will be asking for documents to be able

21   to do that investigation.

22          We would anticipate getting cooperation from both

23   the Debtors and Pacific Life, and if not, Your Honor, we'll

24   be back before Your Honor in short order.  But that was the

25   only comment I had about the order, Your Honor.

1          THE COURT:  Okay.  Thank you.  Just to -- for

2     everyone's reference, if you do have discovery issues, I

3     would prefer that you reach out to chambers for a

4     teleconference or now I guess it would be a Zoom conference,

5     before we start getting into filing motions for protective

6     orders or motions to compel so that we can see if we can

7     resolve those issues before we get into a full briefing

8     schedule.

9          MR. MILLER:  Understood, Your Honor.

10          THE COURT:  I also saw I received a binder this

11     morning.  I'm not sure who sent that.

12          MR. MILLER:  That is my firm, Your Honor.

13          THE COURT:  Okay.  We do have -- there is a

14     standing order about no hand deliveries to chambers in the

15     COVID era, so please -- and just so everyone know, too, I --

16     one thing that came out of this whole COVID situation is

17     that I will never accept binders again.  I prefer everything

18     electronic, so electronic binders from now on, please.

19          MR. MILLER:  Understood, Your Honor.  Apologies

20     for that.

21          THE COURT:  No problem.

22          MR. MILLER:  I think that leaves just the transfer

23     motion, which is Marriott's motion, so --

24          MR. WENDER:  Actually, Mr. Miller, do you mind if

25     I interject for just one quick second?

1              THE COURT:  Go ahead.

2              MR. WENDER:  Yes.  Sorry, Your Honor.  David

3     Wender with Alston and Bird, and I just wanted to -- and I

4     view these as a matter of housekeeping.  One, with respect

5     to the continuation of the stay relief motion, we wanted --

6     although I think it's implicit, I wanted to just confirm

7     that the deadlines that are imposed under the code for

8     holding hearings in the time periods will be extended.  I

9     think that's implicit, but it wasn't said.  I'm just aware

10    of some bad district court precedents, that says if it's not

11    clear, those dates still apply, so I want to make sure the

12    14- and 30-day hearings requirements are extended

13    contemporaneous with the actual hearing on that motion.

14             THE COURT:  We've already -- the parties already

15    submitted their objection and responses to that motion,

16    right?

17             MR. WENDER:  That's correct, Your Honor.

18             THE COURT:  Okay, so I don't think we need to

19    extend it that far out.

20             MR. WENDER:  No, not for response deadlines.

21    There's an obligation for the Court to hold a hearing and so

22    I just want to confirm that by agreeing to extend it out,

23    the Court's obligation to conduct that hearing is also being

24    extended.  That's all --

25             THE COURT:  Okay, yes.  Okay.  That's fine.

1           MR. WENDER:  Thank you, Your Honor.  And

2     secondary, with respect to discovery, and if Your Honor --

3     we are familiar with your procedures with respect to

4     (indiscernible), we have already produced over, I think,

5     4,000 records, over, I think the number was 45,000 pages,

6     although I don't have my notes directly in front of me.  We

7     will continue to work.  Most of the documents have been in

8     Marriott's possession since the origination of Pacific Life

9     prepetition loans.

10           We will continue to work with respect to

11    reasonable requests and we hope not to bother the Court

12    further with that, but we've been here and we've been an

13    open book.  Thank you, Your Honor.

14           THE COURT:  Thank you, Mr. Wender.  All right.

15    Mr. Miller, the motion to transfer?

16           MR. MILLER:  Yes, Your Honor.  And I just wanted

17    to quickly note, in the COVID world, because we're not in

18    front of you, I don't see you up on the video.  I don't know

19    if you have the -- we don't need to Your Honor.  I just

20    didn't know if you were able to see stuff if we put it on

21    the screen.

22           THE COURT:  I am on.  My video is turned on.  I

23    can see myself.

24           MS. DAVIS JONES:  And I see Your Honor.

25           MR. MILLER:  I can't see you.  That's odd.  Well,

1    I'm sure you look fabulous this morning, Your Honor.  So let

2    me -- let's try this.  Mr. Moats from my firm has a

3    demonstrative, a presentation we were planning to put up and

4    if we could share or give him administrator rights so he

5    could put that on the screen and hopefully you'll be able to

6    see that.

7              THE COURT:  Yes.  Go ahead.  We'll give you the

8    rights and you can be -- you'll be able to bring it up.

9              CLERK:  What's the name of the party that needs

10   the right?

11             MR. MILLER:  Eric Moats.

12             THE COURT:  There we go.

13             MR. MILLER:  Great.  And before I get started with

14   the argument, Your Honor, we did reach out to Debtor's

15   counsel yesterday and I believe we have agreement on four

16   documents that will go into evidence, and they are -- they

17   were in the binder that was sent to chambers and we can

18   follow this up or we could send it right now.  It is an

19   email, in electronic form, but the four documents are pretty

20   simple.

21             The first one is the Debtor's bankruptcy petition,

22   top 20 creditor list, so that's Docket Item 1.  The second

23   document is Mr. Decker's first day declaration.  That's

24   Docket Item 2.  The third document is the hotel management

25   agreement between Marriott and the Debtor.  That's been

1    attached to numerous pleadings in this case including the

2    objection to the DIP financing.  And then tab -- the fourth

3    document is a document compiled by the U.S. Courts and it is

4    a website which shows the caseload specifics for the

5    different districts and it shows it for both Washington,

6    D.C. and the District of Delaware, Your Honor.

7              So if Debtors could confirm that those four

8    documents can come in without objection, I'd appreciate it.

9              MS. DAVIS JONES:  No objection, Your Honor.

10             THE COURT: All right, so we will identify those as

11   Marriott Exhibits 1 through 4.

12             MR. MILLER:  Great.

13             THE COURT:  They're admitted without objection.

14             (Marriott Exhibits 1-4 Admitted Into Evidence.)

15             MR. MILLER:  Thank you, Your Honor.  So Your

16   Honor, and Mr. Moats, if you could go to the next slide

17   please.  So Your Honor, this case is about a Washington,

18   D.C. controversy.  It's about a historic property located in

19   Washington, D.C. where all of the four creditors that were

20   listed by the Debtor on its petition are located in D.C. or

21   in the immediate suburbs.

22             The Debtor does not and cannot seriously contest

23   that a controversy over the single piece of real estate is

24   not significant to the Washington, D.C. community.  And

25   let's use the Debtor's words to illustrate the importance of

1   this property to the local Washington, D.C. community.  Mr.

2   Decker in his first day declaration testified that -- and I

3   have this up on the screen, Your Honor -- that "The hotel

4   has a long and storied history.  It opened in 1918 just days

5   after the end of World War I and in the midst of the Spanish

6   flu pandemic.  Over the last century, the hotel has been

7   home to former Presidents Herbert Hoover, Dwight Eisenhower,

8   and Lyndon Johnson, former U.S. Senators Barry Goldwater and

9   Bob Dole, plus many other politicians and dignitaries."

10          Mr. Decker continued in his first-day declaration

11  that the hotel is listed on the National Register of

12  Historic Places and is located in a prime location in our

13  nation's capital.  Mr. Moats, if you'd go to the next slide.

14          Your Honor, the Washington, D.C. interests here.

15  The only asset is a historic piece of D.C.'s real property,

16  as already mentioned.  The hotel's principal place of

17  business is in Washington, D.C.  All unsecured -- all non-

18  insider unsecured creditors are located in Washington, D.C.

19  or the D.C. metropolitan area.  The hotel's hundreds of

20  former employees and their union are located in Washington,

21  D.C.  The hotel's books and records are in Washington, D.C.

22  or in the D.C. metropolitan area.

23          A hotel redevelopment, which is one of the

24  alternatives the Debtors discussed in this case, would be

25  governed by D.C. real estate law, and the Marriott

1    management agreement, the HMA that was admitted into

2    evidence, is also governed by D.C. law.  Your Honor, this

3    strong local interest that's present virtually all single

4    real estate asset cases is the reason by bankruptcy courts

5    almost universally transfer those cases to the jurisdiction

6    where the real property is located.  Next slide, Mr. Moats.

7            We cited a number of these cases in our papers,

8    but two of them I think give the best summary of the

9    position of courts.  In the Midland Associates case, "In

10   virtually every single asset improved real estate

11   partnership case which we have seen, the Court has

12   transferred the bankruptcy to the jurisdiction where the

13   assets are located."

14           Judge Gross in Rehoboth Hospitality case, and I'll

15   quote him.  "In the context of what is essentially a single

16   asset case, the location of the loan improved real estate

17   asset is of particular concern to the Court, especially in

18   the event of potential liquidation and the case is better

19   administered by a Court in the district in which is it

20   located."  Next slide, Mr. Moats.

21           Contrary to what the Debtor and Pacific Life try

22   to piece together in their objections, nothing in this case

23   has a national scope and their reliance on the hiring of

24   counsel, other professionals, and a handful of service crews

25   and engineers to run this liquidation does not change that

1   fact.

2           No one is claiming, Your Honor, to be clear, that

3   this Court is not one of the premier jurisdictions to handle

4   complex Chapter 11 cases that have nationwide creditors and

5   assets, complex balance sheets, and national interest, but

6   that is not this case.

7           The Debtor lists just four unsecured creditors in

8   the top 20 list, all in D.C. or the D.C. metro area, and

9   it's entirely unlike the PWS Holding case that the Debtors

10  and Pacific Life rely upon.  The PWS case was the

11  traditional mega case that filed in this jurisdiction with

12  over a billion dollars in liability, a national presence,

13  and the 30 largest creditors were located in 13 different

14  states.

15          The Debtor cannot change the essential facts of

16  this case.  There's one primary asset which is real property

17  in Washington, D.C. and the primary issues involved is value

18  and sale of that real estate, and a dispute over a hotel

19  management agreement governed by Washington, D.C. law.  Mr.

20  Moats, the next slide, please.

21          I'm not going to go through all the different

22  factors, Your Honor, because I don't think it's really all

23  that helpful just to tick down them one by one, but I will

24  talk about a few of them that have been emphasized in the

25  papers.  So first with respect to the Debtors choice of

1   venue, Your Honor.  This motion first is not about whether

2   venue is permissible in Delaware.

3          That's not what our transfer motion is about.

4   This transfer motion is based on the convenience of the

5   parties or the interests of justice, and that presumes a

6   venue proper in the original forum.  Unsurprisingly, the

7   Debtors most vocal complaint about transfer is that it would

8   disregard its choice of forum.  But as Judge Gross tells in

9   the Rehoboth Hospitality case, which was another single-

10  asset real estate hotel case, the fact -- and I'll quote --

11  "is diminished when the choice of forum is not directly

12  related to the operative underlying facts of the case," Your

13  Honor.

14         If this were not true, single-asset real estate

15  cases would never be transferred.  The obviate is obviously

16  true.  Next slide, Mr. Moats.

17         Your Honor, this case, as I've already said, is a

18  local Washington, D.C. controversy.  Now in the Debtor and

19  Pacific Life's papers, they try to make the point that

20  Marriott is not in Washington, D.C. and that the location of

21  the hotel is not in the same state as where Marriott is

22  located, but if you just look at a map, Your Honor, and this

23  -- what we have up on the screen here is the D.C. metro map

24  -- you can see how close all of the relevant points are in

25  this case.

1          The D.C. bankruptcy court is obviously right in

2     the middle of D.C.  Wardman Park is very close to where the

3     Marriott headquarters is, Your Honor.  Next slide, Mr.

4     Moats.

5          And contrary to the Debtors' and pacific Life's

6     argument, Delaware is not just up the road from the hotel.

7     They say this a number of times.  The hotel's more than 100

8     miles from this Court, making it beyond the Court's subpoena

9     power.

10          THE COURT:  I -- let me ask you about that, Mr.

11    Miller, because I believe the case law is that you measure

12    the distance as the crow files, not as the road goes.  So as

13    the crow files, I believe D.C. is within a hundred miles of

14    Delaware.

15          MR. MILLER:  Your Honor, you're right and the

16    point is, is that you don't -- so there's a whole host of

17    issues that may require witness testimony in this case and

18    based on the statements the Debtors and Pacific Life have

19    made in their papers about counter claims they have against

20    Marriott and obviously claims that Marriott has against the

21    Debtors, that a lot of these witnesses are going to be

22    former employees of the hotel.  So these employees were all

23    terminated when the Debtor made the decision to permanently

24    close that hotel and they may or may not be within a hundred

25    miles of the way the crow flies from Your Honor's

1     (indiscernible).

2              And what we do know is that in Washington, D.C.,

3     where that court is located, they are not going to have the

4     same difficulty.  Obviously, if someone moved away from the

5     area, that would be an issue, but otherwise, they will not

6     have the same subpoena power issues as Your Honor will have.

7              THE COURT:  Well, that's only the subpoena power

8     to appear and testify in Court, but you still have the

9     ability to depose those witnesses and then present either a

10    video transcript or the transcript itself of that

11    deposition, if it's somebody who's a former employee and

12    outside the subpoena power.

13             MR. MILLER:  But if they are outside of -- if they

14    are outside of Your Honor's subpoena power, we would not be

15    able to force them to appear for a deposition.  They are no

16    longer -- due to the Debtor having terminated all -- well,

17    having closed the hotel which led to the termination of all

18    the employees --

19             THE COURT:  I believe I --

20             MR. MILLER:  We don't have --

21             THE COURT:  I believe this Court has --

22             MR. MILLER:  No --

23             THE COURT:  -- national subpoena power to make

24    someone appear to testify for a deposition.  You can issue a

25    subpoena under Rule 45 to someone in Pennsylvania, Maryland,

1   Virginia, and have them testify by deposition.  There's no -

2   - my subpoena power does not end at 100 miles from the

3   courthouse.

4             MR. MILLER:  Actually, Your Honor, you're right.

5   I'm thinking of normal federal court litigation, not

6   bankruptcy court jurisdiction.  But if we did want -- if we

7   did want them to appear at trial, we may not be able to do

8   so and I think that's the point and that's the point that is

9   emphasized in the cases, Your Honor.  I don't think that we

10  would -- at least, we would not agree that simply having

11  taken trial depositions would be as effective as having

12  someone appear in Court, if their testimony would be

13  relevant and probative to issues that were before Your

14  Honor.

15            THE COURT:  Okay, go ahead.

16            MR. MILLER:  Mr. Moats, if you could go to the

17  next slide.  So the most favorable case that the Debtor

18  relies upon, Your Honor, is the LaGuardia Associates case

19  from the Eastern District of Pennsylvania in 2004.  And in

20  the LaGuardia case, the Debtors' principal place of

21  business, its nerve center as discussed by the Court, was

22  not where the real estate was located in New York, rather

23  where the petition had been filed.

24            Here, Your Honor, contrary to LaGuardia, the

25  Debtors admitted in its petition that its principal place of

Page 22

1    business is at the same place as the hotel in D.C. and has

2    no employees or assets in Delaware, Your Honor.  And we put

3    on the screen there and it's been admitted into evidence the

4    Debtors' petition where they list the principal place of

5    business as being in Washington, D.C.  Next slide, Mr.

6    Moats.

7              Your Honor, with respect to the convenience of the

8    parties, this case is in its early stages.  This is only the

9    second day hearing.  No sale hearing has been set and there

10   is no legitimate argument that the D.C. bankruptcy court

11   could not competently preside over a straightforward sale.

12   The Debtors' attempt to convert this case to one of national

13   importance failed and the Debtors and Pacific Life's heavy

14   reliance on the location of their recently hired

15   professionals, their bankruptcy professionals, is irrelevant

16   to the transfer analysis.

17             And for that, Your Honor, we cited in our papers

18   to the Trico Steel case where the court in Ohio transferred

19   the case back to Delaware, Your Honor.  Mr. Moats, if you

20   could go to the next slide.

21             In contrast, Your Honor, all the ordinary course

22   professionals that were retained prepetition by the Debtor

23   are in D.C. or the surrounding area and we put that up on

24   the right side of the screen there, Your Honor.  And the

25   location -- and this makes sense, because the Debtor

Page 23

1    would've hired local professionals to handle services -- its

2    necessary services as it's a hotel in D.C.

3           The Debtor can't erase that fact through its

4    hiring of bankruptcy professionals that are in other states.

5    Moreover, Your Honor, the fact that Pacific Life filed the

6    dissolution action prepetition in Delaware is also

7    irrelevant.  Your Honor, it's likely the only court that

8    would've been available for that action as it was an

9    internal affairs (indiscernible).  Next slide, Mr. Moats.

10          With respect to the location of witnesses, and I

11   guess we already talked about that, Your Honor, so I'm going

12   to skip over that.  The Debtor and Pacific Life make a point

13   numerous times in their papers that the fact the hotel is

14   closed changes the analysis, but Your Honor, we disagree.

15          There are many live issues, as I already

16   mentioned, surrounding the hotel's operations and former

17   operations, including employee issues, there's severance,

18   parties with reservations, financial records, and the

19   Wardman Tower Residential Condo Association which Your Honor

20   saw an objection from them in connection with DIP financing

21   and that party is actually made up of residents that live in

22   the adjacent residential tower, Your Honor.

23          Also with respect to the relative congestion of

24   the two courts' docket, that also weighs strongly in favor

25   of transfer, Your Honor, with D.C. being significantly less

Page 24

1    congested.  I obviously don't need to tell you how busy

2    you're been, but the statistics are compelling.  From 2019

3    to 2020, Delaware had 3,116 cases and 5,804 pending cases.

4    For the same period, the D.C. court had 618 new cases and

5    only 638 pending cases, Your Honor.  Your Honor obviously

6    always does the best that you can to accommodate the needs

7    of any Debtor, but the district caseload between the

8    jurisdictions is obvious.  Mr. Moats, next slide, please.

9              Recognizing this, Your Honor, the Debtor lays

10   heavily into the argument that in a post-COVID world, all

11   the traditional facts that a court looks at for venue

12   transfer are irrelevant because everyone can appear by

13   video, but this is simply incorrect, Your Honor.  If you

14   were to accept the Debtors' argument, venue transfer would

15   never be available, but that is not the law.  Yes, this

16   Court's user friendly, but that doesn't make the

17   appropriateness of a transfer where the sole asset is a

18   piece of develop real estate located in the jurisdiction go

19   away, Your Honor.

20             No one knows when the courts are going to begin

21   holding in-person hearings again due to the dangers of

22   travel, but as held by the numerous cases that we cited in

23   our papers including the Sanders v. Sanders (indiscernible)

24   and Montgomery v. Barr case, and Diamond (indiscernible),

25   that are ignored by the Debtor in its objection, the

1    pandemic supports having venues in local courts, not the

2    other way around.  Next slide, Mr. Moats?

3              THE COURT:  Well, if the D.C. court was going to

4    take this case, they would be hearing proceedings by video

5    as well, wouldn't they?  They're not having live hearings.

6              MR. MILLER:  They are not.  Currently, they are

7    doing it via Zoom, but with the -- this is a bit of

8    speculation, but with the vaccine being rolled out, Your

9    Honor, I guess -- I know it's certainly my hope and think

10   most people's hope, is that there will be in-person

11   proceedings taking place again sometime soon.

12             THE COURT:  I love your optimism, Mr. Miller, but

13   I think it's going to be a little bit longer than soon, or

14   probably not until after the summer might -- would be my

15   guess.

16             MR. MILLER:  Well, I guess when you look at even

17   the standing orders that have been entered by the district

18   court, they've only postponed trial hearings -- I mean, jury

19   trials until April, so I think maybe I am an eternal

20   optimist, Your Honor, but I think the district court at a

21   minimum at least, appears to be outwardly showing that same

22   optimism.  So I guess the point form the cases is that the

23   dangers of the coronavirus and the dangers of the pandemic

24   make it more important the cases be handled locally rather

25   than in jurisdictions that are further away.

1           With respect to this last slide, Your Honor, the

2    necessity for ancillary administration and liquidation

3    results.  The Debtor's stated plan is that they play to

4    liquidate its sole asset.  They don't plan to reorganize

5    around it.  They've stated that they're not planning to

6    reopen the hotel.  And as Judge Gross wrote in the Rehoboth

7    Hospitality case, in this type of sale case, issues of local

8    law, the importance of the property in the community, and

9    other ancillary issues will be -- and I'll quote here --

10   "better administered by a court in the district in which it

11   is located."

12           I already mentioned the existence of the Warman

13   Tower Residential Condo Association and their numerous ties

14   to the Debtor, but these types of issues with respect to

15   redevelopment, the impact on the local community, the

16   importance of the property to the local community, they are

17   common in single-asset real estate cases and illustrate how

18   a sale will impact the local interests.

19           So Your Honor, based on all those factors,

20   Marriott believes that the case should be transferred to the

21   Washington, D.C. bankruptcy court and Your Honor, unless you

22   have questions for me, I'll just reserve some time, for

23   rebuttal.

24           THE COURT:  Thank you, Mr. Miller.  No questions.

25           MS. DAVIS JONES:  Your Honor, if I may.  Your

1    Honor, the Debtors oppose the motion to transfer venue.  We

2    just heard through that argument a lot of speculation, facts

3    without evidence, and indeed, Mr. Miller's recitation was

4    incorrect on some of the material facts.  Your Honor, while

5    the movant Marriott had the burden on this motion, Your

6    Honor, we will call Mr. James Decker, the company's sole

7    manager, to provide the Court with testimony to support our

8    position and then I will make the argument.

9              If I may, Your Honor, we would call Mr. Decker.

10             THE COURT:  All right.  Mr. Decker, I see you.

11   We'll spotlight you for everybody.  And Mr. Decker, please

12   raise your right hand, state your full name for the record,

13   and spell your last name.

14             MR. DECKER:  James D. Decker, D-E-C-K-E-R.

15             THE COURT:  Do you affirm the testimony you're

16   about to give is the truth, the whole truth, and nothing but

17   the truth, to the best of your knowledge and ability?

18             THE WITNESS:  I do.

19             THE COURT:  Thank you.  You may proceed, Ms.

20   Jones.

21             MS. DAVIS JONES:  Thank you, Your Honor.  If I

22   may, I would ask my partner Mr. Litvak to handle the

23   examination of Mr. Decker.

24             THE COURT:  All right.  Mr. Litvak.

25             MR. LITVAK:  Good morning, Your Honor.  Can you

1    hear me okay?

2              THE COURT:  I can.  Thank you.

3              MR. LITVAK:  Thank you, Your Honor.  Max Litvak,

4    Pachulski Stang Ziehl & Jones, on behalf of the Debtor.

5    Your Honor, there was one exhibit that I wanted to ask to

6    admit into evidence before we commence with the testimony,

7    and it was actually included in the exhibit book that was

8    submitted by Marriott.  It's the amended and restated

9    operating agreement for the Debtor.  It's at Tab Number 14.

10   I would ask for that document to be admitted into evidence.

11             THE COURT:  Is there any objection?

12             (No audible response).

13             THE COURT:  No objection.  It's admitted

14   without --

15             MR. MILLER:  No, Your Honor.

16             THE COURT:  -- admitted without objection.  We'll

17   call that Debtor's Exhibit 1.

18             (Debtor's Exhibit 1 Received Into Evidence)

19             MR. LITVAK:  Thank you, Your Honor.  In addition,

20   we did submit a declaration from Mr. Decker with respect to

21   the Debtor's opposition to the venue transfer motion.  And

22   in addition to Mr. Decker's testimony, I would ask for that

23   declaration to be admitted into evidence.

24             THE COURT:  Is there any objection?

25             MR. MILLER:  Your Honor, no objection to the

1    majority of it.  But I do have an objection to a couple of

2    the statements in there.  So if Your Honor has a copy of it,

3    I can point out which passages I have an objection to.

4              THE COURT:  Let me see.  Hold on one second.  I

5    think I left the binder on my desk.  Let me go grab that

6    real quick.  I'll be right back.

7              (Pause.)

8              THE COURT:  I just realized is that declaration in

9    this binder or is that separate?

10             MS. JONES:  It is in that binder, Your Honor,

11   because it was in connection with our opposition --

12             THE COURT:  Right.

13             MS. JONES:  -- to the motion to transfer venue.

14             THE COURT:  All right.  Let me get -- can you send

15   that to me, please?  Thank you.

16             I'll have one of my clerks send me that

17   declaration so I can bring it up on the screen.

18             MR. MILLER:  And, Your Honor, it's also at Docket

19   Number 81 if that's helpful.

20             THE COURT:  Okay.

21             (Pause.)

22             THE COURT:  Okay.  I have it.  Go ahead, Mr.

23   Miller.  What's your objections?

24             MR. MILLER:  Your Honor, if you look at paragraph

25   17 on page 5, the first sentence, it's a legal statement,

```
1    not a factual statement by a fact witness.  The Debtor's

2    entitled to substantial deference with respect to its choice

3    of forum.  So, Your Honor, we think that should be struck.

4              THE COURT:  Okay.  I agree.  It's stricken.

5              MR. MILLER:  The next one, Your Honor, paragraph

6    18 at the end of page 5 starting with (indiscernible) and

7    going to the end of that paragraph, these are what would

8    essentially be findings by Your Honor, not factual

9    statements by a witness.  So I'd ask that those be struck,

10   as well.

11             THE COURT:  I agree.  It's stricken.

12             MR. MILLER:  And then paragraph 16, although it's

13   not contested, so possibly it's irrelevant, it states that

14   venue is proper before this Court and that's also a legal

15   statement, Your Honor, so that should be stricken, as well.

16             THE COURT:  It's stricken, as well.  The

17   remainder --

18             MR. MILLER:  Other than that, no --

19             THE COURT:  All right.  The remainder of the

20   declaration is admitted as Debtor's Exhibit Number 2.

21             (Debtor's Exhibit 2 Received Into Evidence.)

22             MR. LITVAK:  Thank you, Your Honor.  If I may now

23   commence with the direct examination of Mr. Decker?

24             THE COURT:  Yes.  Go ahead.

25             MR. LITVAK:  Thank you, Your Honor.
```

1                    DIRECT EXAMINATION

2    BY MR. LITVAK:

3    Q    Good morning, Mr. Decker.

4    A    Good morning to you, Mr. Litvak.

5    Q    Mr. Decker, what is your position with the Debtor?

6    A    I am the independent manager, sole independent manager.

7    Q    How long have you been in this position?

8    A    October 1st of 2020.

9    Q    Mr. Decker, could you give the Court a brief background

10   about your professional experience and particularly your

11   investment banking experience?

12   A    Happy to.  After graduating from Wharton with my MBA, I

13   began working for Bear Stearns, and that commenced a 30-year

14   period of investment banking activity principally focused on

15   financial restructuring.  I furthered my career after seven

16   years at Guggenheim Securities where I ran the Special

17   Situations Group which means dealing with sales of

18   distressed companies, both in or out of court or through

19   Article IX sales, things of that nature; raising capital for

20   distressed companies whether that's debtor-in-possession

21   financing, exit-facility financing, (indiscernible); and

22   doing financial structuring transactions, again, that's

23   certified and out of court.

24        I have been through 363 sale transactions or sales

25   pursuant to plan in venues from California to New York to

1   Florida to -- the furthest I've ever gone is Illinois.  So

2   I've -- I've seen quite a few different things in a lot of

3   different places.

4   Q    Thank you, Mr. Decker.  And do you have specific

5   experience in the Delaware Bankruptcy Court?  Do you?

6   A    I do.  I have had two cases in Delaware in this past

7   year.  The first of those was Ravn Air Group which was

8   Alaska's largest interstate airline.  And the second of

9   those was Maines Paper & Food Distribution.

10              THE COURT:  I'm sorry.  You broke up there a

11  little bit, Mr. Decker.  What was the end of your sentence

12  there?

13              THE WITNESS:  The end of my sentence was Maines

14  Paper & Food Distribution.

15              THE COURT:  Okay.

16              THE WITNESS:  The second bankruptcy in Delaware

17  last year that I participated in.

18              THE COURT:  You might need to keep your voice up a

19  little bit so that we can pick you up.  It's a little

20  difficult to hear you.

21              THE WITNESS:  Certainly, sir.

22              THE COURT:  Thank you.

23              THE WITNESS:  Is this better?

24              THE COURT:  That's better.  Thank you.

25              THE WITNESS:  Okay.

1   BY MR. LITVAK:

2   Q    Are you familiar with the procedures and practices of

3   the Delaware Bankruptcy Court, particularly where it relates

4   to asset sales?

5   A    Yes, sir.  I am.

6   Q    And have you had experience in Delaware Bankruptcy

7   Court with asset sales?

8   A    I have.

9   Q    Could you give the Court a little summary of what that

10  experience includes?

11  A    Well, it would include the two cases that I just

12  mentioned, first of which Ravn was a sale transaction, the

13  second of which, that was a restructuring transaction that

14  was Maines.  I have been through several other sale

15  processes in Chapter 11 in Delaware -- Champion Products

16  which was a housing manufacturer based in Michigan with a

17  Delaware bankruptcy that was sold pursuant to Section 363.

18      I can go on with, you know, a wide variety of others.

19  But as I said, I've been through numerous sale transactions

20  in Delaware.  I'm very comfortable with the venue, and I

21  believe I understand its (indiscernible).

22  Q    Have you ever been to D.C. Bankruptcy Court?

23  A    I -- I have been a member of the American College of

24  Bankruptcy, a fellow in the American College of Bankruptcy

25  for I think 15 years.  I've -- I've practiced nothing but

1    restructuring for over 20 years.  I am embarrassed to admit

2    to you that I didn't realize until this objection that D.C.

3    actually had a bankruptcy court.

4    Q    Let me move on, Mr. Decker, and ask you where do you

5    reside and work?

6    A    Atlanta, Georgia.

7    Q    Now I'm going to ask a few questions about the

8    governance of the Debtor.  And in doing so, I want to make

9    sure that our terminology is clear.  Are you aware that

10   Pacific Life Insurance Company is the pre-petition and post-

11   petition lender to the Debtor?

12   A    Yes, sir.

13   Q    And so when I refer to Pacific Life Insurance, is it

14   okay with you if I refer to -- if in reference to Pacific

15   Life Insurance, I'm referring to the lender?

16   A    That's how I understand it.

17   Q    And do you understand that PL Wardman Member, LLC, is

18   the equity holder of the Debtor?

19   A    Yes, sir.  I do.

20   Q    Is PL Wardman Member an affiliate of Pacific Life

21   Insurance?

22   A    Yes.

23   Q    Where is Pacific Life Insurance based?

24   A    California, specifically in Newport Beach.

25   Q    Who appointed you as the independent manager of the

1   Debtor?

2   A     PL Wardman Member.

3   Q     In your position as the independent manager of the

4   Debtor, do you report to anybody else?

5   A     I do not.

6   Q     Are you the sole decision-maker for the Debtor?

7   A     Yes, sir.

8   Q     Are you the sole independent manager for the Debtor?

9   A     Yes, sir.

10  Q     Can you be removed from your position as independent

11  manger by PL Wardman Member?

12  A     Yes.

13  Q     Under what circumstances?

14  A     I may get the standard wrong, but I believe it's gross

15  negligence, fraud, things of that nature.

16          MR. MILLER:  Your Honor, Curtis Miller.  I -- you

17  know, I've been -- sort of been quiet for a little bit, but

18  I object on the basis of relevance.  I'm not quite sure how

19  this is relevant to the transfer motion.  I could see how it

20  was relevant to the DIP motion, but I'm not sure whether or

21  not Mr. Decker can be removed for cause for wrongful acts,

22  that that has anything to do with whether the convenience of

23  the parties is more in favor of the case being prosecuted in

24  D.C. rather than Delaware, Your Honor.

25          THE COURT:  Mr. Litvak?

1          MR. LITVAK:  I'm done with this line of

2    questioning, Your Honor.

3          THE COURT:  Okay.  Thank you.

4    BY MR. LITVAK:

5    Q    Mr. Decker, was there a prior Delaware Chancery Court

6    proceeding involving PL Wardman Member and a former co-owner

7    in the Debtor, JBG Smith?

8    A    Yes.

9    Q    Was that matter filed and resolved last year?

10   A    Yes.

11   Q    Is the Debtor organized in Delaware?

12   A    It is.

13   Q    Is PL Wardman Member also organized in Delaware?

14   A    Yes, sir.

15   Q    Did you make the decision for the Debtor to file for

16   bankruptcy in Delaware?

17   A    I did.

18   Q    Why did you make that decision?

19   A    First of all, as you point out, both the Debtor and the

20   equity owner are Delaware companies.  Because of the action

21   in Chancery Court, I think having been through the Delaware

22   courts is important.  However, more importantly to me is

23   simply the fact that this Court is very familiar with these

24   types of cases.

25        And in particular, that's important to me as the

1    manager because my job here, number one, is to protect the

2    assets and make sure that it's safe for people to be in

3    while I go about the task of maximizing its value.  I'm

4    personally indifferent as to how we maximize the value,

5    whether we sell this to somebody who wants to run it as a

6    hotel or somebody who wants to knock it down and build their

7    own home or build an Embassy or build a multi-family

8    development.  That's -- you know, that's not for me to

9    decide.  That's for the market to decide.

10        And in my experience as a banker, markets abhor

11   uncertainty.  Markets want -- want to know that they're

12   going to be able to transact in a certain fashion.  And it's

13   my experience in Delaware that buyers get a lot of comfort

14   from the fact that it's pretty well established how these

15   types of properties run in Delaware.  And I did not mean to

16   be flippant about the D.C. Court, but I would imagine

17   there's a lot of people like me in the financial world that

18   have no experience in the D.C. Court.  And having no

19   experience means it introduces an uncertainty.

20        This is a Tiffany piece of real estate, whether -- set

21   aside what's on the property in terms of improvements today,

22   the physical location of this property is of tremendous

23   value.  The question is who values it the most.  Is it

24   somebody from the Middle East?  Is it somebody from Europe?

25   Is it somebody from North America?  From Asia?

1        Again, I don't know, but that's why I've hired Estill

2    to be our investment banker broker on the property.  I hired

3    Estill because they have reach into all of these disparate

4    areas around the world.  But I chose Delaware because it

5    provided a platform with the greatest stability and this

6    knowledge internationally for buyers to look at when they

7    come to look at this property and hopefully pay top dollar

8    for what we have to sell here.

9    Q    Thank you, Mr. Decker.  Marriott says in its reply

10   papers that the key stakeholders in this case would expect

11   it to be in D.C.  Do you agree with that statement?

12   A    I -- I guess I don't agree with that statement.  I

13   don't -- I really don't understand that statement.

14   Q    And let me ask you a follow-up question then.  Are you

15   aware of any party in interest other than Marriott who has

16   suggested that venue should be moved to D.C.?

17   A    I am aware of nobody.  In fact, yesterday at the IDI

18   meeting with the U.S. Trustee's Office, I inquired if the

19   U.S. Trustee had heard from anybody who wanted to be on a

20   Committee of Unsecured Creditors.  And the exact words of --

21              MR. MILLER:  Objection, Your Honor.  This is

22   hearsay.

23              THE COURT:  Sustained.

24              MR. LITVAK:  That's fine.  Let me move on.

25   BY MR. LITVAK:

1  Q    Mr. Decker, the property itself, how would you describe

2  the Debtor's primary asset?

3  A    I would describe the Debtor's primary asset as a

4  property comprised of approximately 13 acres in if not the

5  finest one of the finest neighborhoods in Washington D.C.

6  Q    Is the property currently closed?

7  A    It is closed.

8  Q    It's not operated as a hotel?

9  A    It is not.  Hasn't been since March.

10  Q    Does the property generate any revenues?

11  A    It does not.

12  Q    In Marriott's reply papers, there was a reference that

13  the property has been closed for only a few weeks.  Is that

14  accurate?

15  A    It is not.

16  Q    And when you say the property has been closed since

17  March, is that March 2020?

18  A    Yes, sir.

19  Q    When was Marriott terminated?

20  A    On January 11th of this year.

21  Q    And then did the Debtor subsequently seek to reject a

22  management agreement with the Debtor -- with Marriott,

23  excuse me?

24  A    Yes.

25  Q    What is happening at the property today?

1    A     We have a small team that are providing security, that

2    are maintaining the operating systems -- ventilation, air

3    conditioning, water, what have you.  So we have probably at

4    any one time four or five people on premise charged with

5    securing and -- and maintaining the property.

6    Q     And did you in fact hire someone to assist you in

7    managing the maintenance of the property?

8    A     I did.

9    Q     Who did you hire?

10   A     The -- the spear -- tip of the spear on this would be a

11   company called PDSI which is based here in Atlanta, Georgia.

12   They are in turn managed by hotelAVE who I've also hired.

13   And the two in conjunction basically help me maintain this

14   property.

15   Q     what does PDSI specifically do for you?

16   A     They handle more the physical plant issues, the hiring

17   of security personnel.  Engineers, for example, are engaging

18   with Schindler to repair the -- to repair and maintain the

19   elevators, things of that nature.

20   Q     Is your primary contact at PDSI based in D.C.?

21   A     No.

22   Q     Where is he based or she?

23   A     The primary -- the team -- the CEO of PDSI is based

24   here in Atlanta.  The primary individual managing this

25   property, Chris Richardson, I believe he is from San

1    Antonio, Texas.  And then his -- his sort of number two on-

2    site manager is also -- I think he's from Houston, Texas.

3    Q    Thank you.  And with respect to hotelAVE, what is it

4    that that firm does for you, for the Debtor?

5    A    HotelAVE helps maintain the books and records, helps in

6    assisting Estill in their sale process.  You know, they are

7    sort of my -- they're more my paper-pusher, if you will, and

8    PDSI is more of my, you know, the labor on site, if you

9    will.

10   Q    And who is your primary contact at hotelAVE?

11   A    John Paulsen.

12   Q    And where is Mr. Paulsen based?

13   A    John lives in suburban New York, metro New York area.

14   His firm is in Providence --

15   Q    How many people --

16   A    -- Rhode Island.  Excuse me.

17   Q    I apologize.  You said his firm is from Providence,

18   Rhode Island, that's hotelAVE?

19   A    Yes, sir.

20   Q    How many people on a typical day would you expect to

21   have at the property?

22   A    Somewhere in the neighborhood of four or five.

23   Q    And what do those four or five people do there?

24   A    A couple of them will be security guards, and then the

25   balance will be people that are, you know, engineers that

1    are maintaining the boilers that are just taking care of the

2    physical plant.

3    Q    Does the Debtor have any employees?

4    A    It does not.

5    Q    Has the Debtor ever had any employees?

6    A    No.

7    Q    Were the workers at the property when it was operated

8    as a hotel actually employees of Marriott?

9    A    Yes.

10   Q    Were those employees represented by a union?

11   A    A great many were, but not all.

12   Q    Does the union have claims against Marriott?

13   A    I believe so.

14   Q    Why did the Debtors schedule the union as a potential

15   claimant in this case?

16   A    Not because the Debtor felt we owe the union or its

17   employees anything, but more from a notice standpoint.  We

18   wanted to make sure that people understood what was

19   happening with the property.

20   Q    Where are management decisions for the Debtor made?

21   A    Right here in Atlanta, Georgia.

22   Q    By you?

23   A    Yes, sir.

24   Q    Do you frequently travel to the property?

25   A    I've been twice.  I went the first time to the property

1    on my own accord before I was employed as the manager --

2    appointed as the manager.  That was back around Labor Day.

3    I did not go inside the building.  I couldn't go inside the

4    building, but I just wanted to see it.  But that was part of

5    a personal trip.  And then the second time I went was on

6    January 11th.

7    Q    Do you believe that you can effectively manage the

8    property remotely from Atlanta?

9    A    Yes, I do.

10   Q    Where are the books and records of the Debtor?

11   A    The books and records of the Debtor are in multiple

12   places.  I have books and records of the Debtor here in my

13   office in Atlanta.  PDSI would have some records with

14   respect to, obviously, the mechanical operations and that

15   kind of stuff.  I don't know exactly where PDSI houses

16   those, whether that is on site or whether that is in

17   Atlanta, their headquarters, or if Mr. Richardson keeps them

18   in his San Antonio office.

19       Mr. Paulsen and hotelAVE would possess books and

20   records of the Debtor,  Pacific Life in its various

21   capacities would have information regarding the Debtor.  I

22   presume that is kept in California.  And then, of course,

23   Marriott Corporation would have books and records which I

24   assume again would be in Maryland.

25   Q    Thank you, Mr. Decker.  Does the Debtor have any bank

1    accounts?

2    A    The Debtor has two bank account with Wells Fargo.

3    Q    Did you establish those accounts?

4    A    I established both of them, yes.

5    Q    And where did you establish those accounts?

6    A    Here in Atlanta.

7    Q    Are you aware of any witnesses necessary to this

8    bankruptcy case who are located in D.C.?

9    A    I don't believe so.  I'm not sure if -- I'm not sure

10   how to answer your question.  That would run right to the --

11   to the witness.  But simple answer is no, not aware of any.

12   Q    Is it the case that Marriott sued the Debtor pre-

13   petition?

14   A    It is.

15   Q    Where was that suit filed?

16   A    In Maryland State Court.

17   Q    What was that lawsuit about, generally?

18   A    I would say that the lawsuit is about breach of

19   contract.

20   Q    Where is Marriott located?

21   A    I believe their headquarters is in Bethesda, Maryland.

22   Q    Does the Debtor have any litigation pending at all in

23   the District of Columbia?

24   A    None.

25   Q    Is the Debtor current on D.C. local taxes?

1   A     We are --

2   Q     Will the Debtor continue --

3   A     -- (indiscernible).

4   Q     Sorry, Mr. Decker.  Were you finished?

5   A     I said, in fact -- we are current on our taxes in D.C.

6   and, in fact, we're owed a refund.

7   Q     Thank you, Mr. Decker.  The creditor matrix that the

8   Debtor filed reflects certain creditors in Maryland and D.C.

9   and elsewhere.  Why are these creditors listed on the

10  Debtor's matrix?

11  A     We believe that these are creditors of Marriott

12  Corporation, and my answer is similar to why we listed the

13  union.  It's really for notice so that those creditors would

14  know who to look to.

15  Q     Thank you, Mr. Decker.  Just the last topic area that I

16  want to cover in your testimony, what is your goal for this

17  case?

18  A     My goal, as I said, is in the interim to protect this

19  property, maintain it, make it secure.  My overarching goal

20  is to sell the property for its maximum possible value which

21  could come from a variety of sources and that is what we are

22  working through.  We're in the market.  We still --

23  (indiscernible) are out in the market right now.  And I

24  believe that that process that we've initiated has already

25  gotten tremendous amount of interest.  And I think that we

1    are going to find that there's considerable value here for

2    all creditors.

3    Q    What types of buyers do you expect to have a serious

4    interest in this property?

5    A    I expect that certain buyers who might view having a

6    hotel here or continuing as a hotel here will express

7    interest.  Best information that I've been provided so far,

8    however, indicates that the most likely highest and best

9    will derive from somebody -- financial firm, a Wall Street

10   firm, or otherwise a financial player will want to redevelop

11   or there are a lot of companies out there that do nothing

12   but redevelop properties such as this.

13        It could also be a buyer, I think I mentioned this

14   earlier, that has a very different use of sort of, you

15   know -- I literally have heard the Russians could put an

16   Embassy, obviously.  I -- I don't know, but that is -- that

17   kind of buyer is out there.  If we find a unicorn buyer

18   that'll pay us $250 million for this thing, we are all ears.

19   Q    Is this going to be a local sale process or is it going

20   to be national or international in nature?

21   A    Absolutely international.

22   Q    Why do you say that?

23   A    It is a fantastic location in a fantastic international

24   city which has a lot of -- of attributes that, you know,

25   European buyers, Asian, Middle Eastern buyers, domestic --

1   this is the kind of thing that people are very interested

2   in.

3   Q    I believe you mentioned earlier that you've already

4   retained brokers to sell the property, correct?

5   A    Correct.

6   Q    And have they actually gone to market?

7   A    They have.  I approved the -- the process to go to

8   market has been first the circulation of a brief

9   (indiscernible) memorandum that's gone out a little over a

10  week ago.  It solicits people who are interested to sign an

11  NDA.  That process is well under way.  And on Friday, I

12  approved the final draft of the memorandum which has now

13  been distributed to parties who have executed an NDA.

14  Q    Do you know approximately how many parties have already

15  executed NDAs?

16  A    Mr. Litvak, I am embarrassed to tell you I'm not sure

17  of the exact number, but it's in excess of 50.

18  Q    What impact would a venue transfer have on the sale

19  process in your view?

20  A    Well, we are out in the market having told the market

21  that this is a Delaware bankruptcy, that they can expect

22  that -- you know, the usual things that sophisticated buyers

23  look to the Delaware Bankruptcy Courts to provide in terms

24  of transactional process, we have clearly intimated that

25  that is how this process is going to be run.

1      If we were to change venue, we would have some

2   significant explaining to do to the buyer universe.  It will

3   just beg a question why are you doing that, what's wrong

4   here.  It introduces uncertainty.  And in markets when you

5   introduce uncertainty, you drive value down.

6   Q    Thank you, Mr. Decker.

7           MR. LITVAK:  Your Honor, that concludes the direct

8   testimony.

9           THE COURT:  Thank you.  Mr. Miller, any cross?

10          MR. MILLER: Just briefly, Your Honor.

11                    CROSS-EXAMINATION

12   BY MR. MILLE:

13   Q    Mr. Decker, can you hear me okay?

14   A    I can, Mr. Miller.

15   Q    Great.  So Mr. Litvak asked you a few questions about

16   your experience in the D.C. Bankruptcy Court.  Do you

17   remember that?

18   A    I do.

19   Q    And you stated a few times that you didn't -- well, you

20   stated once that you didn't even know the D.C. Bankruptcy

21   Court existed.  Is that right?

22   A    I think I said I didn't know that the District of

23   Columbia had a bankruptcy court.

24   Q    Okay.  And you're a member of the College of Bankruptcy

25   Lawyers you testified.  Is that right?

1   A    No.  I am a member of the American College of -- I am a

2   fellow in the American College of Bankruptcy.

3   Q    Okay.  And -- but as a fellow, you're not suggesting,

4   are you, to Judge Dorsey that the D.C. Court is not well

5   equipped to handle this case, are you?

6   A    I think I was simply embarrassed to admit that I didn't

7   know that the District of Columbia had a bankruptcy court.

8   Q    Okay.  So let me ask my question again.  You're not

9   suggesting to this Court that the D.C. Bankruptcy Court is

10  not well equipped to handle this bankruptcy case, are you?

11  A    I don't think I made an affirmative statement or a

12  negative statement to that.  I simply articulated why I felt

13  that for this asset, the Delaware courts were uniquely

14  equipped to handle this case.

15  Q    Okay.  So let me ask you the question in a more

16  straightforward way because you're having trouble answering

17  my question.  Are you telling Judge Dorsey that the D.C.

18  Bankruptcy Court is not able to properly handle this

19  bankruptcy case?

20  A    I think I do understand your question. I'm not trying

21  to tell Judge Dorsey anything.  I'm simply trying to tell

22  you why I chose Delaware.

23  Q    Okay.  And you don't -- because you haven't been in the

24  D.C. Bankruptcy Court, you don't know whether that court

25  would be unable to efficiently handle a 363 asset sale, do

1    you?

2    A    I -- I don't have personal knowledge.

3    Q    Do you have any reason to believe that they wouldn't be

4    able to efficiently handle a 363 asset sale?

5    A    No.  I'm saying the fact that I don't think that's the

6    issue here.  I can't imagine that any U.S. bankruptcy court

7    couldn't handle a 363 sale, notwithstanding the fact that

8    this may not be a 363 sale.

9    Q    Okay.  So let's go to that then.  So I think what

10   you're intimating is you're talking about a sale through a

11   plan.  Is that right?

12   A    That is a possible outcome here.

13   Q    Okay.  And you're not testifying that the D.C.

14   Bankruptcy Court wouldn't be able to efficiently handle a

15   sale through a plan; is that right?

16   A    I --

17          MR. LITVAK:  Objection, Your Honor.  I apologize.

18   There's a like triple negative in that question, and I would

19   just ask Counsel to clarify.  That would be the objection.

20          THE COURT:  Can you restate it, Mr. Miller?

21          MR. MILLER:  Sure.

22   BY MR. MILLER:

23   Q    Mr. Decker, are you testifying that the D.C. Bankruptcy

24   Court would be unable to efficiently handle an asset sale

25   through a plan?

1  A    Mr. Miller, I have no knowledge of what the D.C. Court

2  can and can't do.

3  Q    Okay.  Who's the broker that you selected for this

4  case?

5  A    Estill.

6  Q    Okay.  And you selected Estill for among other reasons

7  because they have experience, deep experience in selling

8  properties in the D.C. area.  Is that right?

9  A    I can't speak to the degree of experience in the grand

10  overall experiences of Estill that relates to D.C.  They

11  have sold properties in D.C., but they're an

12  internationally-focused firm.  They sell properties all over

13  the place and sell them well.

14  Q    Okay.  But your testimony today is not that Estill had

15  the deepest knowledge of both the D.C. market and the hotel

16  and that's why you selected them?

17  A    That is certainly a relevant element of why I selected

18  them.

19          MR. MILLER:  Okay.  Mr. Moats, if you could please

20  pull up Mr. Decker's deposition transcript, page 215.

21          And if you could please blow up page 215 when you

22  find it.

23  BY MR. MILLER:

24  Q    Mr. Decker, can you see the top right part of the

25  transcript or is that too small?

1    A    I've got it.

2    Q    Mr. Decker, could you hear me?

3    A    I do.  I see -- I see the --

4    Q    Okay.  I'm sorry.

5    A    I see line 5 through 24 of page 216.

6    Q    Great.  So you were deposed in this case, right?

7    A    Yes, sir.

8    Q    And you were -- you gave that testimony under oath?

9    A    Yes.

10   Q    Okay.  And during that deposition, I'm going to read

11   from lines 6 through 12.  Were you asked -- you were asked

12   this question:

13   "Q   How did you come to select Estill as a broker?

14   "A   We -- I thought that Estill -- we interviewed I believe

15   six firms, and we thought that Estill had the most

16   creativity, the deepest knowledge of both the D.C. market on

17   the hotel as well as the redevelopment side."

18        Do you see that?

19   A    Yes.

20   Q    And did I properly state your answer to that question?

21   A    I think you accurately read it from the transcript.

22   Q    Do you believe that it was not accurately transcribed?

23        MR. WENDER:  Your Honor, may I object?  Your

24   Honor, for the record, this is David Wender.  I think it's

25   the rule of completeness, it actually makes sense to read

1    the rest of Mr. Decker's testimony from the transcript so

2    that it could actually comport completely the prior

3    testimony herein.

4           MR. MILLER:  Your Honor, if Mr. Wender wants to

5    redirect, he can do that --

6           THE COURT:  Well, no, I think that's a legitimate

7    objection to say you have to put the deposition -- part of

8    the deposition you've read, in context.  And I have read it,

9    actually, as we've been sitting here and I think it does

10   comport with his testimony, so, I'll sustain the objection.

11          MR. WENDER:   Thank you, Your Honor.

12          MR. MILLER:  Okay.  Mr. Moats, you can take that

13   down.

14   BY MR. MILLER:

15   Q    Mr. Decker, when did the Debtor make the decision to

16   permanently close the hotel?

17   A    When I arrived on scene, Mr. Miller, it was already

18   closed.  The decision to permanently close it, I don't

19   recall a specific date or announcement, per se, I just don't

20   recall.

21   Q    But that wasn't in March of 2020, was it?

22   A    I can't testify as to what happened in March.

23   Q    But you don't know that, at the time you were hired,

24   whether or not the hotel was permanently closed or not?

25   A    I think the operative word here in your question is

1    "permanently", is that the case?

2    Q    Yes.

3    A    The hotel was certainly closed sometime in March and

4    had remained in that status until I arrived on scene in

5    October.  I don't -- I have no knowledge of whether the word

6    "permanently" would be ascribed to that circumstance.

7    Q    So, you didn't make a decision to permanently close the

8    hotel subsequent to your retention as Independent Manager?

9    A    I did make a decision subsequent to my retention to

10   permanently close the hotel as long as this Debtor was the

11   owner of the hotel -- of the property, I should say.

12   Q    Okay.  So, let me restate the question, then.

13   A    Sure.

14   Q    Because you made the decision to permanently close the

15   hotel, that would assume that the hotel was not permanently

16   closed prior to you making that decision, right?

17   A    Again, I -- if you wish to assume that, please do.  I

18   don't know.

19   Q    Then why would you make the decision to permanently

20   close the hotel if it was already permanently closed?

21   A    I don't know how to answer your question.  The hotel

22   was closed, we made a decision to permanently close the

23   hotel.

24   Q    Okay.  As of December, were there still groups of

25   reservations at the hotel?

1    A    I believe that's the case.

2    Q    One moment, Your Honor.  Your Honor, I didn't have any

3    further questions (indiscernible).

4              THE COURT:  Okay.  Thank you, Mr. Miller.  Mr.

5    Litvak, any redirect?

6              MR. LITVAK:  No, Your Honor.  Thank you.

7              THE COURT:  Thank you.  Mr. Decker, you are

8    excused.  Thank you.

9              MR. DECKER:  Thank you, sir.

10             THE COURT:  All right.  Any further evidence from

11   the Debtor?

12             MS. DAVIS JONES:  No, Your Honor.

13             THE COURT:  All right.  Then you may --

14             MS. DAVIS JONES:  (indiscernible)

15             THE COURT:  Go ahead with your argument, Ms.

16   Jones.

17             MS. DAVIS JONES:  Thank you, Your Honor.  I

18   appreciate that.  Your Honor, Marriott has the burden to

19   convince this Court that venue should be transferred and

20   respectfully, Your Honor, we believe that Marriott has

21   failed to meet their burden.  This is a single piece of real

22   estate in Washington, D.C., it's not operating, it has not

23   been operating since March of 2020, there's no revenue,

24   there's no employees.  Mr. Miller continues to refer to

25   employees, his papers refer to employees, but they're not

1    our employees, Your Honor.  This property is in Washington,

2    D.C., it's approximately 100 miles from this Court.  Your

3    Honor, this is not the Rehoboth Hospitality Case, which

4    Judge Groves did opine on where that was an operating hotel

5    in Abilene, Texas and it's not also, the other cases that

6    they refer to, including one that's an operating hotel and

7    apartments on the Strip in Miami Beach.  This is very

8    different, Your Honor.  This is a non-operating piece of

9    real estate.  Your Honor, D.C. is not the nerve center of

10   the operating business, as counsel suggests in their papers,

11   Your Honor, there's no nerve center here.  It's been closed

12   and that testimony is undisputed.  The books and records,

13   Your Honor, are in D.C., the principal parties are not in

14   D.C., the principal party advisors, for the most part, are

15   not in D.C.  When Marriott brought litigation about the

16   property, they did so in Maryland State Court, not in D.C.

17   When litigation was brought between the owners, it was done

18   in Delaware Chancery Court, not in D.C.  Your Honor, I've

19   addressed some already, but Marriott raises the issue a lot

20   that D.C. parties are not within the subpoena power of this

21   Court.  I was glad to hear Your Honor confirm my memory of

22   evidence that Your Honor has the power, nationally, to

23   require folks to attend a deposition, and indeed, Your

24   Honor, I was going to say, just as a practical matter, we

25   can all do what we've all done in many cases, if necessary,

1    is go take a deposition.  Frankly, Your Honor, given the

2    facts of this case, I don't even see how that's going to be

3    an issue.

4              Your Honor, one point, and I just have to make

5    this, Mr. Miller did something in his questioning, Your

6    Honor, which I found a little offensive.  And Mr. Litvak's a

7    little nicer than me, so he didn't object.  But, Your Honor,

8    there were insinuations, there were suggestions that --

9    somehow -- about the competency of the D.C. Court or what

10   Mr. Decker was trying to say about the D.C. Court.  Your

11   Honor, I am a member of the D.C. Bar and I do know that that

12   Court is very -- it's an excellent Court, as is this Court.

13   Your Honor, the issue here that Mr. Miller put into evidence

14   or put into his argument, is that this Court is too busy to

15   handle this case.  Your Honor, this Court has shown its

16   ability to handle its calendar and its docket, and indeed,

17   Your Honor, you have accommodated the parties by setting

18   aside two days for all the motion practice that Marriott

19   wanted to bring before the Court.  You may recall that our

20   DIP financing came with a lot of objections.  There was a

21   Motion to Transfer Venue, there was also a Motion with

22   respect to recoupment.  Issues, Your Honor, that would have

23   taken time and Your Honor set aside the time.  So, I think,

24   frankly, Your Honor, both Courts would be able to handle the

25   matter and there's just, as Mr. Decker tried to point out,

1   Your Honor, he didn't see a reason to have to disrupt the

2   process that's already in place.  This is a sale case, it's

3   got buyers that are already interested, sales process is

4   well in place, there's no basis, Your Honor, to destabilize

5   the process or cause any confusion in the market.  This is

6   not a situation where the property is going to be liquidated

7   locally.  This is a full sum, international scope, sale

8   process that is well under way.

9          Your Honor, very importantly also, I would add --

10   and not to be taken lightly, no-one else has sought to

11   change venue here.  Indeed, no other party has even joined

12   in Marriott's request, not the Union, not the taxing

13   authority, not the condo association, no-one from the

14   neighborhood, no-one from D.C.  Your Honor, just Marriott.

15   So, it's international operations who is based in Maryland.

16   Your Honor, their style of being aggressive on many

17   different fronts is admirable, but, Your Honor, I don't

18   think it's something they should be rewarded for.  And this

19   Court -- well, Marriott has shown the ability to go to other

20   jurisdictions as they did in Maryland State Court when they

21   had issues and they've had all over the country.  Your

22   Honor, it doesn't require a transfer of the venue of this

23   bankruptcy case, which deals with maximizing value of one

24   piece of property, for which, frankly, its location is

25   irrelevant.  And Your Honor, we'd ask that the Motion be

1    denied.

2             THE COURT:  Okay.  Thank you, Ms. Jones.  Is there

3    anyone else who wishes to speak in opposition to the Motion?

4             MR. WENDER:  Your Honor, if I may.  This is David

5    Wender with Alston & Bird on behalf of Pacific Life and we

6    filed a Joinder.  The Debtor took the primary lead here and,

7    (indiscernible) simple joinder, but I would like to note two

8    separate facts -- two separate things and then I will be

9    quiet.  One is, in listening to the testimony -- sorry, the

10   argument from Mr. Miller and the presentation, there were

11   two things that really caught my ear, and one was a position

12   that the Single Act of the Real Estate Debtors, if a Motion

13   to Transfer Venue is brought, then it almost -- I think that

14   was obvious that the Motion be granted (indiscernible)

15   given.  But that's not the law and, in fact, when Congress

16   added the Single Act of Real Estate Debtor position in the

17   Code, they could have easily said, "and all such cases have

18   to be brought in the jurisdiction where the

19   (indiscernible)."  And that's not the case.  And so, the

20   argument that transfer (indiscernible) supported by the law.

21             The second point I want to touch on is actually --

22   it was raised in the argument and then also brought up in

23   cross-examination and this relates to potential creditors.

24   Mr. Miller asked Mr. Decker specifically whether he was

25   aware of group reservations at the property and my guess

1    was, that those were potential people who have an interest

2    in this case because they had reservations at the property.

3    Well, Your Honor, group reservations -- it's a group,

4    typically not (indiscernible).  Like, a group reservation,

5    those are national conferences (indiscernible) at a

6    convention-style hotel that we have here at the Wardman

7    property.  And I think that testimony (indiscernible) by Mr.

8    Miller confirms that there are national non-D.C. parties in

9    interest or potential creditors that have been overlooked

10   by, potentially the Debtor, I don't know.  But Marriott is

11   arguing that the only relevant people are in the District

12   and the testimony of Mr. Miller and, I think of Mr. Decker

13   (indiscernible) said that, so I think it's indicative of the

14   fact that there are creditors outside the D.C. area.  That's

15   all, Your Honor.  Thank you.

16            THE COURT:  Thank you, Mr. Wender.  Anyone else

17   wish to speak in opposition?  All right.  Mr. Miller,

18   rebuttal?

19            MR. MILLER:  Yes, Your Honor, thank you.  Just a

20   few points.  Well, actually, first to respond to what Mr.

21   Wender just said, the point about the group hotels, and you

22   heard Mr. Decker testify to it, there were group

23   reservations at the hotel as recently as December, Your

24   Honor.  So, the statement that this has been -- there's been

25   no activity at this hotel since March of 2020 is simply

1    incorrect, Your Honor.  The point about -- that Ms. Jones

2    raised about the D.C. Bankruptcy Court and I was actually

3    glad to hear it, is that the point we were making is that

4    the D.C. Court is more than capable of handling an asset

5    sale case, whether it be through a 363 process or through a

6    Plan.  And then, with respect to the argument about single

7    asset real estate debtors, Your Honor, we cited numerous

8    cases in our papers about the fact that in transfer cases

9    with single asset real estate cases -- single asset real

10   estate properties, those are almost always transferred to

11   the location of the jurisdiction.  Your Honor, this case

12   should have been filed in D.C. to begin with, that's where

13   the property is located, that's where the Creditors on the

14   Debtors' Top 20 list are located.  The value and the sale of

15   the property is the primary issue in this case and it's a

16   D.C. real estate issue.  The reason why they (indiscernible)

17   was because of their deep knowledge of the D.C. market. Your

18   Honor, you heard Mr. Decker testify.  The testimony actually

19   supported transfer.  He testified -- and I wrote it down as

20   he said it because I was surprised to hear him talk about it

21   -- that -- and it emphasizes the local, the interest of the

22   local community in this case.  He said that the property is

23   located in the finest neighborhood in D.C.  It's the Tiffany

24   of real estate properties, Your Honor.  There's obviously

25   going to be a strong community interest in who ends up with

1   the hotel and what happens with the hotel, Your Honor.  That

2   supports transfer, it doesn't work against transfer.  Your

3   Honor, the hotel is listed on the National Register of

4   Historic Places.  Obviously, it's very important to D.C.

5   And one other point, Your Honor, and this goes back to the

6   colloquy that we had and I thought I answered it this way,

7   but my co-counsel suggested I may not have, is that with

8   respect to taking a deposition, a trial deposition, Your

9   Honor, even if you can compel them to appear for a trial

10  deposition, that's not the same as having them actually

11  testify in Court, whether it be via Zoom or in person.  The

12  cases talk about being within the 100 mile of the Court's

13  subpoena power and if it was simply the case that having the

14  ability to take the trial deposition was sufficient, Your

15  Honor, that wouldn't be this important factor we've talked

16  about in all of the different cases.

17              THE COURT:  Well, let me ask you, Mr. Miller, Mr.

18  Decker testified that he's unaware of any potential

19  witnesses that would be outside the subpoena power of the

20  Court.  Are you aware of any that -- I mean, it's your

21  burden, but who are the witnesses who I'm going to have to -

22  - who are going to have to be subpoenaed to appear and

23  testify at trial?

24              MR. MILLER:  Yes, Your Honor.  We are and I talked

25  about this during my opening argument.  The Debtor, in their

1    papers, talked numerous times about claims and counterclaims

2    that they have against Marriott.  Those claims and

3    counterclaims are going to involve witnesses, whether the

4    Debtor is right that the Union is not a Creditor of the

5    Debtor or not, those people who previously worked at the

6    location of the hotel are going to be likely witnesses.  So,

7    managers of the building, former employees that worked at

8    the hotel, those are the fact witnesses that would be called

9    in that kind of litigation, Your Honor.  So, we do believe

10   that --

11            THE COURT:  What type of litigation would that be?

12   Are you talking about that the Union has claims against the

13   Debtors as opposed to against Marriott?

14            MR. MILLER:  Well, Your Honor, we do think that

15   they likely do have claims against the Debtor.  I don't

16   think you heard counsel for the Debtor say that they don't

17   believe that they would have an ability to assert claims

18   against them under ERISA, under the Collective Bargaining

19   Agreement or under the NLRB.  So, I think that type of

20   liability does likely attach to the Debtor.  So, those would

21   be, individuals who would be outside of the Court's subpoena

22   power.  But I think really what I'm talking about are former

23   people that worked at the hotel.  That worked there until it

24   was permanently closed and then they had to be terminated,

25   Your Honor.  There are significant issues related to the

1    disputes between the Debtor and Marriott and if those were

2    to actually be litigated before Your Honor, there would be

3    witnesses and they would have to be subpoenaed to appear for

4    a trial.

5                THE COURT:  Okay.

6                MS. DAVIS JONES:  Your Honor -- let me make one

7    point just to --

8                THE COURT:  Hold on, let me -- let Mr. Miller

9    finish his --

10               MS. DAVIS JONES:  I'm sorry, Your Honor.  I

11   thought he was.

12               MR. MILLER:  One moment, Your Honor.  I think I

13   did cover everything.  Your Honor, I didn't have anything

14   else unless you had further questions.

15               THE COURT:  Okay.  Thank you.  Ms. Jones, very

16   briefly.

17               MS. DAVIS JONES:  Your Honor, I just wanted to

18   clarify one point.  On the last point that we were talking

19   about the subpoenas, Your Honor, Mr. Miller is really

20   reaching.  Your Honor, the employees are employees of the

21   Union.  The Union may have a claim against this Debtor, but

22   for -- he talked about claims under the CBA or other issues

23   that the employees may have with respect to the Union.  Your

24   Honor, those cannot be claims of this Debtor.  I think, to

25   suggest that there's hundreds -- I think I read in their

1    papers, hundreds of employees that are going to be affected

2    by this, that have to be in touch with the Debtor.  Your

3    Honor, we do not have a direct connection with them.

4            THE COURT:  All right.  Thank you.

5            MR. MILLER:  Your Honor, I --

6            THE COURT:  Go ahead, Mr. Miller.

7            MR. MILLER:  I think that's a misunderstanding of

8    the statement of the point I was making.  The Debtor

9    alleges, Your Honor -- and they said this numerous times in

10   their papers, that Marriott breached its obligations to the

11   Debtor under the HMA.  That document is governed by D.C. law

12   and the witnesses who observed Marriott's performance under

13   the HMA are in D.C., Your Honor.  So, those fact witnesses

14   related to that issue are going to be in either the D.C. or

15   in the D.C. metropolitan area, that's where they previously

16   were, unless they've moved away since that time is where

17   they're going to be located in connection with that

18   litigation.

19           THE COURT:  All right.  Thank you, Mr. Miller.

20   All right.  I want to take a little bit of time to put my

21   thoughts together and rather than just issue a ruling right

22   now, off the cuff.  So, we have tomorrow afternoon set aside

23   as a carryover because we thought this hearing might take

24   longer, so we'll come back, we'll reconvene at 1 o'clock

25   tomorrow and I'll give you my ruling on the Motion at that

Page 66

1    time.

2              MS. DAVIS JONES:  Thank you, Your Honor.

3              THE COURT:  All right.  Anything else for today

4    before we adjourn?

5              MS. DAVIS JONES:  No, Your Honor.  That's all we

6    had on the agenda.

7              THE COURT:  Okay.  Thank you.  And we're

8    adjourned.  I'll see everyone tomorrow afternoon.

9              MS. DAVIS JONES:  Thank you, Your Honor.

10             MR. MILLER:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MR. WENDER:  Thanks, Your Honor.

13             (Whereupon these proceedings were concluded at

14   11:31 AM)

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 9, 2021

| & |
| --- |
| **&**  3:3,9,14 28:4 |
| 32:9,14 59:5 |

| 1 |
| --- |
| **1**  6:17 13:22 14:11 |
| 28:17,18 65:24 |
| **1-4**  14:14 |
| **10**  7:2 |
| **100**  19:7 21:2 56:2 |
| 62:12 |
| **10:01**  1:14 |
| **11**  1:5 6:24 7:15 |
| 17:4 33:15 |
| **11501**  67:23 |
| **11:31**  1:14 66:14 |
| **11th**  39:20 43:6 |
| **12**  52:11 |
| **13**  17:13 39:4 |
| **14**  11:12 28:9 |
| **15**  33:25 |
| **16**  30:12 |
| **17**  29:25 |
| **18**  30:6 |
| **1918**  15:4 |
| **1st**  31:8 |

| 2 |
| --- |
| **2**  13:24 30:20,21 |
| **20**  13:22 17:8 34:1 |
| 61:14 |
| **2004**  21:19 |
| **2019**  24:2 |
| **2020**  24:3 31:8 |
| 39:17 53:21 55:23 |
| 60:25 |
| **2021**  1:13 67:25 |
| **21-10023**  1:6 6:6 |
| **215**  51:20,21 |
| **216**  52:5 |
| **24**  52:5 |
| **250**  46:18 |
| **27**  9:16 |

| 3 |
| --- |
| **3,116**  24:3 |
| **30**  11:12 17:13 |
| 31:13 |
| **300**  67:22 |
| **330**  67:21 |
| **363**  31:24 33:17 |
| 49:25 50:4,7,8 |
| 61:5 |

| 4 |
| --- |
| **4**  14:11 |
| **4,000**  12:5 |
| **45**  20:25 |
| **45,000**  12:5 |

| 5 |
| --- |
| **5**  2:1 29:25 30:6 |
| 52:5 |
| **5,804**  24:3 |
| **50**  47:17 |
| **59**  2:18 |

| 6 |
| --- |
| **6**  2:9 52:11 |
| **618**  24:4 |
| **62**  2:13 |
| **638**  24:5 |

| 7 |
| --- |
| **7**  6:18 |

| 8 |
| --- |
| **8**  6:19 |
| **81**  29:19 |
| **824**  1:11 |

| 9 |
| --- |
| **9**  1:13 6:23 67:25 |

| a |
| --- |
| **a.m.**  1:14,14 |
| **abhor**  37:10 |
| **abilene**  56:5 |
| **ability**  20:9 27:17 |
| 57:16 58:19 62:14 |
| 63:17 |

**able**  9:18,20 12:20
13:5,8 20:15 21:7
37:12 49:18 50:4
50:14 57:24
**absolutely**  46:21
**accept**  10:17
24:14
**accommodate**
24:6
**accommodated**
57:17
**accord**  43:1
**account**  44:2
**accounts**  44:1,3,5
**accurate**  39:14
67:4
**accurately**  52:21
52:22
**acres**  39:4
**act**  59:12,16
**action**  23:6,8
36:20
**activity**  31:14
60:25
**acts**  35:21
**actual**  11:13
**add**  58:9
**added**  59:16
**addition**  28:19,22
**additional**  9:14
**addressed**  56:19
**adequate**  2:5
**adjacent**  23:22
**adjourn**  6:25 7:19
66:4
**adjourned**  66:8
**adjourning**  7:1
**administered**
16:19 26:10
**administration**
26:2
**administrative**
2:4

**administrator**
13:4
**admirable**  58:17
**admit**  28:6 34:1
49:6
**admitted**  14:13,14
16:1 21:25 22:3
28:10,13,16,23
30:20
**advise**  7:18
**advisors**  56:14
**affairs**  23:9
**affect**  9:6
**affiliate**  34:20
**affirm**  27:15
**affirmative**  49:11
**afternoon**  65:22
66:8
**agenda**  6:7,11,16
6:17,24 66:6
**aggressive**  58:16
**ago**  47:10
**agree**  21:10 30:4
30:11 38:11,12
**agreed**  6:25 7:1
7:19 9:17
**agreeing**  11:22
**agreement**  2:10
9:8 13:15,25 16:1
17:19 28:9 39:22
63:19
**ahead**  6:6 7:11
11:1 13:7 21:15
29:22 30:24 55:15
65:6
**air**  32:7 40:2
**airline**  32:8
**alaska's**  32:8
**albeit**  6:20
**alex**  5:8
**alleges**  65:9
**alston**  3:14 11:3
59:5

alternate 7:17
alternative 2:15
alternatives 15:24
amended 6:11,17
  28:8
amendment 6:13
america 37:25
american 33:23
  33:24 49:1,2
amount 45:25
analysis 22:16
  23:14
ancillary 26:2,9
announcement
  53:19
answer 44:10,11
  45:12 52:20 54:21
answered 62:6
answering 49:16
anticipate 9:22
antonio 41:1
  43:18
anybody 7:6 35:4
  38:19
apartments 56:7
apologies 10:19
apologize 8:7
  41:17 50:17
appear 20:8,15,24
  21:7,12 24:12
  62:9,22 64:3
appears 25:21
apply 11:11
appointed 34:25
  43:2
appreciate 14:8
  55:18
appropriateness
  24:17
approved 47:7,12
approximately
  8:8 39:4 47:14
  56:2

april 25:19
area 15:19,22
  17:8 20:5 22:23
  41:13 45:15 51:8
  60:14 65:15
areas 38:4
arguing 60:11
argument 13:14
  19:6 22:10 24:10
  24:14 27:2,8
  55:15 57:14 59:10
  59:20,22 61:6
  62:25
arrived 53:17
  54:4
arsht 3:9
article 31:19
articulated 49:12
ascribed 54:6
asia 37:25
asian 46:25
aside 37:21 57:18
  57:23 65:22
asked 48:15 52:11
  52:11 59:24
asking 9:20
assert 63:17
asset 15:15 16:4
  16:10,16,17 17:16
  18:10,14 24:17
  26:4,17 33:4,7
  39:2,3 49:13,25
  50:4,24 61:4,7,9,9
assets 16:13 17:5
  22:2 37:2
assist 40:6
assisting 41:6
associates 16:9
  21:18
association 23:19
  26:13 58:13
assume 43:24
  54:15,17

atlanta 34:6 40:11
  40:24 42:21 43:8
  43:13,17 44:6
attach 63:20
attached 14:1
attempt 22:12
attend 56:23
attention 6:12
attorneys 3:4,10
  3:15
attributes 46:24
audible 28:12
authority 2:14
  58:13
authorizing 2:2
automatic 2:6,15
  7:17
available 23:8
  24:15
aware 11:9 34:9
  38:15,17 44:7,11
  59:25 62:20

**b**

b 1:21 3:7
back 7:22 9:24
  22:19 29:6 43:2
  62:5 65:24
background 31:9
bad 11:10
balance 17:5
  41:25
bank 43:25 44:2
banker 37:10 38:2
banking 31:11,14
bankruptcy 1:1
  1:10,23 2:19
  13:21 16:4,12
  19:1 21:6 22:10
  22:15 23:4 26:21
  32:5,16 33:3,6,17
  33:22,24,24 34:3
  36:16 44:8 47:21
  47:23 48:16,20,23

48:24 49:2,7,9,10
  49:18,19,24 50:6
  50:14,23 58:23
  61:2
bar 57:11
bargaining 63:18
barr 24:24
barry 15:8
based 18:4 19:18
  26:19 33:16 34:23
  40:11,20,22,23
  41:12 58:15
basically 40:13
basis 35:18 58:4
beach 34:24 56:7
bear 31:13
becky 5:12
beg 48:3
began 31:13
behalf 6:10 7:10
  28:4 59:5
believe 13:15
  19:11,13 20:19,21
  33:21 35:14 40:25
  42:13 43:7 44:9
  44:21 45:11,24
  47:3 50:3 52:14
  52:22 55:1,20
  63:9,17
believes 26:20
benjamin 4:10
bertenthal 4:3
best 9:1 16:8 24:6
  27:17 46:7,8
bethesda 44:21
better 16:18 26:10
  32:23,24
beyond 19:8
bhavana 4:4
billion 17:12
binder 10:10
  13:17 29:5,9,10

**binders** 10:17,18
**bird** 3:14 11:3
  59:5
**bit** 25:7,13 32:11
  32:19 35:17 65:20
**blow** 51:21
**bob** 15:9
**boggs** 4:4
**boilers** 42:1
**book** 12:13 28:7
**books** 15:21 41:5
  43:10,11,12,19,23
  56:12
**bother** 12:11
**breach** 44:18
**breached** 65:10
**brief** 31:9 47:8
**briefing** 10:7
**briefly** 7:10 48:10
  64:16
**bring** 9:2,2,14
  13:8 29:17 57:19
**broke** 32:10
**broker** 38:2 51:3
  52:13
**brokers** 47:4
**brought** 56:15,17
  59:13,18,22
**bryan** 4:19
**build** 37:6,7,7
**building** 43:3,4
  63:7
**burden** 27:5
  55:18,21 62:21
**business** 15:17
  21:21 22:1,5
  56:10
**busy** 24:1 57:14
**buyer** 46:13,17,17
  48:2
**buyers** 37:13 38:6
  46:3,5,25,25
  47:22 58:3

**c**

**c** 3:1 6:1 27:14
  67:1,1
**cairns** 4:5
**calendar** 8:16
  57:16
**california** 31:25
  34:24 43:22
**call** 27:6,9 28:17
**called** 40:11 63:8
**capable** 61:4
**capacities** 43:21
**capital** 15:13
  31:19
**care** 42:1
**career** 31:15
**carryover** 65:23
**case** 1:6 6:6 8:3
  14:1,17 15:24
  16:9,11,14,16,18
  16:22 17:6,9,10
  17:11,16 18:9,10
  18:12,17,25 19:11
  19:17 21:17,18,20
  22:8,12,18,19
  24:24 25:4 26:7,7
  26:20 35:23 38:10
  42:15 44:8,12
  45:17 49:5,10,14
  49:19 51:4 52:6
  54:1 55:1 56:3
  57:2,15 58:2,23
  59:19 60:2 61:5
  61:11,15,22 62:13
**caseload** 14:4
  24:7
**cases** 16:4,5,7
  17:4 18:15 21:9
  24:3,3,4,5,22
  25:22,24 26:17
  32:6 33:11 36:24
  56:5,25 59:17
  61:8,8,9 62:12,16

**casey** 4:6
**caught** 59:11
**cause** 35:21 58:5
**cavello** 7:18
**cba** 64:22
**center** 21:21 56:9
  56:11
**century** 15:6
**ceo** 40:23
**certain** 37:12 45:8
  46:5
**certainly** 25:9
  32:21 51:17 54:3
**certification** 6:20
  6:22
**certifications** 6:15
**certified** 31:23
  67:3
**challenge** 9:13
**chambers** 7:23
  8:12,17 10:3,14
  13:17
**champion** 33:15
**chancery** 36:5,21
  56:18
**change** 7:3 16:25
  17:15 48:1 58:11
**changes** 23:14
**chapter** 1:5 17:4
  33:15
**charged** 40:4
**choice** 17:25 18:8
  18:11 30:2
**chose** 38:4 49:22
**chris** 40:25
**circulation** 47:8
**circumstance**
  54:6
**circumstances**
  35:13
**cited** 16:7 22:17
  24:22 61:7

**city** 46:24
**claim** 64:21
**claimant** 42:15
**claiming** 17:2
**claims** 2:4 9:6,14
  19:19,20 42:12
  63:1,2,12,15,17
  64:22,24
**clarify** 50:19
  64:18
**clear** 11:11 17:2
  34:9
**clearly** 47:24
**clerk** 13:9
**clerks** 29:16
**close** 18:24 19:2
  19:24 53:16,18
  54:7,10,14,20,22
**closed** 20:17
  23:14 39:6,7,13
  39:16 53:18,24
  54:3,16,20,22
  56:11 63:24
**coc** 7:4
**code** 11:7 59:17
**colin** 4:7
**collective** 63:18
**college** 33:23,24
  48:24 49:1,2
**colloquy** 62:6
**columbia** 2:20
  44:23 48:23 49:7
**come** 8:10 14:8
  38:7 45:21 52:13
  65:24
**comfort** 37:13
**comfortable**
  33:20
**commence** 28:6
  30:23
**commenced** 31:13
**comment** 7:12,14
  9:25

comments 7:13
committee 38:20
common 26:17
community 14:24
  15:1 26:8,15,16
  61:22,25
companies 31:18
  31:20 36:20 46:11
company 3:15
  34:10 40:11
company's 27:6
compel 10:6 62:9
compelling 24:2
competency 57:9
competently
  22:11
compiled 14:3
complaint 18:7
completely 53:2
completeness
  52:25
complex 17:4,5
comport 53:2,10
comprised 39:4
concern 16:17
concluded 66:13
concludes 48:7
conditioning 40:3
condo 23:19 26:13
  58:13
conduct 11:23
conference 10:4
conferences 60:5
confirm 11:6,22
  14:7 56:21
confirms 60:8
confusion 58:5
congested 24:1
congestion 23:23
congress 59:15
conjunction 40:13
connection 23:20
  29:11 65:3,17

considerable 46:1
contact 40:20
  41:10
contemporaneous
  11:13
contest 14:22
contested 30:13
context 16:15
  53:8
continuation 11:5
continue 12:7,10
  45:2
continued 15:10
continues 55:24
continuing 46:6
contract 6:23
  44:19
contrary 16:21
  19:5 21:24
contrast 22:21
controversy 14:18
  14:23 18:18
convenience 18:4
  22:7 35:22
convention 60:6
convert 22:12
convince 55:19
cooperation 9:22
coordinate 8:10
copy 29:2
coronavirus
  25:23
corporation 43:23
  45:12
correct 11:17 47:4
  47:5
counsel 6:7,15,20
  6:22 9:20 13:15
  16:24 50:19 56:10
  62:7 63:16
counter 19:19
counterclaims
  63:1,3

country 58:21
  67:21
couple 29:1 41:24
course 22:21
  43:22
court 1:1,10 2:19
  6:2,5,18 7:4,11,19
  8:2,13,23 10:1,10
  10:13,21 11:1,10
  11:14,18,21,25
  12:11,14,22 13:7
  13:12 14:10,13
  16:11,17,19 17:3
  19:1,8,10 20:3,7,8
  20:19,21,21,23
  21:5,6,12,15,21
  22:10,18 23:7
  24:4,11 25:3,3,12
  25:18,20 26:10,21
  26:24 27:7,10,15
  27:19,24 28:2,11
  28:13,16,24 29:4
  29:8,12,14,20,22
  30:4,11,14,16,19
  30:24 31:9,18,23
  32:5,10,15,18,22
  32:24 33:3,7,9,22
  34:3 35:25 36:3,5
  36:21,23 37:16,18
  38:23 44:16 48:9
  48:16,21,23 49:4
  49:7,9,9,18,24,24
  50:6,14,20,24
  51:1 53:6 55:4,7
  55:10,13,15,19
  56:2,16,18,21
  57:9,10,12,12,12
  57:14,15,19 58:19
  58:20 59:2 60:16
  61:2,4 62:11,17
  62:20 63:11 64:5
  64:8,15 65:4,6,19
  66:3,7,11

court's 11:23 19:8
  24:16 62:12 63:21
courthouse 21:3
courts 14:3 16:4,9
  23:24 24:20 25:1
  36:22 47:23 49:13
  57:24
cover 45:16 64:13
covid 10:15,16
  12:17 24:10
creativity 52:16
creditor 13:22
  45:7 63:4
creditors 14:19
  15:18 17:4,7,13
  38:20 45:8,9,11
  45:13 46:2 59:23
  60:9,14 61:13
crews 16:24
cross 48:9,11
  59:23
crow 19:12,13,25
cuff 65:22
current 44:25
  45:5
currently 25:6
  39:6
curtis 3:12 7:9
  35:16

| d |
| --- |

d 3:20 6:1 27:14
  27:14
d.c. 14:6,18,19,20
  14:24 15:1,14,17
  15:18,19,21,21,22
  15:25 16:2 17:8,8
  17:17,19 18:18,20
  18:23 19:1,2,13
  20:2 22:1,5,10,23
  23:2,25 24:4 25:3
  26:21 33:22 34:2
  35:24 37:16,18
  38:11,16 39:5

40:20 44:8,25
45:5,8 48:16,20
49:4,9,17,24
50:13,23 51:1,8
51:10,11,15 52:16
55:22 56:2,9,13
56:14,15,16,18,20
57:9,10,11 58:14
60:8,14 61:2,4,12
61:16,17,23 62:4
65:11,13,14,15
**d.c.'s** 15:15
**dangers** 24:21
25:23,23
**date** 2:11 7:23 8:7
8:11,15,15,18,20
53:19 67:25
**dates** 11:11
**david** 3:17 4:3,16
11:2 52:24 59:4
**davidson** 4:7
**davis** 3:6 4:8 6:4,8
6:9 8:6,21 12:24
14:9 26:25 27:21
55:12,14,17 64:6
64:10,17 66:2,5,9
**day** 8:19 11:12
13:23 15:2,10
22:9 41:20 43:2
**days** 15:4 57:18
**deadlines** 11:7,20
**dealing** 31:17
**deals** 58:23
**debtor** 2:1,2 9:4
13:25 14:20,22
16:21 17:7,15
18:18 19:23 20:16
21:17 22:22,25
23:3,12 24:7,9,25
26:14 28:4,9 31:5
31:20 34:8,11,18
35:1,4,6,8 36:7,11
36:15,19 39:21,22

41:4 42:3,5,16,20
43:10,11,12,20,21
43:25 44:2,12,22
44:25 45:2,8
53:15 54:10 55:11
59:6,16 60:10
62:25 63:4,5,15
63:16,20 64:1,21
64:24 65:2,8,11
**debtor's** 6:7 9:20
13:14,21 14:25
26:3 28:17,18,21
30:1,20,21 39:2,3
45:10
**debtors** 1:7 3:4
9:23 14:7 15:24
17:9,25 18:7 19:5
19:18,21 21:20,25
22:4,12,13 24:14
27:1 42:14 59:12
61:7,14 63:13
**debtor's** 2:9
**december** 54:24
60:23
**decide** 37:9,9
**decision** 19:23
35:6 36:15,18
53:15,18 54:7,9
54:14,16,19,22
**decisions** 42:20
**decker** 3:20 15:2
15:10 27:6,9,10
27:11,14,14,23
28:20 30:23 31:3
31:5,9 32:4,11
34:4 35:21 36:5
38:9 39:1 43:25
45:4,7,15 48:6,13
50:23 51:24 52:2
53:15 55:7,9
57:10,25 59:24
60:12,22 61:18
62:18

**decker's** 13:23
28:22 51:20 53:1
**declaration** 13:23
15:2,10 28:20,23
29:8,17 30:20
**deep** 51:7 61:17
**deepest** 51:15
52:16
**defer** 8:4
**deference** 30:2
**degree** 51:9
**delaware** 1:2,12
14:6 18:2 19:6,14
22:2,19 23:6 24:3
32:5,6,16 33:3,6
33:15,17,20 35:24
36:5,11,13,16,20
36:21 37:13,15
38:4 47:21,23
49:13,22 56:18
**deliveries** 10:14
**demonstrative**
13:3
**denied** 59:1
**depose** 20:9
**deposed** 52:6
**deposition** 20:11
20:15,24 21:1
51:20 52:10 53:7
53:8 56:23 57:1
62:8,8,10,14
**depositions** 21:11
**derive** 46:9
**describe** 39:1,3
**desk** 29:5
**destabilize** 58:4
**develop** 24:18
**development** 37:8
**devki** 5:9
**diamond** 24:24
**different** 8:20
14:5 17:13,21
32:2,3 46:14 56:8

58:17 62:16
**difficult** 32:20
**difficulty** 20:4
**dignitaries** 15:9
**diminished** 18:11
**dip** 6:19 7:5,14
8:25 9:3,5,10 14:2
23:20 35:20 57:20
**direct** 30:23 31:1
48:7 65:3
**directly** 12:6
18:11
**disagree** 23:14
**discovers** 9:13
**discovery** 10:2
12:2
**discussed** 9:19
15:24 21:21
**disparate** 38:3
**dispute** 17:18
**disputes** 64:1
**disregard** 18:8
**disrupt** 58:1
**dissolution** 23:6
**distance** 19:12
**distressed** 31:18
31:20
**distributed** 47:13
**distribution** 32:9
32:14
**district** 1:2 2:19
11:10 14:6 16:19
21:19 24:7 25:17
25:20 26:10 44:23
48:22 49:7 60:11
**districts** 14:5
**disturbance** 9:8
**doc** 2:1,9,13,18
**docket** 7:15 13:22
13:24 23:24 29:18
57:16
**document** 13:23
13:24 14:3,3

28:10 65:11
**documents** 9:20
  12:7 13:16,19
  14:8
**doing** 25:7 31:22
  34:8 48:3
**dole** 15:9
**dollar** 38:7
**dollars** 17:12
**domenic** 4:22
**domestic** 46:25
**dorsey** 1:22 6:3
  49:4,17,21
**draft** 47:12
**driscoll** 4:9
**drive** 48:5
**due** 20:16 24:21
**dwight** 15:7

### e

**e** 1:21,21 3:1,1 6:1
  6:1 27:14,14 67:1
**ear** 59:11
**earlier** 46:14 47:3
**early** 22:8
**ears** 46:18
**easily** 59:17
**east** 37:24
**eastern** 21:19
  46:25
**ecro** 1:25
**effective** 2:10
  21:11
**effectively** 43:7
**efficiently** 49:25
  50:4,14,24
**eisenhower** 15:7
**either** 7:13 8:17
  20:9 65:14
**electronic** 10:18
  10:18 13:19
**element** 51:17
**elevators** 40:19

**email** 13:19
**embarrassed** 34:1
  47:16 49:6
**embassy** 37:7
  46:16
**emphasized** 17:24
  21:9
**emphasizes** 61:21
**employed** 43:1
**employee** 20:11
  23:17
**employees** 15:20
  19:22,22 20:18
  22:2 42:3,5,8,10
  42:17 55:24,25,25
  56:1 63:7 64:20
  64:20,23 65:1
**ends** 61:25
**engaging** 40:17
**engineers** 16:25
  40:17 41:25
**enter** 7:7
**entered** 25:17
**entirely** 17:9
**entitled** 30:2
**entry** 2:1,9
**equipped** 49:5,10
  49:14
**equity** 34:18
  36:20
**era** 10:15
**erase** 23:3
**eric** 4:18 13:11
**erisa** 63:18
**es** 3:19
**especially** 16:17
**essential** 17:15
**essentially** 16:15
  30:8
**establish** 44:3,5
**established** 37:14
  44:4

**estate** 14:23 15:25
  16:4,10,16 17:18
  18:10,14 21:22
  24:18 26:17 37:20
  55:22 56:9 59:12
  59:16 61:7,9,10
  61:16,24
**estill** 38:1,3 41:6
  51:5,6,10,14
  52:13,14,15
**eternal** 25:19
**europe** 37:24
**european** 46:25
**event** 16:18
**everybody** 27:11
**everyone's** 10:2
**evidence** 13:16
  14:14 16:2 22:3
  27:3 28:6,10,18
  28:23 30:21 55:10
  56:22 57:13
**evidentiary** 7:21
**exact** 38:20 47:17
**exactly** 43:15
**examination**
  27:23 30:23 31:1
  48:11 59:23
**example** 40:17
**excellent** 57:12
**excess** 47:17
**excuse** 39:23
  41:16
**excused** 55:8
**executed** 47:13,15
**exercise** 2:14,15
  7:16
**exhibit** 28:5,7,17
  28:18 30:20,21
**exhibits** 14:11,14
**existed** 9:5 48:21
**existence** 26:12
**exit** 31:21

**expect** 9:19 38:10
  41:20 46:3,5
  47:21
**expense** 2:4
**experience** 31:10
  31:11 32:5 33:6
  33:10 37:10,13,18
  37:19 48:16 51:7
  51:7,9
**experiences** 51:10
**explaining** 48:2
**express** 46:6
**expressly** 9:9
**extend** 8:16 11:19
  11:22
**extended** 11:8,12
  11:24

### f

**f** 1:21 67:1
**fabulous** 13:1
**facility** 31:21
**fact** 17:1 18:10
  23:3,5,13 30:1
  36:23 37:14 38:17
  40:6 45:5,6 50:5,7
  59:15 60:14 61:8
  63:8 65:13
**factor** 62:15
**factors** 17:22
  26:19
**facts** 17:15 18:12
  24:11 27:2,4 57:2
  59:8
**factual** 30:1,8
**failed** 22:13 55:21
**familiar** 12:3 33:2
  36:23
**family** 37:7
**fantastic** 46:23,23
**far** 8:15 11:19
  46:7
**fargo** 44:2

fashion 37:12
favor 23:24 35:23
favorable 21:17
february 1:13
  67:25
federal 21:5
fellow 33:24 49:2
  49:3
felt 42:16 49:12
file 36:15
filed 17:11 21:23
  23:5 36:9 44:15
  45:8 59:6 61:12
files 19:12,13
filing 10:5
final 2:2,6 47:12
financial 23:18
  31:15,22 37:17
  46:9,10
financing 2:3 6:19
  7:5 9:5 14:2 23:20
  31:21,21 57:20
find 8:16 46:1,17
  51:22
findings 30:8
fine 8:21 11:25
  38:24
finest 39:5,5
  61:23
finish 64:9
finished 45:4
firm 10:12 13:2
  41:4,14,17 46:9
  46:10 51:12
firms 52:15
first 4:20 7:15
  13:21,23 15:2,10
  17:25 18:1 29:25
  32:7 33:12 36:19
  42:25 47:8 60:20
five 40:4 41:22,23
flies 19:25

flippant 37:16
florida 32:1
flu 15:6
focused 31:14
  51:12
folks 56:23
follow 13:18
  38:14
food 32:9,14
force 20:15
foregoing 67:3
form 9:1 13:19
  25:22
former 15:7,8,20
  19:22 20:11 23:16
  36:6 63:7,22
forth 9:9
forum 18:6,8,11
  30:3
forward 6:16
found 57:6
four 13:15,19
  14:7,19 17:7 40:4
  41:22,23
fourth 14:2
frankly 57:1,24
  58:24
fraud 35:15
frequently 42:24
friday 47:11
friendly 24:16
front 8:7 12:6,18
fronts 58:17
full 10:7 27:12
  58:7
further 12:12
  25:25 55:3,10
  64:14
furthered 31:15
furthest 32:1

## g

g 6:1
generally 44:17
generate 39:10
geoffrey 5:11
georgia 34:6
  40:11 42:21
getting 9:22 10:5
gilbert 4:10
give 13:4,7 16:8
  27:16 31:9 33:9
  65:25
given 57:1 59:15
glad 56:21 61:3
go 6:6,16 7:11
  11:1 13:7,12,16
  14:16 15:13 17:21
  21:15,16 22:20
  24:18 29:5,22
  30:24 33:18 37:3
  43:3,3 47:7 50:9
  55:15 57:1 58:19
  65:6
goal 45:16,18,19
goes 19:12 62:5
going 7:24 8:14
  17:21 19:21 20:3
  23:11 24:20 25:3
  25:13 30:7 34:7
  37:12 46:1,19,19
  47:25 52:10 56:24
  57:2 58:6 61:25
  62:21,22 63:3,6
  65:1,14,17
goldwater 15:8
good 6:2,8,12
  27:25 31:3,4
gotten 45:25
governance 34:8
governed 15:25
  16:2 17:19 65:11
grab 29:5

graduating 31:12
grand 51:9
grant 5:6
granted 59:14
granting 2:3,5,7
great 13:13 14:12
  42:11 48:15 52:6
greatest 38:5
gross 16:14 18:2
  26:6 35:14
group 31:17 32:7
  59:25 60:3,3,4,21
  60:22
groups 54:24
groves 56:4
guards 41:24
guess 10:4 23:11
  25:9,15,16,22
  38:12 59:25
guggenheim
  31:16

## h

halperin 4:11
hand 10:14 27:12
handful 16:24
handle 17:3 23:1
  27:22 40:16 49:5
  49:10,14,18,25
  50:4,7,14,24
  57:15,16,24
handled 25:24
handling 61:4
haney 4:12
happen 8:6
happened 53:22
happening 39:25
  42:19
happens 62:1
happy 31:12
harrison 4:13
headquarters
  19:3 43:17 44:21

**hear** 6:2 8:19 28:1
32:20 48:13 52:2
56:21 61:3,20
**heard** 7:7,8,10
27:2 38:19 46:15
60:22 61:18 63:16
**hearing** 2:1,7,9,13
2:18 7:6,18,22,23
7:25 8:2,9 11:13
11:21,23 22:9,9
25:4 65:23
**hearings** 11:8,12
24:21 25:5,18
**hearsay** 38:22
**heavily** 24:10
**heavy** 22:13
**held** 24:22
**help** 40:13
**helpful** 17:23
29:19
**helps** 41:5,5
**herbert** 15:7
**highest** 46:8
**hire** 40:6,9
**hired** 22:14 23:1
38:1,2 40:12
53:23
**hiring** 16:23 23:4
40:16
**historic** 14:18
15:12,15 62:4
**history** 15:4
**hma** 6:23 7:5 16:1
65:11,13
**hold** 11:21 29:4
64:8
**holder** 34:18
**holding** 11:8 17:9
24:21
**home** 15:7 37:7
**hon** 1:22
**honor** 6:8,10,14
6:17,19,21,24 7:2

7:9,17,22 8:8,12
8:21,24,25 9:3,12
9:17,23,24,25
10:9,12,19 11:2
11:17 12:1,2,13
12:16,19,24 13:1
13:14 14:6,9,15
14:16,17 15:3,14
16:2 17:2,22 18:1
18:13,17,22 19:3
19:15 20:6 21:4,9
21:14,18,24 22:2
22:7,17,19,21,24
23:5,7,11,14,19
23:22,25 24:5,5,9
24:13,19 25:9,20
26:1,19,21,25
27:1,4,6,9,21,25
28:3,5,15,19,25
29:2,10,18,24
30:3,5,8,15,22,25
35:16,24 36:2
38:21 48:7,10
50:17 52:23,24
53:4,11 55:2,2,6
55:12,17,18,20
56:1,3,8,9,11,13
56:18,21,22,24
57:1,4,6,7,11,13
57:15,17,22,23,24
58:1,4,9,14,16,17
58:22,25 59:4
60:3,15,19,24
61:1,7,11,18,24
62:1,3,5,9,15,24
63:9,14,25 64:2,6
64:10,12,13,17,19
64:20,24 65:3,5,9
65:13 66:2,5,9,10
66:12
**honor's** 6:12
19:25 20:14

**hoover** 15:7
**hope** 12:11 25:9
25:10
**hopefully** 6:11
13:5 38:7
**hospitality** 16:14
18:9 26:7 56:3
**host** 19:16
**hotel** 1:6 2:10,13
2:18 3:10 6:5,10
13:24 15:3,6,11
15:23 17:18 18:10
18:21 19:6,22,24
20:17 22:1 23:2
23:13 26:6 37:6
39:8 42:8 46:6,6
51:15 52:17 53:16
53:24 54:3,8,10
54:11,15,15,20,21
54:23,25 56:4,6
60:6,23,25 62:1,1
62:3 63:6,8,23
**hotel's** 15:16,19
15:21 19:7 23:16
**hotelave** 40:12
41:3,5,10,18
43:19
**hotels** 60:21
**hour** 7:24
**housekeeping**
7:20 11:4
**houses** 43:15
**housing** 33:16
**houston** 41:2
**hundred** 19:13,24
**hundreds** 15:19
64:25 65:1
**hyde** 2:25 67:3,8

**i**

**identify** 14:10
**idi** 38:17
**ignored** 24:25

**ii** 2:3
**iii** 2:4
**illinois** 32:1
**illustrate** 14:25
26:17
**imagine** 37:16
50:6
**immediate** 14:21
**impact** 26:15,18
47:18
**implicit** 11:6,9
**importance** 14:25
22:13 26:8,16
**important** 9:4,6
25:24 36:22,25
62:4,15
**importantly**
36:22 58:9
**imposed** 11:7
**improved** 16:10
16:16
**improvements**
37:21
**inc.'s** 2:13,18
**include** 33:11
**included** 28:7
**includes** 33:10
**including** 14:1
23:17 24:23 56:6
**incorrect** 24:13
27:4 61:1
**independent** 31:6
31:6 34:25 35:3,8
35:10 54:8
**indicates** 46:8
**indicative** 60:13
**indifferent** 37:4
**indiscernible** 8:1
9:15 12:4 20:1
23:9 24:23,24
30:6 31:21 33:21
45:3,23 47:9 55:3
55:14 59:7,14,19

59:20 60:4,5,7,13
61:16
**individual** 40:24
**individuals** 63:21
**information** 43:21
46:7
**initiated** 45:24
**inquired** 38:18
**inside** 43:3,3
**insider** 15:18
**insinuations** 57:8
**insurance** 3:15
34:10,13,15,21,23
**interest** 16:3 17:5
38:15 45:25 46:4
46:7 60:1,9 61:21
61:25
**interested** 47:1,10
58:3
**interests** 15:14
18:5 26:18
**interim** 2:1 45:18
**interject** 10:25
**internal** 23:9
**international**
46:20,21,23 58:7
58:15
**internationally**
38:6 51:12
**interstate** 32:8
**interviewed** 52:14
**intimated** 47:24
**intimating** 50:10
**introduce** 48:5
**introduces** 37:19
48:4
**investigation** 9:21
**investment** 31:11
31:14 38:2
**involve** 63:3
**involved** 17:17
**involving** 36:6

**irrelevant** 22:15
23:7 24:12 30:13
58:25
**island** 41:16,18
**issue** 6:21 7:20
20:5,24 50:6
56:19 57:3,13
61:15,16 65:14,21
**issues** 6:13 9:2,3,4
9:18 10:2,7 17:17
19:17 20:6 21:13
23:15,17 26:7,9
26:14 40:16 57:22
58:21 63:25 64:22
**it'll** 9:15
**itai** 5:1
**item** 7:15 13:22
13:24
**iv** 2:6
**ix** 31:19

**j**

**james** 3:20 27:6
27:14
**january** 39:20
43:6
**jason** 1:25
**jbg** 36:7
**jennifer** 4:21
**jessica** 5:7
**jing** 4:14
**job** 37:1
**john** 1:22 4:23
5:10 41:11,13
**johnson** 15:8
**joinder** 59:6,7
**joined** 58:11
**jones** 3:3,6 6:4,8,9
6:10 8:4,6,21
12:24 14:9 26:25
27:20,21 28:4
29:10,13 55:12,14
55:16,17 59:2
61:1 64:6,10,15

64:17 66:2,5,9
**joshua** 5:3
**jtd** 1:6
**judge** 1:23 6:3,4
8:6 16:14 18:8
26:6 49:4,17,21
56:4
**jurisdiction** 16:5
16:12 17:11 21:6
24:18 59:18 61:11
**jurisdictions** 17:3
24:8 25:25 58:20
**jury** 25:18
**justice** 18:5

**k**

**k** 27:14
**katz** 4:15
**keep** 32:18
**keeps** 43:17
**kept** 43:22
**key** 38:10
**kind** 43:15 46:17
47:1 63:9
**knew** 8:6
**knock** 37:6
**know** 7:22,25
8:25 10:15 12:18
12:20 20:2 25:9
33:18 35:17 37:8
37:11 38:1 41:6,8
41:25 43:15 45:14
46:15,16,24 47:14
47:22 48:20,22
49:7,24 53:23
54:18,21 57:11
60:10
**knowledge** 27:17
38:6 50:2 51:1,15
52:16 54:5 61:17
**knows** 24:20

**l**

**l.l.c.** 1:6
**labor** 41:8 43:2
**laguardia** 21:1
21:20,24
**largest** 17:13 32:8
**larry** 4:11
**late** 6:20
**laura** 3:6 4:8,12
6:9
**laurel** 4:25
**law** 15:25 16:2
17:19 19:11 24:15
26:8 59:15,20
65:11
**lawsuit** 44:17,18
**lawyers** 48:25
**lays** 24:9
**lead** 59:6
**leaves** 7:2 10:22
**led** 20:17
**ledanski** 2:25 67:3
67:8
**left** 29:5
**legal** 29:25 30:14
67:20
**legitimate** 22:10
53:6
**lender** 34:11,15
**liability** 17:12
63:20
**liens** 2:3
**life** 3:15 9:7,9,15
9:23 12:8 16:21
17:10 19:18 23:5
23:12 34:10,13,15
34:20,23 43:20
59:5
**life's** 18:19 19:5
22:13
**lightly** 58:10
**linda** 4:6

lindsay 4:13
line 36:1 52:5
lines 52:11
liquidate 26:4
liquidated 58:6
liquidation 16:18
  16:25 26:2
list 13:22 17:8
  22:4 61:14
listed 14:20 15:11
  45:9,12 62:3
listening 59:9
lists 17:7
literally 46:15
litigated 64:2
litigation 21:5
  44:22 56:15,17
  63:9,11 65:18
little 25:13 32:11
  32:19,19 33:9
  35:17 47:9 57:6,7
  65:20
litvak 3:7 27:22
  27:24,25 28:3,3
  28:19 30:22,25
  31:2,4 33:1 35:25
  36:1,4 38:24,25
  47:16 48:7,15
  50:17 55:5,6
litvak's 57:6
live 23:15,21 25:5
lives 41:13
llc 6:6,10 34:17
llp 3:3,9
loan 16:16
loans 12:9
local 15:1 16:3
  18:18 23:1 25:1
  26:7,15,16,18
  44:25 46:19 61:21
  61:22
locally 25:24 58:7

located 14:18,20
  15:12,18,20 16:6
  16:13,20 17:13
  18:22 20:3 21:22
  24:18 26:11 44:8
  44:20 61:13,14,23
  65:17
location 15:12
  16:16 18:20 22:14
  22:25 23:10 37:22
  46:23 58:24 61:11
  63:6
long 15:4 31:7
  54:10
longer 7:24 20:16
  25:13 65:24
look 13:1 18:22
  25:16 29:24 38:6
  38:7 45:14 47:23
looking 6:17
looks 24:11
lot 19:21 27:2
  32:2 37:13,17
  46:11,24 56:19
  57:20
love 25:12
lyndon 15:8

**m**

m 4:3
maines 32:9,13
  33:14
maintain 40:13,18
  41:5 45:19
maintaining 40:2
  40:5 42:1
maintenance 40:7
majority 29:1
maker 35:6
making 19:8
  54:16 61:3 65:8
manage 43:7
managed 40:12

management 2:10
  13:24 16:1 17:19
  39:22 42:20
manager 27:7
  31:6,6 34:25 35:3
  35:8 37:1 41:2
  43:1,2 54:8
managers 63:7
managing 40:7,24
manderscheid
  4:16
manger 35:11
manufacturer
  33:16
map 18:22,23
march 39:9,17,17
  53:21,22 54:3
  55:23 60:25
market 1:11 37:9
  45:22,23 47:6,8
  47:20,20 51:15
  52:16 58:5 61:17
markets 37:10,11
  48:4
marriott 2:13,18
  3:10 6:25 7:3,10
  9:7,8,13 13:25
  14:11,14 15:25
  18:20,21 19:3,20
  19:20 26:20 27:5
  28:8 38:9,15
  39:19,22 42:8,12
  43:23 44:12,20
  45:11 55:18,20
  56:15,19 57:18
  58:14,19 60:10
  63:2,13 64:1
  65:10
marriott's 7:16
  10:23 12:8 39:12
  58:12 65:12
martinez 4:17

maryland 20:25
  43:24 44:16,21
  45:8 56:16 58:15
  58:20
material 27:4
matrix 45:7,10
matter 6:15,19
  7:1,2 11:4 36:9
  56:24 57:25
matters 6:17
max 28:3
maxim 3:7
maximize 37:4
maximizing 37:2
  58:23
maximum 45:20
mba 31:12
mean 25:18 37:15
  62:20
means 31:17
  37:19
measure 19:11
mechanical 43:14
meet 55:21
meeting 38:18
mega 17:11
member 9:15
  33:23 34:17,20
  35:2,11 36:6,13
  48:24 49:1 57:11
memorandum
  47:9,12
memory 56:21
mention 9:18
mentioned 15:16
  23:16 26:12 33:12
  46:13 47:3
metro 17:8 18:23
  41:13
metropolitan
  15:19,22 65:15
miami 56:7

**michael** 4:9,17
**michigan** 33:16
**middle** 19:2 37:24
   46:25
**midland** 16:9
**midst** 15:5
**mile** 62:12
**miles** 19:8,13,25
   21:2 56:2
**mille** 48:12
**miller** 3:12 7:9,9
   7:12 8:4,9,24 10:9
   10:12,19,22,24
   12:15,16,25 13:11
   13:13 14:12,15
   19:11,15 20:13,20
   20:22 21:4,16
   25:6,12,16 26:24
   28:15,25 29:18,23
   29:24 30:5,12,18
   35:16,16 38:21
   48:9,10,14 50:20
   50:21,22 51:1,19
   51:23 53:4,12,14
   53:17 55:4,24
   57:5,13 59:10,24
   60:8,12,17,19
   62:17,24 63:14
   64:8,12,19 65:5,6
   65:7,19 66:10
**miller's** 27:3
**million** 46:18
**mind** 10:24
**mineola** 67:23
**minimum** 25:21
**misunderstanding**
   65:7
**moats** 4:18 13:2
   13:11 14:16 15:13
   16:6,20 17:20
   18:16 19:4 21:16
   22:6,19 23:9 24:8
   25:2 51:19 53:12

**modifying** 2:6
**mohler** 4:19
**moment** 55:2
   64:12
**montgomery**
   24:24
**month** 8:8
**morning** 6:2,9
   10:11 13:1 27:25
   31:3,4
**morris** 3:9 7:9
**motion** 2:1,9,13
   2:18 7:3,16 8:25
   10:23,23 11:5,13
   11:15 12:15 18:1
   18:3,4 27:1,5
   28:21 29:13 35:19
   35:20 57:18,21,21
   58:25 59:3,12,14
   65:25
**motions** 10:5,6
**movant** 27:5
**move** 34:4 38:24
**moved** 20:4 38:16
   65:16
**multi** 37:7
**multiple** 43:11

**n**

**n** 3:1 6:1 67:1
**name** 4:20 13:9
   27:12,13
**narrowing** 6:13
**nassiri** 4:21
**nation's** 15:13
**national** 15:11
   16:23 17:5,12
   20:23 22:12 46:20
   60:5,8 62:3
**nationally** 56:22
**nationwide** 17:4
**nature** 31:19
   35:15 40:19 46:20

**nda** 47:11,13
**ndas** 47:15
**necessary** 23:2
   44:7 56:25
**necessity** 26:2
**need** 11:18 12:19
   24:1 32:18
**needed** 9:3
**needs** 13:9 24:6
**negative** 49:12
   50:18
**negligence** 35:15
**neighborhood**
   41:22 58:14 61:23
**neighborhoods**
   39:5
**nerve** 21:21 56:9
   56:11
**never** 10:17 18:15
   24:15
**new** 21:22 24:4
   31:25 41:13,13
**newport** 34:24
**news** 6:12
**nicer** 57:7
**nichols** 3:9 7:10
**nlrb** 63:19
**non** 9:8 15:17
   56:8 60:8
**normal** 21:5
**north** 1:11 37:25
**note** 12:17 59:7
**notes** 12:6
**notice** 42:17 45:13
**notwithstanding**
   50:7
**number** 6:24 12:5
   16:7 19:7 28:9
   29:19 30:20 37:1
   41:1 47:17
**numerous** 14:1
   23:13 24:22 26:13
   33:19 61:7 63:1

65:9
**ny** 67:23

**o**

**o** 1:21 6:1 67:1
**o'clock** 65:24
**oath** 52:8
**object** 35:18
   52:23 57:7
**objection** 11:15
   14:2,8,9,13 23:20
   24:25 28:11,13,16
   28:24,25 29:1,3
   34:2 38:21 50:17
   50:19 53:7,10
**objections** 16:22
   29:23 57:20
**obligation** 11:21
   11:23
**obligations** 65:10
**observed** 65:12
**obtain** 2:2
**obviate** 18:15
**obvious** 24:8
   59:14
**obviously** 9:1
   18:15 19:1,20
   20:4 24:1,5 43:14
   46:16 61:24 62:4
**october** 31:8 54:5
**odd** 12:25
**offensive** 57:6
**office** 38:18 43:13
   43:18
**oh** 8:18
**ohio** 22:18
**okay** 6:3,3 8:23
   10:1,13 11:18,25
   11:25 21:15 28:1
   29:20,22 30:4
   32:15,25 34:14
   36:3 48:13,24
   49:3,8,15,23 50:9
   50:13 51:3,6,14

51:19 52:4,10
53:12 54:12,24
55:4 59:2 64:5,15
66:7
**old** 67:21
**omnibus** 7:25 8:2
8:7,18,19
**once** 48:20
**open** 12:13
**opened** 15:4
**opening** 62:25
**operated** 39:8
42:7
**operating** 28:9
40:2 55:22,23
56:4,6,8,10
**operations** 23:16
23:17 43:14 58:15
**operative** 18:12
53:25
**operator** 1:25
**opine** 56:4
**oppose** 27:1
**opposed** 63:13
**opposition** 28:21
29:11 59:3 60:17
**optimism** 25:12
25:22
**optimist** 25:20
**order** 2:9 7:15 9:1
9:6,10,16,24,25
10:14
**order's** 9:11
**orders** 2:2 6:18
7:7 10:6 25:17
**ordinary** 22:21
**organized** 36:11
36:13
**ori** 4:15
**original** 18:6
**origination** 12:8
**outcome** 50:12

**outside** 20:12,13
20:14 60:14 62:19
63:21
**outwardly** 25:21
**overall** 51:10
**overarching**
45:19
**overlooked** 60:9
**owe** 42:16
**owed** 45:6
**owner** 1:6 6:6,10
36:6,20 54:11
**owners** 56:17

**p**

**p** 3:1,1 4:5 6:1
**pac** 9:15
**pachulski** 3:3 6:9
28:4
**pacific** 3:15 9:7,8
9:23 12:8 16:21
17:10 18:19 19:5
19:18 22:13 23:5
23:12 34:10,13,14
34:20,23 43:20
59:5
**pacitti** 4:22
**page** 29:25 30:6
51:20,21 52:5
**pages** 12:5
**pandemic** 15:6
25:1,23
**paper** 32:9,14
41:7
**papers** 16:7 17:25
18:19 19:19 22:17
23:13 24:23 38:10
39:12 55:25 56:10
61:8 63:1 65:1,10
**paragraph** 9:16
29:24 30:5,7,12
**park** 19:2
**part** 43:4 51:24
53:7 56:14

**participated**
32:17
**particular** 16:17
36:25
**particularly**
31:10 33:3
**parties** 6:24 7:19
8:10 11:14 18:5
22:8 23:18 35:23
47:13,14 56:13,20
57:17 60:8
**partner** 27:22
**partnership** 16:11
**party** 2:5 13:9
23:21 38:15 56:14
58:11
**passages** 29:3
**patrick** 4:24
**paulsen** 4:23
41:11,12 43:19
**pause** 29:7,21
**pay** 38:7 46:18
**pdsi** 40:11,15,20
40:23 41:8 43:13
43:15
**pending** 24:3,5
44:22
**pennsylvania**
20:25 21:19
**people** 37:2,17
40:4 41:15,20,23
41:25 42:18 47:1
47:10 60:1,11
63:5,23
**people's** 25:10
**performance**
65:12
**period** 9:13 24:4
31:14
**periods** 11:8
**permanently**
19:23 53:16,18,24
54:1,6,7,10,14,15

54:19,20,22 63:24
**permissible** 18:2
**person** 24:21
25:10 62:11
**personal** 43:5
50:2
**personally** 37:4
**personnel** 40:17
**petition** 2:11
13:21 14:20 21:23
21:25 22:4 34:10
34:11 44:13
**physical** 37:22
40:16 42:2
**pick** 32:19
**piece** 14:23 15:15
16:22 24:18 37:20
55:21 56:8 58:24
**pl** 34:17,20 35:2
35:11 36:6,13
**place** 15:16 21:20
21:25 22:1,4
25:11 51:13 58:2
58:4
**places** 15:12 32:3
43:12 62:4
**plan** 26:3,4 31:25
50:11,15,25 61:6
**planning** 13:3
26:5
**plant** 40:16 42:2
**platform** 38:5
**play** 26:3
**player** 46:10
**pleadings** 14:1
**please** 10:15,18
14:17 17:20 24:8
27:11 29:15 51:19
51:21 54:17
**plus** 15:9
**point** 7:21 18:19
19:16 21:8,8
23:12 25:22 29:3

**[point - real]**

36:19 57:4,25
59:21 60:21 61:1
61:3 62:5 64:7,18
64:18 65:8
**points** 18:24
60:20
**politicians** 15:9
**position** 16:9 27:8
31:5,7 35:3,10
59:11,16
**possess** 43:19
**possession** 12:8
31:20
**possible** 45:20
50:12
**possibly** 30:13
**post** 24:10 34:10
**postpetition** 2:3
**postponed** 25:18
**potential** 16:18
42:14 59:23 60:1
60:9 62:18
**potentially** 60:10
**potter** 4:24
**power** 19:9 20:6,7
20:12,14,23 21:2
56:20,22 62:13,19
63:22
**practical** 56:24
**practice** 57:18
**practiced** 33:25
**practices** 33:2
**pre** 34:10 44:12
**precedents** 11:10
**prefer** 10:3,17
**premier** 17:3
**premise** 40:4
**prepared** 7:7
**prepetition** 2:5
12:9 22:22 23:6
**presence** 17:12
**present** 4:1 16:3
20:9

**presentation** 13:3
59:10
**preserved** 9:9
**preside** 22:11
**presidents** 15:7
**presume** 43:22
**presumes** 18:5
**pretty** 13:19
37:14
**previously** 63:5
65:15
**primary** 17:16,17
39:2,3 40:20,23
40:24 41:10 59:6
61:15
**prime** 15:12
**principal** 15:16
21:20,25 22:4
56:13,14
**principally** 31:14
**prior** 8:9 36:5
53:2 54:16
**probably** 25:14
40:3
**probative** 21:13
**problem** 10:21
**procedure** 9:17
**procedures** 12:3
33:2
**proceed** 27:19
**proceeding** 36:6
**proceedings** 25:4
25:11 66:13 67:4
**process** 41:6
45:24 46:19 47:7
47:11,19,24,25
58:2,3,5,8 61:5
**processes** 33:15
**produced** 12:4
**products** 33:15
**professional**
31:10

**professionals**
16:24 22:15,15,22
23:1,4
**proper** 18:6 30:14
**properly** 49:18
52:20
**properties** 37:15
46:12 51:8,11,12
61:10,24
**property** 14:18
15:1,15 16:6
17:16 26:8,16
37:21,22 38:2,7
39:1,4,6,10,13,16
39:25 40:5,7,14
40:25 41:21 42:7
42:19,24,25 43:8
45:19,20 46:4
47:4 54:11 56:1
56:16 58:6,24
59:25 60:2,7
61:13,15,22
**prosecuted** 35:23
**protect** 37:1 45:18
**protection** 2:5
**protective** 10:5
**provide** 27:7
47:23
**provided** 38:5
46:7
**providence** 41:14
41:17
**providing** 2:4
40:1
**pull** 51:20
**pursuant** 31:25
33:17
**pusher** 41:7
**put** 12:20 13:3,5
22:2,23 46:15
53:7 57:13,14
65:20

**pws** 17:9,10

**q**

**question** 37:23
38:14 44:10 48:3
49:8,15,17,20
50:18 52:12,20
53:25 54:12,21
**questioning** 36:2
57:5
**questions** 26:22
26:24 34:7 48:15
55:3 64:14
**quick** 10:25 29:6
**quickly** 12:17
**quiet** 35:17 59:9
**quite** 32:2 35:18
**quote** 16:15 18:10
26:9

**r**

**r** 1:21 3:1 6:1
27:14 67:1
**raise** 7:20 27:12
**raised** 59:22 61:2
**raises** 56:19
**raising** 31:19
**ran** 31:16
**ravn** 32:7 33:12
**raymond** 4:25
**raz** 5:1
**reach** 7:18,22
8:17 10:3 13:14
38:3
**reached** 6:25
**reaching** 64:20
**read** 52:10,21,25
53:8,8 64:25
**real** 14:23 15:15
15:25 16:4,6,10
16:16 17:16,18
18:10,14 21:22
24:18 26:17 29:6
37:20 55:21 56:9
59:12,16 61:7,9,9

61:16,24
**realize** 34:2
**realized** 29:8
**really** 17:22 38:13
  45:13 59:11 63:22
  64:19
**reason** 16:4 50:3
  58:1 61:16
**reasonable** 12:11
**reasons** 51:6
**rebuttal** 26:23
  60:18
**recall** 53:19,20
  57:19
**received** 10:10
  28:18 30:21
**recitation** 27:3
**recognizing** 24:9
**reconvene** 65:24
**record** 6:5 27:12
  52:24 67:4
**records** 12:5
  15:21 23:18 41:5
  43:10,11,12,13,20
  43:23 56:12
**recoupment** 2:14
  7:16 57:22
**redevelop** 46:10
  46:12
**redevelopment**
  15:23 26:15 52:17
**redirect** 53:5 55:5
**refer** 34:13,14
  55:24,25 56:6
**reference** 10:2
  34:14 39:12
**referring** 34:15
**reflects** 45:8
**refund** 45:6
**regarding** 43:21
**register** 15:11
  62:3

**rehoboth** 16:14
  18:9 26:6 56:3
**reject** 39:21
**rejecting** 2:10
**rejection** 6:23 7:5
**related** 2:7 18:12
  63:25 65:14
**relates** 33:3 51:10
  59:23
**relative** 23:23
**releases** 9:19
**relevance** 35:18
**relevant** 18:24
  21:13 35:19,20
  51:17 60:11
**reliance** 16:23
  22:14
**relief** 2:7,15 7:17
  11:5
**relies** 21:18
**rely** 17:10
**remainder** 30:17
  30:19
**remained** 54:4
**remaining** 6:16
**remember** 48:17
**remotely** 43:8
**removed** 35:10,21
**reopen** 26:6
**reorganize** 26:4
**repair** 40:18,18
**reply** 38:9 39:12
**report** 35:4
**represented** 42:10
**request** 58:12
**requests** 12:11
**require** 19:17
  56:23 58:22
**requirements**
  11:12
**reservation** 60:4
**reservations**
  23:18 54:25 59:25

60:2,3,23
**reserve** 26:22
**reside** 34:5
**residential** 23:19
  23:22 26:13
**residents** 23:21
**resolution** 6:21
**resolve** 9:2,4,18
  10:7
**resolved** 36:9
**respect** 6:22,25
  7:13,14,15 8:24
  11:4 12:2,3,10
  17:25 22:7 23:10
  23:23 26:1,14
  28:20 30:2 41:3
  43:14 57:22 61:6
  62:8 64:23
**respectfully** 55:20
**respond** 60:20
**response** 11:20
  28:12
**responses** 11:15
**rest** 53:1
**restate** 50:20
  54:12
**restated** 28:8
**restructuring**
  31:15 33:13 34:1
**results** 26:3
**retained** 22:22
  47:4
**retention** 54:8,9
**revenue** 55:23
**revenues** 39:10
**reviewed** 7:6 8:25
**revised** 9:1,4
**rewarded** 58:18
**rhode** 41:16,18
**richard** 4:14 5:2
**richardson** 40:25
  43:17

**right** 7:4,5 8:16
  11:16 12:14 13:10
  13:18 14:10 19:1
  19:15 21:4 22:24
  27:10,12,24 29:6
  29:12,14 30:19
  42:21 44:10 45:23
  48:21,25 50:11,15
  51:8,24 52:6
  54:16 55:10,13
  60:17 63:4 65:4
  65:19,20,21 66:3
**rights** 2:14,16
  7:16 13:4,8
**riley** 5:2
**road** 19:6,12
  67:21
**rolled** 25:8
**rosenthal** 5:3
**rule** 20:25 52:25
**ruling** 65:21,25
**run** 6:7 16:25
  37:5,15 44:10
  47:25
**russians** 46:15

---

**s**

**s** 3:1,12 6:1
**safe** 37:2
**sale** 17:18 22:9,11
  26:7,18 31:24
  33:12,14,19 41:6
  46:19 47:18 49:25
  50:4,7,8,10,15,24
  58:2,7 61:5,14
**sales** 31:17,19,24
  33:4,7 58:3
**san** 40:25 43:18
**sanders** 24:23,23
**saw** 10:10 23:20
**saying** 50:5
**says** 11:10 38:9
**scene** 53:17 54:4

schedule 10:8
42:14
scheduled 8:14
scheduling 2:6
schindler 40:18
scope 16:23 58:7
screen 12:21 13:5
15:3 18:23 22:3
22:24 29:17
se 53:19
second 10:25
13:22 22:9 29:4
32:8,16 33:13
43:5 59:21
secondary 12:2
section 33:17
secure 45:19
secured 2:3,5
securing 40:5
securities 31:16
security 40:1,17
41:24
see 7:4 8:14 9:12
10:6 12:18,20,23
12:24,25 13:6
18:24 27:10 29:4
35:19 43:4 51:24
52:3,3,5,18 57:2
58:1 66:8
seek 9:15 39:21
seeking 2:9
seen 16:11 32:2
select 52:13
selected 51:3,6,16
51:17
sell 37:5 38:8
45:20 47:4 51:12
51:13
selling 51:7
senators 15:8
send 13:18 29:14
29:16

sense 8:11 22:25
52:25
sent 10:11 13:17
sentence 29:25
32:11,13
separate 29:9
59:8,8
serious 46:3
seriously 14:22
service 16:24
services 2:13,18
3:10 23:1,2
set 7:25 8:15,20
9:9,11 22:9 37:20
57:23 65:22
setoff 2:16
setting 57:17
seven 31:15
severance 23:17
share 13:4
sheets 17:5
short 9:24
showing 6:21
25:21
shown 57:15
58:19
shows 14:4,5
side 22:24 52:17
sign 47:10
signed 6:18
significant 14:24
48:2 63:25
significantly
23:25
similar 45:12
simple 13:20
44:11 59:7
simply 21:10
24:13 36:23 49:6
49:12,21 60:25
62:13
single 14:23 16:3
16:10,15 18:9,14

26:17 55:21 59:12
59:16 61:6,9,9
sir 32:21 33:5
34:12,19 35:7,9
36:14 39:18 41:19
42:23 52:7 55:9
site 41:2,8 43:16
sitting 53:9
situation 10:16
58:6
situations 31:17
six 52:15
skip 23:12
slide 14:16 15:13
16:6,20 17:20
18:16 19:3 21:17
22:5,20 23:9 24:8
25:2 26:1
small 40:1 51:25
smith 36:7
sold 33:17 51:11
sole 24:17 26:4
27:6 31:6 35:6,8
solicits 47:10
soloway 5:4
solutions 67:20
somebody 20:11
37:5,6,24,24,25
46:9
sonya 2:25 67:3,8
soon 25:11,13
sophisticated
47:22
sorry 11:2 32:10
45:4 52:4 59:9
64:10
sort 35:17 41:1,7
46:14
sought 58:10
sources 45:21
spanish 15:5
speak 51:9 59:3
60:17

spear 40:10,10
special 31:16
specific 32:4
53:19
specifically 6:16
34:24 40:15 59:24
specifics 14:4
speculation 25:8
27:2
spell 27:13
spencer 1:25
spiro 5:5
spotlight 27:11
stability 38:5
stages 22:8
stakeholders
38:10
standard 35:14
standing 10:14
25:17
standpoint 42:17
stang 3:3 6:9 28:4
start 10:5
started 13:13
starting 30:6
state 18:21 27:12
44:16 52:20 56:16
58:20
stated 26:3,5
48:19,20
statement 29:25
30:1,15 38:11,12
38:13 49:11,12
60:24 65:8
statements 19:18
29:2 30:9
states 1:1,10
17:14 23:4 30:13
statistics 24:2
status 54:4
stay 2:6,15 7:17
11:5

stearns 31:13
steel 22:18
stein 5:6
steinhagen 5:7
storied 15:4
straightforward 22:11 49:16
street 1:11 46:9
stricken 30:4,11 30:15,16
strip 56:7
strong 16:3 61:25
strongly 23:24
struck 30:3,9
structuring 31:22
stuff 12:20 43:15
style 58:16 60:6
submit 6:20 28:20
submitted 6:14 11:15 28:8
subordination 9:7
subpoena 19:8 20:6,7,12,14,23 20:25 21:2 56:20 62:13,19 63:21
subpoenaed 62:22 64:3
subpoenas 64:19
subsequent 54:8,9
subsequently 39:21
substantial 30:2
suburban 41:13
suburbs 14:21
sued 44:12
sufficient 62:14
suggest 64:25
suggested 38:16 62:7
suggesting 49:3,9
suggestions 57:8
suggests 56:10

suit 44:15
suite 67:22
sum 58:7
summary 16:8 33:9
summer 25:14
superpriority 2:4
support 27:7
supported 59:20 61:19
supports 25:1 62:2
sure 8:13 10:11 11:11 13:1 34:9 35:18,20 37:2 42:18 44:9,9 47:16 50:21 54:13
surprised 61:20
surrounding 22:23 23:16
sustain 53:10
sustained 38:23
systems 40:2

### t

t 1:22 67:1,1
tab 14:2 28:9
take 25:4 53:12 57:1 62:14 65:20 65:23
taken 21:11 57:23 58:10
talk 17:24 61:20 62:12
talked 23:11 62:15,24 63:1 64:22
talking 50:10 63:12,22 64:18
task 37:3
taxes 44:25 45:5
taxing 58:12
team 40:1,23

teleconference 10:4
telephonic 3:19
telephonically 3:6 3:7,12,17 4:1
tell 24:1 47:16 49:21,21
telling 49:17
tells 18:8
terminated 19:23 20:16 39:19 63:24
termination 20:17
terminology 34:9
terms 37:21 47:23
testified 15:2 48:25 61:19 62:18
testify 20:8,24 21:1 53:22 60:22 61:18 62:11,23
testifying 50:13 50:23
testimony 19:17 21:12 27:7,15 28:6,22 45:16 48:8 51:14 52:8 53:1,3,10 56:12 59:9 60:7,12 61:18
texas 41:1,2 56:5
thank 6:8,18 8:21 10:1 12:1,13,14 14:15 26:24 27:19 27:21 28:2,3,19 29:15 30:22,25 32:4,22,24 36:3 38:9 41:3 43:25 45:7,15 48:6,9 53:11 55:4,6,7,8,9 55:17 59:2 60:15 60:16,19 64:15 65:4,19 66:2,7,9 66:10,11

thanks 66:12
thing 10:16 46:18 47:1
things 31:19 32:2 35:15 40:19 47:22 59:8,11
think 10:22 11:6,9 11:18 12:4,5 16:8 17:22 21:8,9 25:9 25:13,19,20 29:5 30:3 33:25 36:21 41:2 45:25 46:13 48:22 49:6,11,20 50:5,9 52:21,24 53:6,9,25 57:23 58:18 59:13 60:7 60:12,13 63:14,16 63:19,22 64:12,24 64:25 65:7
thinking 21:5
third 6:11,17 13:24
thought 8:10 52:14,15 62:6 64:11 65:23
thoughts 65:21
tick 17:23
ties 26:13
tiffany 37:20 61:23
time 8:16,19 11:8 26:22 40:4 42:25 43:5 53:23 57:23 57:23 65:16,20 66:1
times 19:7 23:13 48:19 63:1 65:9
timothy 4:5
tip 40:10
today 37:21 39:25 51:14 66:3
todd 5:4

told 8:9 47:20
tomorrow 65:22
  65:25 66:8
top 13:22 17:8
  38:7 51:24 61:14
topic 45:15
touch 59:21 65:2
tower 23:19,22
  26:13
traditional 17:11
  24:11
traditionally 9:12
transact 37:12
transaction 33:12
  33:13
transactional
  47:24
transactions
  31:22,24 33:19
transcribed 2:25
  52:22
transcript 20:10
  20:10 51:20,25
  52:21 53:1 67:4
transfer 2:19
  10:22 12:15 16:5
  18:3,4,7 22:16
  23:25 24:12,14,17
  27:1 28:21 29:13
  35:19 47:18 57:21
  58:22 59:13,20
  61:8,19 62:2,2
transferred 16:12
  18:15 22:18 26:20
  55:19 61:10
travel 24:22 42:24
tremendous 37:22
  45:25
trepp 5:8
trial 21:7,11
  25:18 62:8,9,14
  62:23 64:4

trials 25:19
trico 22:18
tried 57:25
trip 43:5
triple 50:18
trouble 49:16
true 18:14,16 67:4
trustee 38:19
trustee's 38:18
truth 27:16,16,17
try 13:2 16:21
  18:19
trying 49:20,21
  57:10
tunnel 3:9
turn 6:6 40:12
turned 12:22
twice 42:25
two 6:15 7:8 16:8
  23:24 32:6 33:11
  40:13 41:1 44:2
  57:18 59:7,8,11
type 26:7 63:11
  63:19
types 26:14 36:24
  37:15 46:3
typical 41:20
typically 60:4

**u**

u.s. 1:23 14:3 15:8
  38:18,19 50:6
ultimately 9:18
unable 49:25
  50:24
unaware 62:18
uncertainty 37:11
  37:19 48:4,5
underlying 18:12
understand 33:21
  34:16,17 38:13
  49:20
understood 10:9
  10:19 42:18

undisputed 56:12
unicorn 46:17
union 15:20 42:10
  42:12,14,16 45:13
  58:12 63:4,12
  64:21,21,23
uniquely 49:13
united 1:1,10
universally 16:5
universe 48:2
unsecured 15:17
  15:18 17:7 38:20
unsurprisingly
  18:6
use 14:25 46:14
user 24:16
usual 47:22

**v**

v 2:6 24:23,24
vaccine 25:8
value 17:17 37:3,4
  37:23 45:20 46:1
  48:5 58:23 61:14
values 37:23
variety 33:18
  45:21
various 43:20
ventilation 40:2
venue 2:19 7:3
  18:1,2,6 24:11,14
  27:1 28:21 29:13
  30:14 33:20 38:16
  47:18 48:1 55:19
  57:21 58:11,22
  59:13
venues 25:1 31:25
veritext 67:20
vi 2:7
video 12:18,22
  20:10 24:13 25:4
view 11:4 46:5
  47:19

virginia 21:1
virk 5:9
virtually 16:3,10
visit 8:11
vocal 18:7
voice 32:18

**w**

waldeck 5:10
wall 46:9
want 9:17 11:11
  11:22 21:6,7 34:8
  37:11,11 45:16
  46:10 59:21 65:20
wanted 7:20,22
  11:3,5,6 12:16
  28:5 38:19 42:18
  43:4 57:19 64:17
wants 7:6 9:14
  37:5,6 53:4
war 15:5
wardman 1:6 6:5
  6:10 19:2 23:19
  34:17,20 35:2,11
  36:6,13 60:6
warman 26:12
washington 14:2
  14:17,19,24 15:1
  15:14,17,18,20,21
  17:17,19 18:18,20
  20:2 22:5 26:21
  39:5 55:22 56:1
wasn't 53:21
water 40:3
way 9:11 19:25
  25:2 47:11 49:16
  58:8 62:6
we've 11:14 12:12
  12:12 45:24 53:9
  56:25 62:15
website 14:4
week 47:10
weeks 39:13

weighs  23:24
wells  44:2
wender  3:17
 10:24 11:2,3,17
 11:20 12:1,14
 52:23,24 53:4,11
 59:4,5 60:16,21
 66:12
wendy  5:5
went  42:25 43:5
wharton  31:12
wide  33:18
williams  5:11
wilmington  1:12
wish  7:7 54:17
 60:17
wishes  59:3
witness  3:19
 19:17 27:18 30:1
 30:9 32:13,16,21
 32:23,25 44:11
witnesses  19:21
 20:9 23:10 44:7
 62:19,21 63:3,6,8
 64:3 65:12,13
word  53:25 54:5
words  14:25
 38:20
work  8:12 12:7,10
 34:5 62:2
worked  63:5,7,23
 63:23
workers  42:7
working  31:13
 45:22
works  8:18
world  12:17 15:5
 24:10 37:17 38:4
would've  23:1,8
wrong  35:14 48:3
wrongful  35:21
wrote  26:6 61:19

**y**

yeah  8:13,17
year  31:13 32:7
 32:17 36:9 39:20
years  31:16 33:25
 34:1
yerak  5:12
yesterday  6:20
 13:15 38:17
york  21:22 31:25
 41:13,13

**z**

ziehl  3:3 6:9 28:4
zoom  10:4 25:7
 62:11

**<u>EXHIBIT C</u>**

**HOTEL MANAGEMENT AGREEMENT**

**Execution Version**

Exhibit No 4082-D

MARRIOTT WARDMAN PARK HOTEL

SECOND AMENDED AND RESTATED MANAGEMENT AGREEMENT

between

MARRIOTT HOTEL SERVICES, INC.

(as "MANAGER")

and

WARDMAN HOTEL, L.L.C., WARDMAN TOWER, L.L.C.,

WARDMAN COTILLION RESIDENTIAL, L.L.C.

and WARDMAN PARK RESIDENTIAL, L.L.C.

(collectively, as "OWNER")

Dated as of  July 1, 2005

# TABLE OF CONTENTS

ARTICLE I  MANAGEMENT OF THE HOTEL ................................................................................. 3
  1.01  Management of the Hotel as a Marriott ................................................................ 3
  1.02  Management Responsibilities ............................................................................. 3
  1.03  Chain Services .................................................................................................... 4
  1.04  Employees ........................................................................................................... 5
  1.05  Owner's Right to Inspect .................................................................................... 5
ARTICLE II  TERM .......................................................................................................................... 5
  2.01  Term .................................................................................................................... 5
  2.02  Performance Termination ................................................................................... 5
ARTICLE III  COMPENSATION OF MANAGER ........................................................................... 7
  3.01  Management Fees ................................................................................................ 7
  3.02  Operating Profit ................................................................................................. 8
  3.03  Owner Representative ........................................................................................ 8
ARTICLE IV  ACCOUNTING MATTERS ...................................................................................... 8
  4.01  Accounting, Distributions and Annual Reconciliation ...................................... 8
  4.02  Books and Records ............................................................................................. 9
  4.03  Accounts, Expenditures ..................................................................................... 9
  4.04  Annual Operating Projection .............................................................................. 10
  4.05  Working Capital ................................................................................................. 11
  4.06  Fixed Asset Supplies .......................................................................................... 11
  4.07  Manager Contribution ........................................................................................ 12
ARTICLE V  REPAIRS MAINTENANCE AND REPLACEMENTS ............................................. 12
  5.01  Repairs and Maintenance Costs Which Are Expensed ...................................... 12
  5.02  FF&E Reserve .................................................................................................... 12
  5.03  Capital Expenditures .......................................................................................... 14
  5.04  Ownership of Replacements ............................................................................... 15
  5.05  Hotel Renovation and Conversion Projects ....................................................... 15
  5.06  A&T Lot Releases .............................................................................................. 15
ARTICLE VI  INSURANCE, DAMAGE, CONDEMNATION, AND FORCE MAJEURE ............... 16
  6.01  Property Insurance .............................................................................................. 16
  6.02  Operational Insurance ........................................................................................ 19
  6.03  Insurance for Residential Regime or Other Structure Involving Non-Hotel Components ......... 20
  6.04  Damage and Repair ............................................................................................ 20
  6.05  Condemnation .................................................................................................... 21
ARTICLE VII  TAXES ..................................................................................................................... 21
  7.01  Real Estate and Personal Property Taxes ........................................................... 21
ARTICLE VIII  OWNERSHIP OF THE HOTEL ............................................................................. 22
  8.01  Ownership of the Hotel ...................................................................................... 22
  8.02  Subordination, Non-Disturbance and Attornment ............................................. 23
  8.03  No Covenants, Conditions or Restrictions ......................................................... 24
  8.04  Liens; Credit ...................................................................................................... 25
ARTICLE IX  DEFAULTS ................................................................................................................ 25
  9.01  Default ................................................................................................................ 25
  9.02  Remedies ............................................................................................................ 26
  9.03  Additional Remedies ......................................................................................... 26
ARTICLE X  ASSIGNMENT AND SALE ....................................................................................... 27
  10.01 Assignment ......................................................................................................... 27
  10.02 Sale of the Hotel ................................................................................................. 28
ARTICLE XI MISCELLANEOUS .................................................................................................... 30
  11.01 Right to Make Agreement .................................................................................. 30

i

11.02 Consents and Cooperation ................................................................................. 30
11.03 Relationship ................................................................................................. 31
11.04 Applicable Law ............................................................................................. 31
11.05 Recordation ................................................................................................. 31
11.06 Headings ..................................................................................................... 31
11.07 Notices ....................................................................................................... 31
11.08 Environmental Matters ................................................................................. 33
11.09 Confidentiality ............................................................................................. 33
11.10 Projections .................................................................................................. 34
11.11 Actions to be Taken Upon Termination ......................................................... 34
11.12 Trademarks, Trade Names and Service Marks ............................................... 36
11.13 Competing Facilities .................................................................................... 37
11.14 Waiver ........................................................................................................ 37
11.15 Partial Invalidity .......................................................................................... 38
11.16 Survival ...................................................................................................... 38
11.17 Affiliates ..................................................................................................... 38
11.18 Negotiation of Agreement ........................................................................... 38
11.19 Estoppel Certificates ................................................................................... 38
11.20 System Standards ....................................................................................... 39
11.21 Expert Decisions ......................................................................................... 39
11.22 Entire Agreement ........................................................................................ 40
11.23 Joint and Several Liability ............................................................................ 40
11.24 Prevailing Party .......................................................................................... 40
11.25 Amended and Restated Provisions ............................................................... 40
ARTICLE XII ............................................................................................................. 40
12.01 Definition of Terms ..................................................................................... 40

EXHIBIT A          Legal Description of the Site
EXHIBIT B          Equity Interest in Owner
EXHIBIT C          Technical Services Agreement

## SECOND AMENDED AND RESTATED MANAGEMENT AGREEMENT

This Second Amended and Restated Management Agreement ("Agreement") is executed as of the 1st day of July, 2005 ("Effective Date"), by WARDMAN HOTEL, L.L.C., WARDMAN TOWER, L.L.C., WARDMAN COTILLION RESIDENTIAL, L.L.C., WARDMAN PARK RESIDENTIAL, L.L.C., each a Delaware limited liability company (jointly and severally, "Owner") with a mailing address at c/o Wardman Investor, L.L.C., 4445 Willard Avenue, Suite 400, Chevy Chase, Maryland 20815 and MARRIOTT HOTEL SERVICES, INC. ("Manager"), a Delaware corporation, with a mailing address at c/o Marriott International, Inc., 10400 Fernwood Road, Bethesda, Maryland 20817.

# R E C I T A L S

WHEREAS, as of the Effective Date, each of the parties comprising Owner will be the owner of fee title to a portion of the parcel of real property (the "Site") described on <u>Exhibit A</u> attached to this Agreement and incorporated herein, which is improved with a building or buildings containing, as of the Effective Date, approximately 1,347 Guest Rooms, a lobby, restaurants, meeting rooms, administrative offices, and certain other amenities and related facilities (the "Improvements"). The Site and/or Improvements may be modified pursuant to certain renovations and modifications, including the reduction of the number of Guest Rooms, as more fully described herein. The Site and the Improvements, in addition to certain other rights, improvements, and personal property as more particularly described in the definition of "Hotel" in Section 12.01 hereof, are collectively referred to as the "Hotel."

WHEREAS, Owner's predecessor in interest and Manager are parties to a certain Amended and Restated Management Agreement dated as of January 15, 1999, as amended by a certain Amendment to Amended and Restated Management Agreement dated as of March 18, 1999, a certain Second Amendment to Amended and Restated Management Agreement dated as of November 29, 2000, and a certain Third Amendment to Amended and Restated Management Agreement dated as of November 29, 2001 (collectively, the "Prior Agreement").

WHEREAS, in connection with Owner's acquisition of the Hotel (as defined in this Agreement) and assumption of the Prior Agreement, Owner and Manager desire to make certain modifications to the Prior Agreement and to amend and restate the Prior Agreement, as more particularly provided herein.

WHEREAS, this Agreement shall comprise the entire agreement between the parties regarding the management and operation of the Hotel and shall supersede and restate in its entirety the Prior Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager agree as follows:

ARTICLE I

MANAGEMENT OF THE HOTEL

1.01    Management of the Hotel as a Marriott

Upon the Closing Date, Manager shall, and Owner hereby authorizes and engages Manager to, supervise, direct, and control the management and operation of the Hotel in accordance with the terms and conditions of this Agreement. During the Term, the Hotel shall be known as the "Marriott Wardman Park Hotel," with such additional identification determined by Manager as may be necessary to provide local identification.

1.02    Management Responsibilities

A.    Manager shall manage the Hotel in accordance with System Standards and shall, subject to the terms of this Agreement, perform each of the following functions (the costs and expenses of which shall be Deductions) with respect to the Hotel:

1.    Recruit, employ, supervise, direct and discharge the employees at the Hotel.

2.    Establish prices, rates and charges for services provided in the Hotel, including Guest Room rates.

3.    Establish and revise, as necessary, administrative policies and procedures, including policies and procedures for the control of revenue and expenditures, for the purchasing of supplies and services, for the control of credit, and for the scheduling of maintenance, and verify that the foregoing procedures are operating in a sound manner.

4.    Make payments on accounts payable and handle collections of accounts receivable.

5.    Arrange for and supervise public relations and advertising, prepare marketing plans, and make available to the Hotel the benefits of various marketing programs in use in the Marriott System as they may exist from time to time, such as the Marriott Rewards program.

6.    Procure all Inventories and the replacement of Fixed Asset Supplies.

7.    Prepare and deliver interim accountings, annual accountings, Annual Operating Projections, Building Estimates, FF&E Estimates, and such other information as is required by this Agreement and be available at reasonable times to discuss the above-listed items as well as the operations at the Hotel generally with Owner.

8.    Plan, execute and supervise repairs, maintenance, and FF&E purchases at the Hotel.

9.     Subject to Section 6.02, provide, or cause to be provided, risk management services relating to the types of insurance required to be obtained or provided by Manager under this Agreement.

10.     Obtain and keep in full force and effect, either in Manager's name or in Owner's name, as may be required by applicable law, any and all licenses and permits to the extent same is within the control of Manager (or, if same is not within the control of Manager, Manager shall use due diligence and reasonable efforts to obtain and keep same in full force and effect).

B.     The operation of the Hotel shall be under the exclusive supervision and control of Manager which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation of the Hotel. In fulfilling its obligations under this Agreement, Manager shall act as a reasonable and prudent operator of the Hotel, having regard for the status of the Hotel and maintaining the System Standards. Manager shall have discretion and control, free from interference, interruption or disturbance by Owner or by any other party claiming under, through or by right of Owner, in all matters relating to the management and operation of the Hotel, including, without limitation, the following: charges for Guest Rooms, commercial space, and services provided by the Hotel; food and beverage services; employment policies; credit policies; granting of leases, subleases, licenses and concessions for shops and businesses within the Hotel, provided that the term of any such lease, sublease, license or concession shall not exceed the Term of this Agreement; receipt, holding and disbursement of funds; maintenance of bank accounts; procurement of Inventories, supplies and services; payment of costs and expenses specifically provided for in this Agreement or otherwise reasonably necessary for the proper and efficient operation of the Hotel; and, generally, all activities necessary for operation of the Hotel.

C.     Manager shall use reasonable efforts to comply with and abide by all applicable Legal Requirements (except for certain Legal Requirements which are Owner's responsibility under Section 5.03 and Section 11.08 hereof) pertaining to its operation of the Hotel, provided that Manager shall have the right, but not the obligation, in its reasonable discretion, to contest or oppose, by appropriate proceedings, any such Legal Requirements (other than those under Section 5.03 and Section 11.08, as to which Owner shall have discretion). All costs and expenses of such compliance shall be paid from Gross Revenues as Deductions in the computation of Operating Profit or from the FF&E Reserve, whichever is applicable. The reasonable expenses of any such contest of a Legal Requirement shall be paid from Gross Revenues as Deductions.

1.03   Chain Services

Commencing with the Closing Date and thereafter during the Term of this Agreement, Manager shall cause to be furnished to the Hotel certain services that are furnished generally on a central, regional or other group basis to other hotels in the Marriott System and which benefit such hotels such as: (i) national sales office services; central training services; career development and relocation of management personnel; central advertising and promotion (including direct and image media and advertising administration); the Marriott national reservations system services and the Marriott computer payroll and accounting services; benefits

administration; gift shop merchandise handling; and (ii) such additional central, regional or other group services as are or may be, from time to time, furnished for the benefit of hotels in the Marriott System (or other systems as described above) or in substitution for services now performed at individual hotels which may be more efficiently performed on a group basis ("Chain Services"). The charges for Chain Services shall include, as applicable, allocation of salaries, wages, and overhead related to the employees of Manager, Marriott, or any Affiliate involved in providing any of the Chain Services and shall be allocated on a fair basis among all hotels receiving such services.

### 1.04    Employees

All personnel employed at the Hotel shall, at all times from and after the Closing Date, be the employees of Manager. Manager shall have absolute discretion with respect to all personnel employed at the Hotel, including, without limitation, decisions regarding hiring, promoting, transferring, compensating, supervising, terminating, directing and training all employees at the Hotel, and, generally, establishing and maintaining all policies relating to employment. Manager shall be permitted to provide free accommodations and amenities to its employees and representatives visiting the Hotel in connection with its management or operation. No person shall otherwise be given gratuitous accommodations or services without prior joint approval of Owner and Manager, except in accordance with usual practices of the hotel and travel industry.

### 1.05    Owner's Right to Inspect

Owner and its agents shall have access to the Hotel at any and all reasonable times for the purpose of inspection or showing the Hotel to prospective purchasers, tenants or Mortgagees.

## ARTICLE II

## TERM

### 2.01    Term

The "Term" of this Agreement shall consist of an "Initial Term" and the "Renewal Term(s)." The Initial Term shall begin on the Effective Date and shall continue through December 28, 2029 (the last day of Fiscal Year 2029). Thereafter, this Agreement shall automatically, and with no further action required by Owner or Manager, be renewed on the same terms and conditions for each of three (3) successive periods of ten (10) full Fiscal Years each ("Renewal Term(s)"), unless Manager shall have given prior written notice to Owner of its election not to renew at least one year prior to the expiration of the then current Initial Term or Renewal Term, as the case may be.

### 2.02    Performance Termination

A.      Subject to the provisions of Section 2.02.B below, Owner shall have the option to terminate this Agreement if:

1.    With respect to any two (2) consecutive full Fiscal Years (not including any Fiscal Year prior to the expiration of the third (3rd) full Fiscal Year following the Fiscal Year in which the Projects, as described in Section 5.05, are completed, and in no event with respect to any Fiscal Year prior to Fiscal Year 2012), Operating Profit is less than the applicable Performance Termination Threshold; provided that, for purposes of this Section 2.02 only, Operating Profit shall be computed without deducting the amount, if any, by which (a) the actual amount of Impositions for such Fiscal Year exceeds (b) Two Million Three Hundred Sixty Three Thousand One Hundred Forty-Five Dollars ($2,363,145) (the "Baseline Amount"). For purposes of this Section 2.02, the Baseline Amount shall be adjusted by the GDP Deflator (as adjusted, the "Adjusted Baseline Amount"); and, with respect to any reduction in the Site and/or the Improvements that results in a reduction of the Impositions charged with respect to the Hotel, the Baseline Amount shall be reduced on a going-forward basis to a number equal to (I) the original Baseline Amount, multiplied by (II) a fraction, the numerator of which shall equal the actual reduced Impositions charged against the Hotel for the Fiscal Year immediately following the Fiscal Year in which the Impositions are reduced, and the denominator of which shall equal the actual Impositions charged against the Hotel for the Fiscal Year prior to the Fiscal Year in which the reduction is taken; and

2.    The Revenue Index of the Hotel during each of such Fiscal Years is less than the Revenue Index Threshold; and

3.    The fact that the Hotel has not met the tests set forth in Sections 2.02.A.1 and 2.02.A.2 is not the result of (x) Force Majeure, (y) Default by Owner, or (z) any renovation of or construction impacting the Hotel, including any Project, which has a material adverse impact on the availability or usage of Guest Rooms, food and beverage services, or availability or usage of meeting space, for an extended period of time during the Fiscal Year which is the subject of the test set forth above ("Tolling Event"). Any Fiscal Year in which any portion of the Hotel is undergoing renovation or construction activities relating to a conversion of Guest Rooms to residential units as provided for in the Projects, as well as the following three (3) full Fiscal Years, shall constitute a Tolling Event period to the extent the tests set forth in Sections 2.02.A.1 and 2.02.A.2 are not met as a result thereof. Additionally, in the event that after December 31, 2006, but prior to July 31, 2009, Owner elects not to proceed with the Wardman Tower Conversion Project, such election shall be deemed a Tolling Event, and the three (3) full Fiscal Year period following such election shall constitute a Tolling Event period for purposes of this Section 2.02.A.

Such option to terminate shall be exercised by serving written notice thereof on Manager no later than sixty (60) days after the receipt by Owner of the annual accounting under Section 4.01.B hereof for the second of the two (2) Fiscal Years referred to in Section 2.02.A.1. If Manager does not elect to avoid such Termination pursuant to Section 2.02.B below, this Agreement shall terminate as of the end of the fourth (4th) full Accounting Period following the date on which Manager receives Owner's written notice of its intent to terminate this Agreement; provided that such period of time shall be extended as required by applicable Legal Requirements pertaining to the termination of the employment of the employees at the Hotel. Owner's failure to exercise its right to terminate this Agreement pursuant to this Section 2.02.A with respect to any given Fiscal

Year shall not be deemed an estoppel or waiver of Owner's right to terminate this Agreement with respect to subsequent Fiscal Years to which this Section 2.02.A may apply.

B.    Upon receipt of Owner's written notice of Termination under Section 2.02.A, Manager shall have the option, to be exercised within sixty (60) days after receipt of said notice, to avoid such Termination by electing (in a notice to Owner) to (i) waive the payment of the Base Management Fee (beginning as of the first day of the next full Accounting Period after the date of such notice from Manager) until such time as the total cumulative amount of such waived Base Management Fee equals the total amount (the "Cure Payment") by which Operating Profit for each of the Fiscal Years in question (i.e., the Fiscal Years referred to in Section 2.02.A.1) was less than the Performance Termination Threshold, or (ii) pay to Owner an amount equal to the Cure Payment. In the event Manager makes a Cure Payment pursuant to this Section 2.02.B, the Fiscal Years with respect to which such Cure Payment was made shall thereafter not be treated, for purposes of subsequent elections by Owner pursuant to Section 2.02.A, as Fiscal Years in which the circumstances described in Section 2.02.A.1 have occurred. If Manager exercises such option to make such Cure Payment, then the foregoing Owner's election to terminate this Agreement under Section 2.02.A shall be canceled and of no force or effect with respect to the two (2) Fiscal Years in question, and this Agreement shall not terminate as a result thereof. Such cancellation, however, shall not affect the right of Owner, as to each subsequent Fiscal Year to which Section 2.02.A applies, to again elect to terminate this Agreement pursuant to the provisions of Section 2.02.A (which subsequent election shall again be subject to Manager's rights under this Section 2.02.B). If Manager does not exercise its option to make a Cure Payment as aforesaid, then this Agreement shall be terminated as of the date set forth in Section 2.02.A. Manager shall have the right to make three (3) Cure Payments pursuant to this Section 2.02.B during the Initial Term of this Agreement, and one (1) Cure Payment during each Renewal Term; provided, that with respect to the second (2nd) and third (3rd) Cure Payments during the Initial Term, if any, Manager may only pay Owner the amount equal to the Cure Payment (and shall not have the option to waive its Base Management Fee); and provided, further, that if Manager has elected to make the first (1st) Cure Payment by waiving its Base Management Fee, then concurrently with the payment of the second (2nd) Cure Payment, if any, Manager shall pay to Owner any amount remaining unpaid with respect to the first (1st) Cure Payment, if any, and Manager's obligation to continue waiving its Base Management Fee shall be extinguished upon such payment.

## ARTICLE III

## COMPENSATION OF MANAGER

### 3.01    Management Fees

Manager shall be paid the sum of the following as its management fees:

A.    the Base Management Fee, which shall be retained by Manager from Gross Revenues; plus

B.     the Incentive Management Fee, which shall be retained by Manager from Operating Profit in accordance with Sections 3.02 and 4.01.

### 3.02   Operating Profit

Operating Profit shall be distributed to Owner and to Manager in the following order of priority:

        1.     an amount equal to Owner's Priority shall be paid to Owner;

        2.     the Incentive Management Fee shall be paid to Manager; and

        3.     any remaining balance of Operating Profit shall be paid to Owner.

To the extent of available Operating Profit for each Accounting Period and within the time period set forth in Section 4.01.A, Manager shall distribute a prorated portion of Owner's Priority to Owner each Accounting Period and shall be entitled to retain a prorated portion of the Incentive Management Fee each Accounting Period based on its good faith estimate of the Incentive Management Fee for the full Fiscal Year.

### 3.03   Owner Representative

Each of Wardman Tower, L.L.C., Wardman Cotillion Residential, L.L.C. and Wardman Park Residential, L.L.C. hereby appoints Wardman Hotel, L.L.C. as its representative and agent for purposes of (i) receiving any and all distributions or other payments to which Owner is entitled under Section 3.02 or otherwise under this Agreement, (ii) giving or receiving notices as more particularly described in Section 11.07 of this Agreement, (iii) authorizing and/or directing any actions on behalf of Owner as may be contemplated under this Agreement, (iv) giving (or withholding) any requisite consents of Owner, and (v) otherwise acting as the representative of Owner for all purposes of this Agreement. Manager may conclusively rely on the provisions of this Section 3.03, and for the avoidance of doubt, is hereby expressly authorized and directed to make any and all such distributions, payments and notices to Wardman Hotel, L.L.C., as agent for Owner. Manager assumes no responsibility for, and Owner shall not hold Manager liable for, any allocation or distribution of funds among the parties comprising Owner.

## ARTICLE IV

## ACCOUNTING MATTERS

### 4.01   Accounting, Distributions and Annual Reconciliation

A.     Within twenty (20) days after the close of each Accounting Period, Manager shall deliver an interim accounting (the "Accounting Period Statement") to Owner showing Gross Revenues, Deductions, Operating Profit, and applications and distributions thereof for the preceding Accounting Period. Manager shall transfer to Owner, with each Accounting Period Statement, any interim amounts due Owner, subject to Working Capital needs, and shall retain any interim amounts due Manager.

B.      Calculations and payments of the Incentive Management Fee, the Base Management Fee, and distributions of Operating Profit made with respect to each Accounting Period within a Fiscal Year shall be accounted for cumulatively. Within ninety (90) days after the end of each Fiscal Year, Manager shall deliver to Owner a statement ("Annual Operating Statement") in reasonable detail summarizing the operations of the Hotel for the immediately preceding Fiscal Year and a certificate of Manager's chief accounting officer certifying that, to the best of his knowledge, such year-end statement is true and correct. The parties shall, within five (5) business days after Owner's receipt of such statement, make any adjustments, by cash payment, in the amounts paid or retained for such Fiscal Year as are needed because of the final figures set forth in such statement.  Such final accounting shall be controlling over the Accounting Period Statements.  No adjustment shall be made for any Operating Loss or Operating Profit in a preceding or subsequent Fiscal Year.

C.      To the extent there is an Operating Loss for any Accounting Period, additional funds in the amount of any such Operating Loss shall be provided by Owner within twenty (20) days after Manager has delivered written notice thereof to Owner. If Owner does not so fund such Operating Loss within the twenty (20) day time period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount equal to such Operating Loss from future distributions of funds otherwise due to Owner.

### 4.02    Books and Records

Books of control and account pertaining to operations at the Hotel shall be kept on the accrual basis and in all material respects in accordance with the Uniform System of Accounts, with the exceptions provided in this Agreement.  Owner may at reasonable intervals during Manager's normal business hours examine such records. If Owner desires, at its own expense, to audit, examine, or review the Annual Operating Statement described in Section 4.01.B, Owner shall notify Manager in writing within sixty (60) days after receipt of such statement of its intention to audit and begin such audit no sooner than thirty (30) days and no later than sixty (60) days after Manager's receipt of such notice. Owner shall complete such audit within ninety (90) days after commencement thereof. If Owner does not make such an audit, then such statement shall be deemed to be conclusively accepted by Owner as being correct, and Owner shall have no right thereafter, except in the event of fraud by Manager, to question or examine the same. If any audit by Owner discloses an understatement of any amounts due Owner, Manager shall promptly pay Owner such amounts found to be due, plus interest thereon (at the Prime Rate plus one percent (1%) per annum) from the date such amounts should originally have been paid. If any audit discloses that Manager has not received any amounts due it, Owner shall pay Manager such amounts, plus interest thereon (at the Prime Rate plus one percent (1%) per annum) from the date such amounts should originally have been paid. Any dispute concerning the correctness of an audit shall be settled by arbitration, in accordance with the then current rules of the American Arbitration Association.

### 4.03    Accounts, Expenditures

A.      All funds derived from operation of the Hotel shall be deposited by Manager in bank accounts (the "Operating Accounts") in a bank or banks designated by Manager, subject to Owner's reasonable approval. Withdrawals from said Operating Accounts shall be made solely

by representatives of Manager whose signatures have been authorized. Reasonable petty cash funds shall be maintained at the Hotel.

B.     All payments made by Manager hereunder shall be made from the Operating Accounts, petty cash funds, or from Working Capital. Manager shall not be required to make any advance or payment with respect to the Hotel except out of such funds, and Manager shall not be obligated to incur any liability or obligation with respect to the Hotel. In any event, if any such liability or obligation is incurred by Manager with respect to the Hotel, Manager shall have the option to deduct such amounts from Owner's share of Operating Profit if Owner has not fully reimbursed Manager for said amounts within ten (10) days after Owner's receipt of notice from Manager that said amounts are due.

C.     Debts and liabilities incurred by Manager as a result of its operation and management of the Hotel pursuant to the terms hereof, whether asserted before or after Termination, will be paid by Owner to the extent funds are not available for that purpose from Gross Revenues. The provisions of this Section 4.03.C shall survive Termination.

### 4.04    Annual Operating Projection

A.     Manager shall deliver to Owner for its review and approval, at least forty-five (45) days prior to the beginning of each Fiscal Year after the first Fiscal Year following the Closing Date, a preliminary draft of the "Annual Operating Projection." The preliminary Annual Operating Projection shall project the estimated percentage changes in Gross Revenues, departmental profits, Deductions, and Operating Profit for the forthcoming Fiscal Year for the Hotel. Owner shall have thirty (30) days after receipt of the preliminary Annual Operating Projection to review and approve it and, in the event that Owner disapproves any category in the Annual Operating Projection, Owner will provide Manager with a specific reason for its disapproval by category within such thirty (30) day period. Thereafter, in the twenty-five (25) day period following receipt of Owner's disapproval, the parties will attempt to resolve in good faith any objections by Owner. In the event of a dispute which the parties are unable to resolve, the matter may be referred by either party to the Expert for resolution. Pending resolution of the dispute, Manager shall operate the Hotel in all material respects in accordance with the categories approved by Owner and, with respect to disapproved categories, in accordance with the Annual Operating Projection for the prior Fiscal Year, as adjusted for inflation and projected increases in Gross Revenues. Notwithstanding the foregoing, Owner shall not be entitled to withhold its approval based on its objections to: (i) Manager's reasonable projections of either Gross Revenues or the components thereof; (ii) projected costs and expenses which are "system charges" (that is, costs and expenses which are generally uniform throughout the Marriott System, such as the cost of the Marriott Rewards program, other chain wide marketing programs, employee benefits and other compensation programs); (iii) costs and expenses which are not within the control of Owner and/or Manager, such as Impositions or the costs of utilities; and (iv) reasonable increases in projected costs and expenses of operating the Hotel which increases are primarily caused by reasonable projected increases in Gross Revenues. As of approximately forty-five (45) days after the beginning of each Fiscal Year following the Closing Date, Manager shall deliver to Owner the final Annual Operating Projection, in which the above mentioned percentage changes are applied to the actual final numbers in the Annual Operating Statement for the preceding Fiscal Year.

B.     Manager shall diligently pursue feasible measures to operate the Hotel in accordance with the Annual Operating Projection. It is understood, however, that the Annual Operating Projection is an estimate only and that unforeseen circumstances such as, but not limited to, the costs of labor, material, services and supplies, casualty, operation of law, or economic and market conditions may make adherence to the Annual Operating Projection impracticable, and Manager shall be entitled to depart therefrom due to causes of the foregoing nature. However, Manager shall notify Owner of any significant variations from the Annual Operating Projection promptly after Manager learns of the same, and shall notify Owner of the nature and extent and reason for such variation. For the purposes of this Section 4.04.B, any major Deduction category (major line item such as general and administrative) that varies by more than ten percent from the Annual Operating Projection or if total Deductions vary by more than seven and one-half percent (7.5%) shall be deemed to be significant. If such significant variation is due to reasons other than Force Majeure, such variation shall be subject to Owner's approval (although it is understood that Owner shall have no greater approval rights for any such variation than those set forth for the Annual Operating Projection in Section 4.04.A).

4.05     Working Capital

As of the Closing Date, Owner shall provide to Manager Working Capital in the amount of Two Million Dollars ($2,000,000). Thereafter, Owner shall, from time to time during the Term, promptly, but no later than ten (10) days after written request by Manager, advance any additional funds necessary to maintain Working Capital at levels determined by Manager to be reasonably necessary to satisfy the needs of the Hotel as its operation may from time to time require consistent with the approved Annual Operating Projection or as a result of "unforeseen circumstances" (as more fully set forth in Section 4.04.B). If Owner does not so fund additional Working Capital within the said ten (10) day time period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount equal to the funds requested by Manager for additional Working Capital from future distributions of funds otherwise due to Owner. All funds so advanced for Working Capital shall be utilized by Manager for the purposes of this Agreement pursuant to cash management policies established for the Marriott System. Upon Termination, Manager shall, except as otherwise provided in this Agreement, return the outstanding balance of the Working Capital to Owner.

4.06     Fixed Asset Supplies

Owner shall, within thirty (30) days after request by Manager, provide funds that are necessary to increase the level of Fixed Asset Supplies to levels determined by Manager, in its good faith judgment, to be necessary to satisfy the needs of the Hotel as its operation may, from time to time, require. Manager agrees that the levels of Fixed Asset Supplies at the Hotel are adequate as of the Closing Date. The cost of Fixed Asset Supplies consumed in the operation of the Hotel shall constitute a Deduction. Fixed Asset Supplies shall remain the property of Owner throughout the Term and upon Termination except for Fixed Asset Supplies purchased by Manager pursuant to Section 11.11.E.

### 4.07   Manager Contribution

Manager has previously contributed certain funds to the operation of the Hotel. In the event that this Agreement is terminated for any reason prior to the expiration of the Initial Term, Owner shall pay to Manager an amount equal to Four Thousand Five Hundred Twenty-Four Dollars ($4,524.00) multiplied by the number of calendar months remaining in the Initial Term as of date of Termination. The provision of this Section 4.07 shall survive any Termination.

## ARTICLE V

## REPAIRS, MAINTENANCE AND REPLACEMENTS

### 5.01   Repairs and Maintenance Costs Which Are Expensed

Subject to the Annual Operating Projection, Manager shall maintain the Hotel in good repair and condition and in conformity with applicable laws and regulations and shall make or cause to be made such routine maintenance, repairs and minor alterations as it determines are necessary for such purposes. The phrase "routine maintenance, repairs, and minor alterations" as used in this Section 5.01 shall include only those which are normally expensed under generally accepted accounting principles. The cost of such maintenance, repairs and alterations shall be paid from Gross Revenues (and not from the FF&E Reserve) and shall be treated as a Deduction in determining Operating Profit.

### 5.02   FF&E Reserve

A.     Manager shall establish a reserve account (the "FF&E Reserve"), in a bank or similar institution reasonably acceptable to both Manager and Owner, to cover the cost of

1.     replacements, renewals and additions to the FF&E at the Hotel; and

2.     Special Capital Expenditures.

B.     As of the Closing Date, Owner shall deposit into the FF&E Reserve the amount of Three Million Five Hundred Thousand Dollars ($3,500,000). Commencing with the Closing Date and for all Accounting Periods thereafter, subject to the provisions of Section 5.02.E, below, Manager shall transfer into the FF&E Reserve an amount equal to five percent (5%) of Gross Revenues for each such Accounting Period. Transfers into the FF&E Reserve shall be made at the time of each interim accounting described in Section 4.01 hereof. All amounts transferred into the FF&E Reserve pursuant to this Section 5.02.B shall be paid from Gross Revenues as Deductions.

C.     Manager shall prepare an annual estimate (the "FF&E Estimate") of the expenditures necessary for (1) replacements, renewals and additions to the FF&E of the Hotel, and (2) Special Capital Expenditures, during the ensuing Fiscal Year and shall deliver the FF&E Estimate to Owner for its review and approval, at the same time as Manager submits the Annual Operating Projection described in Section 4.04. The FF&E Estimate shall also indicate the estimated time schedule for making such replacements, renewals, and additions. Owner shall

have thirty (30) days after receipt of the proposed FF&E Estimate to review and approve it and, in the event Owner disapproves any portion of the FF&E Estimate, Owner will provide Manager in writing with the specific reasons for its disapproval within such thirty (30) day period. Manager may (but shall not be obligated to) designate items or expenditures that are within Manager's discretionary authority (subject to Section 5.02.D) with respect to FF&E and/or Special Capital Expenditures, and such items or expenditures shall not be subject to Owner's approval. Thereafter, in the twenty-five (25) day period following receipt of Owner's disapproval, the parties will attempt to resolve in good faith any objections by Owner. In the event that one or more of Owner's objections have not been resolved as of the end of such 25-day period, any such matter may be referred by either party for resolution by the Expert in accordance with the provisions of Section 11.21.

D.    In any Fiscal Year, Manager shall be entitled to make those (1) replacements, renewals and additions to the FF&E of the Hotel, and (2) Special Capital Expenditures that are authorized under the applicable FF&E Estimate for such Fiscal Year (or that were previously authorized under the FF&E Estimate the preceding Fiscal Year); provided, that in each Fiscal Year, Manager shall be entitled to make expenditures for FF&E and/or Special Capital Expenditures without the same having been approved by Owner (whether or not specifically designated as such in the applicable FF&E Estimate) up to (i) $25,000 (as adjusted by the GDP Deflator) for any particular item (or particular project), and (ii) $250,000 (as adjusted by the GDP Deflator) in the aggregate for all items and/or projects in such Fiscal Year. In any case in which such discretionary items have not been identified in the FF&E Estimate, Manager shall notify Owner of the items or projects that Manager has elected to purchase or undertake pursuant to the preceding sentence. No expenditures on account of FF&E or Special Capital Expenditures will be made other than as provided above, or in excess of the amount of the balance in the FF&E Reserve, without the prior written consent of Owner in each instance, subject to the provisions of Section 5.02.E. The placing of any restrictions on the expenditure by Manager of funds from the FF&E Reserve other than as set forth in this Section 5.02 (including, without limitation, interference resulting from (i) any Litigation involving Owner or the Hotel, or (ii) a Foreclosure) shall constitute an Event of Default by Owner under Section 9.01. At the end of each Fiscal Year, any amounts remaining in the FF&E Reserve shall be carried forward to the next Fiscal Year. Proceeds from the sale of FF&E no longer necessary to the operation of the Hotel shall be added to the FF&E Reserve. The FF&E Reserve will be kept in an interest-bearing account, and any interest which accrues thereon shall be retained in the FF&E Reserve. Neither (1) proceeds from the disposition of FF&E, nor (2) interest which accrues on amounts held in the FF&E Reserve, shall (a) result in any reduction in the required transfers to the FF&E Reserve set forth in Section 5.02.B, nor (b) be included in Gross Revenues.

E.    As the Hotel ages, the percentages of Gross Revenues which are set forth in Section 5.02.B may not be sufficient to keep the FF&E Reserve at the levels necessary to make the replacements, renewals, and additions to the FF&E of the Hotel, or to make the Special Capital Expenditures, which are required to maintain the Hotel in accordance with the System Standards. If the FF&E Estimate prepared in good faith by Manager exceeds the available funds in the FF&E Reserve, Owner shall elect in writing one of the following two (2) alternatives:

1.    to agree in writing to increase the annual percentage in Section 5.02.B to provide the additional funds required, or

2.    to make a lump sum contribution to the FF&E Reserve in the necessary amount; such amount shall be fully repaid (without interest) to Owner from Gross Revenues in equal installments over the period of the next sixty-five (65) Accounting Periods, and such installment repayments shall be Deductions.

A failure of refusal by Owner to either agree in writing to paragraph 1 above or provide the additional funds required in accordance with paragraph 2 above within sixty (60) days after Manager's request therefor shall entitle Manager (without affecting its other remedies hereunder) to terminate this Agreement on one hundred eighty (180) days' written notice to Owner.

### 5.03   Capital Expenditures

A.    Manager shall prepare an annual estimate (the "Building Estimate") of the expenses necessary for non-routine or major repairs, alterations, improvements, renewals, replacements, and additions to the Hotel including, without limitation, the structure, the exterior facade and all of the mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation elements of the Hotel building (the foregoing expenditures, together with all other expenditures which are classified as "capital expenditures" under generally accepted accounting principles, shall be collectively referred to as "Capital Expenditures"). Manager shall submit the Building Estimate to Owner for its approval at the same time the Annual Operating Projection is submitted. Manager shall not make any Capital Expenditures (except for Special Capital Expenditures pursuant to Section 5.02) without the prior written consent of Owner, unless otherwise permitted herein. Notwithstanding the foregoing, in the event of a dispute between Owner and Manager with respect to any Capital Expenditure, either party may refer the matter to the Expert for resolution.

B.    Notwithstanding the provisions of Section 5.03.A, Manager shall be authorized to take appropriate remedial action (including making any necessary Capital Expenditures) without receiving Owner's prior consent in the following circumstances: (i) if there is an emergency threatening the Hotel, its guests, invitees or employees; or (ii) if the continuation of the given condition will subject Manager and/or Owner to civil or criminal liability, and Owner has either failed to remedy the situation or has failed to take appropriate legal action to stay the effectiveness of any such law, ordinance, regulation or order. Manager shall cooperate with Owner in the pursuit of any such action and shall have the right to participate therein.

C.    The cost of all Capital Expenditures (except Special Capital Expenditures pursuant to Section 5.02) (including the expenses incurred by either Owner or Manager in connection with any civil or criminal proceeding described above) shall be borne solely by Owner, and shall not be paid from Gross Revenues nor from the FF&E Reserve.

D.    It shall be an Event of Default by Owner (and Manager shall be entitled to exercise any of the remedies described in Article IX hereof) if Owner fails both to approve any Capital Expenditure and to provide funding for it within sixty (60) days after the submission to Owner of the Building Estimate requesting such Capital Expenditure; provided, however, if Owner has failed to approve any such Capital Expenditure or is disputing such Capital Expenditure and either party has referred the matter to the Expert for resolution, no Event of Default by Owner shall exist until fifteen (15) days after the Expert has rendered its decision (if

the Expert has ruled in favor of Manager and Owner has not, within such fifteen (15) day period, provided the funding for such Capital Expenditure).

E. Except as set forth in Section 5.05 herein, it is understood that any proposed "alterations" and "improvements" which would either (a) increase or decrease the number of Guest Rooms in the Hotel, or (b) involve changing the architectural footprint of the Hotel or involve other significant changes in the structural design of the Hotel, in any case by more than a de minimis amount, are beyond the scope of this Article V, and would require an amendment of this Agreement prior to implementation by either party.

### 5.04   Ownership of Replacements

All repairs, alterations, improvements, renewals or replacements made pursuant to this Article V, and all amounts kept in the FF&E Reserve, shall, except as otherwise provided in this Agreement, be the property of Owner.

### 5.05   Hotel Renovation and Conversion Projects

Owner shall undertake substantial improvements to and shall redevelop portions of the Hotel (collectively, the "Projects" and individually, a "Project"), as more particularly described in the Technical Services Agreement, and the exhibits thereto, attached as Exhibit C to this Agreement. Owner shall notify Manager (and MIDCS pursuant to the Technical Services Agreement) in writing on or before December 31, 2006, if it elects not to go forward with the Wardman Tower Conversion Project (as defined in the Technical Services Agreement and Exhibits E-1 and E-2 attached thereto). If Manager does not receive such written notice on or before December 31, 2006, Owner shall be presumed to have elected to complete the Wardman Tower Conversion Project. Notwithstanding the immediately preceding sentence, if Owner has not given Manager and MIDCS a written election of its intent not to proceed with the Wardman Tower Conversion Project on or before December 31, 2006 (i.e., Owner has elected, or is deemed to have elected, to proceed with the Wardman Tower Conversion Project), at any time on or prior to July 31, 2009, Owner may notify Manager (and MIDCS, pursuant to the Technical Services Agreement) in writing that it has elected not to go forward with the Wardman Tower Conversion Project. If Manager and MIDCS do not receive such notice on or before July 31, 2009, Owner shall be conclusively presumed to have elected to complete the Wardman Tower Conversion Project in accordance with the Renovation Program and Exhibits E-1 and E-2 of the Technical Services Agreement. Once Owner elects in writing not to proceed with the Wardman Tower Conversion Project, it shall not thereafter be entitled to elect to go forward with such Project. The Projects will not be amended or modified, except as permitted pursuant to the Technical Services Agreement. The cost of the Projects shall be borne solely by Owner, and shall not be paid from Gross Revenues nor from the FF&E Reserve. Moreover, the cost of the Projects shall not increase Owner's Priority nor affect any calculation derived therefrom.

### 5.06   A&T Lot Releases

Each of the parties comprising Owner owns a portion of the Site (each, an "A&T Lot"), as more particularly described on (i) Exhibit A-1, as to Wardman Hotel, L.L.C., (ii) Exhibit A-2,

as to Wardman Tower, L.L.C., (iii) Exhibit A-3, as to Wardman Cotillion Residential, L.L.C., and (iv) Exhibit A-4, as to Wardman Park Residential, L.L.C., together with the respective Improvements appurtenant thereto. If, as and when any A&T Lot shall be permanently removed from the operation of the Hotel pursuant to the Projects or otherwise as Owner and Manager may agree, Owner and Manager agree that, from and after the effective date of such permanent removal, (i) the respective fee owner of such A&T Lot shall, without any further action required on the part of any party, be immediately and fully released from any further obligation or liability as a party comprising Owner under this Agreement (and Manager shall be released from all further obligation or liability to such party comprising Owner), and (ii) the applicable A&T Lot and the Improvements thereon shall, without any further action required on the part of any party, be immediately deemed removed from the Hotel, the Improvements and the Site as such terms are used in this Agreement. In such event, Owner and Manager agree, upon the request of either party, to provide confirmatory mutual releases among the parties and to enter into a conforming amendment to this Agreement to better evidence the removal of such A&T Lot and the release of such Owner party from the operation of this Agreement.

## ARTICLE VI

### INSURANCE, DAMAGE, CONDEMNATION, AND FORCE MAJEURE

6.01   Property Insurance

Commencing with the Effective Date, Owner shall procure and maintain the following (or Manager shall procure and maintain the following if (i) Owner requests in writing, at least sixty (60) days prior to the Effective Date, that Manager procure and maintain the following, (ii) the Hotel satisfies the then-current insurability criteria under Manager's insurance program and (iii) Manager approves such request, in its sole and absolute discretion; provided, that to the extent any one or more of the following coverages is not available to Owner outside of Manager's insurance program at commercially reasonable rates, Owner may request that Manager procure and maintain all (but not some) of the following coverages under Manager's insurance program and if the Hotel satisfies the then-current insurability criteria under Manager's insurance program, Manager shall approve such request and shall procure the property insurances coverages for the Hotel without any financial penalty to Owner for having left the insurance program or, alternatively, if the Hotel does not come into Manager's property insurance program, Manager shall waive the requirement for Owner to procure and maintain the particular coverage):

A.   Property insurance (and to the extent applicable builders risk insurance), including boiler and machinery coverage, on the Hotel building(s) and contents against loss or damage by risks as commonly covered by an "all risk of physical loss," form including, but not limited to coverage for the perils of windstorm, certified acts of terrorism as available under the Terrorism Risk Insurance Act (as the same may be amended or replaced), explosion of steam boilers, pressure vessels and other similar apparatus, and other perils generally included under such form, in an amount not less than the full insurable replacement cost (less excavation and foundation costs) of the Hotel. Such coverage shall include an agreed value provision, waiver of co-insurance, landscape improvements coverage of not less than One Million Dollars

($1,000,000) and law and ordinance coverage in an amount equal to twenty-five percent (25%) of the replacement value or Five Million Dollars ($5,000,000) whichever is greater;

B.      Business interruption insurance including extra expense covering at least two (2) years' loss of profits, necessary continuing expenses, and if applicable, rent, for interruptions at the Hotel, including an extended period of indemnity of not less than 365 days, caused by any occurrence covered by the insurance referred to in Section 6.01.A, Section 6.01.C and Section 6.01.D;

C.      If flood insurance is excluded under the property insurance required under Section 6.01.A above and the Hotel is located in whole or in part within an area identified as having a special flood hazard, flood insurance in an amount equal to not less than ten percent (10%) of the replacement cost of the Hotel, to the extent available at commercially reasonable terms, but in no event less than an amount equal to the maximum amount available under the National Flood Insurance Program for such coverage;

D.      If the Hotel is located in an "earthquake-prone zone" as determined by the U.S. Geological Survey, insurance coverage for loss or damage caused by earth movement. Such coverage, including business interruption, shall be for not less than the probable maximum loss as determined by a recognized earthquake engineering firm, less a reasonable deductible. If Owner is procuring the insurance required hereunder and Owner participates in a blanket or shared insurance program, Owner shall provide written notice to Manager if actual losses under such program erode the coverage available to the Hotel;

E.      Such other property insurance as is customarily required by Manager at similar hotels.

F.      All insurance procured hereunder shall be obtained from reputable insurance companies of recognized responsibility and financial standing reasonably acceptable to Manager. Any premiums and deductibles under said policies shall be subject to the reasonable approval of Manager and, upon such approval, shall be paid as Deductions.

G.      If Owner procures such insurance, all such policies of insurance shall be carried in the name of Owner, with Manager as an additional insured. If Manager procures such insurance, all such policies of insurance shall be carried in the name of Manager, with Owner as an additional insured. Any property losses thereunder shall be payable to the respective parties as their interests may appear. The documentation with respect to each Mortgage shall contain provisions to the effect that proceeds of the insurance policies required to be carried under Section 6.01 shall be available for repair and restoration of the Hotel, to the extent required pursuant to Section 6.04.

H.      If Owner procures such insurance, Owner shall (i) deliver to Manager certificates of insurance for such insurance or, upon request by Manager, a certified copy of the policy(ies) so procured and, (ii) in the case of insurance policies about to expire, deliver to Manager certificates with respect to the renewal(s) thereof. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled, nonrenewed or materially changed without at least thirty (30) days' prior written notice to the certificate holder.

I.      Each of Owner and Manager hereby waives its rights of recovery and its insurer rights of subrogation from the other party or any of its Affiliates (and their respective directors, officers, shareholders, agents and employees) for loss or damage to the Hotel, and any resultant interruption of business regardless of the cause of such property or business interruption loss.

J.      If (i) Owner is eligible to participate in Manager's property insurance program, (ii) Owner nevertheless elects to procure its own property insurance and (iii) the costs of the premiums and/or deductibles for coverage under Owner's insurance program exceed the costs of the premiums and deductibles under Manager's insurance program by more than ten percent (10%), then Owner shall be solely responsible (i.e., such costs shall not be paid from Gross Revenues or treated as Deductions) for the entire amount by which such costs under Owner's program exceed such costs under Manager's program.

K.      If the Hotel participates in Manager's insurance program, but thereafter Owner intends to procure its own insurance for the Hotel, Owner shall provide Manager notice of such decision at least ninety (90) days prior to the next renewal date of coverage under Manager's insurance program (which is currently April 1st of each calendar year). If Owner fails to provide such notice within such period of time, but Owner nevertheless procures its own insurance for the Hotel, Owner shall pay (from its own funds and not from Gross Revenues) to Manager an amount equal to ten (10%) of the annual premium under Manager's insurance policies to cover all fixed costs and expenses incurred by Manager for the placement of such insurance. If Owner elects to exit Manager's insurance program in the middle of a coverage year (i.e., prior to the end of a coverage year), (i) the premiums under both Manager's insurance program and Owner's replacement insurance program will each be prorated as of the date on which Manager receives and approves certificates of insurance evidencing Owner's replacement insurance coverage and its compliance with the provisions and requirements hereof and (ii) Owner shall pay to Manager the amount described in the immediately preceding sentence. If Owner elects to exit Manager's insurance program pursuant to the foregoing provisions, Owner may elect to again have the Hotel participate in Manager's insurance program only upon Manager's prior approval, which Manager may withhold in its sole and absolute discretion.

L.      If Owner procures insurance for the Hotel pursuant to the provisions of this Section 6.01, Manager shall pay to Owner, as a Deduction and at the same time that Manager makes interim payments to Owner pursuant to the provisions of Section 4.01.A, the amount of all reasonable insurance premiums relating to such insurance (subject to the provisions of this Section 6.01, including Section 6.01.J) (the amount of such payments, collectively, the "Property Insurance Premiums"). The interim amount of Property Insurance Premiums to be paid by Manager to Owner shall be calculated by prorating the full Fiscal Year budgeted amount (or the actual amount, if available) of such Property Insurance Premiums equally over thirteen (13) Accounting Periods. Owner shall, within five (5) days after Manager's request therefor, provide Manager with evidence (reasonably satisfactory to Manager) of Owner's payment of all premiums under the insurance policies procured by Owner hereunder. Manager shall reconcile prior payments of the Property Insurance Premiums to Owner for each Fiscal Year with the actual amount of the Property Insurance Premiums for such Fiscal Year, and the parties shall make any necessary adjustments with respect thereto following Owner's receipt of each Accounting Period Statement and/or Annual Operating Statement, as applicable. The parties agree that Manager shall only be required to pay Property Insurance Premiums to the extent that

Gross Revenues are available under this Agreement. Owner shall be solely responsible for paying all premiums under insurance policies procured by Owner, before any fine, penalty or interest is added thereto.

### 6.02   Operational Insurance

Commencing with the Effective Date and thereafter during the Term, Manager shall procure and maintain the following:

A.    Commercial general liability insurance against claims for bodily injury, death or property damage occurring in conjunction with the operations of the Hotel, and automobile liability insurance on vehicles operated in conjunction with the Hotel, with a combined single limit for each occurrence of not less than One Hundred Million Dollars ($100,000,000);

B.    Workers' compensation coverage as may be required under applicable laws covering all of Manager's employees at the Hotel, and employer's liability insurance of not less than One Million Dollars ($1,000,000) per accident/disease;

C.    Fidelity bond coverage in an amount not less than Two Million Dollars ($2,000,000) covering Manager's employees at the Hotel; and

D.    Employment practices liability insurance covering Manager's employees at the Hotel, to the extent available at commercially reasonable rates and terms, in an amount not less than One Million Dollars ($1,000,000);

E.    Such other insurance in amounts as Manager, in its reasonable judgment, deems advisable for protection against claims, liabilities and losses arising out of or connected with the operation of the Hotel.

F.    All insurance described in this Section 6.02 (and all insurance described in Section 6.01, if Manager procures the insurance described thereunder) may be obtained through blanket insurance programs, provided that such blanket programs substantially fulfill the requirements specified herein. The blanket insurance programs may include an "Insurance Retention." Insurance Retention shall mean the deductibles or risk retention levels; however, the Hotel's responsibility for such deductibles or risk retention levels shall be limited to the Hotel's per occurrence limit for any loss or reserve as established for the Hotel, which limit shall be the same as other similar hotels participating in the blanket insurance programs.

G.    All insurance required under this Section 6.02 shall be carried in the name of Manager. The insurance required under Section 6.02.A shall include Owner, and any Mortgagees specified by Owner, in writing, as additional insureds.

H.    Manager, upon request, shall deliver to Owner certificates of insurance or insurance binders evidencing the insurance coverages required under Section 6.02.A (and under Section 6.01, if Manager procures the insurance described thereunder) and any renewals thereof. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled or materially reduced without at least thirty (30) days' prior written notice to the certificate holder.

I.      All insurance premiums, costs and other expenses, including any Insurance Retention, for insurance procured pursuant to this Section 6.02 shall be treated as Deductions. All charges under the blanket programs shall be allocated to the Hotel and other similar participating hotels on a reasonable basis. Any losses and associated costs and expenses that are uninsured shall be treated as a cost of insurance and shall also be treated as Deductions.

J.      Upon Termination, a reserve in an amount determined by Manager based on loss projections, shall be established from Gross Revenues to cover the amount of any Insurance Retention and all other costs and expenses that will eventually have to be paid by either Owner or Manager with respect to pending or contingent claims, including those that arise after Termination for causes arising during the Term. If Gross Revenues are insufficient to meet the requirements of such reserve, Owner shall deliver to Manager, within ten (10) days after receipt of Manager's written request thereof, the sums necessary to establish such reserve; and if Owner fails to timely deliver such sums to Manager, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the Operating Accounts, the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager.

6.03    Insurance for Residential Regime or Other Structure Involving Non-Hotel Components

In the event a portion of the Hotel is converted to a mixed-use residential regime or similar structure that includes residential, commercial, or other non-Hotel units (whether or not involving a condominium structure), then as to that portion being operated as a mixed-use project, the insurance provisions in Sections 6.01 and 6.02 shall be amended to adhere to the Manager's standard insurance requirements for a multi-use or residential complex.

6.04    Damage and Repair

A.      If, during the Term, the Hotel is damaged or destroyed by fire, casualty or other cause, Owner shall, at its cost and expense and with all reasonable diligence, repair or replace the damaged or destroyed portion of the Hotel to the same condition as existed previously and Manager shall have the right to discontinue operating the Hotel to the extent it deems necessary to comply with applicable law, ordinance, regulation or order or as necessary for the safe and orderly operation of the Hotel. To the extent available, proceeds from the insurance described in this Agreement shall be applied to such repairs or replacements.

B.      In the event damage or destruction to the Hotel from any cause materially and adversely affects the operation of the Hotel and Owner fails to promptly commence and complete the repairing, rebuilding or replacement of the same so that the Hotel shall be substantially the same as it was prior to such damage or destruction, Manager may, at its option, elect to either undertake such work for the account of Owner or terminate this Agreement by written notice to Owner and this Agreement shall terminate on the date that is sixty (60) days after receipt of such written notice by Owner.

6.05   Condemnation

A.   In the event all or substantially all of the Hotel shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Hotel shall be so taken, but the result is that it is unreasonable to continue to operate the Hotel in accordance with the standards required by this Agreement, this Agreement shall terminate. Owner and Manager shall each have the right to initiate such proceedings as they deem advisable to recover any damages to which they may be entitled (it being agreed that Manager's sole claim shall be the value of this Agreement).

B.   In the event a portion of the Hotel shall be taken by the events described in Section 6.04.A, or the entire Hotel is affected but on a temporary basis, and the result is not to make it unreasonable to continue to operate the Hotel, this Agreement shall not terminate. However, so much of any award for any such partial taking or condemnation as shall be necessary to render the Hotel equivalent to its condition prior to such event shall be used for such purpose; Manager shall have the right to discontinue operating the Hotel to the extent it deems necessary for the safe and orderly operation of the Hotel; and this Agreement shall terminate as to such portion.

ARTICLE VII

TAXES

7.01   Real Estate and Personal Property Taxes

A.   Except as specifically set forth in Section 7.01.B, all real estate and personal property taxes, levies, assessments and similar charges on or relating to the Hotel ("Impositions") during the Term shall be paid by Manager from Gross Revenues, before any fine, penalty, or interest is added thereto or lien placed upon the Hotel or upon this Agreement, unless payment thereof is in good faith being contested and enforcement thereof is stayed. Any such payments shall be Deductions in determining Operating Profit. Owner shall, within five (5) days after receipt, furnish Manager with copies of official tax bills and assessments which it may receive with respect to the Hotel. Either Owner or Manager (in which case Owner agrees to sign the required applications and otherwise cooperate with Manager in expediting the matter) may initiate proceedings to contest any negotiations or proceedings with respect to any Imposition, and all reasonable costs of any such contest shall be paid from Gross Revenues and shall be a Deduction in determining Operating Profit. Manager shall, as part of its contest or negotiation of any Imposition, be entitled, on Owner's behalf, to waive any applicable statute of limitations in order to avoid paying the Imposition during the pendency of any proceedings or negotiations with applicable authorities.

B.   The word "Impositions" as used in this Agreement shall not include the following, all of which shall be paid solely by Owner, not from Gross Revenues nor from the FF&E Reserve:

1.      Any franchise, corporate, estate, inheritance, succession, capital levy or transfer tax imposed on Owner, or any income tax imposed on any income of Owner (including distributions to Owner pursuant to Article III hereof);

2.      Special assessments (regardless of when due or whether they are paid as a lump sum or in installments over time) imposed because of facilities which are constructed by or on behalf of the assessing jurisdiction (for example, roads, sidewalks, sewers, culverts, etc.) which directly benefit the Hotel (regardless of whether or not they also benefit other buildings), which assessments shall be treated as capital costs of construction and not as Deductions;

3.      Impact fees (regardless of when due or whether they are paid as a lump sum or in installments over time) which are required of Owner as a condition to the issuance of site plan approval, zoning variances or building permits, which impact fees shall be treated as capital costs of construction and not as Deductions; or

4.      Tax-increment financing or similar financing whereby the municipality or other taxing authority has assisted in financing the construction of the Hotel by temporarily reducing or abating normal Impositions in return for substantially higher levels of Impositions at later dates.

## ARTICLE VIII

## OWNERSHIP OF THE HOTEL

### 8.01    Ownership of the Hotel

A.      Owner hereby covenants that it holds good and marketable fee title to the Site (each party comprising Owner holding title to the A&T Lot referenced in Exhibits A-1 through A-4) and that it will have, keep, and maintain good and marketable fee title to the Hotel free and clear of any and all liens, encumbrances or other charges, except as follows:

1.      easements or other encumbrances (other than those described in Sections 8.01.A.2 and 8.01.A.3 hereof) that do not adversely affect the operation of the Hotel by Manager and that are not prohibited pursuant to Section 8.03 of this Agreement;

2.      the First Mortgage or any additional or replacement Mortgage and its related security instruments, provided that, with respect to any Mortgage,

(i)      the aggregate principal balance of all Mortgages encumbering the Hotel, including the proposed Mortgage, is no greater than the greater of (x) the aggregate principal balance of all Mortgages prior to placing the proposed Mortgage and (y) seventy-five percent (75%) of the fair market value of the Hotel as of the date such Mortgage is placed; and

(ii)     the ratio of (x) the average annual Operating Profit over the next three (3) full Fiscal Years, as shown on projections reasonably approved by

Manager, to (y) the annual debt service payable on all Mortgages encumbering the Hotel, including the proposed Mortgage, is no less than 1.2 to 1; and

(iii)    Owner, Manager, and the holder of such Mortgage enter into a Subordination Agreement as described in Section 8.02 below.

3.    liens for taxes, assessments, levies or other public charges not yet due or due but not yet payable.

B.    Owner shall pay and discharge, on or before the due date, any and all (1) installments of principal and interest and other payments due and payable upon the First Mortgage, and (2) payments due under any other Mortgage that Owner has, in accordance with the provisions of this Article VIII, entered into with respect to the Hotel. Owner shall indemnify, defend, and hold Manager harmless from and against all claims, litigation and damages arising from the failure to make any such payments as and when required; and this obligation of Owner shall survive Termination. Manager shall have no responsibility for payment of debt service due with respect to the Hotel, from Gross Revenues or otherwise, and such responsibility shall be solely that of Owner.

C.    Owner agrees that it will not encumber the Hotel with any mortgage indebtedness (including, but not limited to, the First Mortgage), nor any refinancing thereof, if the terms and conditions of such indebtedness are contrary or inconsistent with the terms and conditions of this Agreement.

D.    Owner covenants that, so long as Manager is not in Default under this Agreement, Manager shall quietly hold, occupy and enjoy the Hotel throughout the Term hereof free from hindrance, ejection or molestation by Owner or other party claiming under, through or by right of Owner. Owner agrees to pay and discharge any payments and charges and, at its expense, to prosecute all appropriate actions, judicial or, otherwise, necessary to assure such free and quiet occupation.

### 8.02    Subordination, Non-Disturbance, and Attornment

A.    Subject to Section 8.02.C below, it shall be a condition of Manager's obligations under this Agreement that Manager and the First Mortgagee (and any other Mortgagee), if any, shall execute an instrument (the "Subordination Agreement") satisfactory in all commercially reasonable respects to Manager and First Mortgagee (or any other Mortgagee), which shall be recordable in the jurisdiction where the Hotel is located, pursuant to which:

1.    This Agreement and any extensions, renewals, replacements or modifications thereto, and all right and interest of Manager in and to the Hotel, shall be subject and subordinate to the First Mortgage;

2.    Manager shall be obligated to each of the Subsequent Owners to perform all of the terms and conditions of this Agreement for the balance of the remaining Term hereof, with the same force and effect as if such Subsequent Owner were the Owner; and

3.      In the event that there is a foreclosure of the First Mortgage (or a deed in lieu of foreclosure), or other exercise by the First Mortgagee of its remedies in the event of default, in connection with which title or possession of the Hotel is transferred to the First Mortgagee (or its designee) or to a purchaser at foreclosure or to a subsequent purchaser from the First Mortgagee (or from its designee) (all of the foregoing shall collectively be referred to as "Subsequent Owners"), Manager shall not be disturbed in its rights under this Agreement so long as Manager is not in Default hereunder.

B.      In the event that the Subordination Agreement contains provisions requiring Manager (upon a default under the First Mortgage, or upon various other stipulated conditions) to pay certain amounts which are otherwise due to Owner under this Agreement to the First Mortgagee or its designee (rather than to Owner), Owner hereby gives its consent to such provisions, which consent shall be deemed to be irrevocable until the entire debt secured by the First Mortgage has been discharged.

C.      Prior to encumbering the Hotel or the Site with any Mortgage, Owner shall be obligated to use its best efforts to obtain from the proposed Mortgagee an executed, recordable Subordination Agreement, which Manager agrees to execute for the benefit of such proposed Mortgagee. The requirement that Owner use best efforts to obtain a Subordination Agreement shall not impose upon Owner the obligation to incur material additional cost or liability with respect to the proposed Mortgage. If Owner encumbers the Hotel or the Site with a Mortgage without first so obtaining such an agreement from the Mortgagee after using its best efforts to do so in accordance with this Section 8.02.C.: (i) it shall be a Default of Owner under this Agreement, entitling Manager to all of the remedies set forth in Article IX; and (ii) in addition, Manager shall thereafter have the right, for a period of one hundred eighty (180) days after receiving notice of such Mortgage, to deliver notice to terminate this Agreement upon sixty (60) days' prior written notice to Owner.

D.      Notwithstanding the subordination of this Agreement which is described in Section 8.02.A.1 (or any subsequent subordination to any other Mortgage), if, in connection with the exercise by any Mortgagee of its remedies under any Mortgage, Manager is unable to operate the Hotel in accordance the provisions of this Agreement (such as, for example, restrictions imposed upon expenditures from the FF&E Reserve by Manager, where such restrictions are not set forth in this Agreement), the foregoing shall be deemed to be a Default by Owner entitling Manager to all of the remedies set forth in Article IX.

E.      Owner and Manager agree and acknowledge that any Subordination Agreement existing and in effect as of the Effective Date of this Agreement shall be accepted by Manager with respect to the specific Mortgage referenced therein.

8.03    No Covenants, Conditions or Restrictions

A.      Owner covenants that, as of the Closing Date and during the Term, there will not be (unless Manager has given its prior written consent thereto) any covenants, conditions or restrictions, including reciprocal easement agreements or cost-sharing arrangements (collectively referred to as "CC&Rs") affecting the Site or the Hotel or any part thereof (i) which would prohibit or limit Manager from operating the Hotel in accordance with the System Standards,

including related amenities proposed for the Hotel; or (ii) which would allow Hotel facilities (for example, parking spaces) to be used by persons other than guests, invitees or employees of the Hotel. Manager shall not unreasonably withhold, condition or delay its consent to any CC&Rs that are consistent with the Projects.

B. All financial obligations imposed on Owner or on the Hotel pursuant to any CC&Rs shall be paid by Owner from its own funds, and not from Gross Revenues or from the FF&E Reserve, unless Manager has given its prior written consent to the payment of such obligations out of Gross Revenues and the treatment of such costs as Deductions.

8.04    Liens; Credit

Manager and Owner shall use commercially reasonable efforts to prevent any liens from being filed against the Hotel which arise from any maintenance, repairs, alterations, improvements, renewals or replacements in or to the Hotel. They shall cooperate fully in obtaining the release of any such liens, and the cost thereof, if the lien was not occasioned by the fault of either party, shall be treated the same as the cost of the matter to which it relates. If the lien arises as a result of the fault of either party, then the party at fault shall bear the cost of obtaining the lien release. In no event shall either party borrow money in the name of or pledge the credit of the other.

## ARTICLE IX

## DEFAULTS

9.01    Default

Each of the following shall constitute an "Default" under this Agreement.

A. The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by either party, or the admission by either party that it is unable to pay its debts as they become due. Upon the occurrence of any Default by either party (referred to as the "defaulting party") as described under this Section 9.01.A, said Default shall be deemed an "Event of Default" under this Agreement.

B. The consent to an involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by either party. Upon the occurrence of any Default by either party as described under this Section 9.01.B, said Default shall be deemed an "Event of Default" under this Agreement.

C. The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating either party as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree's continuing unstayed and in effect for an aggregate of sixty (60) days (whether or not consecutive). Upon the occurrence of any Default by either party as described under this Section 9.01.C, said Default shall be deemed an "Event of Default" under this Agreement.

D.      The failure of either party to make any payment required to be made in accordance with the terms of this Agreement, as of the due date as specified in this Agreement. Upon the occurrence of any Default by either party as described under this Section 9.01.D, said Default shall be deemed an "Event of Default" under this Agreement if the defaulting party fails to cure such Default within ten (10) days after receipt of written notice from the non-defaulting party demanding such cure.

E.      The failure of either party to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after the defaulting party's receipt of written notice from the non-defaulting party of said failure. Upon the occurrence of any Default by either party as described under this Section 9.01.E, said Default shall be deemed an "Event of Default" under this Agreement if the defaulting party fails to cure the Default within thirty (30) days after receipt of written notice from the non-defaulting party demanding such cure, or, if the Default is such that it cannot reasonably be cured within said thirty (30) day period of time, if the defaulting party fails to commence the cure of such Default within said thirty (30) day period of time or thereafter fails to diligently pursue such efforts to completion.

F.      The failure of Owner to perform, keep or fulfill any of the covenants, undertakings, obligations or conditions set forth in the Technical Services Agreement with respect to the Projects, including the Marriott Core Projects, and the continuance of such default beyond the notice and cure period set forth in the Technical Services Agreement. If Owner disputes the existence of a Default under this Section 9.01.F, Owner may refer the matter to an Expert for resolution under Section 11.21. Upon the occurrence of any Default as described under this Section 9.01.F, and the continuance of such Default for a period of thirty (30) days after Owner's receipt of written notice of such Default, said Default shall be deemed an "Event of Default" under this Agreement.

## 9.02    Remedies

Upon the occurrence of an Event of Default, the non-defaulting party shall have the right to pursue any one or more of the following courses of action: (1) if the Event of Default has a material adverse impact on the non-defaulting party, to terminate this Agreement by written notice to the defaulting party, which termination shall be effective as of the effective date which is set forth in said notice, provided that said effective date shall be at least thirty (30) days after the date of said notice and further provided that, if the defaulting party is Manager, the foregoing period of thirty (30) days shall be extended to seventy-five (75) days (or such longer period of time as may be necessary under applicable laws pertaining to termination of employment); (2) to institute forthwith any and all proceedings permitted by law or equity including, without limitation, actions for specific performance and/or damages; and/or (3) to avail itself of the remedies described in Section 9.03.

## 9.03    Additional Remedies

A.      Upon the occurrence of a Default by either party under the provisions of Section 9.01.D, the amount owed to the non-defaulting party shall accrue interest, at an annual

rate equal to the Prime Rate plus three (3) percentage points, from and after the date on which the Default occurred.

B.      Upon the occurrence of a Default by Owner under the provisions of Section 9.01.D, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount (plus accrued interest as described in 9.03.A above) owed to Manager by Owner from distributions otherwise payable to Owner pursuant to Sections 3.01 and 4.01 of this Agreement.

C.      Upon the occurrence of an Event of Default by Owner under the provisions of Section 9.01.F., Manager shall have the right (without affecting Manager's other remedies under this Agreement) to complete any Marriott Core Project that is the subject of the Event of Default in accordance with the scope set forth in Exhibit E-1 to the Technical Services Agreement for amounts not to exceed the applicable Project Budget and to fund such Marriott Core Project(s) by withholding from Owner each Accounting Period distributions otherwise payable to Owner pursuant to Sections 3.01 and 4.01 of this Agreement in excess of amounts required to pay amounts then owing with respect to any Mortgage on the Hotel with respect to which a Subordination Agreement shall be in force and effect.

D.      Manager and/or any Affiliate shall be entitled, in case of any breach of the covenants of Sections 11.11.E, 11.11.F, or 11.11.G or of Section 11.12 by Owner or others claiming through it, to injunctive relief and to any other right or remedy available at law.

E.      The remedies granted under Sections 9.02 and 9.03 shall not be in substitution for, but shall be in addition to any and all rights and remedies available to the non-defaulting party (including, without limitation, injunctive relief and damages) by reason of applicable provisions of law or equity and shall survive Termination.

## ARTICLE X

### ASSIGNMENT AND SALE

10.01   Assignment

A.      Manager shall not assign or transfer its interest in this Agreement without the prior written consent of Owner; provided, however, that Manager shall have the right, without Owner's consent, to (1) assign its interest in this Agreement to Marriott or any Affiliate, (2) lease shops or grant concessions at the Hotel so long as the terms of any such leases or concessions do not exceed the Term of this Agreement, (3) assign its interest in this Agreement in connection with a merger or consolidation or a sale of all or substantially all of the assets of Manager or Marriott, and (4) assign its interest in this Agreement in connection with a merger or consolidation or a sale of all or substantially all of the Marriott System assets owned by Manager, Marriott or any Affiliate

B.      Owner shall not assign or transfer its interest in this Agreement without the prior written consent of Manager; provided, however, that Owner shall have the right, without such consent, to (1) conditionally assign this Agreement as security for a Mortgage of the Hotel in

accordance with this Agreement, and (2) assign its interest in this Agreement in connection with a Sale of the Hotel which complies with the provisions of Section 10.02 of this Agreement.

C. In the event either party consents to an assignment of this Agreement by the other, no further assignment shall be made without the express consent in writing of such party, unless such assignment may otherwise be made without such consent pursuant to the terms of this Agreement. An assignment by either Owner or Manager of its interest in this Agreement shall not relieve Owner or Manager, as the case may be, from its respective obligations under this Agreement, and shall inure to the benefit of, and be binding upon, its respective successors, heirs, legal representatives, or assigns.

### 10.02 Sale of the Hotel

A. Owner shall not enter into any Sale of the Hotel to any individual or entity which: (1) does not, in Manager's reasonable judgment, have sufficient financial resources and liquidity to fulfill Owner's obligations under this Agreement; (2) is known in the community as being of bad moral character, or is in control of or controlled by persons who have been convicted of felonies in any state or federal court; (3) is engaged, directly or indirectly, in the operation or management (as opposed to ownership) of hotels competitive to Manager or any of its Affiliates; or (4) as its (or its affiliate's) primary business, owns, leases or operates any casino or gambling facility, unless such entity or individual is licensed under the gaming laws of Nevada or New Jersey. Furthermore, Owner shall not enter into a Sale of the Hotel if Owner is at the time in Default under the terms of this Agreement.

B. If Owner decides to offer the Hotel for sale to a third party, or Owner receives an unsolicited offer to buy the Hotel which is acceptable to Owner, then prior to offering the Hotel for sale or negotiating a Sale of the Hotel with any third party, Owner will give Manager notice of such decision or the receipt of such offer (providing the material terms and conditions of such offer), and both Owner and Manager will, during the period of forty-five (45) days after such notice, attempt to negotiate a mutually satisfactory agreement for the purchase of the Hotel. If, after the expiration of forty-five (45) days following the date of Owner's notice to Manager of its desire to sell the Hotel or accept such offer, Owner and Manager have not entered into a written agreement for Manager to purchase the Hotel, Owner shall be free to sell or lease the Hotel to a third party provided it has complied with Section 10.02.A, and Manager shall have no further rights under this Section 10.02.B with respect to such Sale of the Hotel if it is consummated within two hundred and seventy (270) days after receipt of Owner's original notice, but this right shall remain effective with respect to any subsequent Sale of the Hotel.

C. If, after compliance with the provisions of Sections 10.02.A and 10.02.B, Owner desires to enter into a Sale of the Hotel with a third party, Owner shall give written notice thereof to Manager, stating the name of the prospective purchaser and the price and terms and conditions of such proposed Sale of the Hotel. Within thirty (30) days after the date of receipt of Owner's written notice and such other information, Manager shall elect, by written notice to Owner, one of the following alternatives:

1. To consent to such Sale of the Hotel and to the assignment of this Agreement to such purchaser or tenant, provided that concurrently with the finalization thereof

the purchaser or tenant, as the case may be, shall, by appropriate instrument reasonably satisfactory to Manager, assume all of Owner's obligations hereunder. Such consent shall relieve Owner from its obligations under this Agreement. An executed original of such assumption agreement shall be delivered to Manager.

2.    To terminate this Agreement by written notice from Manager to Owner. Such notice will set an effective date for such Termination not earlier than thirty (30) days, nor more than one hundred twenty (120) days, following the date of the giving of such notice. Owner and Manager, upon seven (7) days' prior written notice, shall have the right to change such effective date of Termination to coincide with the date of the finalization of the proposed Sale of the Hotel. If the proposed Sale of the Hotel is not consummated in accordance with the provisions of this Section, said notice of Termination shall not be effective unless Manager has entered into a contractual arrangement which would preclude Manager from continuing to manage the Hotel. At Manager's election, said notice of Termination shall not be effective if such Sale of the Hotel is not finalized. If such Termination by Manager results from a Default by Owner under Section 10.02.A, such Termination shall not relieve Owner of liability to Manager for such Default.

D.    If Manager shall fail to elect one of the alternatives set forth in Section 10.02.C above, within said thirty (30) day period, such failure shall be deemed to constitute an election and consent under Section 10.02.C.1 above, and the provisions thereof shall prevail as if Manager had consented in writing thereto. Any proposed Sale of the Hotel of which notice has been delivered by Owner to Manager hereunder must be finalized within one hundred eighty (180) days following the delivery of such notice. Failing such finalization, such notice, and any response thereto given by Manager, shall be null and void and all of the provisions of Sections 10.02B and 10.02.C must again be complied with before Owner shall have the right to finalize a Sale of the Hotel upon the terms contained in said notice, or otherwise.

E.    If Manager consents (or is deemed to have consented) to the proposed Sale of the Hotel, then Manager shall have the option to require that such purchaser or tenant enter into a new management agreement with Manager, which new management agreement will be on all of the terms and conditions of this Agreement except that the Term of any such new agreement shall consist only of the balance of the Term remaining under this Agreement at the time of execution of any such new agreement. Such new management agreement shall be executed by Manager and such new owner at the time of closing of the Sale of the Hotel, and a memorandum of such new management agreement shall be executed by the parties and recorded immediately following recording of the deed or memorandum of lease or assignment and prior to recordation of any other documents.

F.    Owner represents that its equity is directly and (if applicable) indirectly owned as shown on Exhibit B. In connection with the possibility of a Sale of the Hotel achieved by means of a transfer of the controlling interest in Owner, Owner shall, from time to time, within thirty (30) days after written request by Manager, furnish Manager with a list of the names and addresses of the owners of capital stock, partnership interest, or other proprietary interest of Owner.

G. It is understood that no Sale of the Hotel (which is otherwise in compliance with the provisions of this Article X) shall reduce or otherwise affect: (i) the current level of Working Capital; (ii) the current amount deposited in the FF&E Reserve; or (iii) any of the Operating Accounts maintained by Manager pursuant to this Agreement. If, in connection with any Sale of the Hotel, the selling Owner intends to withdraw, for its own use, any of the cash deposits described in the preceding sentence, the selling Owner must obtain the contractual obligation of the buying Owner to replenish those deposits (in the identical amounts) simultaneously with such withdrawal. The selling Owner is hereby contractually obligated to Manager to ensure that such replenishment in fact occurs. The obligations described in this Section 10.02.G shall survive such Sale of the Hotel and shall survive Termination.

H. Manager shall have the right to terminate this Agreement, on thirty (30) days' written notice, if title to or possession of the Hotel is transferred by judicial or administrative process (including, without limitation, a foreclosure, or a sale pursuant to an order of a bankruptcy court, or a sale by a court-appointed receiver) to an individual or entity which would not qualify as a permitted transferee under clause (1), (2) or (3) of Section 10.02.A, regardless of whether or not such transfer is the voluntary action of the transferring Owner, or whether (under applicable law) Owner is in fact the transferor.

## ARTICLE XI

## MISCELLANEOUS

### 11.01   Right to Make Agreement

Each party warrants, with respect to itself, that neither the execution of this Agreement nor the finalization of the transactions contemplated hereby shall violate any provision of law or judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, other commitment or restriction to which it is a party or by which it is bound; or, require any consent, vote or approval which has not been taken, or at the time of the transaction involved shall not have been given or taken. Each party covenants that it has and will continue to have throughout the Term, the full right to enter into this Agreement and perform its obligations hereunder.

### 11.02   Consents and Cooperation

Unless otherwise expressly provided, wherever in this Agreement or the Technical Services Agreement the consent or approval of Owner or Manager is required, such consent or approval shall not be unreasonably withheld, delayed or conditioned, shall be in writing and shall be executed by a duly authorized officer or agent of the party granting such consent or approval. If either Owner or Manager fails to respond within thirty (30) days to a request by the other party for a consent or approval, such consent or approval shall be deemed to have been given (except as otherwise provided in this Agreement or the Technical Services Agreement). Additionally, Owner agrees to cooperate with Manager by executing such leases, subleases, licenses, concessions, equipment leases, service contracts and other agreements negotiated in good faith

by Manager and pertaining to the Hotel that, in Manager's reasonable judgment, should be made in the name of the owner of the Hotel.

### 11.03 Relationship

In the performance of this Agreement, Manager shall act solely as an independent contractor. Neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted deemed or construed as making Manager a partner, joint venturer with, or agent of, Owner. Owner and Manager agree that neither party will make any contrary assertion, claim or counterclaim in any action, suit, arbitration or other legal proceedings involving Owner and Manager.

### 11.04 Applicable Law

This Agreement shall be construed under and shall be governed by the laws of the District of Columbia.

### 11.05 Recordation

The terms and provisions of this Agreement shall run with the parcel of land designated as the Site, and with Owner's interest therein, and shall be binding upon all successors to such interest. The parties shall execute simultaneously with this Agreement sufficient copies of a "Memorandum of Management Agreement" in recordable form satisfactory to both parties. The Memorandum shall, if legally permitted, be recorded or registered (or such other steps shall be taken by the parties as are necessary, to the extent legally permitted, to give official notice to all third parties that this Agreement binds the Hotel) promptly following the Effective Date of this Agreement in the jurisdiction in which the Hotel is located. Any cost of such recordation shall be initially borne by Owner, reimbursed to Owner from Gross Revenues, and treated as a Deduction.

### 11.06 Headings

Headings of articles and sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular articles or sections to which they refer.

### 11.07 Notices

Notices, statements, and other communications to be given under the terms of this Agreement shall be in writing and delivered by hand against receipt or sent by certified or registered mail or Express Mail service, postage prepaid, return receipt requested or by nationally utilized overnight delivery service, addressed to the parties as follows:

To Owner:

Wardman Hotel, L.L.C.
c/o The JBG Companies
4445 Willard Avenue, Suite 400
Chevy Chase, Maryland 20815
Attn: Kenneth F. Finkelstein
Fax: (240) 333-3610

with a copy to:

c/o The JBG Companies
4445 Willard Avenue, Suite 400
Chevy Chase, Maryland 20815
Attn: Legal Department
Fax: (240) 333-3610

and to:

Bingham McCutchen LLP
1120 20th Street, N.W., Suite 800
Washington, D.C. 20036
Attention: Barry P. Rosenthal, Esq.
Fax: (202) 778-6155

To Manager:

Marriott Hotel Services, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817
Attn: Law Department 52/923 -- Hotel Operations
Fax: (301) 380-6727

with a copy to:

Marriott Hotel Services, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817
Attn: Executive Vice President, Lodging, Dept. 911.01
Fax: (301) 380-1074

or at such other address as is from time to time designated by the party receiving the notice. Any such notice that is mailed in accordance herewith shall be deemed received when delivery is received or refused, as the case may be. Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery service by no later than the second

business day following such transmission. Telephone facsimiles shall be deemed delivered on the date of such transmission.

As provided in Section 5.05, each of Wardman Tower, L.L.C., Wardman Cotillion Residential, L.L.C. and Wardman Park Residential, L.L.C. hereby appoints Wardman Hotel, L.L.C. as its representative and agent for notice purposes pursuant to this Agreement. Notices that otherwise comply with this Section 11.07 and which are given by or to Wardman Hotel, L.L.C. shall (except as expressly otherwise provided in such notice) constitute notice from or to, as the case may be, Owner and each party comprising Owner. Manager may conclusively rely on this paragraph for notice purposes under this Agreement.

### 11.08 Environmental Matters

A.    In the event of the discovery of Hazardous Materials (as defined below) on any portion of the Site or in the Hotel during the Term of this Agreement, Owner shall promptly remove such Hazardous Materials, together with all contaminated soil and containers, and shall otherwise remedy the problem in accordance with (1) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as amended; (2) the regulations promulgated thereunder, from time to time; (3) all federal, state and local laws, rules and regulations (now or hereafter in effect) dealing with the use, generation, treatment, storage, disposal or abatement of Hazardous Materials; and (4) the regulations promulgated thereunder, from time to time (collectively referred to as "Environmental Laws"). Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including, without limitation, engineers' and attorneys' fees and expenses, and the cost of litigation) arising from the presence of Hazardous Materials on the Site or in the Hotel; and this obligation of Owner shall survive Termination of this Agreement. "Hazardous Materials" shall mean and include any substance or material containing one or more of any of the following: "hazardous material", "hazardous waste", "hazardous substance", "regulated substance", "petroleum", "pollutant", "contaminant", or "asbestos" as such terms are defined in any applicable Environmental Law in such concentration(s) or amount(s) as may impose clean-up, removal, monitoring or other responsibility under the Environmental Laws, as the same may be amended from time to time, or which may present a significant risk of harm to guests, invitees or employees of the Hotel.

B.    All costs and expenses of the aforesaid removal of Hazardous Materials from the Site or the Hotel, and of the aforesaid compliance with all Environmental Laws, and any amounts paid to Manager pursuant to the indemnity set forth in Section 11.08.A, shall be paid by Owner from its own funds, not as a Deduction nor from the FF&E Reserve, and shall be treated as an expenditure by Owner pursuant to Section 5.03.

### 11.09 Confidentiality

A.    The parties hereto agree that the matters set forth in this Agreement and all statements, reports, projections, and other information relating to the operation of the Hotel are strictly confidential and each party will make every effort to ensure that the information is not disclosed to any outside person or entities (including the press) without the prior written consent of the other party except as may be required by law and as may be reasonably necessary to obtain

licenses, permits, and other public approvals necessary for the refurbishment or operation of the Hotel, or in connection with Owner's financing of the Hotel (or is required to be provided to the Mortgagee pursuant to the loan documents), a Sale of the Hotel, or a sale of a controlling interest in Owner, Manager, or Marriott (except any financing or sale involving a private or public offering of securities).

B. No reference to Manager or to any Affiliate will be made in any prospectus, private placement memorandum, offering circular or offering documentation related thereto (collectively referred to as the "Prospectus"), issued by Owner or by one of Owner's Affiliates or by one or more Mortgagees, which is designated to interest potential investors in debt or equity securities related to the Hotel, unless Manager has previously received a copy of all such references. However, regardless of whether Manager does or does not so receive a copy of all such references, neither Manager nor any Affiliate will be deemed a sponsor of the offering described in the Prospectus, nor will it have any responsibility for the Prospectus, and the Prospectus will so state. Unless Manager agrees in advance, the Prospectus will not include any trademark, symbols, logos or designs of Manager or any Affiliates. Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including attorneys' fees and expenses, and the cost of litigation) arising out of any Prospectus or the offering described therein; and this obligation of Owner shall survive Termination of this Agreement.

## 11.10 Projections

Owner acknowledges that any written or oral projections, proformas, or other similar information that has been (prior to execution of this Agreement) or will be (during the Term of this Agreement) provided by Manager, Marriott, or any Affiliate to Owner is for information purposes only and that Manager, Marriott, and any such Affiliate do not guarantee that the Hotel will achieve the results set forth in any such projections, proformas, or other similar information. Any such projections, proformas, or other similar information are based on assumptions and estimates. Unanticipated events may occur subsequent to the date of preparation of such projections, proformas, and other similar information. Therefore, the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, proformas, or other similar information and such variations might be material.

## 11.11 Actions to be Taken Upon Termination

Upon a Termination of this Agreement, the following shall be applicable:

A. Manager shall, within ninety (90) days after Termination of this Agreement, prepare and deliver to Owner a final accounting statement with respect to the Hotel, as more particularly described in Section 4.01 B hereof, along with a statement of any sums due from Owner to Manager pursuant hereto, dated as of the date of Termination. Within thirty (30) days of the receipt by Owner of such final accounting statement, the parties will make whatever cash adjustments are necessary pursuant to such final statement. The cost of preparing such final accounting statement shall be a Deduction, unless the Termination occurs as a result of a Default by either party, in which case the defaulting party shall pay such cost. Manager and Owner acknowledge that there may be certain adjustments for which the information will not be

available at the time of the final accounting and the parties agree to readjust such amounts and make the necessary cash adjustments when such information becomes available; provided, however, that all accounts shall be deemed final as of the first (1st) anniversary of the effective date of Termination.

B.     Manager shall release and transfer to Owner any of Owner's funds which are held or controlled by Manager with respect to the Hotel with the exception of funds to be held in escrow pursuant to Sections 6.02.J and 11.11.H and otherwise in accordance herewith.

C.     Manager shall make available to Owner such books and records respecting the Hotel (including those from prior years, subject to Manager's reasonable records retention policies) as will be needed by Owner to prepare the accounting statements, in accordance with the Uniform System of Accounts, for the Hotel for the year in which the Termination occurs and for any subsequent year.

D.     Manager shall (to the extent permitted by law) assign to Owner or to the new manager all operating licenses and permits for the Hotel which have been issued in Manager's name (including liquor and restaurant licenses, if any); provided that if Manager has expended any of its own funds in the acquisition of any of such licenses or permits, Owner shall reimburse Manager therefor if it has not done so already.

E.     Manager shall have the option, to be exercised within thirty (30) days after Termination, to purchase, at their then book value, any items of the Hotel's Inventories and Fixed Asset Supplies as may be marked with any Trade Name, or any Marriott trademark, other trade name, symbol, logo or design. In the event Manager does not exercise such option, Owner agrees that it will use any such items not so purchased exclusively in connection with the Hotel until they are consumed.

F.     Owner shall have the right to operate the improvements on the Site without modifying the architectural design of same, notwithstanding the fact that such design or certain features thereof may be proprietary to Manager and/or protected by trade marks or service marks held by Manager or an Affiliate, provided that such use shall be confined to the Site.

G.     Any computer software (including upgrades and replacements) at the Hotel owned by Manager, Marriott, an Affiliate, or the licensor of any of them is proprietary to Manager, Marriott, such Affiliate, or the licensor of any of them and shall in all events remain the exclusive property of Manager, Marriott, the Affiliate or the licensor of any of them, as the case may be, and nothing contained in this Agreement shall confer on Owner the right to use any of such software. Manager shall have the right to remove from the Hotel without compensation to Owner any computer software (including upgrades and replacements), including, without limitation, the Marriott System software, owned by Manager, Marriott, any Affiliate or the licensor of any of them. Furthermore, upon Termination, Manager shall be entitled to remove from the Hotel any computer equipment which is: (i) owned by a party other than Owner (without reimbursement to Owner); or (ii) owned by Owner, but utilized as part of a centralized reservation or property management system (with reimbursement to Owner of all previous expenditures made by Owner with respect to such equipment, subject to a reasonable allowance for depreciation).

H.     If this Agreement is terminated for any reason, other than a Termination by reason of a Default of Manager hereunder, an escrow fund shall be established from Gross Revenues to reimburse Manager for all costs and expenses incurred by Manager in terminating its employees at the Hotel, such as severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of Manager's employees at the Hotel. If Gross Revenues are insufficient to meet the requirements of such escrow fund, then Owner shall deliver to Manager, within ten (10) days after receipt of Manager's written request therefor, the sums necessary to establish such escrow fund; and if Owner fails to timely deliver such sums to Manager, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager.

I.     Owner shall cause the entity which shall succeed Manager as the operator of the Hotel to hire a sufficient number of the employees at the Hotel to avoid the occurrence, in connection with such Termination, of a "closing" under the WARN Act.

J.     Various other actions shall be taken, as described in this Agreement, including, but not limited to, the actions described in Sections 4.05 and 6.02.J.

K.     Manager shall peacefully vacate and surrender the Hotel to Owner.

The provisions of this Section 11.11 shall survive Termination.

11.12   Trademarks, Trade Names and Service Marks

A.     The name "Marriott," when used alone or in connection with another word or words (collectively, "Trade Names"), and the Marriott trademarks, service marks, other trade names, symbols, logos and designs shall in all events remain the exclusive property of Marriott, and nothing contained in this Agreement shall confer on Owner the right to use any of the Trade Names, or the Marriott trademarks, service marks, other trade names, symbols, logos or designs otherwise than in strict accordance with the terms of this Agreement. Except as provided in Section 11.11.E, upon Termination, any use of or right to use any of the Trade Names, or any of the Marriott trademarks, service marks, other trade names, symbols, logos or designs by Owner shall cease forthwith and Owner shall promptly remove from the Hotel any signs or similar items which contain any of said Trade Names, trademarks, service marks, other trade names, symbols, logos or designs. If Owner has not removed such signs or similar items within ten (10) days after Termination, Manager shall have the right to do so at Owner's expense; and if Owner fails to reimburse Manager for such expense within ten (10) days after receipt of written notice thereof from Manager to Owner, then Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager. Included under the terms of this section are all trademarks, service marks, trade names, symbols, logos or designs used in conjunction with the Hotel, including but not limited to restaurant names, lounge names, etc., whether or not the marks contain the "Marriott" name. The right to use or authorize others to use such Trade Names, trademarks, service marks, trade names, symbols, logos or designs belongs exclusively to Marriott, Manager and/or certain

Affiliates whether or not the same are registered and regardless of the source of the same. The above provisions of this Section 11.12 shall survive Termination. Notwithstanding Section 1.01, if the name of the Marriott System is changed, Manager will change the name of the Hotel to conform thereto.

B.    All Intellectual Property shall at all times be proprietary to Manager or its Affiliates, and shall be the exclusive property of Manager or its Affiliates. During the Term of this Agreement, Manager shall be entitled to take all reasonable steps to ensure that the Intellectual Property remains confidential and is not disclosed to anyone other than Manager's employees at the Hotel. Upon Termination, all Intellectual Property shall be removed from the Hotel by Manager, without compensation to Owner, subject to the provisions of Section 11.11.G regarding Software.

C.    Manager and/or its Affiliates shall be entitled, in case of any breach by Owner of any of the covenants of this Section 11.12, to injunctive relief and to any other right or remedy available at law. This Section 11.12 shall survive Termination.

### 11.13   Competing Facilities

Neither this Agreement nor anything implied by the relationship between Manager and Owner shall prohibit any of the Marriott Companies from constructing, operating, promoting, and/or authorizing others to construct, operate, or promote one or more of the following hotels: JW Marriott Hotels and JW Marriott Resorts; Marriott Hotels, Marriott Resorts, and Marriott Suites Hotels; Bvlgari Hotels; Ritz-Carlton Hotels; Renaissance Hotels and Renaissance Resorts; Marriott Conference Centers; Residence Inn by Marriott; Courtyard by Marriott; SpringHill Suites by Marriott; Fairfield Inn by Marriott and Fairfield Inn & Suites by Marriott; TownePlace Suites by Marriott; or any other lodging concepts, time-share facilities, restaurants, or other business operations of any type, at any location, including a location proximate to the Site. Owner acknowledges, accepts and agrees further that the Marriott Companies retain the right, from time to time, to construct or operate, or both, or promote or acquire, or authorize or otherwise license others to construct or operate, or both, or promote or acquire any hotels, lodging concepts or products, restaurants or other business operations of any type whatsoever, including, but not by way of limitation, those listed above, at any location including one or more sites which may be adjacent, adjoining or proximate to the Site, which business operations may be in direct competition with the Hotel and that any such exercise may adversely affect the operation of the Hotel.

### 11.14   Waiver

The failure of either party to insist upon a strict performance of any of the terms or provisions of this Agreement, or to exercise any option, right or remedy contained in this Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

### 11.15   Partial Invalidity

If any portion of this Agreement shall be declared invalid by order, decree or judgment of a court, this Agreement shall be construed as if such portion had not been so inserted except when such construction would operate as an undue hardship on Manager or Owner or constitute a substantial deviation from the general intent and purpose of said parties as reflected in this Agreement.

### 11.16   Survival

Except as otherwise specifically provided herein, the rights and obligations of the parties herein shall not survive any Termination of this Agreement.

### 11.17   Affiliates

Manager shall be entitled to contract with one or more of its Affiliates to provide goods and/or services to the Hotel, provided that the prices and/or fees paid to any such Affiliate are competitive with the prices and/or fees which would be charged by reputable and qualified parties which are not Affiliates of Manager for similar goods and/or services. The prices and/or fees paid to its Affiliates may include overhead and the allowance of a reasonable return customary for the goods and/or services to be provided. In determining, pursuant to the foregoing, whether such prices and/or fees are competitive, the goods and/or services which are being purchased shall be grouped in reasonable categories, rather than being compared item by item.

### 11.18   Negotiation of Agreement

Owner and Manager are both business entities having substantial experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to the rule that ambiguities in a document are to be construed against the draftsman. No inferences shall be drawn from the fact that the final, duly executed Agreement differs in any respect from any previous draft hereof.

### 11.19   Estoppel Certificates

Each party to this Agreement shall at any time and from time to time, upon not less than thirty (30) days' prior notice from the other party, execute, acknowledge and deliver to such other party, or to any third party specified by such other party, a statement in writing: (a) certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications); (b) stating whether or not to the best knowledge of the certifying party (i) there is a continuing Default or Event of Default by the non-certifying party in the performance or observance of any covenant, agreement or condition contained in this Agreement, or (ii) there shall have occurred any event which, with the giving of notice or passage of time or both, would become a Default or Event of Default, and, if so, specifying each such Default or Event of Default or occurrence of which the certifying party may have knowledge; and (c) stating such other information as the non-certifying party may reasonably request. Such statement shall be

binding upon the certifying party and may be relied upon by the non-certifying party and/or such third party specified by the non-certifying party as aforesaid. The obligations set forth in this Section 11.19 shall survive Termination (that is, each party shall, on request, within the time period described above, execute and deliver to the non-certifying party and to any such third party a statement certifying that this Agreement has been terminated).

## 11.20   System Standards

In the event of either (i) a Legal Requirement, including an order, judgment or directive by a court or administrative body which is issued in connection with any Litigation involving Owner, or (ii) any action taken by a Mortgagee in connection with a Foreclosure, which in either case restricts or prevents Manager, in a material and adverse manner, from operating the Hotel in accordance with System Standards (including without limitation, any restrictions on expenditures by Manager from the Operating Accounts or from the FF&E Reserve, other than restrictions which are set forth in this Agreement), Manager shall be entitled, at its option, to terminate this Agreement upon sixty (60) days' written notice to Owner. The foregoing shall not reduce or otherwise affect the rights of the parties under Article IX.

## 11.21   Expert Decisions

Where a matter is referred to an Expert for determination, the following provisions shall apply to such Expert's determination:

A.     The decision of the Expert shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration, in court or otherwise.

B.     Each party shall be entitled to make written submissions to the Expert, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission. The parties shall make available to the Expert all books and records relating to the issue in dispute and shall render to the Expert any assistance reasonably requested of the parties. The costs of the Expert and the proceedings shall be borne as directed by the Expert unless otherwise provided for herein. The Expert may direct that such costs be treated as Deductions.

C.     The terms of engagement of the Expert shall include an obligation on the part of the Expert to:

1.     notify the parties in writing of his decision within forty-five (45) days from the date on which the Expert has been selected (or such other period as the parties may agree or as set forth herein);

2.     apply the standards applicable to Marriott hotels in accordance with the System Standards; and

3.     establish a timetable for the making of submissions and replies.

### 11.22 Entire Agreement

This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, including without limitation, the Prior Agreement, and may be changed only by a writing signed by the parties hereto.

### 11.23 Joint and Several Liability

Subject to Section 5.06 hereof, the duties, covenants, obligations, representations and warranties of Owner in this Agreement shall be joint and several obligations of the parties comprising Owner.

### 11.24 Prevailing Party.

In any litigation, action, claim, suit, arbitration, or proceeding brought by the parties with respect to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party expenses (including reasonable attorneys' fees) incurred at the pretrial, trial or appellate level.

### 11.25 Amended and Restated Provisions

The provisions of this Agreement shall apply to all matters regarding the management of the Hotel and the rights and obligations of the parties to one another with respect to the Hotel and shall supersede and restate the Prior Agreement in its entirety.

## ARTICLE XII

## DEFINITION OF TERMS

### 12.01 Definition of Terms

The following terms when used in this Agreement attached hereto shall have the meanings indicated:

"Accounting Period" shall mean the four (4) week accounting periods having the same beginning and ending dates as Manager's four (4) week accounting periods, except that an Accounting Period may occasionally contain five (5) weeks when necessary to conform Manager's accounting system to the calendar.

"Accounting Period Statement" shall have the meaning set forth in Section 4.01.A.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power to

vote 5% or more of the voting stock of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock, by contract or otherwise.

"Agreement" shall mean this Second Amended and Restated Management Agreement between Owner and Manager, including the exhibits attached hereto.

"Annual Operating Projection" shall have the meaning ascribed to it in Section 4.04.A.

"Annual Operating Statement" shall have the meaning ascribed to it in Section 4.01.B.

"Available Cash Flow" shall mean an amount, with respect to each Fiscal Year or portion thereof during the Term of this Agreement, equal to the excess, if any, of Operating Profit over Owner's Priority.

"Base Management Fee" shall mean the following amounts payable to Manager as a Deduction from Gross Revenues for each Accounting Period:

(i)     For Fiscal Years 2005 through 2008, the following aggregate amounts, which amounts shall be payable in equal installments over the thirteen (13) Accounting Periods in each such Fiscal Year:

| | |
|---|---|
| Fiscal Year 2005: | $3,209,000 |
| Fiscal Year 2006: | $3,582,000 |
| Fiscal Year 2007: | $4,310,000 |
| Fiscal Year 2008: | $4,364,000 |

(ii)    Commencing in Fiscal Year 2009, 3.75% of Gross Revenues for each Accounting Period; provided, that if the Center Tower Project is not completed by the Outside Completion Date (as defined in the Technical Services Agreement), the Base Management Fee for Fiscal Year 2009 shall be the greater of (A) $4,364,000, or (B) 3.75% of Gross Revenues for Fiscal Year 2009.

"Building Estimate" shall have the meaning ascribed to it in Section 5.03.A.

"Capital Expenditures" shall have the meaning set forth in Section 5.03.A.

"Chain Services" shall have the meaning set forth in Section 1.03.

"CC&Rs" shall have the meaning set forth in Section 8.03.

"Closing Date" shall mean the date on which Owner obtains fee title to the Site and title to the Improvements thereon.

"Competitive Set" shall mean the group of full-service hotels which are closest in geographical distance from the Hotel and which are generally within the same hotel market segment as the Hotel. The parties agree that the Competitive Set shall consist of the Omni Shoreham Hotel and The Washington Hilton Hotel only. If any one or more of these hotels

either changes its chain affiliation or ceases to operate or otherwise ceases to reflect the general criteria set forth in the first sentence of this definition, Owner and Manager agree to mutually, reasonably, and in good faith, discuss appropriate changes to the foregoing list of the hotels in the Competitive Set. Disputes regarding such changes to the Competitive Set will be resolved by an Expert under Section 11.21.

"Cure Payment" shall have the meaning ascribed to it in Section 2.02.B.

"Deduction(s)" shall have the meaning ascribed to it in the definition of Operating Profit.

"Default" shall have the meaning ascribed to it in Section 9.01.

"Effective Date" shall have the meaning ascribed to it in the Preamble.

"Environmental Laws" shall have the meaning ascribed to it in Section 11.08.

"Event of Default" shall have the meaning ascribed to it in Section 9.01.

"Expert" means an independent nationally recognized consulting firm or individual who is qualified to resolve the issue in question, and who is appointed in each instance by agreement of the parties or, failing agreement, each party shall select one (1) such nationally recognized consulting firm or individual and the two (2) respective firms and/or individuals so selected shall select another such nationally recognized consulting firm or individual to be the Expert. In the event either party calls for an Expert determination pursuant to the terms hereof, the parties shall have ten (10) days from the date of such request to agree upon an Expert and, if they fail to agree, each party shall have an additional ten (10) days to make its respective selection of a firm or individual, and within ten (10) days of such respective selections, the two (2) respective firms and/or individuals so selected shall select another such nationally recognized consulting firm or individual to be the Expert. If either party fails to make its respective selection of a firm or individual within the ten (10) day period provided for above, then the other party's selection shall be the Expert. Also, if the two (2) respective firms and/or individuals so selected shall fail to select a third nationally recognized consulting firm or individual to be the Expert, then such Expert shall be appointed by the American Arbitration Association and shall be a qualified person having at least ten (10) years' recent professional experience as to the subject matter in question.

"FF&E" shall mean furniture, furnishings, fixtures, kitchen appliances, vehicles, carpeting and equipment, including front desk and back-of-the-house computer equipment, but shall not include Fixed Asset Supplies or any computer software of any type (including upgrades and replacements) owned by Manager, Marriott, an Affiliate of Manager or Marriott, or the licensor of any of them.

"FF&E Estimate" shall have the meaning ascribed to it in Section 5.02.C.

"FF&E Reserve" shall have the meaning ascribed to it in Section 5.02.A.

"First Mortgage" shall mean the first-lien Mortgage obtained by Owner to finance the purchase of, or to refinance, the Hotel, including any amendments, modifications, restatements, increases, or replacements thereof.

"First Mortgagee" shall mean the holder of the First Mortgage.

"Fiscal Year" shall mean Manager's Fiscal Year which as of the Effective Date ends at midnight on the Friday closest to December 31 in each calendar year; the new Fiscal Year begins on the Saturday immediately following said Friday. Any partial Fiscal Year between the Closing Date and the commencement of the first full Fiscal Year shall constitute a separate Fiscal Year. A partial Fiscal Year between the end of the last full Fiscal Year and the Termination of this Agreement shall also constitute a separate Fiscal Year. If Manager's Fiscal Year is changed in the future, appropriate adjustment to this Agreement's reporting and accounting procedures shall be made; provided, however, that no such change or adjustment shall alter the term of this Agreement or in any way reduce the distributions of Operating Profit or other payments due hereunder.

"Fixed Asset Supplies" shall mean items included within "Property and Equipment" under the Uniform System of Accounts including, but not limited to: linen, china, glassware, tableware, uniforms, and similar items, whether used in connection with public space or Guest Rooms.

"Force Majeure" shall mean any of the following events beyond the control of the party claiming that a Force Majeure event has occurred, regardless of where it occurs or its duration that have a material adverse impact on the Hotel: acts of nature without the interference of any human agency (including hurricanes, typhoons, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war, attack, invasion or other acts of hostility by foreign enemies; civil war, rebellion, revolution, insurrection or usurpation of sovereign power; riots or other civil commotion; terrorism (including hijacking, sabotage, chemical or biological events, nuclear events, disease-related events, bombings, murder, assault, and kidnapping); strikes or similar labor disturbances; shortage of critical materials or supplies; action or inaction of governmental authorities having jurisdiction over the Hotel (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused for reasons of Force Majeure); and any other events beyond the reasonable control of the parties (excluding, however, (i) lack of financing, or (ii) general economic and/or market factors which are not caused by one of the foregoing events).

"Foreclosure" shall mean any exercise of the remedies available to a Mortgagee, upon a default under the Mortgage held by such Mortgagee, which results in a transfer of title to or possession of the Hotel. The term "Foreclosure" shall include, without limitation, any one or more of the following events, if they occur in connection with a default under a Mortgage: (i) a transfer by judicial foreclosure; (ii) a transfer by deed in lieu of foreclosure; (iii) the appointment by a court of a receiver to assume possession of the Hotel; (iv) a transfer of either ownership or control of Owner, by exercise of a stock pledge or otherwise; (v) if title to the Hotel is held by a

tenant under a ground lease, an assignment of the tenant's interest in such ground lease; or (vi) any similar judicial or non-judicial exercise of the remedies held by the Mortgagee,

"GDP Deflator" shall mean the "Gross Domestic Product Implicit Price Deflator" issued from time to time by the United States Bureau of Economic Analysis of the Department of Commerce, or if the aforesaid GDP Deflator is not at such time so prepared and published, any comparable index selected by Owner and reasonably satisfactory to Manager (a "Substitute Index") then prepared and published by an agency of the Government of the United States, appropriately adjusted for changes in the manner in which such index is prepared and/or year upon which such index is based. Any dispute regarding the selection of the Substitute Index or the adjustments to be made thereto shall be settled by the Expert in accordance with Section 11.21. Except as otherwise expressly stated herein, whenever a number or amount is required to be "adjusted by the GDP Deflator," or similar terminology, such adjustment shall be equal to the percentage increase or decrease in the GDP Deflator that is issued for the month in which such adjustment is to be made (or, if the GDP Deflator for such month is not yet publicly available, the GDP Deflator for the most recent month for which the GDP Deflator is publicly available) as compared to the GDP Deflator which was issued for the month of January 1999.

"Gross Revenues" shall mean all revenues and receipts of every kind derived from operating the Hotel and all departments and parts thereof, including, but not limited to: income (from both cash and credit transactions) from rental of Guest Rooms, telephone charges, stores, offices, exhibit or sales space of every kind; license, lease and concession fees and rentals (not including gross receipts of licensees, lessees and concessionaires); income from vending machines; income from parking; health club membership fees; food and beverage sales; wholesale and retail sales of merchandise; service charges; and proceeds, if any, from business interruption or, other loss of income insurance; provided, however, that Gross Revenues shall not include the following: gratuities to employees of the Hotel; federal, state or municipal excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; proceeds from the sale of FF&E; interest received or accrued with respect to the funds in the FF&E Reserve or the other operating accounts of the Hotel; any refunds, rebates, discounts and credits of a similar nature, given, paid or returned in the course of obtaining Gross Revenues or components thereof; insurance proceeds (other than proceeds from business interruption or other loss of income insurance; condemnation proceeds (other than for a temporary taking); or any proceeds from any Sale of the Hotel or from the refinancing of any debt encumbering the Hotel.

"Guest Profile Data" shall mean personal guest profiles and information regarding guest preferences, which information has been given in confidence by guests to one or more of the Marriott Companies. Guest Profile Data shall not be deemed to include information regarding past or future guest bookings at the Hotel (dates, rates, etc.).

"Guest Room" shall mean a lodging unit in the Hotel.

"Hazardous Materials" shall have the meaning ascribed to it in Section 11.08.

"Hotel" shall mean the Site together with the following: (i) the Improvements and all other Improvements constructed or to be constructed on the Site pursuant to this Agreement;

(ii) all FF&E, Fixed Asset Supplies, and Inventories installed or located on the Site or in the Improvements; and (iii) all easements or other appurtenant rights thereto. The term "Hotel," as used in this Agreement, shall also include any off-site improvements which are necessary for the operation of the Hotel in accordance with the System Standards. Further, the term "Hotel" may be modified in accordance with Section 5.06.

"Impositions" shall have the meaning ascribed to it in Section 7.01.

"Improvements" shall have the meaning ascribed to it in the Recitals, as such term may be modified in accordance with Section 5.05.

"Incentive Management Fee" shall mean an amount payable to Manager that is equal to thirty percent (30%) of Available Cash Flow in any Fiscal Year (or portion thereof), beginning with Fiscal Year 2009; provided however, that if Owner elects in writing, pursuant to Section 5.05, not to undertake the Wardman Tower Project, "Incentive Management Fee" shall mean an amount payable to Manager that is equal to twenty-five percent (25%) of Available Cash Flow in any Fiscal Year (or portion thereof), beginning with Fiscal Year 2009.

"Initial Term" shall have the meaning ascribed to it in Section 2.01.

"Insurance Retention" shall have the meaning ascribed to it in Section 6.01.F.

"Intellectual Property" shall mean: (i) all Software; (ii) all manuals, brochures and directives issued by Manager to its employees at the Hotel regarding the procedures and techniques to be used in operating the Hotel; and (iii) Guest Profile Data.

"Inventories" shall mean "Inventories" as defined in the Uniform System of Accounts, such as, but not limited to, provisions in storerooms, refrigerators, pantries and kitchens; beverages in wine cellars and bars; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"Legal Requirement" shall mean any federal, state or local law, code, rule, ordinance, regulation or order of any governmental authority or agency having jurisdiction over the business or operation of the Hotel or the matters which are the subject of this Agreement, including, without limitation, the following: (i) any building, zoning or use laws, ordinances, regulations or orders; and (ii) Environmental Laws.

"Litigation" shall mean: (i) any cause of action (including, without limitation, bankruptcy or other debtor/creditor proceedings) commenced in a federal, state or local court; or (ii) any claim brought before an administrative agency or body (for example, without limitation, employment discrimination claims).

"Manager" shall have the meaning ascribed to it in the Preamble hereto or shall mean any successor or permitted assign, as applicable.

"Marriott" shall mean Marriott International, Inc., a Delaware corporation.

"Marriott Companies" shall mean Manager, Marriott, and any Affiliate of Manager or Marriott.

"Marriott Core Projects" shall mean the Exhibit Halls Project, the Kitchen Project, the Wardman Tower Guestrooms Renovation Project, the Hospitality Suites Project, and the Center Tower Project (excluding the Center Tower Suite Conversion Project), all as more particularly described in the Technical Services Agreement and Exhibits E-1 and E-2 thereto.

"Marriott Rewards" shall mean Marriott's frequent traveler program as such may be modified from time to time or as may be replaced by any successor marketing program in Marriott's sole discretion.

"Marriott System" shall mean the chain of full-service hotels in the United States which are operated by Manager or its Affiliates under the "Marriott" trade name.

"Mortgage" shall mean any mortgage, deed of trust, or security document encumbering the Hotel and/or the Site.

"Mortgagee" shall mean the holder of any Mortgage.

"Operating Accounts" shall have the meaning set forth in Section 4.03.A.

"Operating Loss" shall mean a negative Operating Profit.

"Operating Profit" shall mean the excess of Gross Revenues over the following deductions ("Deductions") incurred by Manager, on behalf of Owner, in operating the Hotel:

1.    the cost of sales, including, without limitation, compensation, fringe benefits, payroll taxes, ERISA-related liabilities, pension-fund withdrawal liabilities, and other costs related to Hotel employees (the foregoing costs shall include the allocable portion of the salary and other employee costs of any personnel assigned to a "cluster" of hotels which includes the Hotel);

2.    departmental expenses incurred at departments within the Hotel; administrative and general expenses; the cost of marketing incurred by the Hotel; advertising and business promotion incurred by the Hotel; heat, light, and power; computer line charges; and routine repairs, maintenance and minor alterations treated as Deductions under Section 5.01;

3.    the cost of Inventories and Fixed Asset Supplies consumed in the operation of the Hotel;

4.    a reasonable reserve for uncollectible accounts receivable as determined by Manager;

5.    all costs and fees of independent professionals or other third parties who are retained by Manager to perform services required or permitted hereunder;

6. all costs and fees of technical consultants, professionals and operational experts who are retained or employed by Manager, Marriott, and Affiliates for specialized services (including, without limitation, quality assurance inspectors, personnel providing architectural, technical or procurement services for the Hotel, tax consultants, and personnel providing legal services in connection with matters directly involving the Hotel) and the cost of attendance by employees of the Hotel at training and manpower development programs sponsored by Manager;

7. the Base Management Fee;

8. insurance costs and expenses as provided in Section 6.01 and Section 6.02;

9. taxes, if any, payable by or assessed against Manager related to this Agreement or to Manager's operation of the Hotel (exclusive of Manager's income taxes or franchise taxes) and all Impositions;

10. the amount of any transfers into the FF&E Reserve required pursuant to Section 5.02;

11. the Hotel's pro rata share of costs and expenses incurred in connection with marketing programs developed for the Marriott System where such expenses are not deducted as either departmental expenses under paragraph 2 above or as Chain Services under paragraph 12 below, including, without limitation, the Marriott Rewards program;

12. the Hotel's pro rata share of the charges for Chain Services;

13. such other costs and expenses incurred by Manager (either at the Hotel or elsewhere) as are specifically provided for elsewhere in this Agreement or are otherwise reasonably necessary for the proper and efficient operation of the Hotel.

The term "Deductions" shall not include: (a) debt service payments pursuant to any Mortgage on the Hotel; (b) payments pursuant to equipment leases or other forms of financing obtained for the FF&E located in or connected with the Hotel, unless Manager has previously given its written consent to such equipment lease and/or financing (it being understood that Manager has agreed to the existing equipment leases and/or financing for the FF&E located in or connected with the Hotel as of the Closing Date); (c) rental payments pursuant to any ground lease of the Site; or (d) any costs incurred by Manager related to or resulting from the reduction in the number of Guest Rooms or meeting space at the Hotel, including without limitation, severance costs paid to Manager's employees, termination fees, penalties, settlement payments or relocation costs paid to or on behalf of customers that have booked events and/or functions at the Hotel and who can no longer be accommodated due to the reduction in the number of Guest Rooms, and/or meeting rooms, and/or the construction of the Projects, and termination fees, penalties or settlement payments paid to concessionaires or lessees at the Hotel whose agreements or leases are terminated as a result of the construction of the Projects. All of the foregoing items listed in this paragraph shall be paid by Owner from its own funds.

"Owner" shall have the meaning ascribed to it in the Preamble or shall mean any successor or permitted assign, as applicable.

"Owner's Priority" shall mean an amount equal to Eighteen Million Five Hundred Dollars ($18,500,000); provided however, that if Owner elects in writing, pursuant to Section 5.05, not to undertake the Wardman Tower Project, Owner's Priority shall mean an amount equal to Twenty Four Million Dollars ($24,000,000). The foregoing amounts are based on a full Fiscal Year and shall be prorated for any partial Fiscal Year.

"Performance Termination Threshold" shall mean an amount equal to seventy-five percent (75%) of Owner's Priority per full Fiscal Year (prorated for any partial Fiscal Year).

"Person" means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

"Prime Rate" shall mean the "prime rate" of interest announced from time to time in the "Money Rates" section of the *Wall Street Journal* (Eastern Edition).

"Prior Agreement" shall have the meaning ascribed to it in the Recitals.

"Projects" shall have the meaning set forth in Section 5.05.

"Property Insurance Premiums" shall have the meaning ascribed to it in Section 6.01.L.

"Prospectus" shall have the meaning ascribed to it in Section 11.09.B.

"Renewal Term" shall have the meaning ascribed to it in Section 2.01.

"Revenue Data Publication" shall mean Smith's STAR Report, a monthly publication distributed by Smith Travel Research, Inc. of Gallatin, Tennessee, or an alternative source, reasonably satisfactory to both parties, of data regarding the Revenue Per Room of hotels in the general trade area of the Hotel. If such Smith's STAR Report is discontinued in the future, or ceases (in the reasonable opinion of either Owner or Manager) to be a satisfactory source of data regarding the Revenue Per Room of various hotels in the general trade area of the Hotel, Manager shall select an alternative source, subject to Owner's approval (such approval not to be unreasonably withheld). If the parties fail to agree on such alternative source within a reasonable period of time, the matter shall be resolved by the Expert pursuant to Section 11.21.

"Revenue Index" shall mean that fraction which is equal to (a) the Revenue Per Room for the Hotel, divided by (b) the average Revenue Per Room for the hotels in the Competitive Set, as set forth in the Revenue Data Publication. Appropriate adjustments shall be made in the event of a major renovation of the Hotel.

"Revenue Index Threshold" shall mean a fraction equal to ninety-five (95) divided by one hundred (100), or .95 as a decimal. However, if the entry of a new hotel into the Competitive Set (or the removal of a hotel from the Competitive Set) causes significant variations in the Revenue Index which do not reflect the Hotel's true position in the relevant

market, appropriate adjustments shall be made to the Revenue Index Threshold by mutual consent of Owner and Manager (neither such consent to be unreasonably withheld).

"Revenue Per Room" shall mean (i) the term "revenue per room" as defined by the Revenue Data Publication; or (ii) if the Revenue Data Publication is no longer being used (as more particularly set forth in the definition of "Revenue Data Publication"), the aggregate gross room revenues of the hotel in question for a given period of time divided by the total room nights for such period. If clause (ii) of the preceding sentence is being used, a "room" shall be a hotel Guest Room which is keyed as a single unit.

"Sale of the Hotel" shall mean any sale, assignment, transfer or, other disposition, for value or otherwise, voluntary or involuntary, of the fee simple title to the Site and/or the Hotel. For purposes of this Agreement, a Sale of the Hotel shall also include a lease (or sublease) of all or, substantially all of the Hotel or Site and any sale, assignment, transfer or other disposition, for value or otherwise, voluntary or involuntary, in a single transaction or, a series of transactions, of the controlling interest in Owner. If Owner is a corporation, the phrase "controlling interest" shall mean the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the shares of Owner (through ownership of such shares or by contract). If Owner is not a corporation, the phrase "controlling interest" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of Owner.

"Site" shall have the meaning ascribed to it in the Recitals, as such term may be modified in accordance with Section 5.05.

"Software" shall mean all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is commercially available, which are used by Manager in connection with the property management system, the reservation system and all future electronic systems developed by Manager for use in the Hotel.

"Special Capital Expenditure" shall mean certain expenditures which are within the category of Capital Expenditures, as defined in this Agreement, but which will be funded from the FF&E Reserve (pursuant to Section 5.02), rather than pursuant to the provisions of Section 5.03. Special Capital Expenditures consist of the following types of expenditures: exterior and interior repainting; resurfacing building walls, floors and roofs; resurfacing parking areas; replacing folding walls; and miscellaneous similar expenditures.

"Subordination Agreement" shall have the meaning ascribed to it in Section 8.02.A.

"Subsequent Owners" shall have the meaning ascribed to it in Section 8.02.A.

"System Standards" shall mean either (or both, as the context requires) of the following two (2) categories of standards: (i) the operational standards (for example, services offered to guests, quality of food and beverages, cleanliness, staffing, and employee compensation and benefits, etc.); and (ii) the physical standards (for example, quality of the Improvements, FF&E, and Fixed Asset Supplies, frequency of FF&E replacements, etc.). Each of such standards shall be the standard which is generally prevailing or in the process of being implemented at other

hotels in the Marriott System, including all services and facilities in connection therewith that are customary and usual at comparable hotels.

"Technical Services Agreement" means that certain Technical Services Agreement dated as of even date herewith by and between Owner and Marriott International Design & Construction Services, Inc., attached hereto as Exhibit C.

"Term" shall have the meaning ascribed to it in Section 2.01.

"Termination" shall mean the expiration or sooner cessation of this Agreement.

"Tolling Event" shall have the meaning ascribed to it in Section 2.02.A.3.

"Trade Name" shall have the meaning ascribed to it in Section 11.12.

"Uniform System of Accounts" shall mean the Uniform System of Accounts for the Lodging Industry, Ninth Revised Edition, 1996, as published by the Hotel Association of New York City, Inc.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, 29 U.S.C. 2101 et seq.

"Working Capital" shall mean funds that are used in the day-to-day operation of the business of the Hotel, including, without limitation, amounts sufficient for the maintenance of change and petty cash funds, amounts deposited in operating bank accounts, receivables, amounts deposited in payroll accounts, prepaid expenses and funds required to maintain Inventories, less accounts payable and accrued current liabilities.

[Signatures follow on next page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first written above.

**OWNER (jointly and severally)**:

**WARDMAN HOTEL, L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C., a Delaware
limited liability company

By:  JBG/Company Manager, L.L.C.,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**WARDMAN TOWER, L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C. a Delaware
limited liability company

By:  JBG/Company Manager, L.L.C.,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**WARDMAN COTILLION RESIDENTIAL,
L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C., a Delaware
limited liability company

By:  JBG/Company Manager, L.L.C.,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first written above.

**OWNER (jointly and severally):**

**WARDMAN HOTEL, L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C., a Delaware limited liability company

By: JBG/Company Manager, L.L.C., a Delaware limited liability company

By: _____
Name: _Porter G. Dawson_
Title: _Managing Member_

**WARDMAN TOWER, L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C. a Delaware limited liability company

By: JBG/Company Manager, L.L.C., a Delaware limited liability company

By: _____
Name: _Porter G. Dawson_
Title: _Managing Member_

**WARDMAN COTILLION RESIDENTIAL, L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C., a Delaware limited liability company

By: JBG/Company Manager, L.L.C., a Delaware limited liability company

By: _____
Name: _Porter G. Dawson_
Title: _Managing Member_

**WARDMAN PARK RESIDENTIAL,**
**L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C., a Delaware
      limited liability company

      By: JBG/Company Manager, L.L.C.,
          a Delaware limited liability company

      By: _Porter W. Dawson_
      Name: _Porter G. Dawson_
      Title: _Managing Member_

## **MANAGER:**

Attest:

MARRIOTT HOTEL SERVICES, INC.,
a Delaware corporation

_____          By:   _____

Assistant Secretary                    Vice President

**WARDMAN PARK RESIDENTIAL,**
**L.L.C.,** a Delaware limited liability company

By:   Wardman Investor, L.L.C., a Delaware
      limited liability company

      By:  JBG/Company Manager, L.L.C.,
          a Delaware limited liability company

          By: _____
          Name: _____
          Title: _____

**MANAGER:**

Attest:

MARRIOTT HOTEL SERVICES, INC.,
a Delaware corporation

By: _____
      Vice President

Assistant Secretary

## EXHIBIT A

### Legal Description of the Site

All that certain property located in the City of Washington, District of Columbia, and more particularly described as follows:

> Lot numbered Thirty-two (32) in Square numbered
> Twenty-one Hundred Thirty-two (2132) in the
> subdivision made by Washington Sheraton Corporation
> as per plat recorded in the Office of the Surveyor for the
> District of Columbia in Liber 167 at Folio 164.

EXHIBIT A-1

Wardman Hotel, L.L.C. A&T Lot

## EXHIBIT A-1

### LEGAL DESCRIPTION OF HOTEL COMPONENT

#### Lot 832

Metes & Bounds Description - Land known for purposes of Assessment & Taxation as Lot 832, Square 2132 - "Main Hotel" A&T Lot

Part of Lot 32, Square 2132, per plat recorded in Book 167, page 164, among the records of the Office of the Surveyor for the District of Columbia, more particularly described as follows:

Beginning at a southeast corner of said Lot 32, Square 2132, said beginning being on the westerly line of 24th Street, of varying width, at a point removed N 9° 16' 30" E, 265.20 feet from the intersection of said westerly line of 24th Street and the northerly line of Calvert Street, 120 feet wide, and leaving said beginning and running along the boundary of said Lot 32, Square 2132, the four following courses and distances:

1. N 84° 02' W, 310.12 feet
2. S 6° 30' W, 261.97 feet
3. S 85° 50' 15" W, 438.72 feet
4. S 4° 09' 54" E, 23.31 feet

Thence leaving the boundary of said Lot 32, Square 2132, and running through said lot the nineteen following courses and distances:

5. S 85° 50'15" W, 88.30 feet
6. N 23° 11' 56" W, 152.86 feet
7. N 19° 03' 38" W, 34.14 feet
8. N 15° 36' 39" W, 136.65 feet
9. N 74° 35' 05" E, 16.12 feet
10. N 15° 15' 25" W, 4.84 feet
11. N 28° 50' 38" E, 10.90 feet
12. S 60° 42' 20" E, 41.90 feet
13. N 83° 43' 18" E, 5.45 feet
14. N 29° 05' 10" E, 85.41 feet
15. N 86° 33' 25" E, 23.47 feet
16. N 11° 53' 45" W, 68.30 feet
17. N 33° 20' 57" E, 34.35 feet
18. N 54° 47' 35" E, 67.59 feet
19. N 60° 47' 35" E, 23.40 feet
20. N 55° 45'27" E, 92.86 feet
21. N 40° 47'43" E, 160.92 feet
22. N 83° 55'41" E, 14.60 feet
23. N 40° 43'08" E, 78.91 feet, to the southerly line of Woodley Road, 90 feet wide Thence running along said southerly line of Woodley Road,
24. S 80° 34' E, 215.22 feet

Thence leaving the boundary of said Lot 32, Square 2132, and running through said lot, the fourteen following courses and distances:

25. S 39° 53' 02" W, 186.46 feet
26. S 13° 27' 01" W, 25.56 feet

1

27.   S 38° 21' 24" E, 8.89 feet

28.   S 41° 37' 30" W, 6.44 feet

29.   51.82 feet on the arc of a curve to the right of radius 20 feet (Δ = 148°

27' 58", Chord = 38.50 feet, Chord Bearing = S 17° 01' 06" W)

30.   S 4° 15' 31" E, 30.53 feet

31.   N 82° 41' 24" E, 7.96 feet

32.   S 5° 49' 54" E, 1.25 feet

33.   N 84° 10' 06" E, 22.89 feet

34.   S 4° 25' 35" E, 62.99 feet

35.   66.75 feet on the arc of a curve to the right of radius 100 feet (Δ = 38°

14' 36", Chord = 65.52 feet, Chord Bearing = S 66° 16' 32" E)

36.   17.28 feet on the arc of a curve to the left of radius 100 feet (Δ =

9° 54' 10", Chord = 17.26 feet, Chord Bearing = S 62° 34' 56" E)

37.   S 70° 22' 15" E, 104.07 feet

38.   S 84° 09' 37" E, 234.29 feet, to the west line of 24th Street, aforesaid

Thence running with said west line of 24th Street,

40.   S 9° 16' 30" W, 35.16 feet, to the place of beginning, containing 337,334 square
feet.

NOTE: As of the date hereof, the above land is known for assessment and taxation purposes as Lot 83

2

EXHIBIT A-2

Wardman Tower, L.L.C. A&T Lot

## **EXHIBIT A-2**

## **LEGAL DESCRIPTION OF WARDMAN TOWER COMPONENT**

### Lot 833

Metes & Bounds Description - Land known for purposes of Assessment & Taxation as Lot 833, Square 2132 - "Wardman Tower" A&T Lot

Part of Lot 32, Square 2132, per plat recorded in Book 167, page 164, among the records of the Office of the Surveyor for the District of Columbia, more particularly described as follows:

Beginning on the westerly line of 24th Street, of varying width, at a point removed N 9° 16' 30" E, 300.36 feet from the intersection of said westerly line of 24th Street and the northerly line of Calvert Street, 120 feet wide, and leaving said beginning and running through said Lot 32, Square 2132, the fourteen following courses and distances:

1.  N 84° 09' 37" W, 234.29 feet
2.  N 70° 22' 15" W, 104.07 feet
3.  17.28 feet on the arc of a curve to the right of radius 100 feet ($\Delta$ = 9° 54' 10", Chord = 17.26 feet, Chord Bearing = N 62° 34' 56" W)
4.  66.75 feet on the arc of a curve to the left of radius 100 feet ($\Delta$ = 38° 14' 36", Chord = 65.52 feet, Chord Bearing = N 66° 16' 32" W)
5.  N 4° 25' 35" W, 62.99 feet
6.  S 84° 10' 06" W, 22.89 feet
7.  N 5° 49' 54" W, 1.25 feet
8.  S 82° 41'24" W, 7.96 feet
9.  N 4° 15' 31" W, 30.53 feet
10. 51.82 feet on the arc of a curve to the left of radius 20 feet ($\Delta$ = 148° 27' 58", Chord = 38.50 feet, Chord Bearing = N 17° 01' 06" E)
11. N 41° 37' 30" E, 6.44 feet
12. N 38° 21' 24" W, 8.89 feet
13. N 13° 27' 01" E, 25.56 feet
14. N 39° 53' 02" E, 186.46 feet, to the southerly line of Woodley Road, 90 feet wide

Thence running along the boundary of said Lot 32, Square 2132, the eleven following courses and distances:

15. S 80° 34' E, 136.86 feet
16. N 5° 58' E, 29.05 feet
17. S 80° 34' E, 7.28 feet
18. S 66° 11' E, 41.0 feet
19. S 58° 56' E, 50.0 feet
20. S 50° 26' E, 50.0 feet
21. S 42° 09' E, 50.0 feet
22. S 31° 01' E, 50.0 feet
23. S 12° 52' E, 50.0 feet
24. S 0° 52' W, 50.0 feet
25. S 9° 16' 30" W, 155.16 feet, to the place of beginning, containing 143,003 square feet.

3

NOTE: As of the date hereof, the above land is known for assessment and taxation purposes as Lot 833 in Square 2132.

## EXHIBIT A-3

## Wardman Cotillion Residential, L.L.C. A&T Lot

## **EXHIBIT A-3**

## **LEGAL DESCRIPTION OF COTILLION TOWER COMPONENT**

### Lot 830

Metes & Bounds Description - Land known for purposes of Assessment & Taxation as Lot 830, Square 2132 - "Cotillion" A&T Lot

Part of Lot 32, Square 2132, per plat recorded in Book 167, Page 164, among the records of the Office of the Surveyor for the District of Columbia, more particularly described as follows:

Beginning at the northwest corner of said Lot 32, Square 2132, said beginning being on the southerly line of Woodley Road, N.W., 90 feet wide, at a point removed S 80° 34' E, 327.63 feet, from the intersection of said southerly line of Woodley Road and the east line of 29th Street, N. W., 110 feet wide, and leaving said beginning and running along said southerly line of Woodley Road, S 80° 34' E, 523.64 feet; thence leaving said southerly line of Woodley Road and running through said Lot 32, Square 2132, the fifteen following courses and distances:

1. S 40° 43' 08" W, 78.91 feet
2. S 83° 55' 41" W, 14.60 feet
3. S 40° 47' 43" W, 160.92 feet
4. S 55° 45' 27" W, 92.86 feet
5. S 60° 47' 35" W, 23.40 feet
6. S 54° 47' 35" W, 67.59 feet
7. S 33° 20' 57" W, 34.35 feet
8. S 11° 53' 45" E, 68.30 feet
9. S 86° 33' 25" W, 23.47 feet
10. S 29° 05' 10" W, 85.41 feet
11. S 83° 43' 18" W, 5.45 feet
12. N 60° 42' 20" W, 41.90 feet
13. S 28° 50' 38" W, 10.90 feet
14. S 15° 15' 25" E, 4.84 feet
15. S 74° 35' 05" W, 76.31 feet, to a westerly line of said Lot 32, Square 2132

    Thence running with the boundary of said Lot 32, Square 2132, the seven following courses and distances:
16. N 30° 04' W, 173.05 feet
17. N 7° 07' W, 99.92 feet
18. N 7° 35' W, 59.75 feet
19. N 20° 15' W, 59.75 feet
20. N 0° 48' E, 59.75 feet
21. N 34° 37' 30" E, 99.95 feet
22. N 52° 02' 30" E, 84.05 feet, to the place of beginning, containing 200,511 square feet.

NOTE: As of the date hereof, the above land is known for assessment and taxation purposes as Lot 830 in Square 2132.

5

## EXHIBIT A-4

### Wardman Park Residential, L.L.C. A&T Lot

## EXHIBIT A-4

## LEGAL DESCRIPTION OF PARK TOWER COMPONENT

### Lot 831

Metes & Bounds Description - Land known for purposes of Assessment & Taxation as Lot 831, Square 2132 - "Park Tower" A&T Lot

Part of Lot 32, Square 2132, per plat recorded in Book 167, page 164, among the records of the Office of the Surveyor for the District of Columbia, more particularly described as follows:

Beginning at the southwest corner of said Lot 32, Square 2132, said beginning being on the northerly line of Calvert Street, N.W., 120 feet wide, at a point removed N 85° 50' 15" E, 452.07 feet, from the intersection of said northerly line of Calvert Street and the east line of 29th Street, 110 feet wide, and leaving said beginning and running along the westerly boundary of said Lot 32, Square 2132, the four following courses and distances:

1.  N 23° 12' W, 191.06 feet
2.  N 15° 24' W, 75.0 feet
3.  N 20° 07' W, 74.93 feet
4.  N 30° 04' W, 5.77 feet

Thence leaving said westerly boundary of said Lot 32, Square 2132, and running through said lot the five following courses and distances:

5.  N 74° 35' 05" E, 60.20 feet
6.  S 15° 36' 39" E, 136.65 feet
7.  S 19° 03' 38" E, 34.14 feet
8.  S 23° 11' 56" E, 152.86 feet
9.  N 85° 50' 15" E, 88.30 feet, to an east line of said Lot 32, Square 2132

Thence running with the boundary of said Lot 32, Square 2132, the two following courses and distances

10.  S 4° 09' 54" E, 31.69 feet, to the northerly line of Calvert Street, aforesaid
11.  With said northerly line of Calvert Street, S 85° 50' 15" W, 133.05 feet, to the place of beginning, containing 21,465 square feet.

NOTE: As of the date hereof, the above land is known for assessment and taxation purposes as Lot 831 in Square 2132.

## EXHIBIT B

Equity Interest in Owner

# Wardman

Wardman Hotel, L.L.C.
Wardman Tower, L.L.C.
Wardman Cotillion Residential, L.L.C.
Wardman Park Residential, L.L.C.
100%
100%
100%
99%
99%
1%
1%
Wardman Investor, L.L.C.
Wardman Member, L.L.C.
JBG/Company Manager, L.L.C. 0% Managing Member
JBG Investment Fund IV, L.L.C. 50%
CIM/Wardman LLC 50%
JBG/Company Manager, L.L.C. 0% Managing Member
JBG/Fund IV, Inc. 50%
CIM Wardman LLC 50%
Benjamin R. Jacobs
Michael J. Glosserman
Brian P. Coulter
Robert A. Stewart
Porter G. Dawson
(Each a Managing Member)
Benjamin R. Jacobs
Michael J. Glosserman
Brian P. Coulter
Robert A. Stewart
Porter G. Dawson
(Each a Managing Member)
JBG Investment Fund IV, L.L.C. 100%



## EXHIBIT C

Technical Services Agreement

Execution Version

# MARRIOTT WARDMAN PARK HOTEL

## TECHNICAL SERVICES AGREEMENT

by and between

**WARDMAN HOTEL, L.L.C., WARDMAN TOWER, L.L.C., WARDMAN COTILLION RESIDENTIAL, L.L.C., and WARDMAN PARK RESIDENTIAL, L.L.C.**

and

**MARRIOTT INTERNATIONAL DESIGN & CONSTRUCTION SERVICES, INC.**

dated as of

**July 1, 2005**

# TABLE OF CONTENTS

**ARTICLE 1 TERMS AND CONVENTIONS USED IN AGREEMENT** ...................................................................... 2

  1.01   DEFINITION OF TERMS .......................................................................................................................... 2
  1.02   INTERPRETATION ................................................................................................................................... 7

**ARTICLE 2 THE PROJECTS; STANDARDS** ............................................................................................................ 8

  2.01   THE PROJECTS ...................................................................................................................................... 8
  2.02   THE STANDARDS ................................................................................................................................. 10
  2.03   THE EXTERIOR ELEMENTS ................................................................................................................. 10

**ARTICLE 3 MIDCS'S SERVICES AND RESPONSIBILITIES** ................................................................................ 10

  3.01   GENERAL DESCRIPTION OF SERVICES ............................................................................................... 10
  3.02   OVERALL PROJECT SERVICES AND RESPONSIBILITIES ..................................................................... 11
  3.03   DESIGN REVIEW SERVICES ................................................................................................................ 11
  3.04   DESIGN SERVICES .............................................................................................................................. 12
  3.05   RENOVATION REVIEW SERVICES ....................................................................................................... 13

**ARTICLE 4 OWNER'S RESPONSIBILITIES** ......................................................................................................... 13

  4.01   GENERAL DESCRIPTION OF RESPONSIBILITIES ................................................................................. 13
  4.02   GENERAL RESPONSIBILITIES ............................................................................................................. 14
  4.03   DESIGN RESPONSIBILITIES ................................................................................................................ 14
  4.04   RENOVATION RESPONSIBILITIES ....................................................................................................... 15
  4.05   ENVIRONMENTAL RESPONSIBILITIES ................................................................................................. 16
  4.06   OWNER COORDINATION ..................................................................................................................... 17
  4.07   RELEASE OF OWNER PARTIES AND PROJECTS ................................................................................... 17

**ARTICLE 5 COMPENSATION AND INVOICING** ................................................................................................ 17

  5.01   COMPENSATION ................................................................................................................................. 17
  5.02   ADDITIONAL COMPENSATION ........................................................................................................... 18
  5.03   INVOICING ......................................................................................................................................... 18

**ARTICLE 6 COOPERATION AND CHANGES** ..................................................................................................... 19

  6.01   COOPERATION ................................................................................................................................... 19
  6.02   CHANGES ........................................................................................................................................... 19

**ARTICLE 7 NO WARRANTIES OR GUARANTEES** ........................................................................................... 20

  7.01   DESIGN .............................................................................................................................................. 20
  7.02   COST PROJECTIONS ............................................................................................................................ 20

**ARTICLE 8 DURATION AND TERMINATION** .................................................................................................... 20

  8.01   TERM .................................................................................................................................................. 20
  8.02   TERMINATION .................................................................................................................................... 20

**ARTICLE 9 MISCELLANEOUS** ............................................................................................................................ 22

  9.01   PAYMENTS ......................................................................................................................................... 22
  9.02   SURVIVAL OF TERMS ......................................................................................................................... 22
  9.03   LICENSES AND PERMITS .................................................................................................................... 22
  9.04   RESPONSIBILITY FOR MANAGING CONTRACTORS ............................................................................ 23
  9.05   RESPONSIBILITY FOR CONSULTANT, CONTRACTOR AND VENDOR PAYMENTS .................................. 23
  9.06   ASSIGNMENT ...................................................................................................................................... 23
  9.07   DOCUMENTS ...................................................................................................................................... 23
  9.08   OWNER'S INSURANCE REQUIREMENTS ............................................................................................. 24
  9.09   INDEMNIFICATION ............................................................................................................................. 25

| | | |
|---|---|---|
| 9.10 | EXTRAORDINARY EVENTS | 25 |
| 9.11 | DRAWINGS | 26 |
| 9.12 | APPLICABLE LAW AND JURISDICTION | 26 |
| 9.13 | [INTENTIONALLY OMITTED] | 26 |
| 9.14 | PARTIAL INVALIDITY | 26 |
| 9.15 | NOTICES | 26 |
| 9.16 | CONFIDENTIALITY | 27 |
| 9.17 | WAIVER | 28 |
| 9.18 | COUNTERPARTS | 28 |
| 9.19 | ENTIRE AGREEMENT | 28 |
| 9.20 | RELATIONSHIP | 29 |
| 9.21 | NEGOTIATION OF AGREEMENT | 29 |
| 9.22 | PREVAILING PARTY | 29 |
| 9.23 | JOINT AND SEVERAL LIABILITY | 29 |

## **EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Project Budget |
| Exhibit B | - | Project Schedule |
| Exhibit C | - | Approved Design Documents |
| Exhibit D | - | Approved Interior Design Documents |
| Exhibit E-1 | - | Renovation Program (narrative) |
| Exhibit E-2 | - | Renovation Program Timeline and Sequencing |
| Exhibit E-3 | - | Facilities Program |
| Exhibit E-4 | - | Renovation Program Estimate |
| Exhibit F | - | Schedule of Visits and Observations |
| Exhibit G | - | Supplies Documents |

## MARRIOTT WARDMAN PARK HOTEL
## TECHNICAL SERVICES AGREEMENT

**THIS TECHNICAL SERVICES AGREEMENT** (the "**Agreement**") is executed as of July 1, 2005 (the "**Effective Date**") by and between:

**WARDMAN HOTEL, L.L.C., WARDMAN TOWER, L.L.C., WARDMAN COTILLION RESIDENTIAL, L.L.C.** and **WARDMAN PARK RESIDENTIAL, L.L.C.** (jointly and severally, "**Owner**"), each a limited liability company organized and existing under the laws of Delaware, with its registered office at c/o Wardman Investor, L.L.C., 4445 Willard Avenue, Suite 400, Chevy Chase, Maryland 20815;

and

**MARRIOTT INTERNATIONAL DESIGN & CONSTRUCTION SERVICES, INC.** ("**MIDCS**"), a corporation organized and existing under the laws of the State of Delaware, United States of America, with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817.

### RECITALS

A.     As of the Effective Date, each of the parties comprising Owner will own an A&T Lot (defined below) which together comprise the Site located in Washington, D.C., on which there is situated a first-class, full-service hotel known as the Marriott Wardman Park Hotel (the "**Hotel**") containing approximately 1,347 guest rooms.

B.     Pursuant to that certain Second Amended and Restated Management Agreement executed as of the Effective Date (the "**Management Agreement**"), Owner and Marriott Hotels Services, Inc. ("**Manager**") have agreed that Manager will manage and operate the Hotel.

C.     Pursuant to the terms and provisions of the Management Agreement, Owner and Manager intend that the Hotel, as existing as of the Effective Date, will undergo a redevelopment project involving three phases and the projects comprising each phase, more particularly described on Exhibit E-1, Exhibit E-2, Exhibit E-3, and Exhibit E-4 attached hereto (collectively, the "**Projects**" and individually, a "**Project**").

D.     The parties acknowledge and agree that the Projects will result in the Hotel being part of a mixed-use project containing residential units and other facilities and that the intent is to have the Hotel, the residential units and the other facilities, upon completion of the Projects, be part of an aesthetically integrated whole.

E.     Owner desires to retain MIDCS to provide certain technical services in an advisory capacity during the course of the Projects as concerns the Hotel Aspects only, and MIDCS desires to provide such technical services on Owner's behalf upon the terms and conditions set forth in this Agreement and as supplemented by the terms and provisions set forth in the Management Agreement.

134185_8 DOC

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained, the parties agree as follows:

## ARTICLE 1
## TERMS AND CONVENTIONS USED IN AGREEMENT

1.01    Definition of Terms.

The following terms when used in this Agreement shall have the meanings indicated:

"**Agreement**" means this Technical Services Agreement, as amended, restated or supplemented from time to time.

"**A&T Lot**" shall have the meaning given in Section 4.07.

"**Audio/Video Systems**" means general audio and video systems (audio/video) for the public areas of the Hotel, including to the extent applicable, entertainment audio/video systems for lounges and bars, video information system, public address systems and master antenna television distribution system for function spaces.

"**Background Drawings**" means as-built drawings of floor plans, interior wall elevations and reflected ceiling plans of the Hotel prepared by Owner or Owner's Consultant clearly delineating structural grid, walls, partitions, columns, shafts and chases, such drawings generally devoid of dimensional lines and notations within perimeter walls.

"**Back-of-the-House**" means the portions of the Hotel used as service and support areas, and to which guest and public access is restricted.

"**Business Day**" means any day which is not Saturday, Sunday or a Federal or District of Columbia holiday in Washington, D.C.

"**Color Book**" means a loose leaf binder composed of mounted samples of decorative materials and finishes, a "finish index" describing the materials, manufacturing sources and location(s) where the sampled materials are to be installed, and unique finish numbers to cross-reference the samples to their locations on the Interior Design Documents.

"**Commencement Date**" means the commencement date for the applicable Project, as set forth on Exhibits E-1 and E-2.

"**Consultant**" means a firm or individual retained by Owner or MIDCS who provides advice, opinions, and direction in a specific field of expertise for any of the Projects and who may be responsible for producing Design Documents.

"**Control Book**" means an assemblage of all Control Sheets, with samples and identifying manufacturers.

2

"**Control Sheet**" means a MIDCS or similarly designed requisition form completed by the Interior Designer for each Decorative Item to be procured for the Hotel and containing a complete description, quantity, recommended manufacturer and model number, product specification, photograph (when appropriate), installed location, budget per unit, budget for the lot, and other pertinent information.

"**Decorative Items**" means (by way of example, but not limitation) artifacts, artwork, banquettes, carpeting, decorative lighting fixtures, etched glass, furniture, graphics, interior landscaping, televisions and window treatments.

"**Design Documents**" means all drawings, specifications, schedules and other similar technical documents prepared by the Consultants that (i) describe the renovation, furnishing and equipping of the Hotel, and (ii) once approved by both parties, will be incorporated by reference into this Agreement as Exhibit C collectively as the "Approved Design Documents"; such Design Documents include, but are not limited to, reports and studies for final code compliance review for fire and smoke detection and alarm, smoke evacuation, and egress; such "Approved Design Documents" shall include those Interior Design Documents prepared by Interior Designer and approved by MIDCS.

"**Effective Date**" shall have the meaning set forth in the Preamble.

"**Environmental Consultant**" means a Consultant having expertise in environmental matters and the ability to conduct comprehensive investigations concerning the environmental status of properties.

"**Exterior Elements**" means the façade and external skin, landscaping features, location, and footprint of the Residential Buildings, and the connections among the Residential Buildings and between the Residential Buildings and the Hotel to the extent that such items, in Manager's reasonable judgment, materially impact the visual presentation of the Hotel and the Residential Buildings as an aesthetically integrated and functional whole. Exterior Elements shall not be included as part of any Project.

"**Exterior Identity Signage**" means exterior illuminated or non-illuminated signs for identification of the Hotel, such as wall-mounted building signs, pylon signs, and ground-mounted monument signs.

"**Extraordinary Events**" means any of the following events beyond the control of the party claiming that an Extraordinary Event has occurred, regardless of where it occurs or its duration: acts of nature without the interference of any human agency (including hurricanes, typhoons, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war, attack, invasion or other acts of hostility by foreign enemies; civil war, rebellion, revolution, insurrection or usurpation of sovereign power; riots or other civil commotion; terrorism (including hijacking, sabotage, chemical or biological events, nuclear events, disease-related events, bombings, murder, assault, and kidnapping); strikes or similar labor disturbances which have a material adverse impact on the operation of the Hotel and/or Gross Revenues earned by the Hotel; shortage of critical materials or supplies; action or inaction of

3

governmental authorities having jurisdiction over the Hotel; and any other events beyond the control of Owner or MIDCS, which events are likely to have a significant adverse effect upon the performance or fulfillment of the obligations of Owner or MIDCS hereunder.

"**Food Equipment**" means all food preparation, cooking and holding equipment; exhaust hoods and hood fire protection systems; general storage layout, refrigerators and freezers (including coils, condensers and compressors); ice-making, beverage dispensing and other food and beverage equipment; dishwashing equipment (except any glass washer included in Housekeeping Equipment); and all other similar items required for a complete food and beverage service of the Hotel.

"**Graphics**" means food and beverage logos; name signs for suites, meeting rooms, board rooms, conference suites, and ballrooms; guestroom numbers; all directional signs; exterior signs except Exterior Identity Signage; guestroom evacuation signs; elevator, handicapped, fire stair, and elevator restriction signs; miscellaneous directional and loss prevention/safety signs; and all signs required by or for municipal, department of transportation, fire safety, or other jurisdictional authority for the operation of the Hotel.

"**Guest Room**" means each rentable unit in the Hotel consisting of a room or suite of rooms generally used for overnight guest accommodation, the entrance to which is controlled by the same key; adjacent rooms with connecting doors that can be locked and rented as separate units shall be deemed to be separate Guest Rooms.

"**Hotel**" shall have the meaning set forth in the Recitals and as further defined in the Management Agreement, provided however that once a specific Project is commenced, the term Hotel shall expressly exclude any Non-Hotel Aspect of a Project.

"**Hotel Aspect**" shall include that portion of any Project which will relate to the Hotel after completion of such Project, as specifically identified as part of the applicable Project description set forth in the Renovation Program.

"**Hotel Systems**" means the rooms management system, including front office, back office and accounting management systems; reservations system; food and beverage inventory management system; sales and catering system; point-of-sale systems, including food, beverage and retail functions; word processing and personal computer applications, including engineering software; all of which are included in the budget for Operating Supplies.

"**Housekeeping Equipment**" means stationary equipment items (including glass washer) to be used by Hotel employees for cleaning the Hotel on a regular basis.

"**Interior Design Documents**" means those Design Documents that (i) describe the Decorative Items, the floor, wall and ceiling finishes, decorative lighting fixtures, artwork and artifacts or other specific interior treatments of the Hotel, and (ii) once approved by both parties, will be incorporated by reference into this Agreement as Exhibit D collectively as the "Approved Interior Design Documents"; such Design Documents include, but are not limited to, furnishings plans, Control Books, Color Book, and material sample boards.

4

"**Interior Designer**" means the interior design firm retained by Owner to perform the interior design of the Hotel and to prepare and coordinate the Interior Design Documents. Selection of the Interior Designer shall be subject to Manager's approval, not to be unreasonably withheld.

"**Laundry Equipment**" means washers, washer/extractors, dryers, chest-type ironers, steam boiler, thermal fluid heater for ironer, lint control devices, linen folders, linen carts, dry cleaning equipment (if required), laundry sinks, air compressors, laundry scales, and all other similar items required for a complete laundry with ironing capability.

"**Management Agreement**" shall have the meaning set forth in the Recitals.

"**Manager**" shall have the meaning set forth in the Recitals and shall include Manager's legal successors and permitted assigns.

"**Mandatory Sequencing Items**" refers to the following items as shown on and subject to the terms of Exhibit E-1 and Exhibit E-2: (i) the Fitness Center Relocation Project; (ii) the Park Tower Meeting Rooms Relocation Project; (iii) the East Garage Project; (iv) the Junior Ballroom Project; (v) the East Loading Dock Project; (vi) the South Service Corridor & Freight Elevator Project; and (vii) the Center Tower Project.

"**Marriott Design Guide**" means the collective reference to the "Full-Service Hotel Design Standards – United States and Canada," dated September 1999, Module 4 - Spa Design Guide (May 2004), Module 7 – Guest Accommodations (December 2004), Module 8A – Administration Supplement – AYS (February 2003), Module 14 – Fire Protection/Life Safety (July 2004), published by Marriott's Architecture and Construction Division.

"**Marriott System**" means the chain of full-service hotels in the United States which are operated by Manager or its Affiliates under the "Marriott" trade name.

"**MEP Systems**" means the mechanical, electrical and plumbing systems of the Hotel.

"**MIDCS**" shall have the meaning set forth in the Preamble and shall include MIDCS's legal successors and permitted assigns.

"**MIDCS Representative**" means an individual assigned to the Project by MIDCS through whom all communications relating to MIDCS's services under this Agreement will be channeled.

"**Non-Hotel Aspect**" means that portion of any Project which is not a Hotel Aspect [i.e., does not or will not relate to the Hotel upon completion of the Project].

"**Operating Supplies**" means supply items for the Hotel included within the "Property and Equipment" description of the Uniform System of Accounts, including without limitation linen, china, glassware, silver, utensils, automotive equipment, office supplies, computers and software, Hotel Systems, uniforms and similar items.

"**Outside Completion Date**" means July 31, 2009, which is the outside date for Substantial Completion of the Hotel Aspects of all of the Projects, as set forth on Exhibits E-1 and E-2.

5

"**Owner**" shall have the meaning set forth in the Preamble and shall include the legal successors and permitted assigns of each party comprising Owner, subject to Section 4.07.

"**Owner Representative**" means the individual assigned to the Project by Owner through whom all communications relating to the Project shall be channeled.

"**Permitting Event**" means the failure of any public agency or governmental authority to issue or process building permits, licenses, or other regulatory approvals in a timely manner, provided that the applicant for such permit, license or approval has pursued issuance or processing of such permit, license or approval diligently and in good faith.

"**Project Budget**" means the budget for all design, renovation, furnishing and equipping costs estimated to be incurred to perform the applicable Project, calculated on a Project-by-Project basis and in the aggregate for all Projects, which shall be prepared by Owner and reviewed by MIDCS and, as to any approved Project Budget or supplements thereto, shall be attached as Exhibit A.

"**Project Schedule**" means the schedule, prepared using the critical path method, of all design and renovation activities of the applicable Project, including dates of significant milestone events (including the Commencement Date and the Outside Completion Date), Project Sequencing, presentations to Owner and Manager, and submission of Design Documents for the applicable Project by Owner to MIDCS, which will be approved by Owner and submitted for review to MIDCS and, as to any approved Project Schedule or supplements thereto, shall be attached as Exhibit B.

"**Project Sequencing**" means the sequencing of the design and renovation activities for the applicable Project, the Mandatory Sequencing Items, and the sequencing of the Projects themselves, as set forth on Exhibits E-1 and E-2.

"**Project(s)**" shall have the meaning set forth in the Recitals.

"**Renovation Program**" means the renovation program set forth in Exhibits E-1, E-2, E-3, and E-4.

"**Residential Buildings**" means the residential buildings to be converted and renovated or constructed as part of the Projects.

"**Schedule of Visits and Observations**" means the estimated schedule of the visits that MIDCS personnel anticipate making to the Hotel in order to perform the services required under this Agreement, which will be attached as Exhibit F.

"**Security Systems**" means closed circuit television camera monitoring system; two-way radio system; inspection tour recording system; electronic parking controls, and other special security systems required for the Hotel.

"**Standards**" shall have the meaning set forth in Section 2.02.

6

"**Submittals**" means shop drawings, product data and samples submitted by contractors or, vendors which have been specially prepared to illustrate some portion of the Work; such items include, but are not limited to, all furniture, fabrics and upholstery, sprinkler heads and fire alarm systems, interior graphics and building signs.

"**Substantial Completion**" or "**Substantially Complete**" means (i) all work to be done in connection with any Project shall be substantially completed in accordance with the Renovation Program, the Standards, applicable Legal Requirements, and the requirements of this Agreement (other than, with respect to the work for which the designation "Substantial Completion" is sought, minor "punchlist" items or other items that do not individually or in the aggregate impair the use of the Hotel for its intended purpose or materially impair the guest experience at the Hotel), (ii) all required certificates of occupancy, permits and licenses have been issued or other temporary permits allowing the use of the relevant portions of the Hotel for its intended purpose, and (iii) the Hotel shall be available for use for its intended purpose.

"**Supplies Document**" means a list of Operating Supplies for the Hotel showing each item, manufacturer, quantities, total category cost and grand total cost, which will be attached as Exhibit G.

"**Telecommunication Systems**" means the private branch exchange system ("PBX"), call accounting and pocket paging system for the Hotel.

"**Trade Equipment**" means Food Equipment, Laundry Equipment, and Housekeeping Equipment.

"**Variance Notice**" means a separate written statement provided by Owner to MIDCS concurrently with Owner's submittals to MIDCS pursuant to Article 4, which statement shall detail all variances from the Standards.

"**Work**" means the collective activities of renovating, furnishing, and equipping the Hotel in accordance with the Renovation Program.

1.02    Interpretation.

A.    Unless otherwise stated, references to the Preamble, Recitals, Articles, Sections, and Exhibits are to the Preamble, Recitals, Articles, Sections, and Exhibits of or to this Agreement, and all such Exhibits are hereby incorporated herein by reference.

B.    All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all genders; the singular shall include the plural and the plural shall include the singular.

C.    Unless otherwise stated, references to days, months, and years are to calendar days, calendar months, and calendar years, respectively.

D.    The headings to the Articles, Sections, and Exhibits are for convenience only and have no legal effect.

7

E.      Every word or term in this Agreement which is capitalized for the purpose of indicating a particular meaning and not specifically defined herein has the meaning set forth in the Management Agreement.

## ARTICLE 2
## THE PROJECTS; STANDARDS

2.01    The Projects.

A.      Each Project shall be designed, constructed and completed in accordance with and subject to the Renovation Program, and, with respect to the Hotel Aspects of each Project, if any, in accordance with the Design Documents, the Standards, and the applicable Project Schedule. The Projects shall be completed at Owner's sole cost and expense and, as to the Hotel Aspects of the Projects, to Manager's reasonable satisfaction. The Hotel shall remain in operation throughout the course of the Projects.

B.      The Projects (all as defined and described further on Exhibits E-1, E-2, E-3, and E-4) shall be divided into three phases.

Phase I shall consist of the following Projects:

- the Fitness Center Relocation Project

- the Park Tower Meeting Room Relocation Project

- the East Garage Project

- the Junior Ballroom Project

- the East Loading Dock Project

- the Park Tower Condominium Conversion Project

- the South Service Corridor and Freight Elevator Project

- the Exhibit Halls Project

- the Kitchen Project

- the Wardman Tower Guestrooms Renovation Project

Phase II shall consist of the following Projects:

- the Cotillion Project

- the Hospitality Suites Project

- the Cotillion Residential Project

Phase III shall consist of the following Projects:

- the Center Tower Project (including the Center Tower Suite Conversion Project)

- the Wardman Tower Conversion Project

C. The Center Tower Project of Phase III of the Renovation Program includes, among other things, the following components with respect to renovation of certain public areas: the Lobby and Public Restrooms Re-do, the Lobby Lounge Re-do, the Exhibit Level B - North Pre-Function Corridor, the Main Exhibit Hall Level, and the Perle's and Medici's Restaurant Reconcepting (collectively, the "**Center Tower Public Area Projects**"). The cost of the Center Tower Public Area Projects is estimated to be $8,162,000 (including a 10% contingency but excluding design fees), as shown on Exhibit E-4. MIDCS, on behalf of itself and Manager, agrees that after designs for the Center Tower Public Area Projects have been approved by MIDCS pursuant to this Agreement and final estimates obtained, if the cost of the Center Tower Public Area Projects exceeds $5,162,000 (including a 10% contingency but excluding design fees) (the "**Public Areas Cap**"), MIDCS, Manager and Owner shall work together in good faith to refine the scope of the Center Tower Public Area Projects in order to bring such scope within the Public Areas Cap. If after the Center Tower Project is designed and prior to the commencement of work on such Project, the final estimate for the cost of such work exceeds the "order of magnitude" budget set forth on Exhibit E-4, MIDCS and Manager agree to consider in good faith proposals by Owner to value-engineer the scope of the Center Tower Project in order to bring it within the "order of magnitude" budget. However, MIDCS and Manager are not required to approve such value-engineering proposals if in their reasonable opinion, such proposals would cause the Center Tower Project not to comply with the Renovation Program or the Standards.

D. Owner shall notify MIDCS and Manager in writing on or before December 31, 2006, if it elects not to go forward with the Wardman Tower Conversion Project. If MIDCS and Manager do not receive such written notice on or prior to December 31, 2006, Owner shall be presumed to have elected to complete the Wardman Tower Conversion Project. Notwithstanding the immediately preceding sentence, if Owner has not given MIDCS and Manager a written election of its intention not to proceed with the Wardman Tower Conversion Project on or before December 31, 2006 (i.e., Owner has elected, or is deemed to have elected, to proceed with the Wardman Tower Conversion Project), at any time on or prior to July 31, 2009, Owner may notify Manager and MIDCS in writing that it has elected not to proceed with the Wardman Tower Conversion Project. If Manager and MIDCS do not receive such notice on or before July 31, 2009, Owner shall be conclusively presumed to have elected to complete the Wardman Tower Conversion Project in accordance with the Renovation Program and Exhibits E-1 and E-2. Once Owner elects in writing not to proceed with the Wardman Tower Conversion Project, it shall not thereafter be entitled to elect to go forward with such Project. If Owner elects not to proceed with the Wardman Tower Conversion Project as provided for in this Section 2.01D., at Owner's request, MIDCS shall meet with Owner to consider the scope of the Center Tower Project, and in particular to examine the strategy for refurbishment of the Center Tower suites in light of (i) the decision to leave the Wardman Tower Guest Rooms in service at the Hotel and/or(ii) the fact that the Owner does not undertake the Center Tower Suite Conversion Project because of its election not to proceed with the Wardman Tower Conversion Project.

9

## 2.02   The Standards.

The Hotel Aspects of the Projects shall be completed in substantial conformity with (i) the standards of quality, durability and efficiency established by MIDCS and its Affiliates as set forth in the Marriott Design Guide, (ii) the Renovation Program attached hereto as Exhibit E, (iii) National Fire Protection Association ("NFPA") Life Safety Code 101 - 2000, NFPA Standard 13 - Sprinkler Installation, and (iv) such other requirements upon which Owner and MIDCS shall mutually agree to meet the needs of the Hotel. The foregoing are collectively referred to herein as the "Standards." In the event that the requirements of local codes and regulations exceed the Standards, the Hotel shall comply with such local codes and regulations. Owner and MIDCS agree that, except as described in the Renovation Program, as required to comply with life-safety requirements, as otherwise required to comply with applicable Legal Requirements, or as Owner and MIDCS may otherwise mutually agree, Owner shall not be required to comply with the Standards if (i) the physical structure or MEP Systems of the Hotel would require significant work to be performed in order to bring the Hotel into compliance (e.g., changing Guest Room dimensions), or (ii) the aspect of the Project or Projects in question was previously approved by MIDCS and Manager as part of the approval of the Renovation Program and compliance could reasonably be expected to result in a material increase in the Project Budget for the applicable Project(s) or a delay in the Project Schedule for such Project(s).

## 2.03   The Exterior Elements.

The Exterior Elements shall be completed at Owner's sole cost and expense and to Manager's reasonable satisfaction in accordance with the plans and designs approved by MIDCS in accordance with the provisions of Article 3 of this Agreement.

## ARTICLE 3
## MIDCS'S SERVICES AND RESPONSIBILITIES

### 3.01   General Description of Services.

MIDCS will, subject to the terms and conditions contained herein, provide technical advisory services and limited design services to Owner for each Project (exclusive of any Non-Hotel Aspect) and for the Exterior Elements in order to assist Owner in complying with its obligations under Section 5.05 of the Management Agreement. MIDCS will advise Owner and the Consultants as described in this Article 3 on the Standards, aesthetics and systems necessary for the Hotel to be operated by Manager as a Marriott System hotel. Such advice will be provided to Owner and the Consultants in the areas of architectural and interior design, MEP Systems, Trade Equipment specifications and layouts, life safety requirements, and Audio/Video Systems, Telecommunication Systems, Security Systems and Hotel Systems. All MIDCS services will be coordinated through the MIDCS Representative who shall communicate all such advice promptly and concisely to Owner.

134185_8 DOC

3.02    Overall Project Services and Responsibilities.

With respect to the Exterior Elements and the Hotel Aspect, if any, of each Project, MIDCS shall:

A.    Provide, communicate and interpret the Standards for Owner and Owner's Consultants during all phases of the Project and with respect to the Exterior Elements;

B.    Attend design meetings and make periodic observations of the Work throughout the Project and with respect to the Exterior Elements in accordance with the Project Schedule and the Schedule of Visits and Observations in order to advise and provide guidance to Owner and the Consultants in complying with the Standards;

C.    Review the Project Schedule prepared by Owner for completeness and reasonableness, and, if revisions are necessary, assist Owner to revise the Project Schedule in a manner acceptable to Owner, after consultation with Manager and MIDCS. Any revisions to (i) the Outside Completion Date, (ii) the Mandatory Sequencing Items, (iii) the delay in the Commencement Date for the Wardman Towers Guestrooms Renovation Project beyond January 1, 2006; or (iv) the delay in the Commencement Date for the Center Tower Project beyond July 31, 2008, must be mutually agreed by Owner, Manager and MIDCS (provided, that Owner shall have the unilateral right to elect not to proceed with the Wardman Tower Conversion Project as set forth in Section 2.01D., and if such election is made on or prior to December 31, 2006, Owner shall not be obligated to complete the Center Tower Suite Conversion Project). Other than with respect to the Wardman Tower Guestrooms Renovation Project and the Center Tower Project, any revisions to the Commencement Date for any Project may be made by Owner in its reasonable discretion, so long as the Mandatory Sequencing Items are not impacted, the Project can still practicably be completed prior to the Outside Completion Date, and Owner provides notice to MIDCS as soon as reasonably practicable prior to the originally scheduled Commencement Date (if all of the foregoing requirements are not satisfied, approval of MIDCS and Manager shall be required for any revisions to the Commencement Date);

D.    Abide by the agreed-upon Project Schedule (as it may be revised from time to time as set forth in Section 3.02C.), and review, advise and approve any subsequent revisions proposed by Owner to the Project Schedule in accordance with Section 3.02C.; and

E.    Review and comment on the Project Budget submitted by Owner.

3.03    Design Review Services.

MIDCS will provide the following design review and advisory services to verify that the Design Documents prepared by Owner and the Consultants are in substantial compliance with the Standards and to advise Owner when such Design Documents require revisions to meet the Standards. MIDCS will also review and provide guidance to Owner on the general aesthetics of the proposed design with regard to its acceptability to Manager. In providing these design review services MIDCS shall:

A.    Review and comment on the Design Documents submitted by Owner at the completion of the design phases listed in Section 4.03A. in accordance with the Project Schedule

11

for the applicable Project and for the Exterior Elements, completing each review within fifteen (15) Business Days of their receipt by MIDCS. Such review shall be to confirm compliance of the submitted Design Documents with the Standards and the Renovation Program, and to confirm the acceptability of the general aesthetics of the design. Any items which diverge from the Standards and the Renovation Program or are not aesthetically acceptable will be returned with a written explanation detailing the reason(s) for such divergence or unacceptability and recommending acceptable alternatives;

B.     Coordinate approval by Owner and MIDCS of the Design Documents submitted by Owner, which, when approved, shall be incorporated, by reference and collectively, into this Agreement as Exhibit C;

C.     Prior to formal presentations conducted by Owner's Consultants, review and comment on the materials prepared and submitted to MIDCS;

D.     Review and comment on the formal interior design presentation boards and documents prepared by Owner for the formal interior design presentation to Manager by MIDCS. Owner shall submit such formal presentation boards and documents to MIDCS not less than fifteen (15) Business Days prior to the scheduled presentation. Upon mutual agreement by Owner and MIDCS, the formal interior design presentation boards and documents shall be modified to incorporate the comments of MIDCS. Owner and MIDCS agree to cooperate to revise and amend the formal presentation boards and documents to obtain final acceptance of the interior design concepts by Manager; and

E.     Present the interior design concepts prepared by MIDCS to Manager for its approval. Upon Manager's confirmation that the interior design concepts comply with the Standards and are aesthetically acceptable, coordinate approval of the Interior Design Documents which, when approved, shall be incorporated, by reference and collectively, into this Agreement as Exhibit D.

3.04   Design Services.

MIDCS will provide the following design services for certain areas and systems within the Hotel to the extent reasonably necessary to fulfill its obligations hereunder. The results of such design services shall be incorporated into the Design Documents by Owner's Consultants to the extent required to meet the Standards, as set forth in Section 2.02. In providing these design services, MIDCS shall:

A.     Assist in determining the types and extent of Security Systems required to meet the Standards, provide on Background Drawings the location of security devices and provide specifications, power and space requirements of each additional Security System required under the Renovation Program;

B.     Assist in the preparation of specifications, equipment schedules, diagrams, drawings and other data required to solicit proposals from qualified vendors and/or contractors to furnish and install Hotel Systems (excluding conduit, wire and power requirements);

12

C. Provide guidelines for telecommunications conduit sizing and for cable distribution, power and space requirements for all additional equipment required under the Renovation Program; and

D. Recommend layout planning for new or modified administrative office and Back-of-the-House areas.

3.05 Renovation Review Services.

During each Project and as to the Hotel Aspect, if any, of each Project, MIDCS shall assist Owner in determining that the Hotel is being renovated in accordance with the Renovation Program and the Approved Design Documents and otherwise is in compliance with the Standards. In providing these renovation review services, MIDCS shall:

A. Review and comment on Submittals submitted by Owner or Owner's contractors for compliance with the Design Documents within fifteen (15) Business Days of their receipt by MIDCS;

B. Review, as necessary to fulfill its obligations hereunder, the purchase orders for the Decorative Items prepared by Owner or its procurement agent for compliance with the Control Sheets; such review shall occur prior to the placement of such purchase orders and be performed within fifteen (15) Business Days of receipt of such purchase orders by MIDCS; and

C. Conduct a series of general, scheduled observations of the progress of the Work in accordance with the Schedule of Visits and Observations and provide a written report of each visit to Owner. Such observations shall include reviews of the sample guest room(s) prepared by Owner pursuant to Article 4. The purpose of such observations is to assess the general compliance of the renovation of the Hotel with the Approved Design Documents and otherwise fulfill MIDCS's obligations hereunder. MIDCS's observations are not intended to be exhaustive or comprehensive inspections and are not conducted for the purpose of reviewing the structural integrity of the Hotel building or the Residential Buildings or determining whether the renovation complies with applicable laws, statutes and regulations, all of which is the sole responsibility of Owner.

## ARTICLE 4
## OWNER'S RESPONSIBILITIES

4.01 General Description of Responsibilities.

Owner shall be responsible for the completion of each Project at its sole cost and expense. In carrying out this responsibility, Owner shall perform, by way of example but not limitation, those tasks and actions described in this Article 4, including providing MIDCS with the information and materials as specified herein for it to accomplish its services under this Agreement. This Article is not all-inclusive and any responsibility for the Projects not specifically assigned to MIDCS in Article 3 of this Agreement shall be the responsibility of Owner.

13

4.02    General Responsibilities.

Owner, either on its own or through its Consultants, shall:

A.    Designate, in writing, an Owner Representative;

B.    Retain Consultants and contractors that are duly licensed and authorized to do business in the District of Columbia as necessary for completion of the Projects;

C.    Prepare and submit a Project Budget for each Project to MIDCS for review and comment;

D.    Prepare, maintain and update the Project Schedules for all Projects (including dates for design meetings with and submissions to MIDCS, formal presentations to Manager and all renovation activities), which, when approved by Owner and MIDCS, shall be signed and dated by both parties, and incorporated by reference into this Agreement as Exhibit B; notify MIDCS if scheduled dates for any activity will not be met or when updates to the Project Schedules are made; and revise the Project Schedules as necessary in accordance with the provisions of Section 3.02C. Unless otherwise agreed by MIDCS and Manager as set forth in Section 3.02C., Owner shall (i) complete the Projects by the Outside Completion Date; (ii) complete the Mandatory Sequencing Items in the stated order; (iii) commence the Wardman Tower Guestrooms Renovation Project by January 1, 2006; and (iv) commence the Center Tower Project by July 31, 2008.

E.    Participate in and cause Consultants, as required, to participate in each meeting and formal presentation as specified in the Project Schedules at sites to be mutually agreed upon by Owner and MIDCS;

F.    Submit one or more Variance Notices to MIDCS, if and when applicable, for written approval by MIDCS;

G.    Effect no changes, modifications or revisions (other than de minimis changes, modifications or revisions) to any document approved by MIDCS without the prior written consent (or deemed consent in accordance with the provisions of this Agreement) of MIDCS; and

H.    Complete the renovation, furnishing, and equipping of the Hotel in accordance with this Agreement and the Management Agreement.

4.03    Design Responsibilities.

Owner shall manage all aspects of the design of the Projects. In performing these responsibilities Owner, either on its own or through its Consultants, shall:

A.    Prepare and submit Design Documents, together with a Variance Notice, if applicable, in the following phases and in accordance with the applicable Project Schedules:

(1)    schematic documents illustrating the work required to complete each Project;

14

(2)     70% documents detailing the work to be performed in each Project; and

(3)     100% documents detailing the work to be performed in each Project.

B.      Prepare and submit Interior Design Documents, together with a Variance Notice, if applicable, and materials for formal presentations to MIDCS for approval in accordance with the Project Schedules; materials for formal presentations shall be submitted to MIDCS no less than fifteen (15) Business Days prior to the scheduled formal presentation;

C.      Incorporate MIDCS's comments (which comments shall be made with respect to compliance with the Standards and as further provided in Section 3.03A.) from each submission and formal presentation into subsequent Design Documents and resubmit for MIDCS approval; once approved by MIDCS, the Design Documents shall be incorporated into this Agreement by reference and collectively as Exhibit C;

D.      Incorporate the results of the design services provided by MIDCS pursuant to Section 3.04 into the Design Documents to the extent required by this Agreement;

E.      Submit formal interior design presentation boards, together with a Variance Notice, if applicable, and documents to MIDCS not less than fifteen (15) Business Days prior to the scheduled presentation. Upon mutual agreement between Owner and MIDCS, modify the formal interior design presentation boards and documents to incorporate MIDCS's comments;

F.      Cooperate with MIDCS to revise and amend the formal interior design presentation boards and documents to obtain final acceptance of the interior design concepts by Manager;

G.      Prior to placing purchase orders for any Decorative Items specified in the Control Sheets, provide copies of such purchase orders to MIDCS, if requested, for its review; and

H.      Ensure that any Hotel System procured by Owner shall be the specific make, model and type specified in or consistent with the Standards.

4.04     Renovation and Construction Responsibilities.

Owner shall manage all aspects of the Projects. In performing these responsibilities Owner, either on its own or through its Consultants or Contractors, shall:

A.      Manage the work of contractors engaged in the Projects;

B.      Prior to executing the Work, provide to MIDCS, for its review and comment, contractor Submittals for the Projects related to matters that are governed by the Standards, and Variance Notices, if applicable;

C.      Assure that no Work shall be performed prior to approval by MIDCS of the Design Documents and Submittals for that portion of the Work being performed if and as required by the terms of this Agreement;

D.      Provide quarterly cost forecasts to MIDCS comparing forecasted Project costs to the Project Budget for each Project, as applicable;

15

E. Reject and order the correction or replacement of Work cited by MIDCS which does not conform with the Approved Design Documents or the Standards, unless MIDCS and Owner agree that such non-conformance is not material and does not require correction or replacement;

F. Deliver one (1) complete copy of a set of warranties, guarantees, and operating manuals for newly installed equipment at the Hotel, and deliver "as-built" drawings and specifications to MIDCS upon completion of each Project.

G. Prepare sample guest rooms, for guest rooms that will be renovated pursuant to the Approved Design Documents set forth as Exhibit C, in the following phases, with each phase being subject to approval by MIDCS:

(1) Apply the finishes which shall be inspected for compliance with the Design Documents and which, when approved, shall be the standard of quality to be followed throughout the Projects;

(2) Install Decorative Items and other furnishings (such as safes and mini-bars) to complete the guest room which shall be inspected and arranged for proper effect and fit and which, when approved, shall be the standard arrangement to be followed throughout the Projects.

No work shall proceed in the remaining guest room areas until MIDCS has approved the respective phase of the sample room(s);

H. Notify MIDCS at least thirty (30) days prior to completion of the sample guest rooms and Substantial Completion of each Project to enable MIDCS to schedule its inspection. To the extent that MIDCS reasonably determines that the Hotel as renovated, furnished, or equipped does not conform to the Approved Design Documents, Owner shall promptly correct such nonconforming work;

I. Procure, install and ensure that the Hotel will have all Decorative Items, Trade Equipment, Operating Supplies and other equipment reasonably necessary to operate the Hotel as specified in the Renovation Program, Approved Design Documents and Supplies Documents; and

J. Provide complete and final cleaning of all spaces and surfaces, including interior and exterior of all glass surfaces, leaving the Hotel areas affected by the Projects in a neat, clean, and orderly condition, suitable and ready for their intended use and occupancy.

4.05 Environmental Responsibilities.

Owner shall submit to MIDCS a copy of any environmental report prepared for or submitted to Owner with respect to the Hotel. In the event such report indicates the presence or likelihood of Hazardous Materials upon or near the Site or within the Hotel building, Owner shall be responsible for all costs associated with the discovery, handling, removal, transfer and disposal of Hazardous Materials.

16

### 4.06 Owner Coordination.

Each of Wardman Tower, L.L.C., Wardman Cotillion Residential, L.L.C. and Wardman Park Residential, L.L.C. hereby appoints Wardman Hotel, L.L.C. as its representative and agent for purposes of (i) giving or receiving notices as more particularly described in Section 9.15 hereof, (ii) authorizing and/or directing any actions on behalf of Owner as may be contemplated hereunder, (iii) giving (or withholding) any requisite consents of Owner, (iv) appointing the Owner Representative, and (v) otherwise acting on behalf of all of the parties comprising Owner for all purposes of this Agreement. MIDCS may conclusively rely on the provisions of this Section 4.06 for all purposes with respect to this Agreement.

### 4.07 Release of Owner Parties and Projects.

Each of the parties comprising Owner owns a portion of the Site (each, an "**A&T Lot**"), as more particularly described in the Management Agreement, together with the respective Improvements appurtenant thereto. If, as and when any party comprising Owner and its respective A&T Lot shall be released from the scope of the Management Agreement pursuant to the terms thereof (i.e., upon commencement of the applicable Project and the permanent removal of such A&T Lot from the operation of the Hotel), Owner and MIDCS agree that, from and after the effective date of such release, (i) the respective fee owner of such A&T Lot shall, without any further action required on the part of any party, be immediately and fully released from any further obligation or liability as a party comprising Owner under this Agreement (and MIDCS shall be released from further obligation or liability to such party comprising Owner), and (ii) the applicable A&T Lot and the Improvements thereon shall, without any further action required on the part of any party, shall be immediately deemed removed from the Hotel, the Improvements and the Site as such terms are used in this Agreement. In such event, Owner and MIDCS agree, upon the request of either party, to provide confirmatory mutual releases among the parties and to enter into a conforming amendment to this Agreement to better evidence the removal of such A&T Lot and the release of such Owner party from the operation of this Agreement.

## ARTICLE 5
## COMPENSATION AND INVOICING

### 5.01 Compensation.

For the services performed by MIDCS pursuant to Article 3, Owner shall pay MIDCS the sum of:

A. Three Hundred Fifty Thousand Dollars ($350,000), paid in ten (10) equal quarterly installments pursuant to Section 5.03; plus

B. All reasonable expenses, such as postage, shipping, reproduction of documents, transportation, communications, meetings, per diem expenses, subsistence expenses and other similar expenses, which are incurred by MIDCS in the performance of the services.

17

134185_8 DOC

5.02    Additional Compensation.

MIDCS shall be entitled to increase its compensation for additional work performed by MIDCS due to circumstances beyond the control of MIDCS. Prior to the start of such additional work, Owner and MIDCS shall mutually agree on the compensation and payment terms for which the additional work shall be performed. Examples of such additional work include, without limitation:

1.    Services requested by Owner outside the scope of this Agreement.

2.    Changes requested by Owner to the Renovation Program.

3.    Additional document review due to (a) non-compliance with Standards, (b) incomplete submissions, or (c) changes by Owner to previously approved Design Documents.

4.    Owner-requested participation in meetings and site observations of the Work in addition to those listed in the Project Schedule and the Schedule of Visits and Observations.

5.    Work resulting from delay, if Owner does not complete all Design Documents and Work in accordance with the Project Schedule.

6.    Substantial increase in the cost of any services performed by MIDCS under this Agreement when such increase is caused by an Extraordinary Event.

5.03    Invoicing.

A.    The amount due under Section 5.01A. shall be paid to MIDCS in quarterly installments, which amounts shall be included on the invoices described in Section 5.03B. and shall be paid pursuant to the provisions of this Section 5.03.

B.    On a quarterly basis, MIDCS shall issue an invoice to Owner for amounts due under Section 5.01B.

C.    Any amounts due under Section 5.02 shall be invoiced to Owner by MIDCS in accordance with the mutually agreed upon terms and conditions.

D.    Within thirty (30) days of the invoice date, Owner shall remit the invoice amount to MIDCS via wire transfer to an account designated on the invoice. Owner shall pay any applicable wire transfer costs. Invoiced amounts which are not paid in accordance herewith shall accrue interest at a rate per annum equal to twelve percent (12%), beginning on the date said amounts become overdue until such amounts are paid in full.

E.    Owner shall give MIDCS written notice of any disputed invoice within ten (10) days of receipt of the invoice. The portions of the invoice which are not disputed shall be due and payable as provided in Section 5.03D. The parties shall use their best efforts to resolve any disputes as expeditiously as possible. Once resolved, all correct portions of the invoice that have

18

not been paid when due shall accrue interest starting thirty (30) days from the date of the corrected invoice at the rate set forth in Section 5.03D.

## ARTICLE 6
## COOPERATION AND CHANGES

6.01    Cooperation.

The parties shall cooperate fully with respect to all matters contemplated by this Agreement. Subject to the understandings contained herein, each party agrees in good faith to:

A.     Commence promptly, pursue diligently and complete timely whatever matters are required of it by this Agreement;

B.     Fully cooperate and keep each other (through their designated representatives) regularly and reasonably informed of the progress being made in the preparation and review of the documents, technical data and other information pertinent to the Projects. Owner and MIDCS agree that all documents, technical data and other information submitted for review by either party to the other party shall be promptly reviewed by the recipient, who shall, unless otherwise expressly provided herein, be permitted reasonable time to review and respond. Owner and MIDCS shall provide complete and accurate responses to all written or verbal communications from the other party; and

C.     Unless otherwise provided, wherever in this Agreement the consent or approval of Owner or MIDCS is required, such consent or approval shall not be unreasonably withheld, delayed or conditioned. With respect to all Owner submissions for MIDCS approval, MIDCS shall be under no obligation to review any incomplete package forwarded by Owner until MIDCS has received the complete package, at which time the approval period shall commence. Unless otherwise provided, if either Owner or MIDCS fails to respond within fifteen (15) Business Days to a written request by the other party for a consent or approval, the requesting party shall notify the other party in writing of the pending request, and if the other party fails to respond within five (5) Business Days, such consent or approval shall be deemed to have been given.

6.02    Changes.

Neither party shall make or cause to be made any material changes in the previously approved designs, plans, layouts or specifications for any Project as concerns the Hotel Aspects of such Project without the prior approval of the other party (if such party's approval is required under this Agreement), which approval shall not be unreasonably withheld. Owner shall use commercially reasonable efforts to implement MIDCS-generated comments or modifications to all plans and specifications to the extent consistent with Article 2.

19

## ARTICLE 7
## NO WARRANTIES OR GUARANTEES

### 7.01   Design.

In performing the services hereunder, MIDCS makes no representation or warranty, expressed or implied, regarding the sufficiency of any designs, plans or drawings, and, in the event of any errors or omissions in the designs, plans or drawings reviewed by MIDCS pursuant to this Agreement. Owner and MIDCS agree that in each instance in this Agreement where MIDCS is required to give its approval of plans, specifications and/or budgets, no such approval shall imply or be deemed to constitute an opinion or warranty of MIDCS, nor impose upon MIDCS any responsibility for the design or construction of the Projects, including but not limited to, structural integrity or life-safety requirements, adequacy of any budgets, or the means, methods, techniques, sequences or procedures of construction. Owner acknowledges that MIDCS will, in its review process, provide comments on the plans and specifications. Such reviews do not relieve Owner and its Consultants of their responsibility to determine the completeness and coordination of their documents and to ensure that the design and construction of the Projects comply with applicable Legal Requirements.

### 7.02   Cost Projections.

In providing or otherwise participating in the review of any budgets or other cost projections in connection with the Project, MIDCS will use its good faith efforts to assist Owner, but shall not in any way guarantee the figures or results shown in any such budgets or projections.

## ARTICLE 8
## DURATION AND TERMINATION

### 8.01   Term.

This Agreement shall commence upon the Effective Date and, unless terminated at an earlier date as provided herein, shall expire upon the date that both parties have fully completed all of the obligations pursuant to this Agreement.

### 8.02   Termination.

A.    This Agreement may be terminated (unless otherwise restricted by applicable law) on thirty (30) days written notice upon the happening of any of the following events:

1.    By either party, upon the occurrence of any of the following events:

a.    The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by the other party, or the admission by the other party that it is unable to pay its debts as they become due; or

20

b. The consent by the other party to an involuntary petition in bankruptcy, or the failure by the other party to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition in bankruptcy; or

c. The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the other party as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of such party's assets and such order, judgment, or decree continued unstayed and in effect for any period of ninety (90) days; or

d. The termination of the Management Agreement.

2. By MIDCS, upon the occurrence of any of the following events:

a. If Owner shall (i) fail to make the proper payment to MIDCS when due, or (ii) fail to make proper payment to Consultants, contractors or vendors when due, or (iii) fail to perform or observe any other covenant, obligation or requirement of this Agreement, and such failure shall continue for thirty (30) days after written notice thereof from MIDCS specifying the nature and extent of any such default; provided, however, that if upon receipt of such notice, Owner shall (if such default is not a failure to make a proper payment to MIDCS and is not susceptible of being cured within thirty (30) days) promptly commence to cure the default, and shall thereafter diligently pursue such efforts to completion, then such notice shall be of no force and effect; or

b. If Owner fails to commence any Project by the Commencement Date for such Project or to diligently pursue the Hotel Aspects of a Project in accordance with the applicable Project Schedule; provided, however, that if there are delays which are due to Extraordinary Events or Permitting Events, then the time for completion shall be extended for the duration of any such cause, not to exceed one (1) year, notwithstanding Section 9.10 hereof, after which one (1) year period MIDCS shall have the option to terminate this Agreement regardless of the cause of such delay; or

c. If Owner is unable to Substantially Complete the Hotel Aspects of a Project by the Outside Completion Date or in accordance with this Agreement and the Management Agreement as set forth therein, or if Owner is unable to Substantially Complete any component of the Hotel Aspects of a Project in accordance with the time frame set forth in the applicable Project Schedule; provided, however, that if there are delays which are due to Extraordinary Events or Permitting Events, then the time for completion shall be extended for the duration of any such cause, not to exceed one (1) year, notwithstanding Section 9.10 hereof, after which one (1) year period

MIDCS shall have the option to terminate this Agreement regardless of the cause of such delay; or

d.      If Hazardous Materials are (i) discovered at the Site or within the Hotel building, (ii) discovered near the Site, if such Hazardous Materials are reasonably likely to affect the Site, (iii) introduced into the Work, or (iv) present or, likely to be present at or near the Site or within the Hotel.

3.      By Owner, if MIDCS shall fail to perform or observe any obligation or requirement of this Agreement and such failure shall continue for thirty (30) days after written notice thereof from Owner specifying the nature and extent of such default; provided, however, that if upon receipt of such notice, MIDCS shall (if such default is not susceptible of being cured within thirty (30) days) promptly commence to cure the default, and shall thereafter diligently pursue such efforts to completion, then such notice shall be of no force and effect.

B.      To the extent expressly provided in Section 9.01.F of the Management Agreement, Owner's failure to perform, keep or fulfill any of the covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default beyond any notice and cure periods provided herein shall constitute a default by Owner under the Management Agreement. With respect to such a default, Manager shall have all rights and remedies provided in the Management Agreement. MIDCS's failure to perform or observe any obligation or requirement of this Agreement shall not constitute a default by Manager under the Management Agreement. Any rights or remedies arising from a default by MIDCS under this Agreement shall not give rise to a right by Owner to terminate or otherwise bring an action under the Management Agreement.

## ARTICLE 9
## MISCELLANEOUS

### 9.01    Payments.

The termination of this Agreement shall not in any way relieve Owner of its obligation to pay or reimburse MIDCS for all amounts owing or to be reimbursed to MIDCS under the terms hereof through the date of termination, and all such amounts shall become immediately due and payable, and such liability shall continue until discharged, notwithstanding termination of this Agreement.

### 9.02    Survival of Terms.

The obligations hereunder shall survive for one year after the termination of this Agreement except to the extent that a party has commenced legal action to enforce its rights hereunder within such one year period.

### 9.03    Licenses and Permits.

Owner shall, at its cost and expense, use diligent, good faith efforts to secure all local licenses, permits and approvals necessary for the completion of the Projects, including but not

22

134185_8 DOC

limited to any necessary building, occupancy, sewer, and utility permits and all necessary approvals or permits from governmental authorities to clear imported items through customs, but in any event shall secure such licenses, permits and approvals prior to commencing any work for which such license, permit or approval is required. For purposes of clarification, the licenses, permits, approvals, and other instruments referred to in this Section 9.03 shall not include those licenses, permits, approvals, and other instruments necessary to operate the Hotel, such as the operating permit or liquor license, the responsibility for which is provided for in the Management Agreement.

### 9.04   Responsibility for Managing Contractors.

MIDCS shall not be responsible for, and neither shall MIDCS have any authority as it relates to (i) managing or supervising in any manner the contractors engaged by Owner to carry out any portion of the Project; (ii) renovation means, methods, techniques, sequences or procedures; (iii) safety precautions and programs in connection with the Project, or (iv) the failure of any contractor to carry out any portion of the Project.

### 9.05   Responsibility for Consultant, Contractor and Vendor Payments.

Owner shall be responsible for the payment of all invoices and requisitions of Consultants, contractors, and vendors engaged by Owner to complete the Project.

### 9.06   Assignment.

Neither party may assign or transfer this Agreement nor its rights or obligations hereunder without the prior written consent of the other party; provided, however, that MIDCS shall have the right, without Owner's consent, to (1) assign its interest in this Agreement to Marriott or any Affiliate of Marriott; (2) assign its interest in this Agreement in connection with a merger or consolidation or a sale of all or substantially all of the assets of MIDCS or Marriott; and (3) assign its interest in this Agreement in connection with a merger or consolidation or a sale of all or substantially all of the Marriott System assets owned by MIDCS, Marriott, or any Affiliate of MIDCS or Marriott, and Owner may assign this Agreement as additional security to any lender. In the case of an assignment described in this Section 9.06(1), (2), or (3), MIDCS shall be relieved of its obligations under this Agreement.

### 9.07   Documents.

All drawings, plans, specifications and other documents prepared by MIDCS for the Projects pursuant to this Agreement shall remain the property of MIDCS whether or not the Project is completed, provided that Owner shall have a license to use all such documents and to convey such license to any successor interest. Owner shall be provided with a sufficient number of copies to complete the Work. Owner agrees that such drawings, plans, specifications and other documents will not be used by Owner on any other project or for purposes other than for this specific Project without first obtaining MIDCS's written consent, which may be withheld in MIDCS's sole and absolute discretion. This Section 9.07 shall survive the expiration or termination of this Agreement.

23

9.08    Owner's Insurance Requirements.

At all times during the Project, including but not limited to construction, furnishing, equipping and reconstruction, Owner shall, at its expense, procure and maintain (or cause its general contractor to procure and maintain), either on its own or through its contractors, the following insurance at its sole expense unless otherwise approved by Manager (such approval not to be unreasonably withheld):

A.    Comprehensive or commercial general liability insurance with combined single limits for bodily injury and property damage in an amount not less than One Million Dollars ($1,000,000) each occurrence. Such insurance shall include the following coverage or endorsements:

- Premises and Operations Liability
- Independent Contractors Liability
- Products and Completed Operations Liability to be maintained for two (2) years after the Renovation is complete and for residential construction, such coverage shall be maintained for at least five (5) years after the Renovation is complete
- Contractual Liability covering Owner's indemnification obligations under Section 9.09
- Additional Insureds – Employees
- Broad Form Property Damage Liability, including Completed Operations
- Blanket X, C and U Coverage
- Severability of Interests provision

If the above coverage is provided under a commercial general liability policy form, the general aggregate limit of such coverage shall be not less than Two Million Dollars ($2,000,000), and it shall apply, in total, to this Project only.

B.    Business automobile liability including owned, non-owned and hired vehicles with combined single limits of bodily injury and property damage in an amount not less than One Million Dollars ($1,000,000) each occurrence.

C.    Umbrella excess liability on a following form in an amount not less than One Hundred Million Dollars ($100,000,000) excess of the insurance required under Sections 9.08A. and 9.08B.

D.    Workers compensation coverage in statutory amounts covering Owners, contractors, subcontractors and any and all agents working on the Project including employers liability of not less than $1,000,000 per accident.

E.    The insurance under Sections 9.08A. through 9.08C. and 9.08G. shall name MIDCS, Manager, their affiliates, and their employees and agents as additional insureds for any losses or claims arising out of or resulting from this Agreement. Such insurance shall be endorsed to provide that the coverage will be primary and that any insurance carried by MIDCS, Manager, or their affiliates shall be excess. Prior to commencing work, Owner shall furnish MIDCS with certificates of insurance evidencing the required coverage herein and any renewals thereafter and if

24

134185_8 DOC

requested Owner shall provide copies of such policies. Such insurance shall not be cancelled or materially changed without thirty (30) days advance written notice to MIDCS.

F.     Owner hereby waives its right of recovery against MIDCS, Manager, their affiliates, and their employees and agents for any physical loss or damage to the Hotel, or to any materials, equipment and supplies to be incorporated therein. It is the intent of this Agreement that Owner shall rely on its own builder's risk and property insurance policies to the extent such policies compensate Owner for the loss. ·

G.     Owner shall maintain or cause to be maintained a policy of builder's all-risk insurance covering the Hotel and the Projects, with coverage in the amount of the full replacement value thereof and coverages and provisions as required pursuant to Article 6.01 of the Management Agreement. Such coverage shall be on a completed form basis and include business interruption and delay in opening coverage in amounts and with such coverages and provisions as required by Article 6.01 of the Management Agreement. To the fullest extent possible, but subject to the requirements of any lender, Owner shall make all proceeds of the builder's risk insurance available to its contractors to rebuild or repair the Hotel in the event of an insurable casualty.

9.09   Indemnification.

To the fullest extent permitted by law, Owner shall indemnify, defend and hold harmless MIDCS, Manager, and their affiliates, agents and employees from and against all claims, losses, liabilities, costs and expenses (including, without limitation, attorneys' fees and expenses, and litigation costs and expenses), damages (including, without limitation, consequential, punitive and exemplary damages) and third-party claims, based on, arising out of or resulting from the Projects, including but not limited to the actions of the Owner and any contractors, subcontractors, agents or invitees of the Owner, except when such claim, loss, liability, penalty, cost, expense or damage is a result of the bad faith, fraud or willful misconduct of MIDCS, Manager, and their affiliates, employees, or agents.

9.10   Extraordinary Events.

Time is of the essence of this Agreement. 'Neither party shall be responsible, however, for failure or delay in performing any obligation hereunder to the extent such failure or delay results from any Extraordinary Event or Permitting Event (other than (i) the failure to make monetary payments as required by this Agreement, (ii) the failure to procure and/or maintain commercially available insurance coverages specified in Section 9.08, or (iii) except as otherwise specifically provided in Sections 8.02A.2.b. and 8.02A.2.c., and such failure (except regarding insurance coverages and monetary payments) shall be excused for as long as the continuance of such failure is caused, in whole or in part, by such Extraordinary Events or Permitting Events. In order to receive the benefit of excuse of failure under this Section 9.10, the party wishing to make an Extraordinary Events or Permitting Events claim must notify the other party within one hundred eighty (180) days after the Extraordinary Event or Permitting Event first begins to affect the claiming party's performance.

25

### 9.11   Drawings.

All drawings produced by either Owner or by MIDCS hereunder (or by any Consultants) shall be of a quality sufficient to reproduce completely and clearly at half-size and shall be capable of being stored electronically such as on a computer diskette.

### 9.12   Applicable Law and Jurisdiction.

A.      This Agreement is executed pursuant to, and shall be construed under and governed exclusively by, the laws of the District of Columbia without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the laws of the District of Columbia to the rights and duties of the parties.

B.      Notwithstanding anything to the contrary herein, either party may seek injunctive relief (including, without limitation, restraining orders and preliminary injunctions) in any court of competent jurisdiction.

### 9.13   [INTENTIONALLY OMITTED]

### 9.14   Partial Invalidity.

If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable, to any extent, the remainder of this Agreement and the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision of this Agreement shall be replaced with a provision which is valid and enforceable and most nearly reflects the original intent of the invalid or unenforceable provision.

### 9.15   Notices.

Notices, statements and other communications to be given under the terms of this Agreement shall be in writing and delivered (i) by hand against receipt, (ii) by certified or registered mail, postage prepaid, return receipt requested, or (iii) by reputable overnight international courier service with package tracking capability, addressed to the parties as follows:

To Owner:

Wardman Hotel, L.L.C.
Wardman Tower, L.L.C.
Wardman Cotillion Residential, L.L.C.
Wardman Park Residential, L.L.C.
c/o The JBG Companies
4445 Willard Avenue, Suite 400
Chevy Chase, Maryland 20815
Attn: Kenneth F. Finkelstein
Fax: 240-333-3610

26

With a copy to:

c/o The JBG Companies
4445 Willard Avenue, Suite 400
Chevy Chase, Maryland 20815
Attn: Legal Department
Fax: 240-333-3610

Bingham McCutchen LLP
1120 20th Street, N.W., Suite 800
Washington, DC 20036
Attn: Barry P. Rosenthal, Esq.
Fax: 202-778-6155

To MIDCS:

Marriott International Architecture & Construction
Department 70/100
10400 Fernwood Road
Bethesda, Maryland 20817
Attn: Vice President
Fax: 301-380-6513

With a copy to:

Marriott International, Inc.
Department 52/923
10400 Fernwood Drive
Bethesda, Maryland 20817
United States of America
Attn: Law Department – Lodging Operations
Fax: 301-380-6727

or at such other address as is from time to time designated by the party receiving the notice. Any such notice that is delivered by mail or reputable overnight international courier service in accordance herewith shall be deemed received when delivery is received or refused, as the case may be. Additionally, notices may be given by telephone facsimile transmission with electronic or telephonic confirmation of receipt, provided that an original copy of such transmission shall be delivered to the addressee by reputable overnight international courier service by no later than the second business day following such transmission. Telephone facsimiles shall be deemed delivered (i) on the date of such transmission if sent during the receiving party's normal business hours or (ii) on the next succeeding day on which the receiving party is normally open for business if not sent during the receiving party's normal business hours.

9.16    Confidentiality.

The matters set forth in this Agreement are strictly confidential and, except as otherwise required by law or permitted by this Agreement, each party shall make every effort to ensure that

27

the information contained herein or received pursuant hereto is not disclosed to any Person who is not a party hereto without the prior consent of the other party, except (but in all events subject to the provisions of Section 11.13 C. of the Management Agreement) as required by law or to the extent necessary (i) to obtain licenses, permits, and other public approvals, (ii) in connection with a Sale or financing of the Hotel, or (iii) in connection with a financing or sale of MIDCS, Marriott International, Inc., or any of their Affiliates or its or their corporate assets. No statement shall be provided to the press regarding this Agreement without the prior written consent of both parties. This Section 9.16 shall survive termination of this Agreement.

### 9.17   Waiver.

The failure of a party to insist upon strict performance of any provision of this Agreement or to exercise any option, right or remedy contained in this Agreement shall not constitute a waiver or a relinquishment for the future of such provision, option, right, or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by such party.

### 9.18   Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart. The submission of an unsigned copy of this Agreement or an electronic instrument with or without electronic signature to either party shall not constitute an offer or acceptance. This Agreement shall become effective and binding only upon execution and delivery of this Agreement in non-electronic form by both parties in accordance with this Section 9.18.

### 9.19   Entire Agreement.

This Agreement, together with all designs, drawings, documents and schedules incorporated herein by reference, other writings signed by the parties hereto and expressly stated to be set forth to this Agreement, and any instruments to be executed and delivered pursuant to this Agreement, constitute the entire agreement between the parties regarding the subject matter hereof, supersede all prior understandings and writings, and may be changed only by a written non-electronic instrument that has been duly executed by the non-electronic signature of an authorized representative of each of the parties. This Agreement may not be amended or modified by electronic signature, and each party is hereby put on notice that any individual purporting to amend or modify this Agreement by electronic signature is not authorized to do so. In the event of a conflict between this Agreement and the Management Agreement governing the rights and obligations of Owner and Manager with respect to the management of the Hotel, the Management Agreement shall control and Owner shall be released from complying with any contrary provisions contained herein. Further, notwithstanding anything to the contrary herein or in any other document, but without negating Section 8.02B. of this Agreement, the parties agree and acknowledge that this Agreement constitutes an independent and severable Agreement between Owner and MIDCS, and: (i) it shall not be integrated or otherwise interpreted as part of the

28

134185_8 DOC

Management Agreement; (ii) MIDCS's actions hereunder are independent of Marriott or Manager's action under the Management Agreement, and shall not constitute a waiver, approval or disapproval of any right or consent which Marriott or Manager has under the Management Agreement; and (iii) an allegation of or proven default or breach of this Agreement shall not constitute an allegation of or a breach of default under the Management Agreement, except as expressly set forth in the Management Agreement and/or this Agreement. It is further acknowledged by the parties that MIDCS's role for Owner is limited to the services to be provided under this Agreement. Manager's appointment under the Management Agreement is in no way altered by this Agreement.

### 9.20    Relationship.

In the performance of this Agreement, MIDCS shall act solely as an independent contractor. Neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted, deemed or construed as making MIDCS a joint venturer with, or partner or agent of, Owner. Owner and MIDCS agree that neither party will make any contrary assertion, claim or counterclaim in any action, suit, arbitration or other legal proceedings involving Owner and MIDCS.

### 9.21    Negotiation of Agreement.

Owner and MIDCS are both business entities having substantial experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to any rule that otherwise may require ambiguities in a provision or document to be construed against the party which drafted the provision or document. No inferences'shall be drawn from the fact that the final, duly executed version of this Agreement differs in any respect from any previous draft of this Agreement.

### 9.22    Prevailing Party.

In any litigation, action, claim, suit, arbitration, or proceeding brought by the parties with respect to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party expenses (including reasonable attorneys' fees) incurred at the pretrial, trial or appellate level.

### 9.23    Joint and Several Liability.

Subject to Section 4.07, the duties, covenants, obligations, representations and warranties of Owner in this Agreement shall be joint and several obligations of the parties comprising Owner.

[Signatures follow on next page]

134185_8 DOC

29

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives as of the Effective Date.

<div align="center">

**OWNER (jointly and severally)**:

</div>

**WARDMAN HOTEL, L.L.C.,** a Delaware limited liability company

By: Wardman Investor, L.L.C., a Delaware limited liability company

    By: JBG/Company Manager, L.L.C., a Delaware limited liability company

        By: _____
        Name: _____
        Title: _____

**WARDMAN TOWER, L.L.C.,** a Delaware limited liability company

By: Wardman Investor, L.L.C. a Delaware limited liability company

    By: JBG/Company Manager, L.L.C., a Delaware limited liability company

        By: _____
        Name: _____
        Title: _____

**WARDMAN COTILLION RESIDENTIAL, L.L.C.,** a Delaware limited liability company

By: Wardman Investor, L.L.C., a Delaware limited liability company

    By: JBG/Company Manager, L.L.C., a Delaware limited liability company

        By: _____
        Name: _____
        Title: _____

**WARDMAN PARK RESIDENTIAL, L.L.C.,**
a Delaware limited liability company

By: Wardman Investor, L.L.C., a Delaware
limited liability company

   By: JBG/Company Manager, L.L.C.,
   a Delaware limited liability company

   By: _____
   Name: _____
   Title: _____

**MIDCS:**

**MARRIOTT INTERNATIONAL DESIGN
& CONSTRUCTION SERVICES, INC.,** a
Delaware corporation

By: _____
Name: _____
Title: _____

## EXHIBIT A

## PROJECT BUDGET

Once prepared and mutually approved by the parties, the Project Budget will be dated, signed and incorporated by reference in this Exhibit A.

## **EXHIBIT B**

## **PROJECT SCHEDULE**

Once prepared and mutually approved by the parties, the Project Schedule will be dated, signed and incorporated by reference in this Exhibit B.

# EXHIBIT C

## APPROVED DESIGN DOCUMENTS

As Design Documents are mutually approved by the parties, they will be incorporated by reference in this Exhibit C.

**Exhibit E-1**

January 28, 2005

## Marriott Wardman Park Hotel ("Hotel")
Renovation Requirements for work to be executed concurrent with major building projects.

### PHASE I

**Fitness Center Relocation Project:** (Commencing September 30, 2005 – Approximate duration 3 months)

- Prior to commencing construction of a new Junior Ballroom in the current location of the fitness center (as discussed below), this use will be relocated within the Hotel. The fitness center relocation should be deemed an interim step pending Substantial Completion of the new fitness center as described below. Relocate temporary fitness center location in lower lobby meeting rooms in the Wardman Tower for approximately two years; then replace with the new fitness center in basement level of new residential tower (i.e., current location Cotillion Ballroom).

**Park Tower Meeting Rooms Relocation Project:** (Commencing January 1, 2006 – Approximate duration 3 months)

- Park Tower meeting rooms to be relocated to either 1) the block of rooms overlooking the East loading docks, or 2) the space currently housing the fitness center locker rooms. If the conversion of that portion of the Park Tower which includes the Park Tower meeting rooms is deferred, then the relocation of the Park Tower meeting rooms may be similarly delayed, but must be Substantially Completed prior to the conversion of the remainder of the Park Tower.

**East Garage Project:** construction of new below-grade garage in the front of the hotel (Commencing January 1, 2006 – Approximate duration 8 months)

- A new below-grade garage ("East Garage") will be constructed in the area which is approximately bounded by the ingress and egress driveways in front of the Hotel, in the area in front of the Porte Cochere. Ingress and egress to the Hotel from Woodley Road will remain open and the main entrance to the Hotel will not be obstructed.

- After construction is complete, the surface area must be restored to pre-construction condition, subject to providing for ingress and egress to the newly constructed garage.

- The East Garage will consist of approximately 175 parking spaces and will be connected to the passageway which currently connects the Wardman Tower to the main portion of the Hotel for ingress and egress. This garage will initially replace the parking capacity of the Cotillion Garage when it is demolished and will ultimately serve as the parking facility for the Wardman Tower upon its conversion to residential, as discussed below.

**Junior Ballroom Project:** construction of new Junior Ballroom in current location of Fitness Center, including new landscaped terrace area (Commencing following the Substantial Completion of the Fitness Center & Park Tower Meeting Rooms Relocation Project - Approximate duration 6 months)

- A new Junior Ballroom totaling approximately 10,000 square feet will be constructed in the current location of, and displace, the existing fitness center and outdoor terrace. The average ceiling height of the new ballroom will be 20 feet. The Junior Ballroom will be subdivided with moveable partitions into approximately 8 sub-divisions. A proportionally sized (approximately 45% of net ballroom square footage) pre-function space will be created to serve the Junior Ballroom. The pre-function space will be located in the area currently occupied by the existing fitness facility. The pre-function corridor will wrap around three sides of the Junior Ballroom.

- Install new escalators to the Junior Ballroom level from the main Lobby level. The area to the rear of the new Junior Ballroom will be developed as back-of-house service corridor with connection to the existing service elevator in that vicinity.

**East Loading Dock Project:** construct second loading dock level at east garage; enclose lower level (Commencing January 1, 2006 - Approximate Duration 4 months)

- The east loading dock will be upgraded with the addition of a second level to provide for additional loading capacity and direct loading access to the kitchen, as well as the full enclosure of the existing loading area to provide for 24-hour loading and unloading.

2

**Park Tower Condominium Conversion Project:** (Commencing April 1, 2006 -
Duration 14 months)

- Park Tower (199 guest rooms) is removed from Hotel
  inventory for conversion to residential use.

- Project will involve the conversion of the existing Hotel guest
  rooms to residential use. The "ground floor" which accesses
  Calvert Street will also be reconfigured to provide for a
  separate lobby entrance for the new residential component,
  which reconfiguration may possibly including the introduction
  of one additional elevator.

- Construction of condominiums within the existing double-
  height space between the 6th and 8th floors which is currently
  Exhibit Hall space will be delayed until no earlier than July 1,
  2006 to minimize disruption of currently scheduled exhibit hall
  functions.

- A loading facility for the Park Tower Condominiums will be
  constructed at the north end of the Park Tower, along with an
  egress point for the upper floors of the Park Tower garage,
  which will ultimately provide for overflow garage egress for
  Hotel parking.

- In order to allow for truck access during construction and for
  future loading for the Park Tower from Calvert Street, an
  approximately 22 ft. by 36 ft section of the 2nd floor which
  currently overhangs the Calvert Street access drive will be
  removed.

- It is anticipated that the ground floor and first floors of the Park
  Tower garage (approximately 94 spaces) will be removed from
  hotel service and transferred to use by the condominium.

**South Service Corridor & Freight Elevator Project:** expand/construct service corridor
to provide access from East Loading Dock to Exhibit Hall A (Commencing April 1, 2006
- Approximate duration 3 months)

- To facilitate the ability for the east loading dock to ultimately
  service all areas within the hotel, the existing south service
  corridor will be reconfigured or expanded, and additional
  corridor area will be added as needed along the southern
  portion of the hotel.

- Add a new freight elevator to serve the exhibit space.

3

**Exhibit Halls Project:** construct flexible meeting space in Exhibit Halls B South and C (Commencing September 30, 2006 - Approximate duration 3-4 months)

- Flexible meeting space, similar to that which currently exists in Exhibit Hall B North, will be constructed within Exhibit Hall B South and Exhibit Hall C. Moveable partitions will allow for the maximum in flexibility within the exhibit halls.

- Approximately 7,500 square feet of Exhibit Hall A (Park Tower floors 6 through 8) will be converted to residential use.

**Kitchen Project:** (Commencing September 30, 2006)

- $865,000 allowance to renovate / replace kitchen facilities and equipment as necessary.

**Wardman Tower Guestrooms Renovation Project:** (Commencing July 1, 2005 - Approximate duration 6 months)

*Guestrooms*

- Replace: carpet and carpet base, wall vinyl, corner guards, graphics, drapery, lamps, sheeted duvet, bedskirt, euro shams, accent pillow, artwork and upholstered furniture (task chair, upgraded lounge chair or recliner).
- Paint ceilings, doors, frames and grilles.
- Smooth guestroom ceiling finish.
- Smooth bathroom ceiling finish.

*Bathrooms*

- Replace softgoods: wall vinyl, shower curtain/liner and curved rod, artwork, decorative mirror, and wall sconces.
- Paint ceiling, door, frame and grille.

*Guestroom Corridor*

- Replace softgoods: Axminster carpet and carpet base, wall vinyl, corner guards, graphics, window treatment, soft seating, lamps, artwork and artifacts.
- Paint ceilings, doors, frames and grilles.

## PHASE II

4

**Cotillion Project:** demolish Cotillion Ballroom and garage, and construct new below-grade Hotel parking and new Fitness Center along with parking for new residential tower (Commencing following the Substantial Completion of the Junior Ballroom Project, the East Loading Dock Project, the South Service Corridor & Freight Elevator Project, and the East Garage Project) - Approximate duration 11 months)

- Commence with the demolition of the Cotillion Ballroom, Cotillion Garage and surface parking and the West Loading Dock.

- In this area below grade will be constructed (i) a 10,000 s.f. min. Fitness facility and Indoor Pool, (ii) approximately 200 below-grade parking spaces for the hotel, and (iii) approximately 305 below-grade parking spaces for the future Cotillion Tower (collectively "North Garage"). Upon completion of the North Garage, the East Garage and the Park Tower garage reconfiguration there will be no less than 615 dedicated hotel parking spaces (in the event that Owner elects not to convert the Wardman Tower to residential units, additional parking spaces will be allocated to the Hotel upon mutual agreement by Owner and Manager).

- The hotel portion of the North Garage will be directly accessible from the existing front driveway. This garage will connect below-grade to the hotel parking areas of the existing Park Tower garage to facilitate full circulation of hotel parking and the ability to use the new Park Tower garage egress noted above during peak egress periods in connection with major events at the hotel.

**Hospitality Suites Project:** (Commencing July 2006 - Approximate duration 2-3 months)

- Construct 3 new Hospitality Suites off Exhibit Hall area and provide finishes to coordinate with existing spaces. Suites to include high quality wood divisible walls so that spaces are flexible for occupancy reasons.
- Relocate back-of-house areas effected by above.
- Provide built in cabinetry with stone tops in new suites
- Provide lounge furnishings and other FF&E to create an upgraded concierge lounge ambiance. Ensure furnishings can be easily moved for various functions.

**Cotillion Residential Project:** construction of above-grade "Cotillion Tower" residential building construction commences (Commencing January 1, 2007 - Approximate duration 18 months)

5

- The Cotillion Tower will be a first-class residential building approximately ten stories in height and consisting of approximately 300,000 gross square feet. The Cotillion Tower portion of the North Garage which will be accessed from Woodley Road.

## PHASE III

**Center Tower Project:** renovation and reconfiguration of Center Tower (Commencing July 1, 2007 - Approximate duration 12 months)

The Center Tower will be substantially renovated during 2007 and 2008. The scope for this renovation is set forth below.

Suite Conversion (the "Center Tower Suite Conversion Project")

- In the event that Owner elects to convert the Wardman Tower to residential use, guestrooms in the Center Tower will be converted to suites in accordance with the repositioned facilities criteria as described in Exhibit E-3.

Guestrooms

1. Replace carpet and carpet base.
2. Replace wall vinyl and corner guards.
3. Replace graphics.
4. Replace lamps.
5. Provide new sheeted duvet, bed-skirt, "euro" shams, and accent pillow.
6. Replace artwork.
7. Replace upholstered furniture (task chair and upgraded lounge chair or recliner).
8. Remove textured ceiling finish, and refinish sooth and paint.
9. Install crown molding.
10. Paint door frames, grilles and accessories.
11. Replace casegoods, including headboards w/reading lights, night stands, side table, dresser, and desk.
12. Replace counter top at existing "niche" with granite.
13. Install new welcome light and new "pin spot" over counter top in "niche".
14. Replace closet doors with a pair of hinged doors.
15. Provide new wood luggage rack.
16. Remove guestroom entry false column "furr-out" radius on wing wall and refinish as "squared-off" end.
17. Install porcelain tile at guestroom entry.
18. Relocate fire alarm to bath wall; needed in 50% of rooms.
19. Provide 27" flat screen (conventional tube) TV.

6

20. Provide 32" flat panel HDTV, w/ jack box and stand in 10% of guestrooms (Concierge level).
21. Replace existing fan-coil thermostat with digital read-out unit.
22. Replace guestroom entry door, including new hardware and trim, except reuse existing electronic lock-set.

Guest Bathrooms

1. Installation of shower only in 50% of King guest rooms (160 guest rooms)
2. Replace shower curtain and liner.
3. Install new curved shower rod.
4. Replace/add artwork.
5. Paint ceiling, door, frame and grille.
6. Remove textured ceiling finish, and refinish sooth and paint.
7. Add new millwork wall shelving unit next to mirror.
8. Replace bathroom door, hardware and trim.
9. Add new towel caddies.

Guest Corridor

1. Replace carpet with Axminster carpet.
2. Replace vinyl wall covering.
3. Replace corner guards.
4. Replace graphics.
5. Replace window treatments.
6. Replace/add soft seating.
7. Replace/add artwork and artifacts.
8. Paint ceilings, doors and frames.
9. Add "pin lighting" at guestroom entry doors.
10. Re-clad elevator doors.
11. Install wood casings at guestroom entry doors.
12. Add wood base in corridors.

**Renovation of Public Areas** (Commencing with renovation of Center Tower)

### Lobby

*Registration Lobby*

1. Paint all trim work at ceiling dome in colorations that provide an elegant but new and fresh appearance.
2. Add satin finish sheen to front desk and concierge desk millwork face that matches the back registration wall millwork.
3. Replace the faux wood millwork vinyl at bulkhead above front desk and surrounding area with wood to match registration wall.
4. Replace seating groups including softgoods and casegoods. New furnishings to be supplemented with additional smaller seating groups in key areas of main lobby area.
5. Provide seating/benches for waiting near front entry.

7

6. Add table lamps at seating groups to add task lighting and a residential ambiance to this space.
7. Provide necessary electrical floor outlets for table lamp locations.
8. Add new large scaled center focal table under dome with large artifacts/fresh flowers.
9. Replace area rugs with large needlepoint wood area rugs with intricate colorations and larger scaled patterns.
10. Add lamps at front desk to provide accent lighting and a warmer residential ambiance to space.
11. Add artwork behind concierge desk.

### *Public Restrooms*

1. Completely renovate public restrooms adjacent to Harry's Pub to same quality as Park Tower.
2. In restrooms adjacent to Lobby Lounge, provide the following:
    a. Add millwork removable panel to underside of vanity top to conceal plumbing.
    b. Provide new decorative vanity mirrors and wall sconces.

## Food & Beverage

### *Lobby Lounge*

1. Reconfigure lobby lounge to provide a stronger presence within overall space.
2. Provide a millwork screening or other method that defines space however is still open to traffic flow.
3. Incorporate alternative flooring materials such as wood.
4. Provide new ceiling treatment that is differentiated from surrounding areas. Relocate bar to a more prominent location and becomes a feature in the lounge. Shield views so that guest does not see bar equipment.
5. Provide all new casegoods and softgoods that are overly worn.

### *Perles and Medici's*

1. Reconfigure and re-concept Perle's (190 seats) and Medici's (50 seats) to an upscale "steakhouse" concept which offers more private dining facilities and the ability to scale seating as required.
2. Replace bar in Medici's space to accommodate approximately 10 to 12 stools.
3. Relocate buffet in Perles to current private dining area and provide back service.
4. Provide new private dining rooms in current buffet location.
5. Replace carpet and softgoods.

## Meeting Spaces

### *General Comment*

1. Add flat screen reader boards in appropriate locations throughout all meeting areas.

8

*Exhibit Level – B North Prefunction Corridor*
1. Raise ceiling and add gyp board coffers with low profile chandeliers. Include crown molding and trim work.
2. Provide crown molding at perimeter areas.
3. Replace one existing escalator and with two new (separate up and down) escalators. Keep one staircase.
4. Add new ADA elevator with lobbies at 2 floors.
5. Improve access to BOH service corridor.
6. Provide new finishes at disturbed areas of construction that complement existing.

**Wardman Tower Conversion Project:** (Commencing following the Substantial Completion of the Center Tower Project)

- At the election of the Owner prior to December 31, 2006, the Wardman Tower may be converted to residential units commencing after Substantial Completion of the Center Tower Project, but no sooner than July 31, 2009. Parking for these residential units will be provided in the East Garage. A new drop off for the Wardman Tower will be introduced onto the site. The existing passageway connection with the Hotel will remain as this provides access for the Wardman Tower to the East Garage as well as to the Hotel facilities, as appropriate, and allows for provision of Hotel services by the Hotel to the residents in the Wardman Tower.

Exhibit E-2

**Wardman Park Construction Schedule**

| Task Name | Duration (Days) | Commencement Date | Completion Date | Outside Completion Date |
|---|---|---|---|---|
| Phase I | 1314 | 1-Feb-05 | 26-May-08 | |
| Close on Acquisition of Property | 0 | 1-Feb-05 | 1-Feb-05 | |
| Fitness Center Relocation Project | 90 | 30-Sep-05 | 29-Dec-05 | 27-Jun-06 |
| Park Tower Meeting Rooms Relocation Project | 90 | 1-Jan-06 | 1-Apr-06 | 28-Sep-06 |
| East Garage Project | 240 | 1-Jan-06 | 29-Aug-06 | 26-May-07 |
| Junior Ballroom Project | 180 | 1-Jan-06 | 30-Jun-06 | 30-Jun-07 |
| East Loading Dock Project | 120 | 1-Jan-06 | 1-May-06 | 1-May-07 |
| Park Tower Condominium Conversion Project | 425 | 1-Apr-06 | 31-May-07 | 30-May-08 |
| South Service Corridor & Freight Elevator Project | 90 | 1-Apr-06 | 30-Jun-06 | 27-Dec-06 |
| Exhibit Halls Project | 120 | 30-Sep-06 | 28-Jan-07 | 28-Jan-08 |
| Kitchen Project | 120 | 30-Sep-06 | 28-Jan-07 | 28-Jan-08 |
| Wardman Tower Guestrooms Renovation Project [1] | 180 | 1-Jul-07 | 28-Dec-07 | 26-Jun-08 |
| Phase II | 1827 | 29-Aug-04 | 1-Jul-07 | |
| Cotillion Project | 330 | 29-Aug-06 | 25-Jul-07 | 24-Jul-08 |
| Hospitality Suites Project | 65 | 1-Jul-06 | 4-Sep-06 | 3-Mar-07 |
| Cotillion Residential Project | 547 | 1-Jan-07 | 1-Jul-07 | 1-Jul-07 |
| Phase III | 1279 | 1-Jul-07 | 31-Dec-10 | |
| Center Tower Project [2] | 364 | 1-Jul-07 | 29-Jun-07 | 29-Jun-07 |
| Wardman Tower Conversion Project (Owner decision by December 31, 2006) | 364 | 31-Jul-09 | 31-Dec-10 | |
| Timing of Phase I through Phase III | 2159 | 1-Feb-05 | 31-Dec-10 | |

(1) Soft and case goods redo is currently scheduled for 2005, and soft goods only again in 2010.
(2) Soft goods redo is currently scheduled for 2005.



| | |
|---|---|
| Represents Approximate Project Duration | |
| Represents Approximate Phase Duration | |
| Additional Flex Time for Owner | |
| Milestone | ♦ |
| Indicates Mandatory Sequencing Items* | → |

* Indicates projects that cannot commence without Marriott's approval until a preceding project is Substantially Complete.

# EXHIBIT E-3

## FACILITIES PROGRAM

### Marriott Wardman Park
### Summary of Current Facilities

|  | Wardman Tower | | Park Tower | | Central Tower | | Total |
|---|---|---|---|---|---|---|---|
| **Standard Rooms** | # | SF | # | SF | # | SF | |
| King | 72 | 325 | 20 | 325 | 325 | 325 | 417 |
| Dbl/Dbl | 59 | 325 | 161 | 325 | 533 | 325 | 753 |
| Queen | 18 | 325 | - | | - | | 18 |
| *Rooms Sub-Total* | 149 | | 181 | | 858 | | 1,188 |
| **Suites** | | | | | | | |
| Junior Suites* | - | | 3 | 400-500 | 48 | 400-500 | 51 |
| Parlor Suites | | | 13 | 250-450 | | | 13 |
| 1 BR Suites | 35 | 1.125 | 2 | 825 | 26 | 825 | 63 |
| 2 BR Suites | 8 | 1,135 | - | | - | | 8 |
| Presidential Suites | 9 | 1.060-2.930 | - | | 2 | 2.930 | 11 |
| *Suites Sub-Total* | 52 | | 18 | | 76 | | 146 |
| **Total Guestrooms** | 201 | | 199 | | 934 | | 1.334 |
| Suite Mix | 26% | | 9% | | 8% | | 11% |
| Meeting Space (SF) | 3.392 | | 15.276 (includes Cotilli | | 54.137 | | 72.805 |
| F&B Outlets | - | | - | | 6 | | 6 |
| Parking Spaces | - | | 120 surface valet spaces/17 front entrance 489 garage spaces** | | | | 626 |
| Other | Outdoor pool | | | | Outdoor pool; Fitness Center; Concierge level; Gift Shop; 95,000 SF of exhibit space | | |

\* Includes Deluxe Rooms, Junior. & Hospitality Suites
\*\* Includes 160 spaces in Cotillion Garage
Note: 3 rooms on 8th floor of the Park Tower (meeting space) and 1 room in Wardman Tower (PSE&G) have been excluded from the room count

### Marriott Wardman Park
### Proposed Facilities upon Repositioning

|  | Wardman Tower | | Park Tower | | Central Tower | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Standard Rooms** | # | SF | # | SF | # | SF | | | | |
| King | - | | - | | 320 | 325 | 320 | | | |
| Dbl/Dbl | - | | - | | 503 | 325 | 503 | | | |
| *Rooms Sub-Total* | - | | - | | 823 | | 823 | | | |
| **Suites** | | | | | | | | | | |
| Junior Suites* | - | | - | | 43 | 400-500 | 43 | | | |
| 1 BR Suites | - | | - | | 26 | 825 | 26 | | Rooms | |
| Presidential Suites | - | | - | | 2 | 2.930 | 2 | Bays | Needed | |
| New Hosp. Suites | | | | | 12 | 650 | 12 | 2 | | 24 |
| New Vice-Presidential Suites | | | | | 2 | 975 | 2 | 3 | | 6 |
| New Presidential Suites | | | | | 1 | 1.625 | 1 | 5 | | 5 |
| Standard Rooms Converted to New Suites | | | | | | | | | | 35 |
| *Suites Sub-Total* | - | | - | | 86 | | 86 | | | |
| **Total Guestrooms** | - | | - | | 909 | | 909 | | | |
| Suite Mix | - | | - | | 9% | | 9% | | | |
| Meeting Space (SF) | - | | - | | 70.000 ** | | 70.000 | | | |
| F&B Outlets | - | | -- | | 5 | | 5 (Medici's/Perle's combined & and reconcepted to steakhouse) | | | |
| Parking Spaces | - | | | | | | 630 (Based on JBG 11/22 conceptual design) | | | |
| Other | - | | | | New 10K SF Health Club with indoor pool; 3 new hospitality suites on exhibit level; Concierge level; Gift Shop; 87.500 SF of exhibit space*** | | | | | |

\* Includes Deluxe Rooms, Junior, Hospitality, & Parlor Suites – Decrease of 5 suites in repositioning due to Lanai rooms converted to meeting space to offset loss of Park Tower 8th Floor meeting space
\*\* Assumes 16.000 SF of additional space in Center Tower - new 10K SF junior ballroom & 6K SF breakout (relocated from Park Tower 8th Floor)
\*\*\* Assumes loss of 7.500 SF of Exhibit Hall A for conversion to residential use

Note: 5 Kings and 30 DD in Central Tower are assumed to be converted to the 15 additional suites needed to partially replace the 52 suites in the Wardman Tower. Additionally, 3 new hospitality suites are assumed for the exhibit level.

# EXHIBIT E-4

## RENOVATION PROGRAM ESTIMATE

## *TOP LEVEL SUMMARY*

December 7, 2004

### *PRELIMINARY ORDER OF MAGNITUDE DUE DILIGENCE ESTIMATE*

| PROPERTY NAME / LOCATION: | Wardman Park Marriott | PROJECT #: | ZX41 |
|---|---|---|---|
| | | YEAR BUILT / CONVERTED: | 1979 |
| PROPOSED BRAND | Marriott | TOTAL ROOMS: | 909 |

| ESTIMATE BREAKDOWN: | Surveyed by Estimating: 01-Dec-04 Scope Issued: 02-Dec-04 | Totals | | Project Totals | Comments: |
|---|---|---|---|---|---|
| **Brand-Related and Décor** | | | | | |
| Guestrooms & Corridors (Main Tower) | | $17.907.000 | | $17.907.000 | |
| Suites (Main Tower) | | $8,821,000 | | $8.821.000 | |
| Wardman Tower Rooms | | $2.841.000 | | $2.841.000 | |
| Concierge Lounge | | $339,000 | | $339.000 | |
| Perles & Medici's Restaurants | | $2.307.000 | | $2.307.000 | |
| Lobby | | $1,343,000 | | $1.343.000 | |
| Lobby Lounge | | $1,686,000 | | $1,686.000 | |
| B - North Prefunction | | $964,000 | | $964.000 | |
| Main Exhibit Hall | | $1,120.000 | | $1,120.000 | |
| Meeting Space Electronic Reader Boards | | $200.000 | | $200.000 | This is an allowance |
| Kitchen Equipment | | $865,000 | | $865,000 | Amount is based on Hotel Capex request |
| **SUBTOTAL** | | $38,393,000 | | $38,393,000 | |
| Contingency | 10% | $3,839,300 | | $3,839,300 | |
| **SUBTOTAL (escalated to 2006)** | | $42,232,300 | | $42,232,300 | |
| Project Order of Magnitude Cost:  Cat 2-7 | | *$42,232,300* | | *$42,232,300* | |
| Project Cost per Key | | *$46,460* | | *$46,460* | |

### Notes and Assumptions:

1   Estimate is based on the Preliminary Property Assesment Report dated 12/2/04.

2   All unit and area quantifications are approximates based on the limited building plans available for quantity take-offs   The estimate may require adjustments if actual quantities or area calculations vary from the estimated values

3   Estimate excludes all soft costs; i.e. pre-opening expenses. legal fees, construction loan interest, etc .

4   No ADA survey was completed at this time.

5   MIDCS has no control over the cost of labor and materials, the general contractor's or subcontractors method of determining prices, or competitive bidding and market conditions. This opinion of probable cost is made on the basis of the experience, qualifications, and best judgment of the professional estimator familiar with the industry.  MIDCS does not guarantee that proposals. bids, or actual construction cost will not vary from this or subsequent cost estimates.

6   MIDCS ' staff of professional estimators has prepared this conceptual estimate in accordance with generally accepted principles and practices.

7   No asbestos, hazardous material testing or abatement is included in this estimate.

## MARRIOTT INTERNATIONAL
### 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
Confidential and proprietary information of Marriott International, Inc  Unauthorized use prohibited.
### Marriott Guestroom Softgoods and Casegoods Redo

| Property Name: | Wardman Park | Contact: Brian Lux | | Telephone: | 301 380-1923 |
|---|---|---|---|---|---|
| Project Name: | Guestroom Redo 2006 | | | Date Prepared: | 7-Dec-04 |

| | | |
|---|---|---|
| Assumptions: | New MHR Room decor. Guestroom size: 12'-0" x 26'-0". double-loaded guestroom corridors. NON-UNION labor  Managed and procured by A&C | |
| Inclusions: | Contractor burdens, tax, freight, procurement fee, warehousing, installation. contingency, professional services | |
| Exclusions: | UNION OR LABOR PREMIUMS. 5SU (supplies), any property-related costs due to the renovation, any fire alarm or life safety upgrades | |

| STANDARD GUESTROOM SOFTGOODS AND CASEGOODS REDO | Cost / Room | Total Rooms | Total |
|---|---|---|---|
| **Guestroom (12'-0" x 26'-0"):** | | | |
| Replace softgoods: carpet and carpet base, wall vinyl, corner guards. graphics. drapery, lamps,  sheeted duvet, bedskirt. euro shams, accent pillow. artwork and upholstered furniture (task chair. upgraded lounge chair or recliner). Provide crown molding and paint ceilings, doors, frames and grilles | | | |
| Replace casegoods:  headboard(s) w/ reading lights. nightstand(s). side table. dresser. desk. niche w/ granite shelf, new closet doors w/mirror. welcome light and luggage rack | $10,112 | 823 | $8,321,818 |
| **\*Guest Bathroom (5'-0" x 8'-0"):** | | | |
| Replace softgoods: wall vinyl. shower curtain/liner and curved rod. artwork. decorative mirror. and wall sconces Paint ceiling. door, frame and grille. | $2,094 | 823 | $1,722,951 |
| Replace casegoods:  decorative lighting, granite vanity top w/wood apron, sink with faucet. towel bar at tub. | | | |
| **\*Guest Corridor (include all guestroom and suite BAYS, for single-loaded corridors see Corridors' section  below):** | | | |
| Replace softgoods: Axminster carpet and carpet base. wall vinyl, corner guards, graphics. window treatment. | $1,442 | 823 | $1,186.647 |
| soft seating, lamps, artwork and artifacts  Paint ceilings, doors. frames and grilles | total suite BAYS | 183 | $263,859 |
| Replace casegoods: decorative wall sconces, ceiling light fixtures. add pin lighting at entry door | | | |
| | | | |
| **Subtotal Cost per Standard Room** | **$13,647** | | **$11,495,275** |

| Halo & Primary Market Hotels: | | | |
|---|---|---|---|
| Smooth guestroom ceiling finish | $885 | 823 | $728,355 |
| Smooth coat bathrom ceiling | $225 | 823 | $185,175 |
| Remove guestroom entry foyer false column/furr-out wing wall radius to square-off | $150 | 823 | $123,450 |
| Tiled entry foyer in guestroom | $825 | 823 | $678,975 |
| Relocate fire alarm to bath wall (50% of rooms) | $200 | 412 | $82,400 |
| 27" standard TV w/flat screen | $400 | 823 | $329,200 |
| Refurbish existing guestroom entry doors | $400 | 823 | $329,200 |
| Replace one thermostat with digital thermostat; reuse existing wiring / voltage | $100 | 823 | $82,300 |
| Refurbish bathroom doors | $250 | 823 | $205,750 |
| Replace ceramic floor tile, threshold and base with porcelain tile | $615 | 0 | $0 |
| Replace tub surround cement board. ceramic tile. and soap dish | $1,125 | 0 | $0 |
| Install grab bar at tub surround | $75 | 0 | $0 |
| New tub brightwork (excludes mixing valve replacement) | $195 | 0 | $0 |
| Reclad elevator doors and frames in corridors | $3.000 | 36 | $108,000 |
| Union Labor Premium | | 5% | $717,404 |
| Index for 2006 | | 3% | $451,965 |
| | | | |
| **Total Cost per Halo/Prime Mrkt Room** | **$22,092** | | **$15,517,448** |

| PROPERTY'S SPECIFIC NEEDS | Cost / Room | Total Rooms | Total |
|---|---|---|---|
| **Guestroom:** | | | |
| New entry door (includes hardware and trim  Reuse existing frame and lock set) | $500 | 823 | 411.500 |
| Premium for 32" flat panel HDTV w/jack box and stand (10% of guestrooms) | $2,100 | 82 | 172.200 |
| Safe (drawer type) | $300 | 823 | 246.900 |
| | | | |
| **Guest Bathroom:** | | | |
| Bathroom  door (wood swing. Including hardware and trim) | $500 | 823 | 411.500 |
| Reuse granite top and bowl | ($200) | 823 | (164.600) |
| Reuse mirrors and decorative lighting | ($200) | 823 | (164.600) |
| Millwork wall unit w/shelving | $270 | 823 | 222.210 |
| Bathroom Towel Caddie | $100 | 823 | 82.300 |
| Allow for converting bathrooms to shower only - (50% of King rooms) | $1,500 | 160 | 240.000 |
| Replace mixing valve | $175 | 823 | 144.025 |
| | | | |
| **Guest Corridors:** | | | |
| Add for corridor and over sized elevator lobbies artwork and furnishings | $250 /Bay | 1,006 | 251.500 |
| Add for door casings in corridors | $250 | 823 | 205.750 |
| Add for wood base in corridors | $150 /Bay | 1,006 | 150.900 |
| Union premium | | 5% | 110.479 |
| Index to 2006 | | 3% | 69.602 |

| Grand Total Marriott Guestroom Softgoods and Casegoods Redo | $17,907,115 |
|---|---|

## *MARRIOTT INTERNATIONAL*
### *2005 CAPEX BUDGET GUIDELINES WORKSHEETS*
*Confidential and proprietary information of Marriott International, Inc. Unauthorized use prohibited.*
### *Suites Softgoods and Casegoods Redo*

| Property Name: | Wardman Park | Contact: Brian Lux | Telephone: | 301 380 1923 |
|---|---|---|---|---|
| Project Name: | 2006 Suites Redo | | Date Prepared: | 7-Dec-04 |

**Assumptions:** Bay size: 12'-0" x 26'-0", double-loaded guestroom corridors, NON-UNION labor. Managed and procured by A&C.

**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services.
**Exclusions:** UNION OR PREMIUM LABOR, 5SU (supplies). any property-related costs due to the renovation, any fire alarm or life safety upgrades

| * To aid in your budgeting, please fill in the two boxes to the right. Your number of | | Number of Suites: | 86 |
|---|---|---|---|
| BAYS should be GREATER THAN your number of suites (refer to size noted above). | | Number of BAYS: | 183 |

| STANDARD SUITE SOFTGOODS AND CASEGOODS REDO | Cost per BAY | Number of BAYS | Total |
|---|---|---|---|
| **Suite:** | | | |
| Replace softgoods: Axminster carpet, wall vinyl. corner guards, graphics, draperies, lamps, bedcovering, florals. artwork and soft furniture (dining chairs, task chairs, sofa(s), recliner(s).lounge chair(s), and ottoman(s)) Paint ceilings, doors, frames and grilles *This excludes wall bed units. See below for additional cost.* | | | |
| Replace casegoods: headboards, nightstands. dresser, workstation, dining table. end tables. consoles, credenzas, mirrors, bar face and top, closet racks and decorative lighting | $26,390 /BAY | 183 | $4,829,370 |
| **Suite Bathroom (assumes one per suite):** | | | |
| Replace softgoods: wall vinyl, shower curtain and curved rod, caulking Paint ceiling. door, frame and grille | | | |
| Replace casegoods: stone vanity top with wood apron, sink, faucet, mirror. and decorative lighting | | | included above |
| **Total Cost per BAY** | $26,390 | | $4,829,370 |

| PROPERTY'S SPECIFIC NEEDS | | | | |
|---|---|---|---|---|
| **Suite:** | Unit Costs | | Quantity | Total |
| Premium for a custom redo (for the VP & Pres Suites only) | $3,500 | /bay | 11 | $38,500 |
| Smooth ceiling finish | $885 | /bay | 183 | 161,955 |
| Refrigerator | $350 | /each | 86 | 30,100 |
| Safe (drawer type) | $300 | /each | 86 | 25,800 |
| Provide 32" HDTV's w/ jack box and stand | $2,500 | /each | 102 | 255,000 |
| Additional draperies for a second full-length window in a bay | $1,600 | /window | 49 | 78,400 |
| Replace entry tile with marble tile | $30 | /sf | 15,480 | 464,400 |
| Add French doors w/sheers to bed area of bedsitting suite | $2,400 | /opening | 26 | 62,400 |
| Furnish and install painted wood base and crown molding | $900 | /BAY | 183 | 164,700 |
| Replace entry door with hardware and molding | $1,250 | /each | 108 | 134,375 |
| Replace one thermostat with digital thermostat; reuse existing wiring / voltage | $100 | /each | 183 | 18,300 |
| Add for converting existing guestrooms into suites | $15,000 | /Bay | 28 | 420,000 |
| **Suite Bathroom:** | | | | |
| Softgoods and casegoods redo for additional guest baths | $3,000 | /bath | 26 | 77.400 |
| Replace marble floor tile, base and threshold | $38 | /sf | 5,160 | 196,080 |
| Replace marble wall tile (includes cement board replacement) | $41 | /sf | 23,392 | 959,072 |
| Replace marble shower surround and floor | $2,100 | /bath | 31 | 65,100 |
| New frameless glass shower door | $600 | /each | 86 | 51.600 |
| Install new grab bar at tub surround | $155 | /each | 86 | 13.330 |
| Install new downlight over tub; tie to existing switch | $225 | /each | 6 | 1.350 |
| Replace spa tub | $7,500 | /each | 6 | 45.000 |
| Replace powder room door including hardware, reuse existing frame | $220 | /each | 86 | 18,920 |
| New tub brightwork, excluding mixing valve replacement | $250 | /each | 86 | 21,500 |
| Replace mixing valve | $275 | /each | 86 | 23.650 |
| Union premium | | | 5% | 407.815 |
| Index for 2006 | | | 3% | 256.924 |

| Grand Total Suites Softgoods and Casegoods Redo | $8,821,041 |
|---|---|

## MARRIOTT INTERNATIONAL
### 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
*Confidential and proprietary information of Marriott International, Inc  Unauthorized use prohibited.*

### Marriott Guestroom Softgoods Redo

| **Property Name:** | Wardman Park | **Contact: Brian Lux** | | **Telephone:** | 301 380-1923 |
| **Project Name:** | Wardman Tower Guestroom Redo 2006 | | | **Date Prepared:** | 7-Dec-04 |

| **Assumptions:** | New MHR Room decor, Guestroom size: 12'-0" x 26'-0", double-loaded guestroom corridors. NON-UNION labor.  Managed and procured by A&C |
|---|---|
| **Inclusions:** | Contractor burdens, tax, freight, procurement fee. warehousing. installation. contingency, professional services |
| **Exclusions:** | UNION OR LABOR PREMIUMS. 5SU (supplies). any property-related costs due to the renovation. any fire alarm or life safety upgrades |

| STANDARD GUESTROOM SOFTGOODS AND CASEGOODS REDO | Cost / Room | Total Rooms | Total |
|---|---|---|---|
| **Guestroom (12'-0" x 26'-0"):** | | | |
| Replace softgoods:  carpet and carpet base. wall vinyl, corner guards, graphics, drapery, lamps,  sheeted duvet, bedskirt. euro shams, accent pillow, artwork and upholstered furniture (task chair. upgraded lounge chair or recliner). Paint ceilings, doors. frames and grilles | | | |
| | $5,272 | 310 | $1,634,320 |
| **\*Guest Bathroom (5'-0" x 8'-0"):** | | | |
| Replace softgoods:  wall vinyl. shower curtain/liner and curved rod. artwork. decorative mirror, and wall sconces. Paint ceiling. door. frame and grille | $960 | 310 | $297,600 |
| **\*Guest Corridor (include all guestroom and suite BAYS, for single-loaded corridors see** | | | |
| **Corridors' section  below):** | | | |
| Replace softgoods:  Axminster carpet and carpet base, wall vinyl, corner guards, graphics, window treatment. soft seating, lamps. artwork and artifacts    Paint ceilings. doors, frames and grilles | $1,131 total suite BAYS | 310 0 | $350,610 $0 |
| **Subtotal Cost per Standard Room** | $7,363 | | $2,282,530 |
| **Halo & Primary Market Hotels:** | | | |
| Smooth guestroom ceiling finish | $885 | 310 | $274,350 |
| Smooth coat bathrom ceiling | $225 | 310 | $69,750 |
| Union Labor Premium | | 5% | $131,332 |
| Index for 2006 | | 3% | $82,739 |
| **Total Cost per Halo/Prime Mrkt Room** | $8,473 | | $2,840,700 |

| **Grand Total Marriott Guestroom Softgoods Redo** | **$2,840,700** |
|---|---|

## MARRIOTT INTERNATIONAL
## 2005 CAPEX BUDGET GUIDELINES WORKSHEETS

*Confidential and proprietary information of Marriott International, Inc. Unauthorized use prohibited.*

### Concierge Lounge Redo

| Property Name: | Wardman Park | Contact: Brian Lux | Telephone: | 301 380 1923 |
|---|---|---|---|---|
| Project Name: | 2006 Concierge Lounge Redo | | Date Prepared: | 7-Dec-04 |

**Assumptions:** NON-UNION labor. Actual costs may vary depending on scope complexity and existing conditions. Assumes management and procurement by A&C.

**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services

**Exclusions:** UNION OR PREMIUM LABOR, 5SU (supplies & systems), any property-related costs due to the renovation, any fire alarm or life safety upgrades

#### RENOVATION of existing Lounge - (in conjunction with a Rooms and/or Corridor redo) *

| | Unit Cost | | Quantity | Total |
|---|---|---|---|---|
| **Replace carpet, vinyl wall covering, paint, and FF&E for:** | | | | |
| 2-Bay Concierge Lounge (see 'Conversion' below to convert to 3-bay Brand Standard) | $80,000 | /lump sum | 0 | $0 |
| 6-Bay Concierge Lounge | 214,000 | /lump sum | 1 | 214,000 |
| **New Buffet** | | | | |
| Construct new base cabinet with stone top, stone floor 3' deep (cost per lf) | 1,375 | /linear foot | 40 | 55,000 |
| **Flat Panel TV - 42" Plasma or LCD (HD Ready)** | | | | |
| Includes new flat screen TV. new power, installation - including new blocking. | 2,500 | /lump sum | 4 | 10.000 |
| **Entry Focal Table & Floral** | | | | |
| Assumes 1 per lounge. | 3,000 | /lump sum | 1 | 3,000 |
| **Renovation of existing Pantry Room (based on 12' x 8' room)** | | | | |
| Replace wall vinyl. ceiling tile and grid. tile flooring. Relaminate countertops. | 87 | /sf | 150 | 13.050 |
| **Replace Typical Pantry Equipment** | | | | |
| Includes refrigerator, dishwasher, coffee maker, ice machine, garbage disposal and microwave. | 14,500 | /lump sum | 1 | 14,500 |
| **Renovation of existing Powder Room** | | | | |
| Replace vinyl, paint, vanity top and faucet set. | 2,000 | /lump sum | 2 | 4.000 |

#### EXPANSION of existing Lounge into adjacent space - (in conjunction with a Rooms, Corridor and/or Conversion redo) *
#### or CONVERSION of existing guestrooms, suites or offices to a Concierge Lounge

| | Unit Cost | | Quantity | Total |
|---|---|---|---|---|
| Expansion of existing Lounge into adjacent spaces or Additional bay on a conversion. per above (assumes pantry will remain in existing lounge and existing partitions are all gypboard). | 46,000 | /BAY | 0 | 0 |
| Convert three (3) bays of guestrooms, suites, or office to new concierge lounge, including FF&E, new 12'-0" x 8'-0" pantry and buffet (assumes one existing bathroom will be converted to pantry). | 185,000 | /lump sum | 0 | 0 |
| Add if partition walls are masonry (cost per wall penetration) | 10,200 | /cutout | 0 | 0 |
| **New Pantry (Assumes 12'-0"x 8'-0")** Construct new Pantry while expanding Lounge (assumes demolition of existing bath, new flooring. ceiling, rework mechanical, electrical and plumbing, new cabinetry and equipment) | 33,500 | /lump sum | 0 | 0 |
| **Construct new powder room utilizing existing guest bath space** Assumes ADA compliant 1/2 bath, with Lounge-level finishes | 10,000 | /lump sum | 0 | 0 |

#### Other Property-Specific Items

| | | | | |
|---|---|---|---|---|
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| Index for 2006 | | | 3% | 9,407 |
| If you are in a busy construction or UNION MARKET, please add 5-20% for premium costs | | | 5% | 16,148 |
| * If the Lounge is being RENOVATED or EXPANDED as a stand-alone project, ADD 20% by entering "Y" | | | | 0 |

| Grand Total Concierge Lounge Redo | $339,104 |
|---|---|

### MARRIOTT INTERNATIONAL
### 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
Confidential and proprietary information of Marriott International, Inc  Unauthorized use prohibited
### Restaurant / Lounge Redo

| Property Name: | Wardman Park | Contact: Brian Lux | Telephone: | 301 380 1923 |
|---|---|---|---|---|
| Project Name: | Perles and Medici's Restaurant Reconcepting | | Date Prepared: | 7-Dec-04 |

**Assumptions:** NON-UNION labor  Assumes management and procurement by A&C.

**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services (kitchen consultant included automatically only if kitchen renovation line item is executed)

**Exclusions:** UNION OR PREMIUM LABOR, Kitchen consultant (unless kitchen renovation line item is filled), 5SU (supplies), POS, pre-opening and other soft costs, any property-related costs due to the renovation, any fire alarm or life safety upgrades

*All projects should be completed with the RESTAURANT DESIGN PROCESS in conjunction with the RVP of Operations and Food and Beverage Core Resources (ext. 81562)*

<u>RENOVATION DESCRIPTIONS:</u>

**Softgoods Redo:** Replace Axminster 80/20 carpet, chairs, banquette upholstery, wall vinyl. and selective artwork  Paint ceiling, doors, frames and millwork

**Softgoods and Casegoods Redo:** Same as Softgoods redo with the following additions:  replace tables, banquettes. hard surface flooring at buffet only Reface buffet and side stands

**Extensive:** Same as Softgoods and Casegoods redo, with the following additions:  increased allowance for lighting (decorative and architectural). full ceiling replacement, new buffet and side stands, and replacement of minimal hard surface flooring within FOH**

| | Unit Cost | | Total Units | Total |
|---|---|---|---|---|
| **Pub Lounge/ Lobby Lounge** | | | | |
| Softgoods Redo | $85 | /FOH sf | 0 | $0 |
| Softgood and Casegoods redo | 150 | /FOH sf | 0 | 0 |
| Extensive | 200 | /FOH sf | 0 | 0 |
| | | | | |
| **Champions (Action Bar, based on 100 seats)** | | | | |
| Softgoods Redo | 100 | /FOH sf | 0 | 0 |
| Softgood and Casegoods redo | 165 | /FOH sf | 0 | 0 |
| Extensive | 225 | /FOH sf | 0 | 0 |
| *Memorabilia/License Package* | | | | |
| Add to above if new Champions, for one-time cost of memorabilia/license | 115,000 | /lump sum | 0 | 0 |
| | | | | |
| **Three Meal-A-Day Restaurant (based on 150 seats)** | | | | |
| Softgoods Redo | 115 | /FOH sf | 0 | 0 |
| Softgood and Casegoods redo | 175 | /FOH sf | 0 | 0 |
| Extensive | 250 | /FOH sf | 0 | 0 |
| | | | | |
| **Upscale/ Fine Dining Restaurant (Medici's)** | | | | |
| Softgoods Redo | 150 | /FOH sf | 0 | 0 |
| Softgood and Casegoods redo | 200 | /FOH sf | 0 | 0 |
| Extensive | 280 | /FOH sf | 1,700 | 476.000 |

| | *Select Range of $275 - $350* | Unit Cost | | Total Units | Total |
|---|---|---|---|---|---|
| **Reconcept: Total New Space Plan and 100% new Build -Out** | | 295 | /FOH sf | 4,500 | 1,327,500 |

Complete demolition of existing FOH space (within reason)  Re-theme, re-orient. and build-out new concept  Includes all construction, décor, tax, freight, procurement fees, professional services, etc  (If kitchen work is also required, refer to additional costs above).

| **Potential Additional Costs, Not Included in Above:** | Unit Cost | | Total Units | Total |
|---|---|---|---|---|
| Renovation to bar or buffet *(included in 'Extensive' & Reconcept redo above)* | 1,000 | /lf * | 0 | 0 |
| Replacement of bar or buffet *(included in 'Extensive' & Reconcept redo above)* | 2,000 | /lf * | 0 | 0 |
| New side stands *(included in 'Extensive' & Reconcept redo above)* | 9,500 | /each | 0 | 0 |
| Ceiling renovations - new drywall w/ articulations *(incl in 'Extensive' & Reconcept redo above )* | 10 | /sf | 0 | 0 |
| Kitchen renovations. including new equipment (per kitchen sf) | 150 | / kitchen sf | 1,500 | 225,000 |
| Kitchen Consultants (typically 5% of kitchen renovation cost)  (calculates automatically) | 5% | — | | 11,250 |
| HVAC, Electrical, Plumbing and/or Sprinkler adjustments. | 15 | /sf | 6,200 | 93,000 |
| Other construction required to meet property's specific needs | 0 | / | 0 | 0 |

| **Other Property-Specific Items:** | | | | |
|---|---|---|---|---|
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| Index for 2006 | | | 3% | 63.983 |
| If you are in a busy construction or  UNION MARKET, please add 5-20% for premium costs | | | 5% | 109.837 |

| **Grand Total Restaurant / Lounge Redo** | $2,306,569 |
|---|---|

\* lf = linear feet

\*\* FOH = Front of House only

## MARRIOTT INTERNATIONAL
## 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
*Confidential and proprietary information of Marriott International, Inc  Unauthorized use prohibited.*
### Lobby and Public Restrooms Redo

| | | | | |
|---|---|---|---|---|
| **Property Name:** | Wardman Park | **Contact:** Brian Lux | **Telephone:** | 301 380 1923 |
| **Project Name:** | Lobby and Public Restrooms Redo | | **Date Prepared:** | 7-Dec-04 |

**Assumptions:** NON-UNION labor, ceiling height maximum 20 feet  Assumes management and procurement by A&C.
**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services.
**Exclusions:** Lounge areas, UNION OR PREMIUM LABOR, 5SU (supplies & systems), any property-related costs due to the renovation, any
fire alarm or life safety upgrades.

| | | |
|---|---|---|
| | SF of lobby: | 10,600 |
| * To aid in your budgeting, please fill in the boxes to the right | SF of elevator lobby: | 0 |
| to aid in calculating your total square feet | SF of vestibule: | 0 |
| | SF behind front desk (area visible to guests): | 0 |
| | Ancillary public spaces, retail corridors, OTHER: | 26,400 |
| | **Total SF:** | 37,000 |

| | Cost per Unit | | Total Units | Total |
|---|---|---|---|---|
| **MINIMUM REQUIREMENTS (all floor finishes excluded - see below)** | | | | |
| Replace softgoods and casegoods: wall vinyl. seating groups. decorative mirrors, drapery. artwork and florals  Paint ceilings, millwork, doors. frames and grilles. | $42 | /sf | 10,600 | $445,200 |
| For JW HOTEL or Resort add $5 per square foot | 5 | /sf | | 0 |
| | | | | |
| **ELEMENTS TO BE ADDED AS NEEDED:** | | | | |
| **Ceiling** | | | | |
| Replace ceiling tile and grid with same - *per SF of tiled area* | 5 | /sf | 0 | 0 |
| Replace ceiling tile and grid with articulated gypboard - *per SF of tiled area* | 13 | /sf | 0 | 0 |
| Replace decorative lighting/chandelier(s) - *use $1,500 per LF of diameter of each chandelier* | 0 | /lf | 0 | 0 |
| **Walls** | | | | |
| Replace wall sconces and tie into existing electrical | 600 | /ea | 0 | 0 |
| Refurbish front desk (including new granite top) | 1,050 | /lf * | 0 | 0 |
| Replace front desk (including new granite top and cabinetry, excludes POS) | 2,100 | /lf * | 0 | 0 |
| Replace bell stand | 1,050 | /lf * | 0 | 0 |
| Replace concierge stand | 1,050 | /lf * | 0 | 0 |
| Replace millwork trim on walls (base, chair and crown) - *per LF of wall, include columns* | 42 | /lf * | 0 | 0 |
| Furnish and install new wood paneling on walls - *per sf of wall surface* | 35 | /sf | 1,251 | 43,785 |
| Use premium paint finish (ex: Duroplex) in lieu of wall vinyl - per sf of wall surface | 0 75 | /sf | 10,425 | 7,819 |
| **Floor** | | | | |
| Replace 80/20 Axminster carpet with same (Use actual carpeted sf area) | 10 | /sf | 37,000 | 370,000 |
| Replace area rugs with same | 45 | /sf | 2,000 | 90.000 |
| **Public Restrooms:** | | | | |
| Replace ceiling tile and grid, marble wall tile (wet wall only). wall vinyl, stone vanities, electric faucets and flush valves, decorative light fixtures, laminate toilet partitions, accessories, and marble floor tile (total cost is per sf area of entire restroom and vestibule) | 170 | /sf | 1,600 | 272,000 |
| ADD for replacement of entry doors to restrooms. | 750 | /ea | 4 | 3,000 |
| For stand-alone public restroom project, ADD 20% by entering "Y" | | | | 0 |
| **Public Telephone Banks:** | | | | |
| Redo existing telephone banks. including ADA, with etched glass partitions, granite shelving and downlight over each telephone  (cost is per telephone stall and excludes telephone). | 990 | /ea | 0 | 0 |
| **Other Property-Specific Items** | | | | |
| Add electrical floor outlets (allowance) | 10,000 | | 1 | 10,000 |
| Index for 2006 | 0 | | 3% | 37,254 |
| If you are in a busy construction or  UNION MARKET, please add 5-20% for premium costs | | | 5% | 63,953 |

| | |
|---|---|
| **Grand Total Lobby and Public Restrooms Redo** | **$1,343,011** |

* lf - linear feet

### MARRIOTT INTERNATIONAL
### 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
*Confidential and proprietary information of Marriott International, Inc. Unauthorized use prohibited.*
### Restaurant / Lounge Redo

| Property Name: | Wardman Park | Contact: Brian Lux | Telephone: | 301 380 1923 |
|---|---|---|---|---|
| Project Name: | Lobby Lounge Redo | | Date Prepared: | 7-Dec-04 |

**Assumptions:** NON-UNION labor. Assumes management and procurement by A&C.
**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services (kitchen consultant included automatically only if kitchen renovation line item is executed).
**Exclusions:** UNION OR PREMIUM LABOR, Kitchen consultant (unless kitchen renovation line item is filled), 5SU (supplies), POS, pre-opening and other soft costs, any property-related costs due to the renovation, any fire alarm or life safety upgrades

*All projects should be completed with the RESTAURANT DESIGN PROCESS in conjunction with the RVP of Operations and Food and Beverage Core Resources (ext. 81562).*

**RENOVATION DESCRIPTIONS:**

**Softgoods Redo:** Replace Axminster 80/20 carpet, chairs, banquette upholstery, wall vinyl, and selective artwork. Paint ceiling, doors, frames and millwork.

**Softgoods and Casegoods Redo:** Same as Softgoods redo with the following additions: replace tables, banquettes, hard surface flooring at buffet only. Reface buffet and side stands

**Extensive:** Same as Softgoods and Casegoods redo, with the following additions: increased allowance for lighting (decorative and architectural). full ceiling replacement, new buffet and side stands, and replacement of minimal hard surface flooring within FOH**

| | Unit Cost | | Total Units | Total |
|---|---|---|---|---|
| **Pub Lounge/ Lobby Lounge** | | | | |
| Softgoods Redo | $85 | /FOH sf | 0 | $0 |
| Softgood and Casegoods redo | 150 | /FOH sf | 0 | 0 |
| Extensive | 200 | /FOH sf | 6,150 | 1,230.000 |
| | | | | |
| **Champions (Action Bar, based on 100 seats)** | | | | |
| Softgoods Redo | 100 | /FOH sf | 0 | 0 |
| Softgood and Casegoods redo | 165 | /FOH sf | 0 | 0 |
| Extensive | 225 | /FOH sf | 0 | 0 |
| _Memorabilia/License Package_ | | | | |
| Add to above if new Champions, for one-time cost of memorabilia/license. | 115,000 | /lump sum | 0 | 0 |
| | | | | |
| **Three Meal-A-Day Restaurant (based on 150 seats)** | | | | |
| Softgoods Redo | 115 | /FOH sf | 0 | 0 |
| Softgood and Casegoods redo | 175 | /FOH sf | 0 | 0 |
| Extensive | 250 | /FOH sf | 0 | 0 |
| | | | | |
| **Upscale/ Fine Dining Restaurant (based on 75 seats)** | | | | |
| Softgoods Redo | 150 | /FOH sf | 0 | 0 |
| Softgood and Casegoods redo | 200 | /FOH sf | 0 | 0 |
| Extensive | 280 | /FOH sf | 0 | 0 |
| | | | | |
| **Reconcept: Total New Space Plan and 100% new Build -Out** *Select Range of $275 - $350* | 325 | /FOH sf | 0 | 0 |

Complete demolition of existing FOH space (within reason)  Re-theme, re-orient, and build-out new concept  Includes all construction, décor. tax, freight, procurement fees, professional services. etc  (If kitchen work is also required, refer to additional costs above).

| **Potential Additional Costs, Not Included in Above:** | | | | |
|---|---|---|---|---|
| Renovation to bar or buffet *(included in 'Extensive' & Reconcept redo above)* | 1,000 | /lf * | 0 | 0 |
| Replacement of bar or buffet *(included in 'Extensive' & Reconcept redo above)* | 2,000 | /lf * | 0 | 0 |
| New side stands *(included in 'Extensive' & Reconcept redo above)* | 9,500 | /each | 0 | 0 |
| Ceiling renovations - new drywall w/ articulations *(incl in 'Extensive' & Reconcept redo above )* | 10 | /sf | 0 | 0 |
| Kitchen renovations. including new equipment (per kitchen sf) | 150 | / kitchen sf | 1,500 | 225,000 |
| Kitchen Consultants (typically 5% of kitchen renovation cost)(calculates automatically) | 5% | --- | | 11,250 |
| HVAC, Electrical. Plumbing and/or Sprinkler adjustments | 15 | /sf | 6,150 | 92,250 |
| Other construction required to meet property's specific needs | 0 | / | 0 | 0 |

| **Other Property-Specific Items:** | | | | |
|---|---|---|---|---|
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| | 0 | | 0 | 0 |
| Index for 2006 | | | 3% | 46,755 |
| If you are in a busy construction or  UNION MARKET, please add 5-20% for premium costs | | | 5% | 80,263 |

| **Grand Total Restaurant / Lounge Redo** | | | | $1,685,518 |
|---|---|---|---|---|

\* lf = linear feet
\*\* FOH = Front of House only

## MARRIOTT INTERNATIONAL
### 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
*Confidential and proprietary information of Marriott International, Inc. Unauthorized use prohibited.*
### Ballroom, Assembly & Public Restrooms Redo

| Property Name: | Wardman Park | Contact: | Brian Lux | Telephone: | 301 380 1923 |
|---|---|---|---|---|---|
| Project Name: | Exhibit Level B - North Prefunction Corridor | | | Date Prepared: | 7-Dec-04 |

**Assumptions:** NON-UNION LABOR, please use the total area of the spaces being renovated - INCLUDING ASSEMBLY. Assumes Management and procurement by A&C.

**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services.

**Exclusions:** UNION OR PREMIUM LABOR, 5SU (supplies), any property-related costs due to the renovation, any fire alarm or life safety upgrades.

| To aid in your budgeting, please fill in the top two boxes for calculating your Total SF  Then, please use the Total SF area for either the Minimal OR Average Ballroom and Assembly Redo | | SF of Ballroom: | 0 |
|---|---|---|---|
| | | SF of Assembly: | 6,000 |
| | | Total SF: | 6,000 |

| | Cost per Unit | | Total Units | Total |
|---|---|---|---|---|
| **MINIMAL Ballroom and Assembly Redo:** | | | | |
| Replace softgoods: wall vinyl, airwall coverings. selective assembly furniture. graphics. Axminster carpet and pad  Paint ceilings, wall moldings and grilles  Refinish service doors | $48 | /sf | 6,000 | $288,000 |
| **AVERAGE Ballroom and Assembly Redo:** | | | Use "Total SF" | |
| Same scope for "Minimal Redo" with the following additions: replace doors and hardware, chandeliers (assumes one per salon), sconces. and assembly area furniture | 70 | /sf | 0 | 0 |
| **OPTIONS TO MEET PROPERTY'S SPECIFIC NEEDS** | | | | |
| **Ceiling Work** | | | | |
| Replace ceiling tiles and grid with same (per SF of tiled area) | 6 | /sf | 0 | 0 |
| Replace ceiling tiles and grid with articulated gypboard (per SF of tiled area) | 13 | /sf | 6,000 | 78,000 |
| Add for new low profile chandeliers | 10,000 | /ea | 6 | 60,000 |
| *Note: These costs assume the existing electrical panel can accommodate added loads, if not, add cost below.* | | | | |
| **Wall Moldings & Doors** | | | | |
| Replace wall moldings including crown. chair, base, verticals (use "Total SF" above) | 5 | /sf | 0 | 0 |
| Replace entry doors & hardware | 4,300 | /leaf | 0 | 0 |
| Replace service & hardware | 3,100 | /leaf | 0 | 0 |
| Install electromagnetic hold-open devices on entry and service doors | 800 | /leaf | 0 | 0 |
| **Operable Partitions:** | | | | |
| Refurbish manual partitions 12 feet and shorter (per SF of partition) | 15 | /sf | 0 | 0 |
| Refurbish manual partitions 13 feet to 16 feet tall (per SF of partition) | 12 | /sf | 0 | 0 |
| Refurbish manual partitions 17 feet and taller (per SF of partition) | 10 | /sf | 0 | 0 |
| Add for electrically-operated partitions (per panel)  *Note: does not include replacement of the motor.* | 550 | /panel | 0 | 0 |
| Replace manually-operated partition (per SF of partition) | 46 | /sf | 0 | 0 |
| Replace electrically-operated partition (per SF of partition) | 57 | /sf | 0 | 0 |
| **Dimming System(s): (Excludes Assembly)** | | | | |
| Refurbish existing racks and upgrade dimming system (per salon) | 4,550 | /salon | 0 | 0 |
| Replacement of existing system, including 6-scenes with touch-screens and infrared remote | 9,100 | /salon | 0 | 0 |
| *Note: Replacement of the dimming system usually triggers replacement of the architectural downlighting as well - see line item in "Ceiling Work" above.* | | | | |
| **Sound System(s): (Excludes Assembly)** | | | | |
| Refurbish existing racks, controls and replace speakers (per salon) | 6,000 | /salon | 0 | 0 |
| Replace existing racks, controls and speakers (per salon) | 11,200 | /salon | 0 | 0 |
| **HVAC System(s):** | | | | |
| Contact Peter Warth at Marriott Headquarters at (301) 380-6232. peter.warth@marriott com | 0 | / | 0 | 0 |
| **Public Restrooms (in conjunction with Ballroom redo):** | | | | |
| Replace ceiling tile and grid, marble wall tile (wet wall only). wall vinyl, stone vanities, electric faucets and flush valves, wall mirrors, decorative light fixtures. laminate toilet partitions, accessories, and marble floor tile (total cost is per sf area of entire restroom and vestibule) | 190 | /sf | 0 | 0 |
| **For stand-alone public restroom project, ADD 20% by entering "Y"** | | | | 0 |
| **Public Telephone Banks:** | | | | |
| Redo existing telephone banks, including ADA, with etched glass partitions, granite shelving and downlight over each telephone (cost is per telephone stall and excludes telephone). | 990 | /each | 0 | 0 |
| **Other Property-Specific Items** | | | | |
| Remove existing escalator and provide 2 new escalators | 175,000 | | 2 | 350,000 |
| Provide new ADA elevator | 100,000 | | 1 | 100,000 |
| Improve access to BOH service corridor | 15,000 | | 1 | 15,000 |
| Index to 2006 | | | 3% | 26.730 |
| If you are in a busy construction or UNION MARKET, please add 5-20% for premium costs | | | 5% | 45,887 |

| Grand Total Ballroom, Assembly & Public Restrooms Redo | $963,617 |
|---|---|

## MARRIOTT INTERNATIONAL
### 2005 CAPEX BUDGET GUIDELINES WORKSHEETS
Confidential and proprietary information of Marriott International, Inc. Unauthorized use prohibited.
### Suites Softgoods and Casegoods Redo

| Property Name: | Wardman Park | Contact: Brian Lux | | Telephone: | 301 380 1923 |
|---|---|---|---|---|---|
| Project Name: | Main Exhibit Hall Level | | | Date Prepared: | 7-Dec-04 |

**Assumptions:** Bay size: 13'-0" x 26'-0", double-loaded guestroom corridors, NON-UNION labor. Managed and procured by A&C

**Inclusions:** Contractor burdens, tax, freight, procurement fee, warehousing, installation, contingency, professional services
**Exclusions:** UNION OR PREMIUM LABOR, 5SU (supplies), any property-related costs due to the renovation, any fire alarm or life safety upgrades

| * To aid in your budgeting, please fill in the two boxes to the right. Your number of | Number of Suites: | 3 |
|---|---|---|
| BAYS should be GREATER THAN your number of suites (refer to size noted above). | Number of BAYS: | 6 |

| STANDARD SUITE SOFTGOODS AND CASEGOODS REDO | Cost per BAY | Number of BAYS | Total |
|---|---|---|---|
| **Suite:** | | | |
| Replace softgoods: Axminster carpet, wall vinyl, corner guards, graphics, draperies, lamps, bedcovering, florals, artwork and soft furniture (dining chairs, task chairs, sofa[s], recliner[s],lounge chair[s], and ottoman[s])  Paint ceilings, doors, frames and grilles  *This excludes wall bed units.  See below for additional cost.* | | | |
| Replace casegoods: headboards, nightstands, dresser, workstation, dining table, end tables, consoles, credenzas, mirrors, bar face and top, closet racks and decorative lighting | $26,390 /BAY | 6 | $158,340 |
| **Suite Bathroom (assumes one per suite):** | | | |
| Replace softgoods: wall vinyl, shower curtain and curved rod, caulking  Paint ceiling, door, frame and grille | | | |
| Replace casegoods: stone vanity top with wood apron, sink, faucet, mirror, and decorative lighting | | | included above |
| **Total Cost per BAY** | $26,390 | | $158,340 |

| OPTIONS TO MEET PROPERTY'S SPECIFIC NEEDS | Unit Costs | | Quantity | Total |
|---|---|---|---|---|
| **Suite:** | | | | |
| Premium for JW Hotel, resort hotel or custom redo | $3,500 | /bay | 6 | $21,000 |
| Refrigerator | 350 | /each | 3 | 1,050 |
| Safe (drawer type) | 300 | /each | 3 | 900 |
| Add one electrical outlet | 100 | /each | 0 | 0 |
| Add queen wall bed unit (complete with mattress) | 9,700 | /each | 0 | 0 |
| 7" quilted foam mattress, King ( 72") | 225 | /room | 0 | 0 |
| Box spring, King ( 72") | 175 | /room | 0 | 0 |
| Bed frame, (King or DD) | 35 | /room | 0 | 0 |
| 7" quilted foam mattress, Double/Double (54") | 325 | /room | 0 | 0 |
| Box spring, Double/Double (54") | 245 | /room | 0 | 0 |
| Additional draperies for a second full-length window in a bay | 1,600 | /window | 0 | 0 |
| Replace entry tile with marble tile | 30 | /sf | 0 | 0 |
| Add French doors w/sheers to bed area of bedsitting suite | 2,400 | /opening | 0 | 0 |
| Furnish and install painted wood base and crown molding | 900 | /BAY | 6 | 5,400 |
| Replace entry door with hardware and molding | 1,250 | /each | 0 | 0 |
| Replace one thermostat with digital thermostat; reuse existing wiring / voltage | 100 | /each | 0 | 0 |
| Plexture wall finish in lieu of vinyl (recommended in high humidity area's,  premium over vinyl) | 150 | /BAY | 0 | 0 |
| 100% skim coating for guestrooms only | 700 | /BAY | 0 | 0 |
| **Suite Bathroom:** | | | | |
| Softgoods and casegoods redo for additional guest baths | 3,000 | /bath | 3 | 9,000 |
| Replace marble floor tile, base and threshold | 38 | /sf | 0 | 0 |
| Hone and polish existing marble floor tile | 6 | /sf | 0 | 0 |
| Replace marble wall tile (includes cement board replacement) | 41 | /sf | 0 | 0 |
| Hone and polish existing marble wall tile | 5 | /sf | 0 | 0 |
| Replace marble shower surround and floor | 2,100 | /bath | 0 | 0 |
| Hone and polish marble shower surround and floor | 320 | /bath | 0 | 0 |
| New frameless glass shower door | 600 | /each | 0 | 0 |
| Install new grab bar at tub surround | 155 | /each | 0 | 0 |
| Replace marble vanity top, sink, faucet set & mirror | 2,000 | /each | 0 | 0 |
| Replace vanity light | 285 | /each | 0 | 0 |
| Install new downlight over tub; tie to existing switch | 225 | /each | 0 | 0 |
| Replace spa tub | 7,500 | /each | 0 | 0 |
| Replace powder room door including hardware, reuse existing frame | 220 | /each | 0 | 0 |
| New tub brightwork, excluding mixing valve replacement | 250 | /each | 0 | 0 |
| Replace mixing valve | 275 | /each | 0 | 0 |

| Other Property-Specific Items | | | | Total |
|---|---|---|---|---|
| Construct 3 new  2 - Bay Hospitality suites | 250 | | 2,100 | 525,000 |
| Relocate BOH areas effected by suite construction | 150 | | 2,100 | 315,000 |
| Add for converting existing guestrooms into suites | 15,000 | | 0 | 0 |
| Index for 2006 | | | 3% | 31,071 |
| If you are in a busy construction or UNION MARKET, please add 5-20% for premium costs | | | 5% | 53,338 |
| * If the Suites are a stand-alone project, ADD 10% by entering "Y" | | | | 0 |

| Grand Total Suites Softgoods and Casegoods Redo | $1,120,099 |
|---|---|

## EXHIBIT F

When the estimated Schedule of Visits and Observations is approved by the parties, it will be dated, signed, and incorporated by reference in this Exhibit F.

## EXHIBIT G

## SUPPLIES DOCUMENTS

The Supplies Documents will be incorporated by reference in this Exhibit G once prepared and approved by the parties.

## **EXHIBIT D**

**DECEMBER 3, 2020 MARYLAND CIRCUIT COURT ORDER**

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| MARRIOTT HOTEL SERVICES, INC. | : | |
| Plaintiff, | : | |
| v. | : | Case No. 483406-V |
| WARDMAN HOTEL OWNER, L.L.C. | : | |
| and | : | |
| PACIFIC LIFE INSURANCE COMPANY | : | |
| Defendants. | : | |

Attorneys and Law Firms:

John M. Quinn, Esq., Ethridge, Quinn, Kemp, Rowan & Hartinger, Rockville, MD, counsel for the plaintiff.

Jessica Ring Amunson, Esq., Lindsay C. Harrison, Esq., Kali Bracey, Esq., Jenner & Block, LLP, Washington, D.C., counsel for the plaintiff.

J. Stephen McAuliffe III, Esq., Rosalyn Tang, Esq., Miles & Stockbridge, Rockville, MD, counsel for defendant Wardman Hotel Owner, L.L.C.

Todd E. Soloway, Esq., Bryan T. Mohler, Esq., Pryor Cashman, LLP, New York, NY, counsel for defendant Wardman Hotel Owner, L.L.C.

Brian D. Frey, Esq., Grant Stein, Esq., David Wender, Esq., Alston & Bird LLP, Atlanta, GA, counsel for defendant Pacific Life Insurance Company.

MEMORANDUM AND ORDER
GRANTING A PRELIMINARY INJUNCTION

On December 1, 2020, and December 2, 2020, the parties appeared, through counsel, beginning at 9:30 a.m., for a hearing on the plaintiffs' motion for a preliminary injunction. The parties were given the opportunity to call witnesses and present exhibits. Counsel for the parties listed above presented argument. The court concludes that the motion should be granted for the reasons set out below.

Findings of Fact

Plaintiff Marriott Hotel Services, Inc. ("Marriott") is the manager of the Washington Marriott Wardman Park Hotel located at 2660 Woodley Rd. NW, Washington, D.C. 20008 (the "Hotel"). The Hotel is located in the heart of Washington D.C.'s Woodley Park neighborhood adjacent to the Woodley Park-Zoo Metro (Red Line). The Hotel sits on approximately twelve (12) acres and consists of 1,152 guest rooms, approximately 200,000 square feet of meeting space, and parking for more than 550 vehicles in a total building area of approximately 1,551,928 square feet. [1]

Defendant Wardman Hotel Owner, L.L.C. ("Wardman") is a Delaware limited liability company and owns the Hotel.

Defendant Pacific Life Insurance Company ("PacLife") is a Nebraska corporation with its principal place of busines in Newport Beach, California. PL Wardman Member, LLC is a Delaware limited liability company with its principal place of business in Newport Beach, California and is owned by PacLife. JBGS/CIM Wardman Owner Member, L.L.C. is a Delaware limited liability company with its principal place of business in Bethesda, Maryland and is owned by JBG Smith Properties, a Maryland Real Estate Investment Fund. Until recently, PL

---

[1] Plaintiff's Exhibit 1s at p. 4.

2

Wardman Member, LLC owned an 80% equity interest in Wardman and JBGS/CIM Wardman Owner Member, L.L.C. owned a 20% equity interest in Wardman. PL Wardman Member, LLC now owns a 100% equity interest in Wardman. As noted, PacLife owns PL Wardman Member, LLC.

Marriot began managing the Hotel in 1998. After Wardman purchased the Hotel, Marriott and Wardman executed the Second Amended and Restated Management Agreement (the "Management Agreement") dated July 1, 2005.[2] The Management Agreement expires on December 28, 2029, but automatically extends for three ten-year periods unless Marriott gives notice of its intent not to renew the Management Agreement a year before each of the ten-year periods expires.[3]

Section 1.02 of the Management Agreement describes the details of the management arrangement between Marriott and Wardman. Section 1.02 states, in pertinent part:

1.02 Management Responsibilities[4]

B. The operation of the Hotel shall be under the exclusive supervision and control of Manager which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation of the Hotel. In fulfilling its obligations under this Agreement, Manager shall act as a reasonable and prudent operator of the Hotel, having regard for the status of the Hotel and maintaining the System Standards. Manager shall have discretion and control, free from interference, interruption or disturbance by Owner or by any other party claiming under, through or by right of Owner, in all matters relating to the management and operation of the Hotel, including, without limitation, the following: charges for Guest rooms, commercial space, and services provided by the Hotel; food and beverage services; employment policies; credit policies; granting of leases, subleases, licenses and concessions for shops and businesses within the Hotel, provided that the term of any such lease, sublease, license or concession shall not exceed the Term of this Agreement; receipt, holding and

---

[2] Plaintiff's Exhibit 1b.

[3] Plaintiff's Exhibit 1b at p. 5 (Section 2.01).

[4] Plaintiff's Exhibit 1b at p. 4.

disbursement of funds; maintenance of bank accounts; procurement of Inventories, supplies and services; payment of costs and expenses specifically provided for in this Agreement or otherwise reasonably necessary for the proper and efficient operation of the Hotel; and, generally, all activities necessary for operation of the Hotel.

Section 4.03 of the Management Agreement describes the accounts Marriott is to use to make payments related to managing the Hotel and establishes that Marriott is not to advance payments or incur liabilities to manage the Hotel. Section 4.03 states, in pertinent part:

4.03 Accounts. Expenditures[5]

B. All payments made by Manager hereunder shall be made from the Operating Accounts, petty cash funds, or from Working Capital. Manager shall not be required to make any advance or payment with respect to the Hotel except out of such funds, and Manager shall not be obligated to incur any liability or obligation with respect to the Hotel. In any event, if any such liability or obligation is incurred by Manager with respect to the Hotel, Manager shall have the option to deduct such amounts from Owner's share of Operating Profit if Owner has not fully reimbursed Manager for said amounts within ten (10) days after Owner's receipt of notice from Manager that said amounts are due.

C. Debts and liabilities incurred by Manager as a result of its operation and management of the Hotel pursuant to the terms hereof, whether asserted before or after Termination, will be paid by Owner to the extent funds are not available for that purpose from Gross Revenues. The provisions of this Section 4.03C shall survive Termination.

Section 4.05 of the Management Agreement discusses Wardman's obligation to fund Working Capital. Section 4.05 states:

4.05 Working Capital[6]

As of the Closing Date, Owner shall provide to Manager Working Capital in the amount of Two Million Dollars ($2,000,000). Thereafter, Owner shall, from time to time during the Term, promptly, but no later than ten (10) days after written request by Manager, advance any additional funds necessary to maintain Working Capital at levels determined by Manager to be reasonably consistent with the approved Annual Operating Projection or as a result of "unforeseen

---

[5] Plaintiff's Exhibit 1b at p. 9-10.

[6] Plaintiff's Exhibit 1b at p. 11.

circumstances" (as more fully set forth in Section 4.04.B). If Owner does not so fund additional Working Capital within the said ten (10) day period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount equal to the funds requested by Manager for additional Working Capital from future distributions of funds otherwise due to Owner. All funds so advanced for Working Capital shall be utilized by Manager for the purposes of this Agreement pursuant to cash management policies established for the Marriott System. Upon Termination, Manager shall, except as otherwise provided in this Agreement, return the outstanding balance of the Working Capital to Owner.

The definitions section of the Management Agreement defines Working Capital.

The Management Agreement states that:

"Working Capital"[7] shall mean funds that are used in the day-to-day operation of the business of the Hotel, including, without limitation, amounts sufficient for the maintenance of change and petty cash funds, amounts deposited in operating bank accounts, receivables, amounts deposited in payroll accounts, prepaid expenses and funds required to maintain Inventories, less accounts payable and accrued current liabilities.

Section 4.04.B further discusses Wardman's obligation to maintain Working

Capital under "unforeseen circumstances." Section 4.04.B states:

4.04 Annual Operating Projection[8]

B. Manager shall diligently pursue feasible measures to operate the Hotel in accordance with the Annual Operating Projection. It is understood, however, that the Annual Operating Projection is an estimate only and that unforeseen circumstances such as, but not limited to, the costs of labor, material, services and supplies, casualty, operation of law, or economic and market conditions may make adherence to the Annual Operating Projection impracticable, and Manager shall be entitled to depart therefrom due to causes of the foregoing nature. However, Manager shall notify Owner of any significant variations from the Annual Operating Projection promptly after Manager learns of the same, and shall notify Owner of the nature and extent and reasons for such variation. For the

• purposes of this Section 4.04.B, any major Deduction category (major line item such as general and administrative) that varies by more than ten percent from the Annual Operating Projection or if total Deductions vary by more than seven and one-half percent (7.5%) shall be deemed to be significant. If such significant

---

[7] Plaintiff's Exhibit 1b at p. 50.

[8] Plaintiff's Exhibit 1b at p. 11.

5

variation is due to reasons other than Force Majeure, such variation shall be subject to Owner's approval (although it is understood that Owner shall have no greater approval rights for any such variation than those set forth for the Annual Operating Projection in Section 4.04.A).

The definitions section of the Management Agreement defines Force Majeure.

Included in the definition of Force Majeure are "acts of nature without the interference of

any human agency" including "epidemics." The Management Agreement states that:

"Force Majeure"[9] shall mean any of the following events beyond the control of the party claiming that a Force Majeure event has occurred, regardless of where it occurs or its duration that have a material adverse impact on the Hotel: acts of nature without the interference of any human agency (including hurricanes, typhoons, tornadoes, cyclones, other severe storms, wins, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in party by human agency; acts of war, attack, invasion or other acts of hostility by foreign enemies; civil war, rebellion, revolution, insurrection or usurpation of sovereign power; riots or other civil commotion; terrorism (including hijacking, sabotage, chemical or biological events, nuclear events, disease-related events, bombings, murder, assault, and kidnapping); strikes or similar labor disturbances; shortage of critical materials or supplies; action or inaction of governmental authorities having jurisdiction over the Hotel (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused for reasons of Force Majeure); and any other events beyond the reasonable control of the parties (excluding, however, (i) lack of financing, or (ii) general economic and/or market factors which are not caused by one of the foregoing events).

The Management Agreement also discusses what happens in the event that a party

fails to make a required payment. Section 9.01 states, in pertinent part, that:

9.01 Default[10]

D. The failure of either party to make any payment required to be made in accordance with the terms of this Agreement, as of the due date as specified in this Agreement. Upon the occurrence of any Default by either party as described under this Section 9.01.D, said Default shall be deemed an "Event of Default" under this Agreement if the defaulting party fails to cure such Default within ten

---

[9] Plaintiff's Exhibit 1b at p. 43.

[10] Plaintiff's Exhibit 1b at p. 25-26.

(10) days after receipt of written notice from the non-defaulting party demanding such cure.

The Management Agreement also provides for remedies for a non-defaulting

party under an Event of Default. Sections 9.02 and 9.03 state, in pertinent part:

> 9.02 <u>Remedies</u>[11]
> Upon the occurrence of an Event of Default, the non-defaulting party shall have the right to pursue any one or more of the following courses of action: (1) if the Event of Default has a material adverse impact on the non-defaulting party, to terminate this Agreement by written notice to the defaulting party, which termination shall be effective as of the effective date which is set forth in said notice, provided that said effective date shall be at least thirty (30) days after the date of said notice and further provided that, if the defaulting party in Manager, the foregoing period of thirty (30) days shall be extended to seventy-five (75) days (or such longer period of time as may be necessary under applicable laws pertaining to termination of employment); (2) to institute forthwith any and all proceedings permitted by law or equity including, without limitation, actions for specific performance and/or damages; and/or (3) to avail itself of the remedies described in Section 9.03.

> 9.03 <u>Additional Remedies</u>[12]
> E. The remedies granted under Sections 9.02 and 9.03 shall not be in substitution for, but shall be in addition to any and all rights and remedies available to the non-defaulting party (including, without limitation, injunctive relief and damages) by reason of applicable provisions of law or equity and shall survive Termination.

In mid-March of 2020, following the outbreak of the COVID-19 global pandemic,

Marriott's cash flow projections showed that the Hotel would not have sufficient funds to meet

its obligations under the Management Agreement.[13] Consequently, Marriott determined that $10

million would be reasonably necessary to operate the Hotel in the upcoming months.[14] On March

16, 2020, Marriott sent Wardman a Funds Request asking it to "fund $10,000,000.00 into the

---

[11] Plaintiff's Exhibit 1b at p. 26.

[12] Plaintiff's Exhibit 1b at p. 26-27.

[13] Plaintiff's Exhibit 1c.

[14] Plaintiff's Exhibit 1c.

Hotel's Operating Account within ten (10) days to cover the forecasted shortfalls."[15] On March 19, 2020, Wardman rejected Marriott's Funds Request.[16] Wardman argued that the Funds Request violated Section 4.05 of the Management Agreement because Marriott was seeking funds that were not "reasonably necessary to satisfy the needs of the Hotel."[17] It also argued that it was "patently unreasonable" of Marriott to ask for $10 million within ten (10) days when, according to its discussions with the on-site management team, the Hotel only needed $2.5 million to get through the end of April.[18]

On March 25, 2020, Marriott agreed to temporarily close the Hotel to guests.[19] On March 27, 2020, Hotel operations were suspended.[20] Despite the temporary closure of the Hotel to guests, Marriott still needed funds to pay for costs related to managing the property, including "payroll and benefits for those employees who must be retained to maintain the property while it is closed, benefits for furloughed employees who otherwise would be owed severance," and "bills that accrued but were not yet paid before the Hotel closed, utilities, taxes, license and permit fees, repairs, maintenance, security, and costs to maintain the systems used to operate the Hotel and to prepare for its reopening."[21]

---

[15] Plaintiff's Exhibit 1c.

[16] Plaintiff's Exhibit 1d.

[17] Plaintiff's Exhibit 1d.

[18] Plaintiff's Exhibit 1d.

[19] Plaintiff's Exhibit 1, Declaration of Julie Bowen in Support of Plaintiff Marriott Hotel Services, Inc.'s Motion for a Preliminary Injunction ("Declaration of Julie Bowen"), at p. 4.

[20] Plaintiff's Exhibit 1, Declaration of Julie Bowen, at p. 4.

[21] Plaintiff's Exhibit 1, Declaration of Julie Bowen, at p. 4.

On March 28, 2020, Wardman authorized Marriott to withdraw $5 million from the FF&E Reserve for Working Capital.[22] Wardman also agreed that it would fund into the FF&E Reserve any amounts Marriott took from the FF&E Reserve to pay for Working Capital within 20 days of Marriott's request.[23] Wardman also acknowledged and agreed that 1) nothing in the agreement waived or otherwise modified Marriott's right to request additional Working Capital and that 2) it would fund the requested amounts into the Operating Account within 10 days or exercise its rights herein.[24]

Marriott expended the initial $5 million from the FF&E Reserve by the end of April.[25] On May 15, 2020, Marriott requested Wardman to fund an additional $1 million to cover projected cash shortfalls for the month of May.[26] Wardman rejected the request.[27] Instead, Wardman offered to fund $1 million from the FF&E Reserve to the Hotel if, among other conditions, Marriott agreed to permanently close the Hotel and if Marriott used all of those funds to facilitate the closure of the Hotel.[28] On May 20, Marriott restated its requests, thereby rejecting Wardman's conditional offer.[29]

---

[22] Plaintiff's Exhibit 1f.

[23] Plaintiff's Exhibit 1f.

[24] Plaintiff's Exhibit 1f.

[25] Plaintiff's Exhibit 1, Declaration of Julie Bowen, at p. 4-5.

[26] Plaintiff's Exhibit 1g.

[27] Plaintiff's Exhibit 1h.

[28] Plaintiff's Exhibit 1h.

[29] Plaintiff's Exhibit 1i.

On May 22, 2020, Marriott requested Wardman to fund an additional $1.5 million to cover projected cash shortfalls for the month of June.[30] Once again, Wardman rejected this request, contesting that it violated Section 4.05 of the Management Agreement.[31] Wardman also stated that if Marriot made "a further Funds Request that complies with Section 4.05 of the HMA, including by explaining in detail (with all appropriate and reliable backup) why the requested funds are reasonably necessary to satisfy the needs of the Hotel," it would evaluate it at that time.[32]

On June 25, 2020, Marriot requested Wardman to fund an additional $1.3 million to cover projected cash shortfalls for the month of July.[33] Once again, Wardman rejected the request on the grounds that it violated Section 4.05 of the Management Agreement and stated that it would consider a Funds Request that complied with Section 4.05.[34]

On July 24, 2020, Marriott requested Wardman to fund an additional $2.7 million to cover projected cash shortfalls anticipated through September.[35] Once again, Wardman rejected the request on the grounds that it violated Section 4.05 of the Management Agreement and stated that it would consider a Funds Request that complied with Section 4.05.[36]

On September 3, 2020, PL Wardman Member, LLC, the former owner of an 80% equity interest in Wardman and the current owner of a 100% equity interest in Wardman, petitioned the

---

[30] Plaintiff's Exhibit 1j.

[31] Plaintiff's Exhibit 1k.

[32] Plaintiff's Exhibit 1k.

[33] Plaintiff's Exhibit 1m.

[34] Plaintiff's Exhibit 1n.

[35] Plaintiff's Exhibit 1o.

[36] Plaintiff's Exhibit 1q.

Delaware Chancery Court to dissolve Wardman and appoint a trustee to wind up its affairs.[37] In its petition, PL Wardman Member, LLC stated that the Hotel "is in financial distress, with liabilities that exceed its value, a near-total loss of revenues, and a need for material capital contributions."[38] JBGS/Company Manager, L.L.C., the former owner of a 20% equity interest in Wardman, responded to PL Wardman Member, LLC's petition with a letter to Vice Chancellor Slights in which it stated that Wardman "still has approximately $850,000 of cash in its operating account as well as an additional approximately $7,000,000 of cash in a furniture, fixtures, and equipment reserve (the "FF&E Reserve") that could be used to fund operating shortfalls."[39]

On September 4, 2020, Marriott requested Wardman to fund an additional $2.2 million to cover additional shortfalls through October.[40] Wardman has not provided these requested funds.[41]

According to Wardman, it rejected each of Marriott's claims for working capital listed above because "they were sent expressly in furtherance of Marriott's baseless March 16 demand for $10 million, they were procedurally improper under the HMA, and because Marriott failed to demonstrate that these vast sums were reasonably necessary each month for the operation of Owner's shuttered, inoperative Hotel."[42]

---

[37] Plaintiff's Exhibit 1s.

[38] Plaintiff's Exhibit 1s.

[39] Plaintiff's Exhibit 1u.

[40] Plaintiff's Exhibit 1r.

[41] Plaintiff's Exhibit 1, Declaration of Julie Bowen, at p. 7.

[42] Defendant Wardman Hotel Owner, L.L.C.'s Opposition to Plaintiff's Motion for a Preliminary Injunction and Other Relief ("Defendant's Opposition), at p. 3-4.

On September 23, 2020, Marriott filed this motion seeking, by way of a preliminary injunction, specific performance of Wardman's obligation to provide Working Capital funds during the pendency of this litigation.[43] Wardman claims that, in its motion, Marriott seeks "to upend the status quo by forcing Owner to make working capital payments now, even though Marriott seeks precisely this remedy as the ultimate relief in its Complaint."[44]

## Discussion

Marriott seeks a preliminary injunction against Wardman requiring it, as the owner of the Hotel, to fulfill its promise set out in Section 4.05 of the Management Agreement to "no later than ten (10) days after a written request by [Marriott], advance any additional funds necessary to maintain Working Capital at levels determined by [Marriott] to be reasonably necessary to satisfy the needs oi the Hotel as its operation may from time to time require....."[45]   Marriott characterizes its request for relief at this juncture as a request for specific performance, as expressly allowed under Section 9.02 of the Management Agreement.  That section provides, upon the event of a default, for the right of the non-defaulting party to seek, among other remedies, specific performance.  That section also refers to the remedies referenced in Section 9.03(E) of the Management Agreement, which include injunctive relief.

Wardman counters that Marriott is simply seeking an injunction for the payment of money, and is doing so well in advance of a determination of the merits of its claims for relief. The court disagrees.

---

[43] Motion by Plaintiff Marriott Hotel Services, Inc. for a Preliminary Injunction and Other Appropriate Relief and Memorandum in Support, p. 1.

[44] Defendant's Opposition, at p. 9.

[45] Plaintiff's Exhibit 1b at p. 11.

In Maryland, a party seeking a preliminary injunction must satisfy a common law, four-factor test. *Fuller v. Republican Central Committee*, 444 Md. 613, 635-36 (2015). Those four common law factors are:

1. The likelihood that the plaintiff will succeed on the merits;

2. The "balance of convenience" of the parties, which is whether greater injury would result from the issuance of the injunction than from its denial;

3. Whether plaintiff will suffer irreparable injury if the injunction is denied; and

4. The public interest.

*Dep't of Transportation v. Armacost*, 299 Md. 392, 404-05 (1984). The burden of proof and persuasion at all times is on the party seeking the injunction. *Eastside Vend Distributors, Inc. v. Pepsi Bottling Group, Inc.,* 396 Md. 219, 241 (2006). The party opposing the injunction has no burden. Although the law in Maryland was once to the contrary, an injunction will not be denied merely because the party seeking it has an adequate remedy at law. Md. R. 15-502(c); *see Anne Arundel Co. v. Whitehall Ven*., 39 Md. App. 197, 200 n. 2 (1978).

In its opinion in Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365, 374-76 (2008), the Supreme Court articulated what must be shown in federal court under Rule 65 to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter,* 129 S. Ct. at 374. All four requirements must be satisfied. Indeed, the Supreme Court in *Winter* rejected a more flexible standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with

our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 375–76.

The Court of Appeals has not yet decided whether to follow the federal courts' recent departure from the "flexible" approach it adopted in *Lerner v. Lerner*, 306 Md. 771, 784 (1986), which was derived from earlier federal cases such as *Hamilton Watch Co., v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). *See also American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983)(discussing then prevailing federal alternative approaches). For present purposes, this court will use the stricter federal standard currently employed under Federal Rule 65. *See Real Truth about Obama, Inc. v. FEC*, 575 F.3d 342, 345-47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reissued in relevant part*, 607 F.3d 355 (4th Cir. 2010).

In any event, the test for a preliminary injunction is not formulaic. There is no specific order in which a trial court is to consider the factors or the weight each factor will have in a particular case, especially absent an injunction's effect on a governmental party. *See Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 456 (1995). The four-factor test is not akin to proving the elements of a tort. "The four factors are simply that, *factors*, designed to guide trial judges in deciding whether a preliminary injunction should be issued." *DMF Leasing, Inc. v. Budget Rent-A-Car of Maryland, Inc.*, 161 Md. App. 640, 648 (2005) (emphasis in original). The Court of Appeals recently has noted, however, that ordinarily the first and the third factors "are generally considered to be the most significant." *Ademiluyi v. Egbuonu*, 466 Md. 80, 114-15 (2019). Nonetheless, the party seeking a preliminary injunction must satisfy its burden of proof as to all four factors. *Winter*, 129 S. Ct. at 374-76.

The parties chose the law of the District of Columbia as part of their agreement. Section 11.04 provides: "This Agreement shall be construed under and shall be governed by the laws of

the District of Columbia." Marriott contends that in using this language the parties elected only the substantive law of the District of Columbia, whereas the procedural law of any forum where suit was brought would govern the applicable remedies. For this reason, among others, Marriott chose to bring this action in Maryland, which in 2004 enacted a statute specifically addressing the remedy of specific performance and hotel management agreements. Wardman contends that only remedies available under the law of the District of Columbia apply to the Management Agreement at issue.

In enacting Section 23-102(b) of the Commercial Law Article in 2004, the General Assembly of Maryland vested trial courts with express statutory authority to enforce hotel management agreements by specific performance. That statute recites: "A court may order the remedy of specific performance for anticipatory or actual breach or attempted or actual termination of an operating agreement notwithstanding the existence of an agency relationship between the parties to the operating agreement." The bill file[46] makes plain that this provision was added to allow enforcement of hotel management agreements by specific performance despite their being considered personal service or agency contracts. At common law in many jurisdictions these types of agreements could not be enforced by specific performance or injunctive relief for a variety of reasons. *See Marriott International, Inc. v. Eden Roc, LLLP*, 962 N.Y.S.2d 111 (N.Y. App. Div. 2013)(holding that a hotel management agreement is a personal services contract that may not be enforced by injunction).

In this court's view, Section 23-102(b) of the Commercial Law Article is both remedial and procedural. As a procedural remedy authorized by statute, Maryland law, not the law of the District of Columbia, governs the availability of remedies potentially available in the event of a

---

[46] Letter of November 4, 2003 from Assistant Attorney General Kathryn M. Rowe to Delegate Anne Marie Doory, at p. 2.

contractual breach.  Even were that to turn out not to be the case, the law of the District of Columbia nonetheless appears to allow specific performance in breach of contract actions. *Stanford Hotels Corp. v. Potomac Creek Assocs.*, 18 A.3d 725, 734-35 (D.C. 2011); *see also IHG Management (Maryland) LLC v. West 44th Street Hotel LLC*, 81 N.Y.S.3d 401 (N.Y. App. Div. 2018) (applying Maryland law and affirming issuance of a preliminary injunction prohibiting the defendant from terminating a management agreement).  Further, regardless of which state's law applies, the Management Agreement itself authorizes either party to seek specific performance from a court as a remedy in the event of a breach.  Thus, it ultimately makes no difference if Section 23-102(b) is held not to be procedural or to be inapplicable.

## LIKELIHOOD OF SUCCESS

Likelihood of success on the merits is measured by whether the plaintiff's claims in the instant litigation have a realistic chance of being resolved in its favor. *Ehrlich v. Perez*, 394 Md. 691, 708 (2006).  Here, Section 4.05 of the Management Agreement expressly requires Wardman to advance additional working capital within ten days of receiving a written request from Marriott.  The court finds that Wardman repeatedly has failed to comply with this promise. Contrary to Wardman's contention, these funds, Working Capital, are not money damages due to or claimed by Marriott on account of Wardman's breach of the contract.  To the contrary, they are funds defined under the parties' contract to be used by Marriott "for the purposes of this Agreement pursuant to cash management policies established for the Marriott System"[47] to run the hotel.  Viewed in that light, Marriott in this case is simply "seeking specific performance of an express contractual undertaking and not merely the securing of an otherwise general

---

[47] Plaintiff's Ex. 1b at p. 11.

16

unsecured claim. Injunctive relief may be granted for that purpose, as the functional equivalent of specific performance." *SECI, Inc. v. Chafitz, Inc.*, 63 Md. App. 719, 726 (1985).

Ordinarily, "specific performance is an 'extraordinary equitable remedy which may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate.'" *Yaffe v. Scarlett Place Residential Condo.*, 205 Md. App. 429, 454 (2012)(quoting *Archway Motors, Inc. v. Herman*, 37 Md. App. 674, 681 (1977)). Yet, as the Court of Special Appeals explained in *SECI, Inc. v. Chafitz, Inc., supra*, it is a remedy that may be available in certain cases of breach of an express promise.

"While a prohibitory injunction requires no action by the person enjoined because it directs the person refrain from specified action, a mandatory injunction directs the person to take action." P. Niemeyer & L. Schuett, Maryland Rules Commentary at 1008 (5th Ed. 2019). A mandatory injunction "should be issued with caution, and is ordinarily restricted to cases where adequate redress at law is not afforded, or where the injury is not compensable in damages." *Maryland Trust Co. v. Tulip Realty Co.*, 220 Md. 399, 412-413 (1959). "[I]n weighing the propriety of issuing it, a court should consider the relative convenience and inconvenience which will result to the parties from granting or refusing this form of injunctive relief." *Id.* (citing *Baltimore & P.S.B. Co. v. Ministers & Trustees of Starr Methodist Protestant Church*, 149 Md. 163, 180 (1925)). Where, "in addition to the inadequacy of the remedy at law for damages for the ends of justice, the injury is of so serious or material a character that the restoring of things to their former condition is the only remedy which will meet the requirements of the case, a mandatory injunction will be awarded." *Baltimore & P.S.B. Co.*, 149 Md. at 180.

Read together, Section 9.01(D), Section 9.02, and Section 9.03(E) of the Management Agreement expressly provide that Marriott may seek specific performance of Wardman's

promises, and do so by way of an injunction. The parties' agreement to remedy a breach through specific performance is "definite" and "certain," and thus is an agreement enforceable by this court. *Scholtz v. Philbin*, 157 Md. 196, 199 (1929).

## IRREPARABLE HARM

In addition to monetary harm to the tune of over $ 5 million it has advanced because of Wardman's breach of promise, Marriott, the court finds, also has shown non-monetary injury proximately resulting from Wardman's conduct. Irreparable injury exists when damage to a party includes harm to reputation, goodwill, and customer relationships. *In re Shawe & Etling LLC*, 2015 WL 4874733, at *28 (Del. Ch. August 13, 2015), *aff'd*, 157 A.3d 152 (Del. 2017). For that reason, "the danger of losing valuable revenue-generating relationships is a harm that may not be compensable in any manner other than injunctive relief." *CRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at * 13 (Del. Ch. Sept. 21, 2009). Marriott has shown such harm in this case; harm to its employee relationships, harm to its vendor relationships, and harm to its relationships with hotel customers.

## BALANCE OF EQUITIES

Even were Marriott's chances on the merits somewhat less than described above, the equities still favor court intervention. The court finds that irreparable harm has resulted and will continue to result if Marriott is forced to wait to receive an award of money damages and to suffer successive breaches of promise by Wardman. Further, the court finds that money damages in this case are, to be sure, under-compensatory. Although an eventual money judgment would suffice in many cases, it would not be adequate here. Moreover, the parties in this case, pursuant to Sections 9.02 and 9.03(E) of the Management Agreement, specifically bargained for specific performance of the contract and injunctive relief, in addition to any other available remedies,

should intervention by a court be needed. Manifestly, these sophisticated parties knew what they bargained for when they signed the Management Agreement.

As noted, "injunctions are designed to maintain the status quo between parties during the course of litigation." *Eastside Vend*, 396 Md. at 241. The status quo means the preservation or maintenance of the last actual, uncontested status of affairs that preceded the pending controversy. *Maloof v. State Dept. of Env't*, 136 Md. App. 682, 693 (2001); *Maryland Comm'n on Human Relations v. Downey*, 110 Md. App. 493, 516 (1996). The status quo in this case is that Marriott requests Working Capital funds from Wardman as the need arises and that Wardman, pursuant to its express promise, provides it. Allowing Wardman to dishonor the bargained-for Working Capital requests destroys that status quo and, in the absence of an injunction, constitutes "irreparable injury in the context of preliminary injunctions." *Lerner*, 306 Md. at 791.

Marriott has spent over $5 million of its own funds to cover Wardman's contractual obligations under the Management Agreement. Marriott, the court finds, also has suffered, and, absent injunctive relief, will continue to suffer, reputational harm among its employees, vendors, and customers. The court finds this to be irreparable harm sufficient to warrant preliminary injunctive relief to maintain the status quo and to prevent further harm.

## PUBLIC INTEREST

The court also finds that the public interest in this case militates in favor of granting a preliminary injunction. The public policy of both Maryland and the District of Columbia, with respect to contracting, is freedom of contract. *Whiting v. Wells Fargo Bank*, N.A., 230 A.3d 916, 923 & n. 10 (D.C. 2020)(citing *Maryland-Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 606-607 (1978). This freedom to organize one's

financial affairs is particularly compelling when all parties to a contract are sophisticated parties, as is the case here. Absent fraud, or other unusual circumstances, a contract among sophisticated parties will be enforced, as written, even if it turns out to be a bad business deal for one side or the other. It is neither the court's job, nor part of the court's function, to fix a deal which, in hindsight, or due to unforeseen conditions, is less than optimal.

For the reasons outlined above, it is this ___ day of December, 2020, at 4:45 p.m.,

ORDERED, that the plaintiff's motion for a preliminary injunction is granted. Wardman shall, within ten (10) days after receiving a written request from Marriott, advance the requested funds determined by Marriott to be reasonably necessary to maintain the Working Capital needs of the Hotel; and it is further

ORDERED, pursuant to Md. Rule 15-503(c), that Marriott shall sign and file with the Clerk of the Court a promissory commitment that it will answer for damages sustained and costs incurred by Wardman in the event that this preliminary injunction is determined to have been wrongly entered,[48] and it is further

ORDERED, that no monetary bond is required to be posted by Marriott until Wardman has provided, pursuant to this preliminary injunction, Working Capital in excess of $ 5 million.

Ronald B. Rubin, Judge

---

[48] P. Niemeyer & L. Schuett, MARYLAND RULES COMMENTARY at 1025 (5th Ed. 2019).

20

## **EXHIBIT E**

**DECEMBER 22, 2020 MARYLAND CIRCUIT COURT ORDER**

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARRIOTT HOTEL SERVICES, INC. :
            :
   Plaintiff,      :
            :
   v.         :  Case No. 483406-V
            :
WARDMAN HOTEL OWNER, L.L.C. :
            :
   and       :
            :
PACIFIC LIFE INSURANCE COMPANY :
            :
   Defendants.     :

Attorneys and Law Firms:

John M. Quinn, Esq., Ethridge, Quinn, Kemp, Rowan & Hartinger, Rockville, MD, counsel for the plaintiff.

Jessica Ring Amunson, Esq., Lindsay C. Harrison, Esq., Kali Bracey, Esq., Jenner & Block, LLP, Washington, D.C., counsel for the plaintiff.

J. Stephen McAuliffe III, Esq., Rosalyn Tang, Esq., Miles & Stockbridge, Rockville, MD, counsel for defendant Wardman Hotel Owner, L.L.C.

Todd E. Soloway, Esq., Bryan T. Mohler, Esq., Pryor Cashman, LLP, New York, NY, counsel for defendant Wardman Hotel Owner, L.L.C.

Brian D. Frey, Esq., Grant Stein, Esq., David Wender, Esq., Alston & Bird LLP, Atlanta, GA, counsel for defendant Pacific Life Insurance Company.

<u>Memorandum and Order</u>

On December 3, 2020, after two days of testimony and argument, the court issued a written order that preliminarily enjoined defendant Wardman Hotel Owner, LLC ("Owner") from continuing to breach its contractual duty, under Section 4.05 of the Operating Agreement, to fund working capital calls necessary for the operation of the Owner's hotel by the plaintiff, Marriott Hotel Services, Inc. ("Marriott").  The court's preliminary injunction order was sent to

the parties by electronic mail on December 3, 2020, although it was not docketed by the Clerk until December 8, 2020.[1]

On December 9, 2020, Owner asked this court to issue a stay pending appeal, and gave the court until 3:30 p.m. on December 10, 2020, to rule on its motion. When this court did not rule by the appointed time, Owner asked the Court of Special Appeals for a stay. By Order entered on December 14, 2020, the Court of Special Appeals denied Owner's motion for a stay, without prejudice to Owner's "opportunity to seek relief in the circuit court, if appropriate, in connection with any capital calls Marriott might make after the date of the injunction."

On December 16, 2020, Owner filed a supplement to its motion for a stay pending appeal. On December 21, 2020, Marriott responded with a written opposition. The court has considered each side's arguments. No hearing is necessary.

The factors governing the issuance of a stay of a trial court order pending an appeal generally are: (1) whether the applicant has made a strong showing that it is likely to prevail on the merits of its appeal; (2) whether the applicant will be injured irreparably absent a stay; (3) whether the issuance of a stay will cause substantial injury to the other party; and (4) whether the public interest will be served by granting the stay. *See Nken v. Holder*, 556 U.S. 418, 427 (2009); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

The court is unpersuaded that Owner has satisfied any of the above-cited factors. First, the court has carefully reviewed all of Owner's arguments on the merits. Respectfully, they are unpersuasive. Owner contractually agreed to fund working capital calls. The court's preliminary injunction simply requires Owner to fulfill its express promise. Other than that the

---

[1] The preliminary injunction was binding on the Owner as of the time it received actual notice, regardless of when it was docketed by the clerk. Md. Rule 15-502(d); *see* P. Niemeyer & L. Schuett, MARYLAND RULES COMMENTARY at 1019 (5th Ed. 2019).

Owner would prefer simply to breach the contract and litigate, no cogent reason has been advanced as to why a sophisticated party should not be held to its bargain.  The record is clear that Owner can finance its obligations when it chooses to do so.  In this case, the court finds, it simply prefers not to do so.

Second and third, the court is persuaded that Marriott, not Owner, would suffer irreparable harm, if a stay were granted.  Owner's refusal to fund working capital calls has forced Marriott to issue WARN notices to hotel employees and to pay more than $5.5 million in hotel operating expenses out-of-pocket.  Guests query Marriott, not Owner, about deposits and contracts for future events.  Vendors are going unpaid, causing them unnecessary hardship.  As the court found when it issued the preliminary injunction, Marriott is suffering substantial reputational harm, among employees, customers, and vendors, because of Owner's contractual breach.  This will only worsen if a stay is granted, as Owner requests.  There is no question in the court's mind that an award of money damages in this case, which the preliminary injunction is not, would be manifestly under-compensatory given the reputational harm the court finds to exist.

Fourth, federal courts in Maryland have concluded, under a variety of circumstances, that the public interest lies in enforcing express promises.  *E.g., Ledo Pizza Sys., Inc. v. Singh*, 983 F. Supp. 2d 632, 643 (D. Md. 2013).  This court agrees and finds that this is one such circumstance.

The request for a stay pending appeal is denied.  It is so ordered, this __22nd__ day of December, 2020.

_____
Ronald B. Rubin, Judge

3